Frances C. Bassett, *Admitted Pro Hac Vice*
Jeremy J. Patterson, *Admitted Pro Hac Vice*
Thomasina Real Bird, *Admitted Pro Hac Vice*
**FREDERICKS PEEBLES & MORGAN LLP**
1900 Plaza Drive
Louisville, Colorado  80027-2314
Telephone:  (303) 673-9600
Facsimile:  (303) 673-9155
Email:  fbassett@ndnlaw.com
Email:  jpatterson@ndnlaw.com
Email:  trealbird@ndnlaw.com

J. Preston Stieff (4764)
**J. PRESTON STIEFF LAW OFFICES**
110 South Regent Street, Suite 200
Salt Lake City, Utah  84111
Telephone:  (801) 366-6002
Email: jps@stiefflaw.com
*Attorneys for Plaintiffs*

---

**UNITED STATES DISTRICT COURT**
**DISTRICT OF UTAH, CENTRAL DIVISION**

---

| | |
|---|---|
| UTE INDIAN TRIBE OF THE UINTAH & OURAY RESERVATION, a federally recognized Indian tribe,  et al.,<br>Plaintiffs,<br><br>v.<br><br>HONORABLE BARRY G. LAWRENCE, District Judge, Utah Third Judicial District Court, in his Individual and Official Capacities, and LYNN D. BECKER,<br>Defendants. | **APPENDIX TO PLAINTIFFS' MOTIONS FOR SUMMARY JUDGMENT AND ENTRY OF INTERIM AND PERMANENT INJUNCTIONS ON GROUNDS OF FEDERAL PREEMPTION, INFRINGEMENT ON TRIBAL SOVEREIGNTY, LACK OF SUBJECT-MATTER JURISDICTION, ILLEGALITY UNDER FEDERAL AND TRIBAL LAW, AND TRIBAL SOVEREIGN IMMUNITY**<br><br>**VOLUME II OF III**<br><br>CASE No. 2:16-cv-00579<br><br>**Judge Clark Waddoups** |

---

## TABLE OF CONTENTS

**Document**                                                                                      **Page**

### VOLUME I

Federal Register – 2017 List of Federally Recognized Indian Tribes ............................ 1

Declaration of Irene Cuch, former Chairwoman of the Ute Indian Tribe's Tribal Business Committee ................................................................................................................ 3

Ute Treaty of 1863 ..................................................................................... 13

Ute Treaty of 1868 ..................................................................................... 19

Act of April 29, 1874, Chapter 136 (18 Stat., 36) ........................................ 31

The Utah Enabling Act (excerpts), Act of July 16, 1894, Chapter 138 (28 Stat. 107) ... 35

Ute Indian Ordinance No. 14-001 ............................................................... 37

Ute Indian Ordinance No. 13-010 ............................................................... 40

Constitution and Bylaws of the Ute Indian Tribe of the Uintah and Ouray Indian Reservation ............................................................................................... 51

Corporate Charter of the Ute Indian Tribe of the Uintah and Ouray Indian Reservation ............................................................................................... 66

Exhibit 22 to the Deposition of Lynn Becker, letter from Lynn Becker to John Jurrius dated December 30, 2003; memo from John Jurrius to Lynn Becker and Brett Painter dated February 9, 2004; and letter from Lynn Becker to John Jurrius, dated February 11, 2003 [2004]. ........................................................................................ 72

UTBC Resolution No. 05-147 approving the Independent Contractor Agreement between the Tribe and Mr. Becker ............................................................... 82

The Independent Contractor Agreement between the Tribe and Mr. Becker ............... 84

Exhibit C to the Becker Independent Contractor Agreement, Ute Indian Tribal Ordinance No. 03-003 ............................................................................... 97

Mr. Becker's Admission that his Independent Contractor Agreement was never approved by the Federal Government ........................................................ 107

2

**Document**                                                                                          **Page**

Lynn Becker Declaration in *Becker v. Ute Indian Tribe, et al.*, Third Judicial District Court, Salt Lake County, Utah, case number 140908394 .......................................... 110

Jury Trial Pretrial Order entered on 7/31/2017 in *Becker v. Ute Indian Tribe, et al.*, case number 140908394, Third Judicial District Court, Salt Lake County, Utah ................. 113

Original caption page from original Complaint and Second Amended Complaint in *Ute Indian Tribe v. Becker*, Ute Indian Tribal Court, case number CV-116253 ................. 116

Tribal Court Order of 3/10/2017 denying Mr. Becker's motion to dismiss the Tribe's suit in *Ute Indian Tribe v. Becker*, Ute Indian Tribal Court, case number CV-116253 ...... 118

Memorandum Decision and Order denying the Tribe's motions for summary judgment in *Becker v. Ute Indian Tribe, et al.*, Third Judicial District Court, Salt Lake County, Utah, case number 140908394 ........................................................................................... 125

The Royal Proclamation of 1763 ................................................................................. 146

Excerpts from the Deposition of Lynn Becker in *Becker v. Ute Indian Tribe*, case number140908394, Third Judicial District Court, Salt Lake County, Utah ................. 152

Excerpts from the original operating agreement for Ute Energy Holdings LLC .......... 167

Excerpts from the original operating agreement for Ute Energy LLC ......................... 176

Declaration of Melissa Brownstein, and excerpts from the Financial Statements of Ute Energy LLC ............................................................................................................ 188

Declaration of Laurie Bales, 6/29/2016, Chief Financial Officer of Ute Energy LLC ... 198

Assignment of Interests in Ute Energy Holdings LLC from Jurrius Ogle Group, LLC to the Ute Indian Tribe in May, 2009, effective October 1, 2008 .................................... 202

Assignment of Interests in Ute Energy LLC from Jurrius Ogle Group, LLC to the Ute Indian Tribe in May, 2009, effective January 1, 2009 ................................................. 205

Order of Dismissal dated 5/22/2009 in *Ute Indian Tribe v. Jurrius*, case number 1:08-cv-01888, in the United States District Court for the District of Colorado ........................ 208

Declaration of Frances C. Bassett ............................................................................. 210

Declaration of Scott S. Trulock ................................................................................. 216

Excerpts from the Ute/FNR LLC Operating Agreement .............................................. 222

**Document**                                                                    **Page**

Excerpts from the EDA between the Ute Tribe, Northern Ute Partners LLC and Dominion Exploration & Production, Inc. ................................................................. 230

## VOLUME II

Excerpts from the Lake Canyon EDA between the Ute Tribe, Bill Barrett, and Barry Petroleum .......................................................................................................... 243

Excerpts from the Wolf Flat EDA between the Ute Tribe and Questar Exploration .... 253

Excerpts from the Monument Butte EDA between the Ute Tribe and Newfield .......... 265

Excerpts from the Little Canyon EDA between the Ute Tribe and Bill Barrett ............ 285

Excerpts from the Ute Tribe's Agreement with SITLA (State of Utah School & Institutional Trust Lands Administrator) ....................................................................... 300

Excerpts from the Dominion Little Canyon EDA between the Ute Tribe and Dominion Exploration ... 31409TBC Resolution No. 05-283 relating to Uintah Basin Field Services, LLC .......................................................................................................... 324

UTBC Resolution No. 05-116, relating to the capitalization of Ute Energy Holdings LLC and Ute Energy LLC ................................................................................................. 342

UTBC Resolution No. 07-124, approving the assignment of SITLA interests ............ 345

UTBC Resolution No. 07-183, approving the assignment of additional Tribal mineral interests to Ute Energy Holdings LLC and Ute Energy LLC ....................................... 348

Schedule of Tribal assets assigned to Ute Energy Holdings LLC and Ute Energy LLC ................................................................................................................................. 354

Declaration, Resume and Expert Report of Ronald L. Seigneur, MBA, CVA, ASA, CPA/ABV/CFF ............................................................................................................. 357

Declaration, Resume and Expert Report of Michael J. Wozniak ................................ 383

8 Howard S. Williams and Charles J. Meyers, Oil and Gas Law (Royalty Interest) .... 400

8 Howard S. Williams and Charles J. Meyers, Oil and Gas Law (Working Interest) ... 401

8 Howard S. Williams and Charles J. Meyers, Oil and Gas Law (Net Revenue Interest) ................................................................................................................................. 402

Schlumberger Oilfield Glossary ................................................................................ 405

**Document**                                                                 **Page**

United States Senate Report No. 97-472 ................................................................... 406

United States H. R. Report No. 97-746 ................................................................... 418

*Long Royalty Company, Appellant*, MMS-87-0244-IND (FE), 1989 WL 1712513
(September 22, 1989) ................................................................................................ 429

Pilar Thomas Declaration, Resume, and Expert Opinion ........................................... 432

Designation of Kelly Williams as Mr. Becker's Counter Expert Witness in *Becker v. Ute
Indian Tribe, et al.*, Third Judicial District Court, Salt Lake County, Utah, case no.
140908394 ............................................................................................................... 452

## VOLUME III

Excerpts from the Deposition of Kelly Williams .......................................................... 461

Kevin Gambrell Resume .......................................................................................... 485

Excerpts from the Deposition of Kevin Gambrell ...................................................... 491

Alexander Tallchief Skibine Resume ......................................................................... 523

Excerpts from the Deposition of Alexander Tallchief Skibine .................................... 533

Robert J. Miller Resume .......................................................................................... 570

Excerpts from the Deposition of Robert J. Miller ...................................................... 578

Excerpts from Felix S. Cohen, On the Drafting of Tribal Constitutions, 55-57 (2006)  620

Ute Tribe's complaint in *Ute Tribe v. Utah*, case number 2:75-cv-00408, U. S. District
Court for the District of Utah .................................................................................... 625

State of Utah's answer and complaint in intervention in *Ute Tribe v. Utah*, case number
2:75-cv-00408, U. S. District Court for the District of Utah ........................................ 632

Mr. Becker's complaint in *Becker v. Ute Indian Tribe, et al.*, case number 140908394,
Third Judicial District Court, Salt Lake County, Utah ................................................ 634

Excerpts of the Ute Tribe's motion to dismiss *Becker v. Ute Indian Tribe*, case number
140908394 ............................................................................................................... 642

State Court Order of 7/23/2015, denying the Ute Tribe's motion to dismiss *Becker v. Ute
Indian Tribe*, case number 140908394 ...................................................................... 644

**Document**                                                                                              **Page**

Utah Court of Appeal's Order of 9/30/2015, summarily dismissing the Tribal Defendants' appeal from the District Court's denial of the Tribe's motion to dismiss, case number 20150702-CA .................................................................................................. 647

State Court Minute Order of 11/6/2015 in *Becker v. Ute Indian Tribe*, case number 140908394 .............................................................................................................. 650

Excerpts from the Ute Tribe's Rule 56 motions filed in *Becker v. Ute Indian Tribe*, case number 140908394, on 9/2/2016 and 12/5/2016 ...................................................... 651

Excerpts from the Ute Tribe's motion to stay proceedings in *Becker v. Ute Indian Tribe*, case number 140908394, until the District Court ruled on the Ute Tribe's challenge to subject matter jurisdiction, filed on 9/2/2016 ............................................................. 655

State Court Order of 9/6/2016 denying the Ute Tribe's motion to stay proceedings in *Becker v. Ute Indian Tribe*, case number 140908394, until the District Court ruled on the Ute Tribe's challenge to subject matter jurisdiction ...................................................... 657

Excerpts of the Ute Tribe's petition for permission to file an interlocutory appeal, Utah Supreme Court, case number 20170174-CA, filed on 3/1/2017 ................................. 659

Utah Court of Appeals' Order of 4/3/2017, denying the Ute Tribe's petition for permission to file an interlocutory appeal, case number 20170174-CA .................... 661

Excerpts of the Ute Tribe's petition for a writ of certiorari, filed on 5/5/2017, with the Utah Supreme Court, case number 20170357-SC ..................................................... 662

Ute Indian Tribal Court Order of 6/9/2017 denying OSC to show cause why the Tribe's suit in Tribal Court should not be dismissed or stayed, case number CV-16253 ....... 664

Excerpts of the Ute Tribe's petition for a writ of prohibition and writ of mandamus or other extraordinary relief filed on 6/14/2017, case number 20170471-SC ................. 667

The Utah Supreme Court's denial of the Ute Tribe's petition for a writ of certiorari, filed on 6/23/2017, case number 20170357-SC ................................................................ 670

The Utah Supreme Court's denial of the Ute Tribe's petition for a writ of prohibition and writ of mandamus or other extraordinary relief, filed on 8/21/2017, case number 20170471-SC ........................................................................................................... 671

Transcript of telephonic hearing in *Becker v. Ute Indian Tribe*, case number 140908394, on 10/2/2017 ............................................................................................................. 672

**Document**                                                                 **Page**

Excerpt from oral argument at the Tenth Circuit Court of Appeals, Denver, Colorado, on 1/18/2017, in *Becker v. Ute Indian Tribe*, case number 16-4175 ............................... 686

Excerpt from State court order of 3/22/2017 denying Tribe's motion to stay proceedings in *Becker v. Ute Indian Tribe* in *Becker v. Ute Indian Tribe*, case number 140908394 ................................................................................................................................ 690

Tribal parties' notice of supplemental authority and renewed Rule 12(b)(1) motion to dismiss for lack of subject matter jurisdiction and to vacate trial setting and pretrial deadlines filed on 8/30/2017 in *Becker v. Ute Indian Tribe*, case number 140908394 ................................................................................................................ 692

Lynn Becker Declaration of 12/20/2016 in *Becker v. Ute Indian Tribe, et al.*, Third Judicial District Court, Salt Lake County, Utah, case number 140908394 ................. 698



04·163

BUSINESS COMMITTEE MEETING

ACTION _Barrett (Info)._

DATE_ June 29, 2004 _



**Northern Ute Tribe
Lake Canyon Project**
**List of Material Terms**

|   | Description | Summary |
|---|---|---|
| 1 | Royalty | 18.75% |
| 2 | Severance Tax | Subject to Existing Severance Tax Ordinance |
| 3 | Bonus<br>1st Term<br>2nd Term<br>3rd Term | <br>$15 Acre - $1,800,000<br>$30 Acre<br>$30 Acre |
| 4 | Agreement Lease Bonus | $50 Acre payable when Agreement Lease Earned |
| 5 | Term | 3 - 5 Year Terms |
| 6 | Deep / Shallow Program | The project has been split between Shallow and Deep development rights |
| 7 | Drilling Obligation | Requirement to drilling a minimum number of Shallow and Deep wells each year or loose all rights to the contract premises |
| 8 | "True" Drilling Obligations | Requirement to pay the Tribe if first year obligation wells are not drilled the value cost to drill the wells. |
| 9 | Right to Participate - Wells | The Tribe has a 25% right to participate in wells drilled on contract premises |
| 10 | Right to Participate - Gathering | The Tribe has a 25% right to participate in gathering systems |
| 11 | Through-put Fee | The Tribe will receive a $.05 per Mcf on all gas transported from the properties. |
| 12 | Right to Propose Wells | The Tribe can push development of the Contract Premises through its right to propose wells. |

UIT_000123

**APPENDIX PAGE 243**

04·1·63



# Northern Ute Tribe
# Lake Canyon Project
### Revenue Interest Analysis
## Participation Option



|  | Net Revenue Interest (NRI) | Working Interest (WI) |
|---|---|---|
| Royalty | 18.75% | 0.00% |
| Barret/Barry | 60.94% | 75.00% |
| Participation Option Northern Ute Tribe | 20.31% | 25.00% |
| Total | 100.00% | 100.00% |

81.25%

UIT_000126

0 4 · 1 6 3

# Northern Ute Tribe
# Lake Canyon Project
### Revenue Interest Analysis

| | Net Revenue Interest (NRI) | Working Interest (WI) |
|---|---|---|
| Royalty | 18.75% | 0.00% |
| Barret/Barry | 81.25% | 100.00% |
| Total | 100.00% | 100.00% |

UIT_000127

04·163

## MEMORANDUM OF
## EXPLORATION AND DEVELOPMENT AGREEMENT

THIS MEMORANDUM OF EXPLORATION AND DEVELOPMENT AGREEMENT ("Memorandum") dated July 13, 2004, sets forth a summary of the material provisions of the Exploration and Development Agreement (the "EDA"), by and between the UTE INDIAN TRIBE OF THE UINTAH AND OURAY RESERVATION, P.O. Box 190, Fort Duchesne, Utah 84026, (the "Ute Indian Tribe") and BILL BARRETT CORPORATION ("BBC"), 1099 18th Street, Suite 2300 Denver, CO 80202, and BERRY PETROLEUM COMPANY ("Berry"), 410 17th Street, Suite 2440, Denver, CO 80202 (jointly, the "Company"), dated July 13, 2004, and to be acknowledged by the UTE DISTRIBUTION CORPORATION, P.O. Box 696, Roosevelt, Utah 84066.

The EDA, together with its various exhibits, provides that the Company shall have the exclusive right for fifteen years to enter onto and evaluate, explore, drill exploratory wells and obtain oil and gas leases (the "Leases") in order to drill wells and install necessary facilities to develop oil and gas resources, including coalbed methane, owned by Ute Indian Tribe and underlying certain lands in Duchesne and Wasatch Counties, Utah, as more particularly described in Exhibit A hereto (referred to as the "Contract Premises"). Further, the EDA includes, but is not limited to, the following terms and conditions:

1. <u>Payments to Ute Indian Tribe</u>. Company will pay and Ute Indian Tribe will receive specified bonus, royalty and throughput payments in accordance with the terms of the EDA, and the terms of various agreements to be entered into by the parties pursuant to the EDA.

2. <u>Oil and Gas Leases</u>. Company will earn the Leases by drilling exploration wells and by drilling development wells, and undertaking related obligations pursuant to specific terms of the EDA, subject to the normal and customary approval of such Leases by the Secretary of the Interior.

3. <u>Ute Indian Tribe's Right to Participate</u>. The Ute Indian Tribe has and may exercise a right to participate as a 25% working interest owner in the Leases and wells under conditions specified in the EDA.

4. <u>Access to Surface</u>. Company and the "Gathering System Entity", which will be formed pursuant to the EDA, shall have full rights of ingress and egress to enter the surface of the Lands, and to install, construct and maintain any and all facilities and equipment related to operations under the EDA including operations under each Lease. This includes drilling wells, construction of roads and pipelines, and installation and operation of equipment and facilities, including tank batteries, serving one or more Leases.

5. <u>Gathering System Entity</u>. A new entity will be formed to own and operate the gathering system for operations under the EDA and Leases issued pursuant to the

## APPENDIX PAGE 246

0 4 · 1 6 3

EDA.  The Ute Indian Tribe has and may exercise a right to participate as a 25% owner in the Gathering System Entity.

6.    Exclusivity.  The rights granted to Company under the EDA are exclusive for the term of the EDA.  Except with respect to portions of the Contract Premises which might be surrendered or relinquished by Company pursuant to the EDA and/or the Leases, the Ute Indian Tribe will not grant any third party rights to evaluate data related to oil and gas development, conduct exploration activities, or develop the oil and gas resources anywhere on the Contract Premises without Company's prior written consent.

7.    Exploration Term.  Subject to Company's Option to Extend, and unless sooner terminated or expiring, the Exploration Term of the EDA shall commence on the Effective Date and shall end at the end of the Fifth Exploration Year, and may be extended for two consecutive five-year periods commencing upon termination of the Exploration Term.

8.    Term.  The EDA shall continue in force, according to the terms and conditions of the EDA, until all operations then being conducted pursuant to the EDA or upon the termination of the last Lease issued under the EDA and all obligations of the parties have been fully discharged.

9.    Area of Mutual Interest and AMI Leases.  Various Areas of Mutual Interest will be established throughout the Contract Premises, based on Leases in which the Ute Indian Tribe has exercised its election to participate, whereby each Party is obligated to offer to the other an undivided interest in any oil and gas interest that such offering party acquires within any Area of Mutual Interest.

10.    Confidentiality.  The Ute Indian Tribe and Company agree to keep the specific terms of the EDA confidential, except as set forth in this Memorandum and in the various Leases, Rights-of-Way and other instruments that are or might be recorded or filed in the future in public records of the Ute Indian Tribe, Duchesne and Wasatch Counties, the State of Utah or the U.S. Government.

11.    Assignment.  Company may not assign or transfer its rights under the EDA or any Leases without the prior written consent of the Ute Indian Tribe and the Superintendent, which consent will not be unreasonably withheld.

This Memorandum is executed by the parties and placed of record for the purpose of placing all persons on notice of the existence of the EDA regarding the Contract Premises.  This Memorandum is not intended to, and shall not, supersede, terminate or otherwise alter any provisions of the EDA in any respect.

200699v1

UIT_000129

**APPENDIX PAGE 247**

04·163

IN WITNESS WHEREOF, this Memorandum is executed by the undersigned duly authorized representatives of each party on the date and year first above written.

UTE INDIAN TRIBE OF THE UINTAH AND OURAY RESERVATION

By: _____
Maxine Natchees
Uintah and Ouray Tribal Business
Committee Chairman


BILL BARRETT CORPORATION

By: _____
William J. Barrett
Chairman and CEO

BERRY PETROLEUM COMPANY

By: _____
Robert F. Heinemann
President and CEO


STATE OF UTAH            )
                         )  ss.
COUNTY OF SALT LAKE      )

On this 13th day of July, 2004, before me personally appeared William J. Barrett, Chairman and CEO of Bill Barrett Corporation, who, being duly sworn by me, acknowledged that he executed the foregoing instrument in the name of said entity, that he had the authority to execute the same, and that he executed the same as the act and deed of said entity for the uses and purposes therein stated.

My commission expires: June 6, 2006

_____
Dana West
Notary Public

Notary Public
DANA WEST
988 South 7500 East, P.O. Box 190
Ft. Duchesne, Utah 84026
My Commission Expires
June 6, 2006
State of Utah

**APPENDIX PAGE 248**

04·163

# EXPLORATION AND DEVELOPMENT AGREEMENT

This Agreement is made and entered into this 13th day of July, 2004, in triplicate under authority of the Indian Mineral Development Act of 1982 (25 U.S.C. §§ 2101-2108), and other applicable acts, among the Ute Indian Tribe of the Uintah and Ouray Reservation, Utah, hereafter called the "Ute Indian Tribe, pursuant to the Constitution and Bylaws of the Ute Indian Tribe, " and Bill Barrett Corporation ("BBC"), a Delaware corporation, and Berry Petroleum Company ("Berry"), a Delaware corporation. BBC and Berry are jointly referred to herein as "Company." The Ute Indian Tribe, BBC and Berry are sometimes referred to individually as "Party" and collectively as "Parties." The Ute Distribution Corporation, a Utah corporation organized with authority under the Ute Partition and Termination Act at 25 U.S.C. §§ 677-677aa (the "Ute Partition Act") to receive certain proceeds from minerals held in trust by the United States for the Ute Indian Tribe ("UDC"), is a signatory to this Agreement to acknowledge and accept the terms of this Agreement as they apply to any interest of the UDC in accordance with the joint management requirements of the Ute Partition Act and all other applicable laws governing the relationship between the Ute Indian Tribe and the UDC.

WHEREAS, the Ute Indian Tribe, and Company have reached an agreement for the exploration and development of oil and gas, as defined below, in and under and that may be produced from lands located in Duchesne and Wasatch Counties, Utah, such lands being particularly described in Exhibit A attached hereto and made a part hereof.

NOW, THEREFORE, in consideration of the mutual obligations and covenants contained herein, and of other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Ute Indian Tribe, and Company hereby agree as follows:

## I. DEFINITIONS

For purposes of this Agreement, the terms and phrases set forth below are defined as follows:

1.1.    Active Lease Block:  A Lease Block which has been established by drilling the first Exploration Well in such Lease Block and is (a) within the Lease Block Term established by said first Exploration Well or (b) within the extended Lease Block Term established by additional drilling pursuant to Section 4.2.F, or (c) extended pursuant to Section 6.1 of this Agreement.

1.2.    Agency:  The Uintah and Ouray Agency of the Bureau of Indian Affairs and any successor office thereof of the Bureau of Indian Affairs.

1.3.    Agreement Lease:  An oil and gas lease from the Ute Indian Tribe to Company covering a quarter-section (160-acre parcel, more or less) or covering a

200545v3

UIT_000137

0 4 · 1 6 3

north line and 818 feet from the east line of the SW/4 NE/4 NE/4, Section 15, T5S, R6W, Duchesne County, Utah.

1.30.  Ute Net Mineral Acres:  The exact net oil and gas mineral acreage owned by the Ute Indian Tribe and subject to this Agreement, consisting of approximately 124,794 acres, subject to adjustments, if any, pursuant to Article XI, below.

II.  REPRESENTATIONS OF THE UTE INDIAN TRIBE AND THE UDC

2.1.    Representations of the Ute Indian Tribe: The Ute Indian Tribe represents and warrants that oil and gas in and under and that may be produced from the Contract Premises is owned by the Ute Indian Tribe or by the United States in trust for the Ute Indian Tribe subject to the provisions of the Ute Partition and Termination Act, 25 U.S.C. §§ 677-677aa (hereinafter the "Ute Partition Act").  The Ute Indian Tribe further represents and warrants that it has the authority to enter into this Agreement pursuant to the Indian Mineral Development Act of Congress. Except as set forth in Schedule 1, the Ute Indian Tribe represents and warrants that no portion of the Contract Premises is subject to any liens, encumbrances or other agreement for the exploration and development of oil and gas effective as of the Effective Date of this Agreement.  This Agreement has been approved by the Venture Fund Board of the Ute Indian Tribe pursuant to Resolution No. 04-004, and by the Business Committee of the Ute Indian Tribe pursuant to Resolution No. 04-163, (copies of which have been provided to Company) and satisfies all Tribal Constitution, ordinance and other requirements with respect to the Ute Indian Tribe.  This Agreement is intended to be approved by the United States Department of the Interior and is intended to satisfy all legal provisons the Department administers, including those under the Indian Mineral Development Act of 1982, 25 U.S.C. §§ 2101-2108, and 25 U.S.C. § 81.

2.2.    Representations   of   the   UDC   and   Joint   Management: By   its acknowledgment the UDC represents and warrants that it is organized pursuant to the Ute Partition Act, and is authorized to receive certain net proceeds from minerals produced from the Contract Premises.  UDC has no legal or economic interest in the surface estate within the Contract Premises.  The grant herein of any right or privilege to Company by the Ute Indian Tribe shall be deemed as well to be a grant of the identical right or privilege to Company by the UDC, to the extent necessary, to explore for, develop, produce, save, gather, and transport oil and gas. It is the specific intent of the UDC by the acknowledgment of this Agreement that it is consenting to the provisions hereof and is granting to Company any interest of the UDC in the Contract Premises, including but not limited to the issuance of Agreement Leases.  The execution and acknowledgement of this Agreement by the Ute Indian Tribe and the UDC pursuant to 25 C.F.R. Part 217 shall be deemed the joint management by the Ute Indian Tribe and the UDC of oil and gas rights in the Contract Premises retained in trust by the United States required by the Ute Partition Act.

2.3.    Joint Management Process: This Agreement shall be subject to the joint management process set forth at 25 C.F.R. Part 217.

5

UIT_000141

**APPENDIX PAGE 250**

04 · 1 6 3

WHEREFORE, the Ute Indian Tribe and Company do hereby make and enter into this Agreement on the date set forth above, to be effective as of the Effective Date, and as acknowledged by the UDC on the date set forth by its signature below.

ATTEST:                                        **UTE INDIAN TRIBE**

Name:  Ryan C. Arney

                                              By: _____
                                                  Maxine Natchees, Chairman

                                              By: _____
                                                  Smiley Arrowchis, Vice Chair
                                                  Uintah and Ouray Tribal Business
                                                  Committee

                                              UTE INDIAN TRIBE BUSINESS
                                              COMMITTEE MEMBERS:

                                              _____
                                              Richard Jenks, Jr.

                                              _____
                                              Ridley Eaglechief

                                              _____
                                              O. Roland McCook, Sr.

                                              _____
                                              Fabian Jenks

ATTEST:                                        **BILL BARRETT CORPORATION**

Name:  David E. Brody

                                              By: _____
                                                  William J. Barrett
                                                  Chairman and CEO

ATTEST:                                        **BERRY PETROLEUM COMPANY**

Name:  Laura K. McAvoy

                                              By: _____
                                                  Robert F. Heinemann
                                                  President and CEO

32

200545v3                                                                    UIT_000168

**APPENDIX PAGE 251**

04·163

ACKNOWLEDGED

ATTEST:                              UTE DISTRIBUTION CORPORATION

_____       By:_____
Name:                             Name:_____
Date:_____               Title:_____
                                  Date:_____

    It has been determined that approval of this document is not such a major federal action significantly affecting the quality of the human environment as to require the preparation of an environmental impact statement under Section 102(2)(c) of the National Environmental Policy Act of 1969 (42 U.S.C. 4332(s)(c)).

    APPROVED Bureau of Indian Affairs, Uintah and Ouray Agency, under authority delegated to the Superintendent by Phoenix Area Redelegation Order No. 3, Amendment 6, Section 2.17, Part 2 (34 F.R.; 11108).


Date: _____       _____
                             Superintendent

200545v3                                                        UIT_000169

**APPENDIX PAGE 252**

Confidential, Privileged and Proprietary Information
383 DM 15, Section 5.6, Exemption 4
25 CFR Part 225

EXPLORATION AND DEVELOPMENT AGREEMENT

Among

THE UTE INDIAN TRIBE,

QUESTAR EXPLORATION AND PRODUCTION COMPANY

and

THE UTE DISTRIBUTION CORPORATION

687-374-05

March 31, 2005

#640221.1
05/04/05 7:22 AM

BIA-1/4

UIT_000286

*5521*

# UTE INDIAN TRIBE/QEP/UDC
## EXPLORATION AND DEVELOPMENT AGREEMENT

### TABLE OF CONTENTS

I.    DEFINITIONS ................................................................................. 1

    1.1.    Agency ............................................................................. 1

    1.2.    Agreement Lease .............................................................. 1

    1.3.    Agreement Term ............................................................... 1

    1.4.    Completion, Complete, or Completing................................ 1

    1.5.    Development Well .............................................................. 2

    1.6.    Effective Date ................................................................... 2

    1.7.    Election to Participate ....................................................... 2

    1.8.    Environmental Defect ........................................................ 2

    1.9.    Environmental Law ........................................................... 2

    1.10.   Force Majeure .................................................................. 3

    1.11.   Gas .................................................................................. 3

    1.12.   Initial Well ........................................................................ 3

    1.13.   Initial Test Well ................................................................ 3

    1.14.   Oil .................................................................................... 3

    1.15.   Operating Agreement ........................................................ 3

    1.16.   Option Lands .................................................................... 3

    1.17.   Secretary ......................................................................... 3

    1.18.   Section 1 Lands ............................................................... 3

    1.19.   Superintendent ................................................................. 3

    1.20.   Tribal Minerals ................................................................. 3

    1.21.   Ute Tribal Surface ............................................................ 4

    1.22.   Visual Mitigation Corridor ................................................. 4

II.   REPRESENTATIONS OF THE UTE INDIAN TRIBE AND THE UDC ................. 4

    2.1.    Representations of the Ute Indian Tribe ............................. 4

    2.2.    Representations of the UDC............................................... 4

    2.3.    Joint Management Process ................................................ 4

III.  OBLIGATIONS................................................................................. 4

    3.1.    Obligations of QEP ........................................................... 4

    3.2.    Grant by and Obligations of the Ute Indian Tribe ............... 6

687-374-05

i

UIT_000287

5521

| | | |
|---|---|---|
| 3.3. | Throughput Fee | 7 |
| 3.4. | Road Rights-of-Way and Surface Use | 7 |
| 3.5. | Throughput Fee Downstream | 8 |
| 3.6. | Limitation on Surface Use | 8 |
| 3.7. | Allottees | 8 |
| IV. | EXPLORATION AND DEVELOPMENT ON SECTION 1 LANDS | 8 |
| 4.1. | Initial Test Well | 8 |
| 4.2. | Development Wells | 9 |
| 4.3. | Agreement Lease | 9 |
| V. | EXPLORATION AND DEVELOPMENT ON OPTION LANDS | 9 |
| 5.1. | Lease Option | 9 |
| 5.2. | Initial Wells | 10 |
| 5.3. | Development Wells | 10 |
| VI. | SEISMIC EXPLORATION | 11 |
| 6.1. | 2D Seismic | 11 |
| 6.2. | 3D Seismic | 11 |
| VII. | PARTICIPATION BY UTE INDIAN TRIBE | 11 |
| 7.1. | Initial Wells | 11 |
| A. | Initial Wells, General Provisions | 11 |
| B. | Initial Test Wells | 12 |
| 7.2. | Development Wells | 12 |
| VIII. | FORCE MAJEURE | 14 |
| IX. | RELINQUISHMENT AND RELEASE | 14 |
| X. | CANCELLATION, BREACH AND LIMITED WAIVER OF SOVEREIGN IMMUNITY | 15 |
| 10.1. | Cancellation of Agreement Leases | 15 |
| 10.2. | Breach | 15 |
| 10.3. | Applicable Law | 15 |
| 10.4. | Limited Waiver of Sovereign Immunity; Jurisdiction; Remedies | 15 |
| XI. | ADDITIONAL COVENANTS BY THE PARTIES | 16 |
| 11.1. | Confidentiality | 16 |
| 11.2. | Appeal of Approval | 16 |
| 11.3. | Public Statements | 16 |

687-374-05

ii

**APPENDIX PAGE 255**

| 11.4. | Sale to Third Party | 17 |
| 11.5. | Ute Indian Tribe's and UDC's Costs | 17 |
| XII. | ENVIRONMENTAL MATTERS | 17 |
| 12.1. | Access to the Ute Tribal Lands | 17 |
| 12.2. | Environmental Liabilities | 17 |
| 12.3. | Assumed Environmental Liabilities | 18 |
| 12.4. | NEPA Requirements | 18 |
| XIII. | MEMORANDUM OF AGREEMENT | 18 |
| XIV. | ASSIGNMENT | 18 |
| 14.1. | Limitations | 18 |
| 14.2. | Exceptions | 18 |
| XV. | TRUST STATUS OF THE CONTRACT PREMISES | 19 |
| XVI. | INDEMNIFICATION BY QEP | 19 |
| XVII. | NOTICES | 19 |
| XVIII. | MISCELLANEOUS | 21 |
| 18.1. | Waiver | 21 |
| 18.2. | Conflict | 21 |
| 18.3. | Headings | 21 |
| 18.4. | Regulatory Authority | 21 |
| 18.5. | Survival | 21 |
| 18.6. | Severability | 21 |
| 18.7. | Modification of Agreement | 21 |
| | APPROVAL | 23 |

687 - 374 - 05

<u>EXHIBITS TO EXPLORATION AND DEVELOPMENT AGREEMENT</u>

| Exhibit A | Ute Tribal Minerals Acreage Description |
| Exhibit A-1 | Ute Tribal Minerals Plat |
| Exhibit B | Agreement Lease Form |
| Exhibit C | Permit for Use of Water |
| Exhibit D | Application for Grant of Right-of-Way |
| Exhibit E | Ordinance No. 01-006 |
| Exhibit F | Right-of-Way Form |
| Exhibit G | Assignment Form |
| Exhibit H | Lease Operating Agreement Form (with COPAS) |
| Exhibit I | Memorandum of Agreement |
| Exhibit J | Seismic Data License Agreement |

UIT_000289

**APPENDIX PAGE 256**

## EXPLORATION AND DEVELOPMENT AGREEMENT

This Agreement is made and entered into this 4th day of May, 2005, but effective as of March 31, 2005, in triplicate under authority of the Indian Mineral Development Act of 1982 (25 U.S.C. §§ 2101-2108), and other applicable acts, among the Ute Indian Tribe of the Uintah and Ouray Reservation, Utah ("Ute Indian Tribe"), pursuant to the Constitution and Bylaws of the Ute Indian Tribe, Questar Exploration and Production Company, a Texas corporation ("QEP"), and the Ute Distribution Corporation, a Utah corporation ("UDC"), organized with authority under the Ute Partition and Termination Act at 25 U.S.C. §§ 677-677aa (the "Ute Partition Act"). The Ute Indian Tribe, QEP and UDC are sometimes referred to individually as "Party" and collectively as "Parties."

WHEREAS, the Ute Indian Tribe, UDC, and QEP have reached an agreement for the exploration and development of oil and gas, as defined below, in and under and that may be produced from lands located in Uintah County, Utah, such lands being particularly described in Exhibit A attached and made a part of this Agreement.

NOW, THEREFORE, in consideration of the mutual obligations and covenants contained herein, and of other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Ute Indian Tribe, UDC, and QEP hereby agree as follows:

### I. DEFINITIONS

For purposes of this Agreement, the terms and phrases set forth below are defined as follows:

1.1.   Agency.   The Uintah and Ouray Agency of the Bureau of Indian Affairs and any successor office thereof of the Bureau of Indian Affairs.

1.2.   Agreement Lease.   An oil and gas lease from the Ute Indian Tribe and UDC to QEP covering all Tribal Minerals within a governmental section (640-acre parcel, more or less) of the Option Lands or Section 1 Lands, issued for a primary term of five (5) years on the form attached hereto as Exhibit B.

1.3.   Agreement Term.   This Agreement shall remain in effect so long as QEP possesses the option to acquire an Agreement Lease under either Section 5.1.A or 5.1.B, or, if QEP no longer possesses such option, this Agreement shall remain in effect only with respect to those lands held by QEP under any Agreement Leases for the term of any such lease.

1.4.   Completion, Complete, or Completing.   Perforating, fracture stimulating (if conducted), and equipping a well through the tanks, in the case of an Oil well, or capable of flowing from the well into a gathering line, in the case of a Gas well (installation of a gathering line is not required for a well to be "completed").

1

UIT_000290

**APPENDIX PAGE 257**

5521

1.5.  ==Development Well.==  Any well drilled subsequent to the Initial Test Well or an Initial Well on any section of the Option Lands, and any well drilled subsequent to the Initial Test Well on Section 1 Lands.

1.6.  Effective Date.  The Effective Date of this Agreement shall be the first day of the month immediately following the date of approval by the Secretary, pursuant to Section 3.2.C of this Agreement.  In the event the Secretary does not approve this Agreement within eighteen (18) months of the date of this Agreement, any Party shall have the right to terminate this Agreement by providing written notice to the other Parties, in which case all Parties' rights and obligations shall thereupon terminate.

1.7.  ==Election to Participate.==  The exercise by the Ute Indian Tribe of its right to participate as a cost-bearing working interest owner in a well drilled by QEP (including related facilities covered by such right to participate) and the related Agreement Lease, as further described in Section 5.1, below.

1.8.  Environmental Defect.  A condition in, on or under the portion of the surface of the Ute Tribal Minerals (including, without limitation, air, land, soil, surface and subsurface strata, surface water and ground water) that causes such surface to be in violation of an Environmental Law or that is the basis for a claim by a third party that such condition has caused and/or will cause damage to such third party, based on common law or any statute.

1.9.  Environmental Law.  Any federal, tribal, state, local or foreign law (including common law), statute, rule, regulation, requirement, ordinance and any writ, decree, bond, authorization, approval, license, permit, registration, binding criteria, standard, consent decree, settlement agreement, judgment, order, directive or binding policy issued by or entered into with a governmental authority pertaining or relating to: (a) pollution or pollution control; (b) protection of human health from exposure to pollutants or protection of the environment; (c) employee safety in the workplace; or (d) the management, presence, use, generation, processing, extraction, treatment, recycling, refining, reclamation, labeling, transport, storage, collection, distribution, disposal or release or threat of release of pollutants.  "Environmental Laws" shall include, without limitation, the Comprehensive Environmental Response, Compensation and Liability Act, 42 U.S.C. § 9601 et seq., the Solid Waste Disposal Act (as amended by the Resource Conservation and Recovery Act), 42 U.S.C. § 6901 et seq., the Hazardous Materials Transportation Act, 49 U.S.C. § 1801 et seq., the Toxic Substances Control Act, 15 U.S.C. § 2601 et seq., the Federal Water Pollution Control Act, 33 U.S.C. § 1251 et seq., the Federal Safe Drinking Water Act, 42 U.S.C. §§ 300f-300, the Federal Air Pollution Control Act, 42 U.S.C. § 7401 et seq., the Oil Pollution Act, 33 U.S.C. § 2701 et seq., the Occupational Safety and Health Act, 29 U.S.C. § 651 et seq., the Endangered Species Act and the regulations and orders respectively promulgated thereunder, each as amended, or any equivalent or analogous state, tribal, or local statutes, laws or ordinances, any regulation promulgated thereunder and any amendments thereto.

2

UIT_000291

**APPENDIX PAGE 258**

*5521*

1.10.  Force Majeure.  An occurrence, situation or event as described in Article VIII of this Agreement.

1.11.  Gas.   Natural gas deposits, either combustible or non-combustible, recovered at the surface in the gaseous state, including but not limited to helium gas, methane gas, coalbed methane gas, carbon dioxide gas, and sulfur gas; and hydrocarbons recovered at the surface as liquids which are the result of condensation caused by reduction of pressure and temperature of hydrocarbons originally existing in a reservoir in a gaseous state; excluding (a) gaseous or liquid substances manufactured from coal, unless such substances are produced in conjunction with or as a result of QEP's development of oil or gas pursuant to this Agreement; (b) oil shale and tar sands; and (c) any other hydrocarbons classified as synthetic hydrocarbons.

1.12.  Initial Well.  Each of  the first wells drilled by QEP on any section of the Option Lands subsequent to the Initial Test Well on the Option Lands.

1.13.  Initial Test Well.  Each of (1) the first well drilled by QEP on the Section 1 Lands, and (2) the first well drilled by QEP on the Option Lands, each drilled either to a depth sufficient to test the Jurassic Formation or to a total depth of 12,000', whichever is lesser, at a location selected by QEP.

1.14.  Oil.  Petroleum or liquid hydrocarbons originally existing in a reservoir in a liquid state.

1.15.  Operating Agreement.  The form of joint operating agreement attached hereto as Exhibit H, including COPAS and all other exhibits.

1.16.  Option Lands.  Those lands located within Uintah County, Utah described on Exhibit "A", and depicted on Exhibit "A-1", the oil and gas underlying which is owned by or held in trust for the Ute Indian Tribe.

1.17.  Secretary.   The Secretary of the Interior or her duly authorized representative.

1.18.  Section 1 Lands.  Those lands located within Section 1, Township 15 South, Range 19 East, Uintah County, Utah, the oil and gas underlying which is owned by or held in trust for the Ute Indian Tribe.

1.19.  Superintendent.  The Superintendent of the Uintah and Ouray Agency of the Bureau of Indian Affairs.

1.20.  Tribal Minerals.  Those oil and gas interests in lands described in Exhibit A and depicted in Exhibit A-1 which are owned by the Ute Indian Tribe or held by the United States in trust for the Ute Indian Tribe and UDC as of the Effective Date of this Agreement.  Tribal Minerals does not include minerals owned by, or held by the United States in trust for, individual allottees.

3

687-374-05

UIT_000292

5521

1.21.  Ute Tribal Surface.  All lands described as Option Lands or Section 1 Lands, the surface of which is owned by or held in trust for the Ute Indian Tribe.

1.22.  Visual Mitigation Corridor.  Those lands comprising the bottom, sides and rim of the canyon through which Hill Creek flows or is situated ("Hill Creek Canyon").

## II. REPRESENTATIONS OF THE UTE INDIAN TRIBE AND THE UDC

2.1.  Representations of the Ute Indian Tribe.  The Ute Indian Tribe represents and warrants that oil and gas in and under and that may be produced from the Ute Tribal Minerals owned by the Ute Indian Tribe or held by the United States in trust for the Ute Indian Tribe subject to the provisions of the Ute Partition and Termination Act, 25 U.S.C. §§ 677-677aa.  The Ute Indian Tribe further represents and warrants that it has the authority to enter into this Agreement pursuant to the Indian Mineral Development Act.  This Agreement has been approved by the Venture Fund Board of the Ute Indian Tribe pursuant to Resolution No. 05-006, and by the Business Committee of the Ute Indian Tribe pursuant to Resolution No. 05-089, (copies of which have been provided to QEP) in accordance with the Ute Tribal Constitution and applicable Ordinances.  This Agreement is intended to be approved by the United States Department of the Interior and is intended to satisfy all legal provisons the Department administers, including those under the Indian Mineral Development Act of 1982, 25 U.S.C. §§ 2101-2108, and 25 U.S.C. § 81.

2.2.  Representations of the UDC.  The UDC represents and warrants that it is organized pursuant to the Ute Partition Act, and is authorized to enter into this Agreement.  This Agreement has been approved by the Board of Directors of UDC pursuant to Resolution _O.2_, dated _5/02/05_ (copies of which have been provided to QEP and the Ute Indian Tribe).  UDC, to the extent it has such rights pursuant to the Ute Partition Act, enters into this Agreement to allow QEP to explore for, develop, produce, save, gather, and transport oil and gas from the Ute Tribal Minerals.

2.3.  Joint Management Process.  This Agreement shall be subject to the joint management process set forth at 25 C.F.R. Part 217.  The execution of this Agreement by the Ute Indian Tribe and the UDC shall be deemed the joint management by the Ute Indian Tribe and the UDC of oil and gas rights in the Ute Tribal Minerals retained in trust by the United States pursuant to 25 C.F.R. Part 217 and in accordance with the Ute Partition Act.  Any disputes between the Ute Indian Tribe and UDC concerning the terms of this Agreement or the administration of this Agreement shall be subject to the joint management process set forth in 25 C.F.R Part 217. The Ute Indian Tribe shall provide to UDC copies of all oil or gas well completion or recompletion reports filed with the Tribe.

## III. OBLIGATIONS

3.1.  Obligations of QEP.

A.  Corporate Information.  QEP has furnished, or shall furnish, to the Superintendent all corporate information required by 25 C.F.R. § 225.29.

4

687-374-05

*5521*

## VII. PARTICIPATION BY UTE INDIAN TRIBE

**7.1.    Initial Wells.**

A.    Initial Wells; General Provisions.    Except as provided in Section 7.1.B below, the Tribe shall have the right, prior to the commencement of any Initial Well or Initial Test Well,  to elect to participate for up to 50% of the actual costs of drilling and Completing (or plugging and abandoning) any such well by giving QEP written notice of its election within 30 days of receipt of the well proposal and AFE.  If the Tribe elects to participate in any Initial Well drilled on the Option Lands subsequent to the Initial Test Well, the Tribe shall reimburse QEP for the Tribe's proportionate share of any 2D Seismic and/or 3D Seismic costs and actual costs for bonus and option payments with respect to the section in which such Initial Well is located and QEP shall deliver an assignment, in the form attached hereto as Exhibit G, assigning the appropriate ownership interest in the section to the Ute Indian Tribe. By way of example only, if ten (10) square miles of 3D Seismic data was acquired, the Tribe's reimbursement to QEP of Seismic costs for any section of land fully covered by such data would be 10% of the total 3D Seismic cost. If the Tribe elects to participate in an Initial Test Well with a working interest beyond the 25% carried working interest, it shall reimburse QEP for its proportionate share of seismic costs relative to said section based on the total resulting working interest, including bearing a proportionate share of the carried working interest to the Tribe.  In addition, if the Tribe elects to participate in an Initial Test Well with a working interest beyond the 25% carried working interest it shall also reimburse QEP for its proportionate share of the bonus and option payment relative to said section based on the total resulting interest, exclusive of the Tribe's proportionate share of the carried interest with respect to the quarter section in which the Initial Test Well is located. "Actual costs" shall be determined in a manner consistent with the Council of Petroleum Accountants Societies' accounting procedures, and as further specified in the Operating Agreement, and shall include without limitation all costs relating to the determination of title to the lands, except Ute Tribal Lands.  The Ute Indian Tribe's election to so participate shall be referred to herein as its "Election to Participate."

B.    Initial Test Wells.  QEP shall carry, and the Tribe shall be deemed to have participated, as to 25% of the actual costs of drilling any Initial Test Well to casing point (referred to in this Section as the "carried interest").  Upon reaching the casing point of either such well, the Tribe shall have the option either to (i) participate in the completion as to 25% of the actual costs of Completing such well, or (ii) go non-consent in the completion subject to a non-consent penalty of 150% of the Tribe's proportionate share of the actual costs of such well subsequent to casing point.  Prior to the commencement of an Initial Test Well, the Tribe may elect, by giving advance notice in the form prescribed by Section 7.3.A, to participate for up to an additional 25% working interest in each such well – which interest will bear its share of all costs, including a proportionate share of the 25% carried working interest to the Tribe. In the event the Tribe did not elect to participate in an additional working interest percentage of the costs of an Initial Test Well but does elect to participate at casing point in the completion of said well, the Tribe, upon making such completion election, shall pay, such additional percentage of the 3D Seismic costs and acreage bonus and option

12

**APPENDIX PAGE 261**

UIT_000301

5521

payment which is allocable to the remaining three (3) quarter sections of the section in which such Initial Test Well is located. Any working interest in an Initial Test Well which the Tribe elects to acquire, over and above the carried interest, shall be subject to the non-consent provisions of the Operating Agreement.

7.2.    Development Wells.  In the two sections in which QEP drills an Initial Test Well, if the Tribe elects to participate with a working interest in addition to the 25% carried working interest, or if the Tribe does not elect to participate with a greater working interest but does elect to participate in the completion of the Initial Test Well as casing point, the Tribe shall have the right to participate in Development Wells at a level up to and including the Tribe's total level of participation in the Initial Test Well in the same section.  If the Tribe does not elect to participate in an Initial Test Well with a working interest in addition to the 25% carried working interest and does not participate in the completion of the Initial Test Well at casing point, the Tribe shall have the right to participate in Development Wells as to a 25% working interest in only the quarter section where the Initial Test Well is located (the Tribe will not have any working interest in the remaining three (3) quarter sections).  However, a party must participate in the first Development Well within any quarter-section in order to retain the right to participate in additional Development Wells within the same quarter-section. If either QEP or the Tribe elects not to participate in the first Development Well in a quarter-section, pursuant to the terms of the Operating Agreement, upon completion of the well the non-participating party shall assign all of its interest in the quarter-section, from the surface to 100' below the stratigraphic equivalent of the total depth drilled in the well, to the participating party subject only to the leasehold burdens in existence at the time of original acquisition. In such event, the non-participating party shall be reimbursed by the participating party at the time of assignment for the bonus and option payments made by the non-participating party with respect to any such quarter section.

*What about*

7.3.    Notice to Tribe.  Prior to commencing the drilling of any Initial Test Well or Initial Well, or any Development Well in which the Tribe retains a right to participate under Sections 7.1 or 7.2, QEP shall provide a Notice of Election to Participate, a well drilling prognosis, a geological presentation, and an authorization for expenditure (collectively, an "AFE") to the Ute Indian Tribe as the estimate of the costs of drilling and completing the well, or plugging and abandoning the well as a dry hole.  Within thirty (30) days after the Ute Indian Tribe's receipt of the AFE, it shall provide written notice to QEP, stating whether the Ute Indian Tribe elects to participate for its share of the actual costs of drilling and Completing (or plugging and abandoning) the well

A.    Exercise of Election to Participate.  If the Ute Indian Tribe exercises its Election to Participate, the Parties' rights and obligations with respect to all operations regarding that well shall be governed by the form of Operating Agreement attached hereto as Exhibit H, which the Ute Indian Tribe, and QEP shall execute prior to commencement of the first well in which the Ute Indian Tribe participates. With respect to the Operating Agreement (in the event the Ute Indian Tribe elects to participate), the form of Exhibit H shall specify "Questar Exploration and Production Company" as Operator.

13

UIT_000302

**APPENDIX PAGE 262**

5521

WHEREFORE, the Ute Indian Tribe, UDC and QEP do hereby make and enter into this Agreement on the date set forth above, to be effective as of the Effective Date, on the date set forth by its signature below.

ATTEST:                                      UTE INDIAN TRIBE

_Mina West_                                  By: _Maxine Natchees_
Name:                                        Maxine Natchees, Chairman
Date: 5/4/05                                 Chairman
                                             Date: 05/04/05


ATTEST:                                      Questar Exploration and Production Company

                                             By: _J.B. Neese_
_____                              Name: J.B. Neese
Name:                                        Title: Executive Vice-President
Date: _____                        Date: May 4, 2005


ATTEST:                                      UTE DISTRIBUTION CORPORATION

_Pala Nelson_                                By: _Lois LaRose_
Name: PALA NELSON                            Name: LOIS LaROSE
Date: 5/4/05                                 Title: President
                                             Date: 5/4/05

687-374-05

23

UIT_000312

**APPENDIX PAGE 263**

*5521*

**EXPLORATION AND DEVELOPMENT AGREEMENT**
**Among**
**THE UTE INDIAN TRIBE,**
**QUESTAR EXPLORATION AND PRODUCTION COMPANY**
**and**
**THE UTE DISTRIBUTION CORPORATION**

APPROVAL

It has been determined that approval of this document is not such a major federal action significantly affecting the quality of the human environment as to require the preparation of an environmental impact statement under Section 10-3(2)(c) of the National Environmental Policy Act of 1969 (42 U.S.C. §4332(s)(c); Environmental Assessment of Oil and Gas Development, Duchesne River Area; Environmental Assessment No. 3, Bureau of Land Management, Vernal District, Vernal, Utah prepared April, 1982.

DATED AND APPROVED this _____ day of _____, 2005, by the United States of America, acting through the Bureau of Indian Affairs, and delegated to the Superintendent by Phoenix Area Redelegation Order No. 3, Amendment 6, Section 2.17 (34 Fed. Reg. 11109), *and* pursuant to authority delegated to the Assistant Secretary - Indian Affairs by 209 DM 8, 230 DM 1, and to the Western Regional Director by 3 IAM 4 (Release No. 99-03), and to the Superintendent/Field Representative by 10 BIAM 11, as amended by Western Regional Release No. 97-1, and any further delegations needed to effectuate the reorganization embodied in DM Releases dated April 21, 2003.

_____
Superintendent
Bureau of Indian Affairs
Uintah and Ouray Agency
Fort Duchesne, Utah 84026

ACKNOWLEDGEMENT OF SUPERINTENDENT

STATE OF UTAH              )
                           ) ss.
COUNTY OF UINTAH           )

        BEFORE ME, a Notary Public, in and for said county and State, on this _____ day of _____, 2005, personally appeared Chester D. Mills, whose name is subscribed to the foregoing Exploration and Development Agreement as Superintendent, Uintah and Ouray Agency, Bureau of Indian Affairs, and who acknowledged that he now is and was at the time of signing the same Superintendent of the Uintah and Ouray Agency, Bureau of Indian Affairs, and he personally acknowledged to me that he executed this said document in his official capacity and pursuant to authority delegated to him for the use and purpose set forth therein.

_____
NOTARY PUBLIC

25

UIT_000314

**APPENDIX PAGE 264**

Confidential, Privileged and Proprietary Information
383 DM 15, Section 5.6, Exemption 4
25 CFR Part 225

UTE TRIBE—

2OG000

2ND ORIGINAL

# EXPLORATION AND DEVELOPMENT AGREEMENT

## Among

## THE UTE INDIAN TRIBE,

## NEWFIELD PRODUCTION COMPANY

## and

## THE UTE DISTRIBUTION CORPORATION

### December 22, 2006

#729423.15

CONFIDENTIAL

UE003490

### UTE INDIAN TRIBE/NEWFIELD/UDC
### EXPLORATION AND DEVELOPMENT AGREEMENT

### TABLE OF CONTENTS

I.    DEFINITIONS ............................................................................1

    1.1.    Affiliate .........................................................................1

    1.2.    Agency .........................................................................1

    1.3.    Agreement Lease(s).......................................................1

    1.4.    Agreement Term ...........................................................1

    1.5.    Allotted Lands ..............................................................2

    1.6.    BIA ...............................................................................2

    1.7.    BLM ..............................................................................2

    1.8.    Completion, Complete, or Completing ..........................2

    1.9.    Contract Lands .............................................................2

    1.10.    Contract Year ...............................................................2

    1.11.    Control .........................................................................2

    1.12.    Drilling Area..................................................................2

    1.13.    Drilling Rights ..............................................................2

    1.14.    Effective Date ..............................................................2

    1.15.    Election to Participate ..................................................3

    1.16.    Environmental Defect....................................................3

    1.17.    Environmental Law........................................................3

    1.18.    Force Majeure ..............................................................3

    1.19.    Gas ..............................................................................3

    1.20.    Gathering Pipeline........................................................4

    1.21.    Green River Formation..................................................4

    1.22.    Oil.................................................................................4

    1.23.    Operating Agreement ...................................................4

    1.24.    Secretary......................................................................4

    1.25.    Superintendent ............................................................4

    1.26.    Transportation Pipeline ................................................4

    1.27.    Ute Tribal Lands...........................................................4

i

### APPENDIX PAGE 266

CONFIDENTIAL

UE003491

2OG0005609

**TABLE OF CONTENTS**
(continued)

                                                                                **Page**

        1.28.   Ute Tribal Minerals .............................................................4
        1.29.   Ute Tribal Surface .............................................................4
        1.30.   Wells ............................................................................4
II.     REPRESENTATIONS OF THE UTE INDIAN TRIBE AND THE UDC ................5
        2.1.    Representations of the Ute Indian Tribe.................................5
        2.2.    Representations of the UDC ...............................................5
        2.3.    Joint Management Process.................................................5
        2.4.    Representations of the Ute Indian Tribe concerning Allotted Lands..........5
III.    OBLIGATIONS.......................................................................5
        3.1.    Obligations of the Company...............................................5
        3.2.    Grant by and Obligations of the Ute Indian Tribe ....................7
        3.3.    Throughput Fee.............................................................8
        3.4.    Third Party Oil or Gas ....................................................9
        3.5.    Road Rights-of-Way and Surface Use ...................................9
        3.6.    Throughput Fee Downstream.............................................9
        3.7.    No Right for Third Party Minerals ......................................9
IV.     EXPLORATION AND DEVELOPMENT..........................................10
        4.1.    General Obligations.......................................................10
        4.2.    Obligations of Company to Drill Wells During Agreement Term............10
        4.3.    Obligations of Company to Drill Wells During Initial Extension Term ......10
        4.4.    Obligations of Company to Drill Wells During Additional Extension
                Term.........................................................................10
        4.5.    Agreement Lease ..........................................................11
V.      PARTICIPATION BY UTE INDIAN TRIBE.......................................12
        5.1.    Right to Participate; Notice to Ute Indian Tribe ......................12
        5.2.    Costs of Participation ....................................................12
        5.3.    Exercise of Election to Participate......................................12
        5.4.    Ute Indian Tribe's Right to Propose Wells............................13
        5.5.    Participation in Drilling Area ............................................13

**APPENDIX PAGE 267**

CONFIDENTIAL

UE003492

**TABLE OF CONTENTS**
(continued)

Page

VI.     EXTENSIONS OF AGREEMENT TERM ........................................13
        6.1.    Initial Extension Term .............................................13
        6.2.    Additional Extension Term .......................................14
VII.    FORCE MAJEURE ...................................................................14
VIII.   RELINQUISHMENT, SURRENDER AND RELEASE ....................15
        8.1.    Surrender of Contract Lands ...................................15
        8.2.    Release of Ute Tribal Minerals ...............................15
IX.     CANCELLATION, BREACH, APPLICABLE LAW AND  LIMITED WAIVER
        OF SOVEREIGN IMMUNITY ....................................................15
        9.1.    Cancellation of Agreement Leases ..........................15
        9.2.    Breach.....................................................................16
        9.3.    Applicable Law .......................................................16
        9.4.    Limited Waiver of Sovereign Immunity for Commercial Transaction;
                Jurisdiction; Remedies ............................................16
X.      ADDITIONAL COVENANTS BY THE PARTIES ...........................17
        10.1.   Confidentiality.........................................................17
        10.2.   Appeal of Approval .................................................17
        10.3.   Public Statements ..................................................17
        10.4.   Sale to Third Party .................................................17
        10.5.   Severance Taxes ...................................................18
XI.     ENVIRONMENTAL MATTERS ..................................................18
        11.1.   Access to the Ute Tribal Lands ...............................18
        11.2.   Environmental Liabilities .........................................18
        11.3.   Assumed Environmental Liabilities............................18
        11.4.   NEPA Requirements ...............................................19
XII.    MARKETING ...........................................................................19
XIII.   OPERATING COST...................................................................19
XIV.    SECONDARY WATERFLOOD; UNITIZATION................................20
XV.     MEMORANDUM OF AGREEMENT ...........................................20
XVI.    ASSIGNMENT .........................................................................20

iii

**APPENDIX PAGE 268**

CONFIDENTIAL

UE003493

2OG0005609

**TABLE OF CONTENTS**
(continued)

Page

16.1. Limitations ......................................................20

16.2. Exceptions ......................................................20

XVII. TRUST STATUS OF THE CONTRACT PREMISES .................................21

XVIII. INDEMNIFICATION BY THE COMPANY .........................................21

XIX. NOTICES ..........................................................22

19.1. Delivery of Notices ...............................................22

19.2. Change of Address .................................................23

XX. MISCELLANEOUS ....................................................23

20.1. Waiver ..........................................................23

20.2. Conflict ........................................................23

20.3. Headings ........................................................23

20.4. Regulatory Authority ..............................................23

20.5. Survival ........................................................23

20.6. Severability .....................................................23

20.7. Modification of Agreement .........................................23

iv

**APPENDIX PAGE 269**

CONFIDENTIAL

UE003494

## EXPLORATION AND DEVELOPMENT AGREEMENT

This Agreement (this "Agreement") is made and entered into this 22nd day of December, 2006, in triplicate under authority of the Indian Mineral Development Act of 1982 (25 U.S.C. §§ 2101-2108), and other applicable acts, among the Ute Indian Tribe of the Uintah and Ouray Reservation, Utah ("Ute Indian Tribe"), pursuant to the Constitution and Bylaws of the Ute Indian Tribe, Newfield Production Company, a Texas corporation (the "Company"), and the Ute Distribution Corporation, a Utah corporation ("UDC"), organized under the Ute Partition and Termination Act at 25 U.S.C. §§ 677-677aa (the "Ute Partition Act"). The Ute Indian Tribe, the Company and UDC are sometimes referred to individually as "Party" and collectively as "Parties."

WHEREAS, the Ute Indian Tribe, UDC, and the Company have reached an agreement for the exploration and development of oil and gas, as defined below, in and under and that may be produced from lands located in Uintah County, Utah, such lands being particularly described in Exhibits A-1 and A-2 attached to and made a part of this Agreement.

NOW, THEREFORE, in consideration of the mutual obligations and covenants contained herein, and of other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Ute Indian Tribe, UDC, and the Company hereby agree as follows:

## I. DEFINITIONS

For purposes of this Agreement, the terms and phrases set forth below are defined as follows:

1.1.    Actual Costs. As defined in Section 5.2.

1.2.    Additional Extension Term. As defined in Section 6.2.

1.3.    Additional Option to Extend. As defined in Section 6.2.

1.4.    AFE. As defined in Section 5.1.

1.5.    Affiliate. Any person, partnership, limited liability company, joint venture, corporation, or other form of enterprise which Controls, is Controlled by, or is under common Control with a Party.

1.6.    Agency. The Uintah and Ouray Agency of the Bureau of Indian Affairs and any successor office thereof of the Bureau of Indian Affairs or successor agency.

1.7.    Agreement Lease(s). An oil and gas lease(s) granted by the Ute Indian Tribe and UDC to the Company covering all of the Ute Tribal Minerals within a portion of a specified Drilling Area (as defined below). Each Agreement Lease shall be issued on the form attached hereto as Exhibit B.

1.8.    Agreement Term. Subject to Company's Initial Option to Extend and Additional Option to Extend (both as defined in Article VI), this Agreement shall expire

1

CONFIDENTIAL

UE003496

five (5) years from the Effective Date, provided, that any Agreement Lease, right-of-way or permit shall remain in effect according to their respective terms.

1.9.  Allotted Lands.  Parcels of land within the Contract Lands which have been conveyed to allottees pursuant to the General Allotment Act of 1887, 25 U.S.C § 331 et seq., or the Act of March 3, 1905, ch. 1479, 33 Stat. 1048, 1069-70.

1.10.  BIA.  The United States Department of the Interior, Bureau of Indian Affairs.

1.11.  BLM.  The United States Department of the Interior, Bureau of Land Management.

1.12.  Buyer.  As defined in Section 10.4.

1.13.  Completion, Complete, or Completing.  Perforating, fracture stimulating (if conducted), and equipping a well through the tanks, in the case of an Oil well, or capable of flowing from the well into a gathering line, in the case of a Gas well.  In the case of a dry hole, plugging and abandoning the well, or completion as an injection well for waterflood purposes or preservation of such wellbore for same by setting casing.

1.14.  Contract Lands.  Ute Tribal Minerals and Ute Tribal Surface on those lands owned or within the control of the Ute Indian Tribe in the areas described on Exhibit A-1 and depicted on Exhibit A-2.  As regards Ute Tribal Minerals, "Contract Lands" are limited to those formations from the surface to the base of the Green River Formation.

1.15.  Contract Year.  The First Contract Year shall run from the Effective Date to December 31, 2007.  Each subsequent Contract Year shall be a calendar year.

1.16.  Control.  The ability, directly or indirectly through one or more intermediaries, to direct or cause the direction of the management and policies of such entity through (i) the legal or beneficial ownership of voting securities or membership interests; (ii) the right to appoint managers, directors or corporate management; (iii) contract; (iv) operating agreement; (v) voting trust; or otherwise; and, when used with respect to a person, means the actual or legal ability to control the actions of another, through family relationship, agency, contract or otherwise; and, when used as a noun, means an interest which gives the holder the ability to exercise any of the foregoing powers.

1.17.  Drilling Area.  One of the four Drilling Areas described on Exhibits A-1 and A-2.

1.18.  Drilling Rights.  The rights and obligations of the Company pursuant to Section 4.1 to formations from the surface of the earth down to and including the base of the Green River Formation.

1.19.  Effective Date.  The Effective Date of this Agreement shall be the date of approval by the Superintendent or applicable regulatory agency.  Upon the execution of this Agreement, the Ute Indian Tribe and UDC agree to use reasonable efforts to obtain the approval of this Agreement by the Superintendent or authorized regulatory agency.

2

**APPENDIX PAGE 271**

CONFIDENTIAL

UE003497

In the event the Superintendent or authorized regulatory agency does not approve this Agreement within six (6) months of the date of this Agreement, any Party shall have the right to terminate this Agreement by providing written notice to the other Parties, in which case all Parties' rights and obligations shall thereupon terminate.

1.20.  Election to Participate.  The exercise by the Ute Indian Tribe of its right to participate as a cost-bearing working interest owner in a well drilled by the Company (including related facilities covered by such right to participate) and the related Agreement Lease(s), as further described in Article V, below.

1.21.  Environmental Defect.  A condition in, on or under a portion of the surface of the Ute Tribal Minerals (including, without limitation, air, land, soil, surface and subsurface strata, surface water and ground water) that causes a violation of an Environmental Law, or that is the basis for a claim by a third party that such condition has caused and/or will cause damage to such third party, based on common law or any statute.

1.22.  Environmental Law.  Any federal, tribal, state, or local law (including common law), statute, rule, regulation, requirement, ordinance or any writ, decree, bond, authorization, approval, license, permit, registration, binding criteria, standard, consent decree, settlement agreement, judgment, order, directive or binding policy issued by or entered into with a governmental authority pertaining or relating to: (a) pollution or pollution control; (b) protection of human health from exposure to pollutants or protection of the environment; (c) employee safety in the workplace; or (d) the management, presence, use, generation, processing, extraction, treatment, recycling, refining, reclamation, labeling, transport, storage, collection, distribution, disposal or release or threat of release of pollutants.  "Environmental Laws" shall include, without limitation, the Comprehensive Environmental Response, Compensation and Liability Act, 42 U.S.C. § 9601 et seq., the Solid Waste Disposal Act (as amended by the Resource Conservation and Recovery Act), 42 U.S.C. § 6901 et seq., the Hazardous Materials Transportation Act, 49 U.S.C. § 1801 et seq., the Toxic Substances Control Act, 15 U.S.C. § 2601 et seq., the Federal Water Pollution Control Act, 33 U.S.C. § 1251 et seq., the Federal Safe Drinking Water Act, 42 U.S.C. §§ 300f-300, the Federal Air Pollution Control Act, 42 U.S.C. § 7401 et seq., the Oil Pollution Act, 33 U.S.C. § 2701 et seq., the Occupational Safety and Health Act, 29 U.S.C. § 651 et seq., the Endangered Species Act and the regulations and orders respectively promulgated thereunder, each as amended, or any equivalent or analogous state, tribal, or local statutes, laws or ordinances, any regulation promulgated thereunder and any amendments thereto.

1.23.  Extension Acreage.  As defined in Section 6.1.

1.24.  Force Majeure.  An occurrence, situation or event as described in Article VII of this Agreement.

1.25.  Gas.  Natural gas deposits, either combustible or non-combustible, recovered at the surface in the gaseous state, including but not limited to helium gas, methane gas, coalbed methane gas, carbon dioxide gas, and sulfur gas; and hydrocarbons recovered at the surface as liquids which are the result of condensation caused by reduction of pressure and temperature of hydrocarbons originally existing in

CONFIDENTIAL                                                                 UE003498

a reservoir in a gaseous state; excluding (a) gaseous or liquid substances manufactured from coal, unless such substances are produced in conjunction with or as a result of the Company's development of oil or gas pursuant to this Agreement; (b) oil shale and tar sands; and (c) any other hydrocarbons classified as synthetic hydrocarbons.

1.26.   Gathering Pipeline.  A pipeline constructed in an Oil or Gas field for the purpose of gathering of Oil or Gas for sale to a purchaser or for the purpose of aggregating gas volumes to be transported on a Transportation Pipeline.

1.27.   Green River Formation.  From the surface of the earth to the Base of the Green River as found at a depth of six-thousand seven-hundred sixty feet (6,760') on the Compensated Density-Neutron Log of the Newfield Production Company (formerly Walker Exploration and Production) Sand Pass #14-21 Well, located in the SE¼SW¼ of Section 21, Township 4 South, Range 1 West, Duchesne County, Utah.

1.28.   Information.  As defined in Section 10.1.

1.29.   Initial Extension Term.  As defined in Section 6.1.

1.30.   Initial Option to Extend.  As defined in Section 6.1.

1.31.   Lease Bonus Payment.  As defined in Section 3.1D.

1.32.   Notice of Intent to Sell.  As defined in Section 10.4A.

1.33.   Notices.  As defined in Section 19.1.

1.34.   Oil.   Petroleum or liquid hydrocarbons originally existing in an underground reservoir in a liquid state.

1.35.   Operating Agreement.   The form of joint operating agreement attached hereto as Exhibit F, including COPAS and all other exhibits.  This form is intended to cover operations on all Contract Lands.

1.36.   Secretary.  The Secretary of the United States Department of the Interior or his duly authorized representative.

1.37.   Superintendent.  The Superintendent of the Agency.

1.38.   Third Party Minerals.  As defined in Section 3.4.

1.39.   Third Party Transportation Fee.  As defined in Section 3.4.

1.40.   Throughput Fee.  As defined in Section 3.3.

1.41.   Transportation Pipeline.  A market, common carriage or contract carriage pipeline, downstream of Gathering Pipelines.

1.42.   Ute Tribal Lands.  All lands, including Ute Tribal Minerals and Ute Tribal Surface, owned or leased by or held in trust for the Ute Indian Tribe within the boundaries of the Contract Lands, together with all Allotted Lands leased to the Ute Indian Tribe or to an Affiliate of the Ute Indian Tribe.

4

**APPENDIX PAGE 273**

CONFIDENTIAL                                                    UE003499

1.43. Ute Tribal Minerals. Those oil and gas interests in lands within the Contract Lands that are owned or leased from allottees by the Ute Indian Tribe or held by the United States in trust for the Ute Indian Tribe and UDC as of the Effective Date of this Agreement. Ute Tribal Minerals do not include minerals (a) owned by, or held by the United States in trust for, individual allottees, (b) leased by the Ute Indian Tribe to third parties, or (c) held by production from a well drilled by a third party and producing prior to the Effective Date of this Agreement. Upon cancellation or termination, the lands and leases under that certain Lease Option Agreement between the Ute Indian Tribe and Armstrong Resources LLC (Contract No. 4916) and that certain Lease No. 4836 shall be included in Ute Tribal Minerals subject to this Agreement.

1.44. Ute Tribal Surface. All lands within the boundaries of the Contract Lands, the surface of which is owned by or held in trust for the Ute Indian Tribe.

1.45. Wells. One or more wells drilled to formations above the base of the Green River Formation.

## II. REPRESENTATIONS OF THE UTE INDIAN TRIBE AND THE UDC

2.1. Representations of the Ute Indian Tribe. The Ute Indian Tribe represents and warrants that oil and gas in and under and that may be produced from the Ute Tribal Minerals is owned or leased from allottees by the Ute Indian Tribe or held by the United States in trust for the Ute Indian Tribe, subject to the provisions of the Ute Partition and Termination Act, 25 U.S.C. §§ 677-677aa. The Ute Indian Tribe further represents and warrants that it has the authority to enter into this Agreement pursuant to the Indian Mineral Development Act. This Agreement has been approved by the Venture Fund Board of the Ute Indian Tribe pursuant to Resolution No. 06-012, and by the Business Committee of the Ute Indian Tribe pursuant to Resolution No. 06-217, (copies of which have been provided to the Company) in accordance with the Ute Tribal Constitution and applicable Ordinances. This Agreement is intended to be approved by the United States Department of the Interior and is intended to satisfy all legal provisions the Department of the Interior administers, including those under the Indian Mineral Development Act of 1982, 25 U.S.C. §§ 2101-2108, and 25 U.S.C. § 81.

2.2. Representations of the UDC. The UDC represents and warrants that it is organized pursuant to the Ute Partition Act, and is authorized to enter into this Agreement. This Agreement has been approved by the Board of Directors of UDC pursuant to Resolution _____, dated _____ (copies of which have been provided to the Company and the Ute Indian Tribe). UDC, to the extent it has such rights pursuant to the Ute Partition Act, enters into this Agreement to allow the Company to explore for, develop, produce, save, gather, and transport oil and gas from the Ute Tribal Minerals.

2.3. Joint Management Process. This Agreement shall be subject to the joint management process set forth at 25 C.F.R. Part 217. The execution of this Agreement by the Ute Indian Tribe and the UDC shall be deemed the joint management by the Ute Indian Tribe and the UDC of oil and gas rights in the Ute Tribal Minerals retained in trust by the United States pursuant to 25 C.F.R. Part 217 and in accordance with the Ute Partition Act. Any disputes between the Ute Indian Tribe and UDC concerning the joint

5

CONFIDENTIAL

UE003500

WHEREFORE, the Ute Indian Tribe, UDC and the Company do hereby make and enter into this Agreement on the date set forth above, to be effective as of the Effective Date, on the date set forth by its signature below.

ATTEST:

Name: _____
Date: _____

**UTE INDIAN TRIBE**

By: _____
Name: T. SMILEY ARROUCHES
Date: 12-22-06
Title: VICE CHAIRMAN

ATTEST:

Name: _____
Date: _____

NEWFIELD PRODUCTION COMPANY

By: _____
Name: GARY D. PACKER
Date: 12-22-06
Title: PRESIDENT

ATTEST:

Name: _____
Date: _____

UTE DISTRIBUTION CORPORATION

By: Lynn McClure
Name: LYNN McCLURE
Date: 12-22-06
Title: PRESIDENT

24

CONFIDENTIAL

UE003519

2OG0005609

**EXPLORATION AND DEVELOPMENT AGREEMENT**
**Among**
**THE UTE INDIAN TRIBE,**
**NEWFIELD PRODUCTION COMPANY**
**and**
**THE UTE DISTRIBUTION CORPORATION**

## A P P R O V A L

It has been determined that approval of this document is not such a major federal action significantly affecting the quality of the human environment as to require the preparation of an environmental impact statement under Section 10-3(2)(c) of the National Environmental Policy Act of 1969 (42 U.S.C. § 4332(s)(c); Environmental Assessment of Oil and Gas Development, Duchesne River Area; Environmental Assessment No. 3, Bureau of Land Management, Vernal District, Vernal, Utah prepared April, 1982.

DATED AND APPROVED this _____ day of _____, 2007, by the United States of America, acting through the Bureau of Indian Affairs, and delegated to the Superintendent by Phoenix Area Redelegation Order No. 3, Amendment 6, Section 2.17 (34 Fed. Reg. 11109), *and* pursuant to authority delegated to the Assistant Secretary - Indian Affairs by 209 DM 8, 230 DM 1, and to the Western Regional Director by 3 IAM 4 (Release No. 99-03), and to the Superintendent/Field Representative by 10 BIAM 11, as amended by Western Regional Release No. 97-1, and any further delegations needed to effectuate the reorganization embodied in DM Releases dated April 21, 2003.

acting

Superintendent
Bureau of Indian Affairs
Uintah and Ouray Agency
Fort Duchesne, Utah  84026

### ACKNOWLEDGEMENT OF SUPERINTENDENT

STATE OF UTAH            )
                         ) ss.
COUNTY OF UINTAH         )

BEFORE ME, a Notary Public, in and for said county and State, on this 23rd day of _____, 2007, personally appeared Lynn N. Hunt, whose name is subscribed to the foregoing Exploration and Development Agreement as Superintendent, Uintah and Ouray Agency, Bureau of Indian Affairs, and who acknowledged that he now is and was at the time of signing the same Superintendent of the Uintah and Ouray Agency, Bureau of Indian Affairs, and he personally acknowledged to me that he executed this said document in his official capacity and pursuant to authority delegated to him for the use and purpose set forth therein.

Notary Public
SARAH A. JACK
988 S. 7500 E., P.O. Box 130
Fort Duchesne, UT 84026
My Commission Expires
June 15, 2010
State of Utah

NOTARY PUBLIC
Exp: 06-16-2010

228 :349828v2                                    1

## EXHIBIT "A-1" - Ute Tribal Lands

**to Exploration and Development Agreement between the Ute Indian Tribe, Newfield Production Company and the Ute Distribution Corporation Covering Lands in the Monument Butte Area**

LEGEND:
| | |
|---|---|
| UTS | Ute Tribal Surface |
| UTM | Ute Tribal Minerals |
| UIN | Uintah County |
| DUC | Duchesne County |
| TWP | Township |
| RNG | Range |
| SEC | Section |

A-1" Newfield/Ute Indian Tribe

Page 1 of 8

CONFIDENTIAL

UE003523



2OG0005609

| Twp. | Rng. | County | Sec. | Legal Description: | UTM Gross Acres | UTM Net Acres | Ute Tribal Mineral Ownership | UTS Gross Acres |
|---|---|---|---|---|---|---|---|---|
| **Drilling Block A** | | | | **UTE TRIBAL LANDS** | | **MINERALS** | | **SURFACE** |
| 4S | 2W | Duc | 1 | Lot 1,SE¼NE¼ | 83.03 | 83.03 | oil, gas, oil shale and nitrogen only | 0.00 |
| 4S | 2W | Duc | 1 | Lot 2,SW¼NE¼ | 82.86 | 82.86 | oil, gas, oil shale and nitrogen only | 0.00 |
| 4S | 2W | Duc | 1 | NW¼SE¼ | 40.00 | 40.00 | oil, gas, oil shale and nitrogen only | 0.00 |
| 4S | 2W | Duc | 4 | Lots 3,4,SW¼NW¼ | 127.18 | 127.18 | oil and gas only | 0.00 |
| 4S | 2W | Duc | 5 | Lot 1,SE¼NE¼,NE¼SE¼ | 123.55 | 123.55 | oil and gas only | 0.00 |
| 4S | 2W | Duc | 5 | SE¼SE¼ | 40.00 | 40.00 | oil, gas, oil shale and nitrogen only | 0.00 |
| 4S | 2W | Duc | 7 | Lots 1,2,E½NW¼,S½NE¼,NW¼NE¼ | 279.04 | 279.04 | oil, gas, oil shale and nitrogen only | 0.00 |
| 4S | 2W | Duc | 7 | Lot 3,NE¼SW¼,N½SE¼ | 159.70 | 159.70 | all minerals | 0.00 |
| S | 2W | Duc | 8 | NE¼NE¼,S½NE¼ | 120.00 | 120.00 | oil, gas, oil shale and nitrogen only | 0.00 |
| 4S | 2W | Duc | 8 | SE¼ | 160.00 | 160.00 | oil, gas, oil shale and nitrogen only | 0.00 |
| 4S | 2W | Duc | 11 | N½S½ | 160.00 | 160.00 | all minerals | 0.00 |
| 4S | 2W | Duc | 11 | SW¼SW¼ | 40.00 | 40.00 | oil, gas, oil shale and nitrogen only | 0.00 |
| 4S | 2W | Duc | 11 | SE¼SE¼ | 40.00 | 40.00 | oil, gas, oil shale and nitrogen only | 0.00 |
| 4S | 2W | Duc | 12 | E½NE¼,SW¼NE¼ | 120.00 | 120.00 | all minerals | 120.00 |
| 4S | 2W | Duc | 12 | W½SW¼ | 80.00 | 80.00 | oil, gas, oil shale and nitrogen only | 0.00 |
| 4S | 2W | Duc | 12 | E½SE¼ | 80.00 | 80.00 | oil, gas, oil shale and nitrogen only | 0.00 |
| 4S | 2W | Duc | 13 | NW¼ | 160.00 | 160.00 | oil, gas, oil shale and nitrogen only | 0.00 |
| 4S | 2W | Duc | 14 | Lot 1NW¼SE¼,SW¼NE¼,SE¼NW¼ | 151.00 | 151.00 | oil, gas, oil shale and nitrogen only | 0.00 |
| 4S | 2W | Duc | 14 | NW¼NW¼ | 40.00 | 40.00 | oil, gas, oil shale and nitrogen only | 0.00 |
| 4S | 2W | Duc | 14 | Lot 2,SW¼NW¼,W½SW¼ | 152.75 | 152.75 | oil, gas, oil shale and nitrogen only | 0.00 |
| 4S | 2W | Duc | 14 | parts of SE¼SW¼,SW¼SE¼ | 16.25 | 16.25 | all minerals | 16.25 |
| 4S | 2W | Duc | 16 | E½NW¼,SW¼NW¼ | 120.00 | 120.00 | all minerals | 0.00 |
| 4S | 2W | Duc | 16 | NW¼NW¼ | 40.00 | 40.00 | oil, gas, oil shale and nitrogen only | 0.00 |
| 4S | 2W | Duc | 17 | N¼NE¼,SW¼NE¼ | 120.00 | 120.00 | oil, gas, oil shale and nitrogen only | 0.00 |
| S | 2W | Duc | 17 | SE¼NE¼,N½SE¼,NW¼,NW¼SW¼ | 320.00 | 320.00 | all minerals | 0.00 |
| 4S | 2W | Duc | 18 | Lot 2,E½NW¼ | 119.97 | 119.97 | oil, gas, oil shale and nitrogen only | 0.00 |
| 4S | 2W | Duc | 18 | Lot 1 | 39.91 | 39.91 | all minerals | 0.00 |
| 4S | 2W | Duc | 18 | Lots 3,4,E½SW¼,SE¼ | 320.12 | 320.12 | oil, gas, oil shale and nitrogen only | 0.00 |
| 4S | 2W | Duc | 19 | Lot 1,2,E½NW¼,W½NE¼ | 240.20 | 240.20 | oil, gas, oil shale and nitrogen only | 0.00 |
| 4S | 2W | Duc | 20 | Lots 3,4,E½SW¼,SE¼ | 320.12 | 320.12 | oil, gas, oil shale and nitrogen only | 0.00 |
| 4S | 2W | Duc | 21 | S½N½,NE¼,SE¼,S½SW¼ | 320.00 | 320.00 | all minerals | 0.00 |
| 4S | 2W | Duc | 21 | NW¼ | 160.00 | 160.00 | oil, gas, oil shale and nitrogen only | 0.00 |
| 4S | 2W | Duc | 22 | S½ | 320.00 | 320.00 | oil, gas, oil shale and nitrogen only | 0.00 |
| 4S | 2W | Duc | 23 | Lots 1,6,7,NE¼NE¼ | 82.00 | 82.00 | oil, gas, oil shale and nitrogen only | 0.00 |
| 4S | 2W | Duc | 23 | W½NW¼ | 80.00 | 80.00 | all minerals | 0.00 |
| 4S | 2W | Duc | 23 | parts of S½NE¼,NW¼NE¼,NE¼NW¼ | 45.15 | 45.15 | all minerals | 45.15 |
| 4S | 2W | Duc | 24 | Lot 1,NE¼SW¼ | 79.05 | 79.05 | oil, gas, oil shale and nitrogen only | 0.00 |
| 4S | 2W | Duc | 26 | Lot 4 | 6.89 | 6.89 | all minerals | 0.00 |

APPENDIX PAGE 278

CONFIDENTIAL

UE003524




**2OG0005609**

| Twp. | Rng. | County | Sec. | Legal Description: | UTM Gross Acres | UTM Net Acres | Ute Tribal Mineral Ownership | UTS Gross Acres |
|------|------|--------|------|-------------------|-----------------|---------------|------------------------------|-----------------|
| 4S | 2W | Duc | 27 | Lots 1,2,3,4 | 26.59 | 26.59 | all minerals | 0.00 |
| 4S | 2W | Duc | 28 | Lots 1,2,3,4 | 126.64 | 126.64 | all minerals | 0.00 |
| 4S | 2W | Duc | 30 | Lots 1,2,3,4,5,6,NE¼,E½NW¼ | 475.16 | 475.16 | all minerals | 0.00 |
| | | | | **Total UTM Acres - Block A** | **5,617.16** | **5,617.16** | **Total UTS Acres - Block A** | **181.40** |

| | | | | **UTE TRIBAL LANDS [ALLOTTED]** | | | | |
|------|------|--------|------|-------------------|-----------------|---------------|------------------------------|-----------------|
| 4S | 2W | Duc | 5 | SW¼SE¼,SE¼SW¼ | 80.00 | 2.04 | all minerals | 0.00 |
| 4S | 2W | Duc | 8 | NW¼NE¼,NE¼NW¼ | 80.00 | 2.04 | all minerals | 0.00 |
| | | | | **Total UTM [Allotted] Acres - Block A** | **160.00** | **4.08** | **Total UTS [Allotted] Acres - Block A** | **0.00** |

| | | | | | | | | |
|------|------|--------|------|-------------------|-----------------|---------------|------------------------------|-----------------|
| | | | | **Total All UTM Acres - Block A** | **5,777.16** | **5,621.24** | **Total All UTS Acres - Block A** | **181.40** |

| **Drilling Block B** | | | | **UTE TRIBAL LANDS** | **MINERALS** | | | **SURFACE** |
|------|------|--------|------|-------------------|-----------------|---------------|------------------------------|-----------------|
| 4S | 1W | Uin | 1 | Lots 1,2,3,4,5,6,7,SW¼NE¼,S½NW¼ | 397.68 | 397.68 | all minerals | 397.68 |
| 4S | 1W | Uin | 1 | SW¼,W½SE¼ | 240.00 | 240.00 | all minerals | 240.00 |
| 4S | 1W | Uin | 2 | S½SE¼,NE¼SE¼ | 120.00 | 120.00 | all minerals | 120.00 |
| 4S | 1W | Duc Uin | 3 | Lots 1,2,3,4,S½NW¼,W½SW¼ | 330.52 | 330.52 | all minerals | 330.52 |
| 4S | 1W | Duc | 4 | Lots 1,2,S½NE¼,S½SW¼,NE¼SW¼,SE¼ | 447.91 | 447.91 | all minerals | 447.91 |
| 4S | 1W | Duc | 5 | Lots 1,2,S½NE¼,S½SW¼,NE¼SW¼ | 291.97 | 291.97 | all minerals | 291.97 |
| 4S | 1W | Duc | 5 | W½SE¼,SE¼SE¼ | 120.00 | 120.00 | all minerals | 120.00 |
| 4S | 1W | Duc | 5 | Lot 4 | 46.83 | 46.83 | all minerals | 0.00 |
| 4S | 1W | Duc | 6 | Lot 1,S½NE¼ | 127.43 | 127.43 | all minerals | 0.00 |
| 4S | 1W | Duc | 6 | Lots 2,3,4,SE¼NW¼ | 177.51 | 177.51 | all minerals | 0.00 |
| 4S | 1W | Duc | 6 | NE¼SE¼ | 40.00 | 40.00 | all minerals | 0.00 |
| 4S | 1W | Duc | 6 | S½SE¼ | 80.00 | 80.00 | all minerals | 80.00 |
| 4S | 1W | Duc | 7 | Lots 1,2,NE¼NE¼,NE¼,N½SE¼ | 349.33 | 349.33 | all minerals | 349.33 |
| 'S | 1W | Duc | 7 | Lot 4,SE¼SW¼ | 74.53 | 74.53 | all minerals | 0.00 |
| 4S | 1W | Duc | 7 | S½SE¼ | 80.00 | 80.00 | all minerals | 0.00 |
| 4S | 1W | Duc | 8 | ALL | 640.00 | 640.00 | all minerals | 640.00 |
| 4S | 1W | Duc | 9 | S¼ | 320.00 | 320.00 | all minerals | 0.00 |
| 4S | 1W | Duc | 10 | SE¼NE¼ | 40.00 | 40.00 | all minerals | 40.00 |
| 4S | 1W | Uin | 11 | E½,E½NW¼,SW¼NW¼,SW¼ | 600.00 | 600.00 | all minerals | 600.00 |
| 4S | 1W | Uin | 12 | Lots 1,2,3,4,W½E½,W½ | 636.05 | 636.05 | all minerals | 636.05 |
| 4S | 1W | Duc | 13 | Lots 1,2,W½NE¼,NW¼ | 317.66 | 317.66 | all minerals | 317.66 |
| 4S | 1W | Uin | 14 | N½ | 320.00 | 320.00 | all minerals | 0.00 |
| 4S | 1W | Uin | 14 | SE¼ | 160.00 | 160.00 | all minerals | 0.00 |
| 4S | 1W | Duc Uin | 15 | NE¼,N½NW¼,SE¼NW¼ | 280.00 | 280.00 | all minerals | 0.00 |
| 4S | 1W | Duc Uin | 15 | SW¼NW¼,NW¼SW¼ | 80.00 | 80.00 | all minerals | 0.00 |
| 4S | 1W | Duc Uin | 15 | S½SW¼,NE¼SW¼,SE¼ | 280.00 | 280.00 | all minerals | 0.00 |
| 4S | 1W | Duc | 16 | N½N½,SW¼NW¼ | 200.00 | 200.00 | all minerals | 0.00 |

**APPENDIX PAGE 279**

CONFIDENTIAL

UE003525



2OG0005609

| Twp. | Rng. | County | Sec. | Legal Description: | UTM Gross Acres | UTM Net Acres | Ute Tribal Mineral Ownership | UTS Gross Acres |
|------|------|--------|------|-------------------|-----------------|---------------|------------------------------|-----------------|
| 4S | 1W | Duc | 16 | SE¼NE¼,NE¼SE¼ | 80.00 | 80.00 | all minerals | 0.00 |
| 4S | 1W | Duc | 16 | SW¼NE¼,SE¼NW¼, NE¼SW¼,NW¼SE¼ | 160.00 | 160.00 | all minerals | 0.00 |
| 4S | 1W | Duc | 16 | S½S½ | 160.00 | 160.00 | all minerals | 0.00 |
| 4S | 1W | Duc | 17 | N½NE¼ | 80.00 | 80.00 | all minerals | 0.00 |
| 4S | 1W | Duc | 17 | S½SW¼,W½SE¼ | 160.00 | 160.00 | oil and gas only | 0.00 |
| 4S | 1W | Duc | 17 | SE¼SE¼ | 40.00 | 40.00 | all minerals | 0.00 |
| 4S | 1W | Duc | 18 | E½SW¼,E½NW¼ | 160.00 | 160.00 | all minerals | 0.00 |
| 4S | 1W | Duc | 19 | W½NE¼,E½NW¼ | 160.00 | 160.00 | all minerals | 0.00 |
| 4S | 1W | Duc | 19 | Lot 4,SE¼SW¼,W½SE¼ | 154.51 | 154.51 | all minerals | 0.00 |
| 4S | 1W | Duc | 20 | N½SE¼,SW¼SE¼,SE¼SW¼ | 160.00 | 160.00 | all minerals | 0.00 |
| S | 1W | Duc | 21 | E½NE¼ | 80.00 | 80.00 | all minerals | 0.00 |
| 4S | 1W | Duc | 21 | W½NE¼,NE¼NW¼,NW¼SE¼ | 160.00 | 160.00 | all minerals | 0.00 |
| 4S | 1W | Duc | 21 | NE¼SE¼ | 40.00 | 40.00 | all minerals | 0.00 |
| 4S | 1W | Duc Uin | 22 | NW¼ | 160.00 | 160.00 | all minerals | 0.00 |
| 4S | 1W | Duc Uin | 22 | NW¼SW¼ | 40.00 | 40.00 | all minerals | 0.00 |
| 4S | 1W | Uin | 23 | E½NE¼,SW¼NE¼,SE¼NW¼ | 160.00 | 160.00 | oil and gas only | 0.00 |
| 4S | 1W | Uin | 24 | SE¼NW¼,NE¼SW¼,S½SW¼ | 160.00 | 160.00 | all minerals | 160.00 |
| 4S | 1W | Uin | 25 | Lots 1,2,3,4,5,NW¼NE¼,N½NW¼ | 283.45 | 283.45 | all minerals | 283.45 |
| 4S | 1W | Duc | 29 | Lots 2,3 | 17.00 | 17.00 | all minerals | 0.00 |
| 4S | 1W | Duc | 30 | Lots 2,3,4 | 24.74 | 24.74 | all minerals | 0.00 |
| | | | | **Total All UTM Acres - Block B** | **9,237.12** | **9,237.12** | **Total UTS Acres - Block B** | **5,054.57** |

| Drilling Block C | | | | UTE TRIBAL LANDS | MINERALS | | | SURFACE |
|------|------|------|------|-------------------|----------|---|---|---------|
| 4S | 1E | Uin | 1 | Lots 1,2,3,4,S½N½ | 320.00 | 320.00 | oil, gas, oil shale and nitrogen only | 0.00 |
| 4S | 1E | Uin | 1 | S½ | 320.00 | 320.00 | oil, gas, oil shale and nitrogen only | 0.00 |
| 1S | 1E | Uin | 2 | Lots 1,2,3,4,S½N½ | 320.00 | 320.00 | oil, gas, oil shale and nitrogen only | 0.00 |
| 4S | 1E | Uin | 2 | S½ | 320.00 | 320.00 | oil, gas, oil shale and nitrogen only | 0.00 |
| 4S | 1E | Uin | 3 | N½ | 320.00 | 320.00 | oil, gas, oil shale and nitrogen only | 0.00 |
| 4S | 1E | Uin | 3 | S½ | 320.00 | 320.00 | oil, gas, oil shale and nitrogen only | 0.00 |
| 4S | 1E | Uin | 4 | N½ | 320.00 | 320.00 | oil, gas, oil shale and nitrogen only | 0.00 |
| 4S | 1E | Uin | 4 | S½ | 320.00 | 320.00 | oil, gas, oil shale and nitrogen only | 0.00 |
| 4S | 1E | Uin | 5 | All | 640.00 | 640.00 | all minerals | 640.00 |
| 4S | 1E | Uin | 6 | All | 648.00 | 648.00 | all minerals | 648.00 |
| 4S | 1E | Uin | 7 | All | 649.44 | 649.44 | all minerals | 649.44 |
| 4S | 1E | Uin | 8 | All | 640.00 | 640.00 | all minerals | 640.00 |
| 4S | 1E | Uin | 9 | N½ | 320.00 | 320.00 | oil, gas, oil shale and nitrogen only | 0.00 |
| 4S | 1E | Uin | 9 | S½ | 320.00 | 320.00 | oil, gas, oil shale and nitrogen only | 0.00 |
| 4S | 1E | Uin | 10 | N½ | 320.00 | 320.00 | oil, gas, oil shale and nitrogen only | 0.00 |
| 4S | 1E | Uin | 10 | S½ | 320.00 | 320.00 | oil, gas, oil shale and nitrogen only | 0.00 |

Exhibit "B-1" Ute Indian Tribe        Page 4 of 8        Exploration Develoment Agreement

CONFIDENTIAL

2OG0005609

| Twp. | Rng. | County | Sec. | Legal Description: | UTM Gross Acres | UTM Net Acres | Ute Tribal Mineral Ownership | UTS Gross Acres |
|------|------|--------|------|-------------------|-----------------|---------------|------------------------------|-----------------|
| 4S | 1E | Uin | 11 | N½ | 320.00 | 320.00 | oil, gas, oil shale and nitrogen only | 0.00 |
| 4S | 1E | Uin | 11 | S½ | 320.00 | 320.00 | oil, gas, oil shale and nitrogen only | 0.00 |
| 4S | 1E | Uin | 12 | N½ | 320.00 | 320.00 | oil, gas, oil shale and nitrogen only | 0.00 |
| 4S | 1E | Uin | 12 | S½ | 320.00 | 320.00 | oil, gas, oil shale and nitrogen only | 0.00 |
| 4S | 1E | Uin | 14 | N½ | 320.00 | 320.00 | oil, gas, oil shale and nitrogen only | 0.00 |
| 4S | 1E | Uin | 14 | S½ | 320.00 | 320.00 | oil, gas, oil shale and nitrogen only | 0.00 |
| 4S | 1E | Uin | 15 | N½ | 320.00 | 320.00 | oil, gas, oil shale and nitrogen only | 0.00 |
| 4S | 1E | Uin | 15 | S½ | 320.00 | 320.00 | oil, gas, oil shale and nitrogen only | 0.00 |
| 4S | 1E | Uin | 17 | All | 640.00 | 640.00 | all minerals | 640.00 |
| 4S | 1E | Uin | 18 | All | 651.12 | 651.12 | all minerals | 651.12 |
| 4S | 1E | Uin | 20 | All | 640.00 | 640.00 | all minerals | 640.00 |
| 4S | 1E | Uin | 21 | All | 0.00 | 0.00 | HBP by third parties | 640.00 |
| 4S | 1E | Uin | 22 | All | 0.00 | 0.00 | HBP by third parties | 649.00 |
| 4S | 1E | Uin | 23 | N½ | 320.00 | 320.00 | oil, gas, oil shale and nitrogen only | 0.00 |
| 4S | 1E | Uin | 23 | SW¼SE¼ | 0.00 | 0.00 | HBP by third parties | 40.00 |
| 4S | 1E | Uin | 23 | SW¼,N¼SE¼,SE¼SE¼ | 280.00 | 280.00 | oil, gas, oil shale and nitrogen only | 280.00 |
| 4S | 1E | Uin | 24 | N½ | 320.00 | 320.00 | oil, gas, oil shale and nitrogen only | 0.00 |
| 4S | 1E | Uin | 24 | S½ | 320.00 | 320.00 | oil, gas, oil shale and nitrogen only | 0.00 |
| 4S | 1E | Uin | 25 | All | 0.00 | 0.00 | HBP by third parties | 640.00 |
| 4S | 1E | Uin | 26 | Lot 1,N¼,N½S½,SE¼SW¼,S½SE¼ | 0.00 | 0.00 | HBP by third parties | 638.25 |
| 4S | 1E | Uin | 27 | N½ | 0.00 | 0.00 | HBP by third parties | 320.00 |
| 4S | 1E | Uin | 28 | N½ | 0.00 | 0.00 | HBP by third parties | 320.00 |
| 4S | 1E | Uin | 29 | N½ | 320.00 | 320.00 | all minerals | 320.00 |
| 4S | 1E | Uin | 29 | Lots 1,2,3,4,NE¼SW¼,N½SE¼ | 239.55 | 239.55 | oil, gas, oil shale and nitrogen only | 0.00 |
| 4S | 1E | Uin | 30 | Lots 1,2,3,NE¼,NE¼NW¼ | 354.21 | 354.21 | all minerals | 354.21 |
| 4S | 1E | Uin | 30 | Lots 4,5 | 53.65 | 53.65 | oil, gas, oil shale and nitrogen only | 0.00 |
| 4S | 1E | Uin | 32 | Lot 1 (All) | 1.58 | 1.58 | oil, gas, oil shale and nitrogen only | 0.00 |
| 4S | 1E | Uin | 35 | Lots 1,2,3,4,12,13,S¼NW¼, NE¼SW¼,N½SE¼ | 353.72 | 353.72 | all minerals | 353.72 |
| 4S | 1E | Uin | 35 | Lots 5,6,7 | 16.60 | 16.60 | oil, gas, oil shale and nitrogen only | 0.00 |
| 4S | 1E | Uin | 35 | Lots 8,9,10,11 | 71.00 | 71.00 | all minerals | 71.00 |
| 4S | 1E | Uin | 36 | Lots 3,4,5,6,8,10,11,12,13,14,N½NE¼,NE¼NW¼, NW¼SW¼ | 393.22 | 393.22 | all minerals | 393.22 |
| | | | | **Total All UTM Acres - Block C** | **13,952.09** | **13,952.09** | **Total UTS Acres - Block C** | **9,527.96** |

### Drilling Block D

| | | | | | UTE TRIBAL LANDS | | MINERALS | | SURFACE |
|------|------|--------|------|------|---|---|---|---|---|
| 4S | 2E | Uin | 19 | Lots 3,4,5,6,7,S¼NE¼,SE¼NW¼,E¼SW¼,W½SE¼,E½SE¼ | 576.49 | 576.49 | Third party lease (all minerals) expires 4/08 with 1 year extension to 4/09 | | 0.00 |
| 4S | 2E | Uin | 20 | All | 640.00 | 640.00 | Third party lease (all minerals) expires 4/08 with 1 year extension to 4/09 | | 0.00 |

UE003526

**APPENDIX PAGE 281**

CONFIDENTIAL

UE003527

2OG0005609

| Twp. | Rng. | County | Sec. | Legal Description: | UTM Gross Acres | UTM Net Acres | Ute Tribal Mineral Ownership | UTS Gross Acres |
|------|------|--------|------|-------------------|-----------------|---------------|------------------------------|-----------------|
| 4S | 2E | Uin | 21 | All | 640.00 | 640.00 | Third party lease (all minerals) expires 4/08 with 1 year extension to 4/09 | 0.00 |
| 4S | 2E | Uin | 23 | Lots 1,2,3,4,6,7,8,9,10,11,W½NE¼,SE¼NE¼ | 451.83 | 451.83 | all minerals | 451.83 |
| 4S | 2E | Uin | 24 | SW¼NW¼ | 40.00 | 40.00 | all minerals | 40.00 |
| 4S | 2E | Uin | 26 | Lots 1,2,5,6,9,10,NW¼NE¼,NE¼NW¼ | 260.24 | 260.24 | all minerals | 260.24 |
| 4S | 2E | Uin | 27 | S½ | 320.00 | 320.00 | all minerals | 320.00 |
| 4S | 2E | Uin | 28 | N½ | 320.00 | 320.00 | oil, gas, oil shale and nitrogen only | 0.00 |
| 4S | 2E | Uin | 28 | S½ | 320.00 | 320.00 | oil, gas, oil shale and nitrogen only | 0.00 |
| 4S | 2E | Uin | 29 | All | 640.00 | 640.00 | Third party lease (all minerals) expires 4/08 with 1 year extension to 4/09 | 0.00 |
| 4S | 2E | Uin | 30 | All | 690.90 | 690.90 | Third party lease (all minerals) expires 4/08 with 1 year extension to 4/09 | 690.90 |
| 4S | 2E | Uin | 31 | Lots 1,2,3,4,5,6,7,NE¼,E½NW¼,N½SE¼ | 568.21 | 568.21 | all minerals | 568.21 |
| 4S | 2E | Uin | 32 | Lots 1,2,3,4,N½S½ | 328.76 | 328.76 | oil, gas, oil shale and nitrogen only | 0.00 |
| 4S | 2E | Uin | 32 | N½ | 320.00 | 320.00 | oil, gas, oil shale and nitrogen only | 0.00 |
| 4S | 2E | Uin | 33 | Lots 1,2,3,4,N½S½ | 325.72 | 325.72 | oil, gas, oil shale and nitrogen only | 0.00 |
| 4S | 2E | Uin | 33 | N½ | 320.00 | 320.00 | oil, gas, oil shale and nitrogen only | 0.00 |
| 4S | 2E | Uin | 34 | All | 644.20 | 644.20 | all minerals | 644.20 |
| 4S | 2E | Uin | 35 | Lots 4,5,6,7,8,9,10,11,12 | 337.01 | 337.01 | all minerals | 337.01 |
| 4S | 2E | Uin | 36 | Lots 2,3,4,5,6,7,8,9,10,11,12,N½NW¼,SE¼NW¼,SE¼ | 595.80 | 595.80 | all minerals | 595.80 |
| 4S | 2E | Uin | 19 | Lots 3,4,9,NE¼,E½NW¼, SE¼SE¼ | 376.65 | 376.65 | all minerals | 0.00 |
| 4S | 3E | Uin | 19 | Uin RIVER | 26.09 | 26.09 | all minerals | 26.09 |
| 4S | 3E | Uin | 20 | Lots 1,2,3,4,8,9,10,11 | 228.99 | 228.99 | all minerals | 228.90 |
| 4S | 3E | Uin | 28 | Lots 1,2 | 0.00 | 0.00 | HBP by third parties | 40.74 |
| 4S | 3E | Uin | 28 | Green River | 0.00 | 0.00 | HBP by third parties | 26.00 |
| 1S | 3E | Uin | 29 | Lots 3,4 | 0.00 | 0.00 | HBP by third parties | 80.00 |
| 4S | 3E | Uin | 29 | Lots 7,8,9,10,S½S½ | 0.00 | 0.00 | HBP by third parties | 319.25 |
| 4S | 3E | Uin | 30 | Lots 1,2,SE¼NE¼ | 88.00 | 88.00 | all minerals | 88.00 |
| 4S | 3E | Uin | 30 | Lots 13,14 | 78.45 | 78.45 | all minerals | 78.45 |
| 4S | 3E | Uin | 30 | NE¼SE¼,S½SE¼ east of river | 75.37 | 75.37 | all minerals | 75.37 |
| 4S | 3E | Uin | 30 | UINTAH RIVER | 32.35 | 32.35 | all minerals | 32.35 |
| 4S | 3E | Uin | 31 | Lots 8,9 | 43.40 | 43.40 | all minerals | 43.40 |
| 4S | 3E | Uin | 31 | Lots 2,3,4,5,13,14,E½NE¼ west of river | 261.07 | 261.07 | all minerals | 261.07 |
| 4S | 3E | Uin | 31 | UINTAH RIVER | 21.68 | 21.68 | all minerals | 21.68 |
| 4S | 3E | Uin | 32 | Lots 1,2,3,4,5,6,7,8,9,10,11,12,13 | 481.65 | 481.65 | all minerals | 481.65 |
| 4S | 3E | Uin | 32 | Lots 14,15,16 | 88.96 | 88.96 | all minerals | 88.96 |
| 4S | 3E | Uin | 32 | Lot 17,NW¼SW¼ west of river | 22.08 | 22.08 | all minerals | 22.08 |
| 4S | 3E | Uin | 32 | UINTAH RIVER, GREEN RIVER | 47.13 | 47.13 | all minerals | 47.13 |
| 4S | 3E | Uin | 33 | Lots 1,2,3,4,5,6,SW¼NW¼4,NW½SW¼ | 0.00 | 0.00 | HBP by third parties | 254.22 |

APPENDIX PAGE 282

CONFIDENTIAL

UE003528

2OG0005609

| Twp. | Rng. | County | Sec. | Legal Description: | UTM Gross Acres | UTM Net Acres | Ute Tribal Mineral Ownership | UTS Gross Acres |
|------|------|--------|------|-------------------|-----------------|---------------|------------------------------|-----------------|
| 4S | 3E | Uin | 33 | Green River | 0.00 | 0.00 | HBP by third parties | 114.00 |
| 5S | 1E | Uin | 1 | Lots 1,2,3,4,5,6,7,SE¼NE¼ | 294.58 | 294.58 | all minerals | 294.58 |
| 5S | 1E | Uin | 2 | Lot 1 (All) | 18.53 | 18.53 | oil, gas, oil shale and nitrogen only | 18.53 |
| 5S | 2E | Uin | 1 | Lots 2,5,6,7,9,10,NE¼SW¼ | 259.02 | 259.02 | all minerals | 259.02 |
| 5S | 2E | Uin | 1 | Green River | 61.20 | 61.20 | all minerals | 61.20 |
| 5S | 2E | Uin | 2 | Lots 1,2,15,17,NW¼NE¼,N½NW¼,SW¼NW¼ | 323.44 | 323.44 | all minerals | 323.44 |
| 5S | 2E | Uin | 2 | Lots 19,20,21,22,23,24,25,26 | 53.66 | 53.66 | all minerals | 53.66 |
| 5S | 2E | Uin | 3 | All | 640.00 | 640.00 | all minerals | 640.00 |
| 5S | 2E | Uin | 4 | Lots 1,2,3,4,-5,E½E½,NW¼NE¼,N½NW¼ | 450.20 | 450.20 | all minerals | 450.24 |
| 5S | 2E | Uin | 5 | Lots 1,2,3,4,5,6,7,8,9,10,11,12,13,14,S½NW¼,W½SW¼,SW¼SE¼ | 540.24 | 540.24 | all minerals | 540.24 |
| 5S | 2E | Uin | 6 | Lots 1-10,S½NE¼,SE¼NW¼,NW¼SW¼,SE¼ | 558.58 | 558.58 | all minerals | 558.58 |
| 5S | 2E | Uin | 7 | All | 96.42 | 96.42 | all minerals | 96.42 |
| 5S | 2E | Uin | 8 | All | 469.99 | 469.99 | all minerals | 469.99 |
| 5S | 2E | Uin | 9 | All | 640.00 | 640.00 | all minerals | 640.00 |
| 5S | 2E | Uin | 10 | All | 640.00 | 640.00 | all minerals | 640.00 |
| 5S | 2E | Uin | 11 | Lots 3,4,5,10,11,13-16, | 198.31 | 198.31 | all minerals | 198.31 |
| 5S | 2E | Uin | 11 | Green River | 95.66 | 95.66 | oil, gas, oil shale and nitrogen only | 0.00 |
| 5S | 2E | Uin | 12 | All | 85.66 | 85.66 | all minerals | 85.66 |
| 5S | 2E | Uin | 12 | Green River | 130.15 | 130.15 | all minerals | 130.15 |
| 5S | 2E | Uin | 14 | Lots 1,2,3 | 131.95 | 131.95 | all minerals | 131.95 |
| 5S | 2E | Uin | 14 | Lot 4 | 28.98 | 28.98 | oil, gas, oil shale and nitrogen only | 0.00 |
| 5S | 2E | Uin | 14 | Green River | 141.88 | 141.88 | all minerals | 141.88 |
| 5S | 2E | Uin | 15 | All | 588.10 | 588.10 | all minerals | 588.10 |
| 5S | 2E | Uin | 16 | All | 242.79 | 242.79 | all minerals | 242.79 |
| 5S | 2E | Uin | 23 | All | 15.78 | 15.78 | oil, gas, oil shale and nitrogen only | 0.00 |
| 5S | 2E | Uin | 23 | Green River | 34.19 | 34.19 | all minerals | 34.19 |
| 5S | 3E | Uin | 5 | Lot 4 | 31.94 | 31.94 | all minerals | 31.94 |
| 5S | 3E | Uin | 5 | Green River | 53.79 | 53.79 | all minerals | 53.79 |
| 5S | 3E | Uin | 6 | Lots 1,2,S½NE¼,SE¼ | 320.40 | 320.40 | all minerals | 320.40 |
| 5S | 3E | Uin | 6 | Green River | 5.10 | 5.10 | all minerals | 5.10 |
| 5S | 3E | Uin | 7 | Lots 5,9,10,11 | 145.94 | 145.94 | all minerals | 145.94 |
| 5S | 3E | Uin | 7 | Green River | 72.17 | 72.17 | all minerals | 72.17 |
| 5S | 3E | Uin | 8 | Lots 2,3,4 | 96.30 | 96.30 | all minerals | 96.30 |
| 5S | 3E | Uin | 8 | Green River | 32.44 | 32.44 | all minerals | 32.44 |
| | | | | **Total UTM Acres - Block D** | **17,708.40** | **17,708.40** | **Total UTS Acres - Block D** | **13,594.52** |

**UT6 TRIBAL LANDS [ALLOTTED]**

| Twp. | Rng. | County | Sec. | Legal Description: | UTM Gross Acres | UTM Net Acres | Ute Tribal Mineral Ownership | UTS Gross Acres |
|------|------|--------|------|-------------------|-----------------|---------------|------------------------------|-----------------|
| 5S | 3E | Uin | 5 | Lots 1,2 | 57.10 | 57.10 | all minerals | 0.00 |
| 5S | 3E | Uin | 6 | Lots 7,8 | 75.70 | 2.16 | all minerals | 0.00 |
| 5S | 3E | Uin | 7 | Lots 2,3,6,7,8,12,13 | 223.98 | 6.40 | all minerals | 0.00 |

**APPENDIX PAGE 283**

CONFIDENTIAL



2OG0005609

| Twp. | Rng. | County | Sec. | Legal Description: | UTM Gross Acres | UTM Net Acres | Ute Tribal Mineral Ownership | UTS Gross Acres |
|---|---|---|---|---|---|---|---|---|
| 4S | 3E | Uin | 31 | Lots 6,7,11,12 | 160.00 | 160.00 | all minerals | 0.00 |
| 4S | 3E | Uin | 31 | Lots 10,15,16,17 | 153.70 | 153.70 | all minerals | 0.00 |
| | | | | Total UTM [Allotted] Acres - Block D | 676.48 | 379.36 | Total UTS [Allotted] Acres - Block D | 0.00 |
| | | | | **Total All UTM Acres - Block D** | **18,378.88** | **18,087.76** | **Total All UTS Acres - Block D** | **13,594.52** |

| | | | UTM Gross Acres | UTM Net Acres | | UTS Gross Acres |
|---|---|---|---|---|---|---|
| **TOTAL UTE TRIBAL LAND ACRES** | | | 47,345.25 | 46,898.21 | | 28,358.45 |
| Bonus Payment per Net Ute Tribal Mineral Acre = | $22.50 | $1,055,209.73 | = Total Bonus Payment | | | |

Exhibit "A-1" Newfield/Ute Indian Tribe    Page 8 of 8    Exploration Development Agreement

UE003529

**APPENDIX PAGE 284**

COMPANY
ORIGINAL

2OG0005608

Confidential, Privileged and Proprietary Information
383 DM 15, Section 5.6, Exemption 4
25 CFR Part 225

**EXPLORATION AND DEVELOPMENT AGREEMENT**

**Among**

**THE UTE INDIAN TRIBE,**

**BILL BARRETT CORPORATION**

**and**

**THE UTE DISTRIBUTION CORPORATION**

**December 22, 2006**

**UTE INDIAN TRIBE/BBC/UDC**
**EXPLORATION AND DEVELOPMENT AGREEMENT**

**TABLE OF CONTENTS**

I.   DEFINITIONS ................................................................. 1

  1.1.   Additional Tribal Acreage ................................. 1
  1.2.   Agency ............................................................... 1
  1.3.   Agreement Lease .............................................. 1
  1.4.   Agreement Term ................................................ 1
  1.5.   AMI Lease .......................................................... 1
  1.6.   Area of Mutual Interest ("AMI") ...................... 2
  1.7.   Commence or Commencement........................ 2
  1.8.   Completion, Complete, or Completing........... 2
  1.9.   Deep or Deep Formation.................................. 2
  1.10.  Development Well .............................................. 2
  1.11.  Effective Date ................................................... 2
  1.12.  Election to Participate...................................... 2
  1.13.  Environmental Defect ....................................... 2
  1.14.  Environmental Law ........................................... 2
  1.15.  Extended Term ................................................. 3
  1.16.  Facilities Lease................................................. 3
  1.17.  First Exploration Year ...................................... 3
  1.18.  Force Majeure .................................................. 3
  1.19.  Gas..................................................................... 3
  1.20.  Initial Well ......................................................... 3
  1.21.  Obligation Well ................................................. 3
  1.22.  Oil ...................................................................... 3
  1.23.  Operating Agreement ...................................... 4
  1.24.  Right-of-Way ..................................................... 4
  1.25.  Secretary .......................................................... 4
  1.26.  Shallow or Shallow Formation......................... 4
  1.27.  Shallow Well...................................................... 4
  1.28.  Superintendent ................................................. 4
  1.29.  Uncompleted Well ............................................ 4

i

**APPENDIX PAGE 286**

1.30. Upper Black Shale Marker.................................................................... 4
1.31. Ute Tribal Lands ........................................................................ 4
1.32. Ute Tribal Minerals ..................................................................... 4
1.33. Ute Tribal Surface ...................................................................... 4
II.    REPRESENTATIONS OF THE UTE INDIAN TRIBE AND THE UDC ............... 4
2.1.   Representations of the Ute Indian Tribe ............................................ 4
2.2.   Representations of the UDC ......................................................... 5
2.3.   Joint Management Process ........................................................... 5
2.4.   Authorization ........................................................................... 5
2.5.   Pending Claims ........................................................................ 5
III.   OBLIGATIONS .......................................................................... 6
3.1.   Obligations of BBC .................................................................... 6
3.2.   Grant by and Obligations of the Ute Indian Tribe ................................ 9
3.3.   Throughput Fee ...................................................................... 10
3.4.   Road Rights-of-Way and Surface Use ............................................. 10
3.5.   Throughput Fee Downstream ....................................................... 11
IV.    EXPLORATION AND DEVELOPMENT ............................................. 11
4.1.   Obligations of BBC to Drill Wells .................................................. 11
4.2.   Failure to Meet Drilling Requirements ............................................ 12
4.3.   Development Wells ................................................................... 12
4.4.   Agreement Lease ..................................................................... 12
V.     PARTICIPATION BY UTE INDIAN TRIBE ......................................... 13
5.1.   Participation Right, General Provisions ........................................... 13
5.2.   Participation Costs and Assignment—Wells on Ute Tribal Minerals ........ 13
5.3.   Notice to Tribe ........................................................................ 13
5.4.   Exercise of Election to Participate ................................................. 14
5.5.   Ute Indian Tribe's Right to Propose Wells ....................................... 14
VI.    AREA OF MUTUAL INTEREST ..................................................... 14
6.1.   Formation; Acquisition of Interests ............................................... 14
VII.   FORCE MAJEURE ..................................................................... 15
VIII.  EXTENSION OF AGREEMENT TERM............................................... 15
IX.    ADDITIONAL TRIBAL ACREAGE. .................................................. 16

APPENDIX PAGE 287

X.      RELINQUISHMENT AND RELEASE ............................................................ 16

        10.1.  Surrender ..................................................................................... 16

XI.     CANCELLATION, BREACH AND LIMITED WAIVER OF SOVEREIGN
        IMMUNITY ............................................................................................. 17

        11.1.  Cancellation of Agreement Leases ................................................ 17

        11.2.  Breach .......................................................................................... 17

        11.3.  Applicable Law ............................................................................. 18

        11.4.  Limited Waiver of Sovereign Immunity; Jurisdiction; Remedies ............ 18

XII.    ADDITIONAL COVENANTS BY THE PARTIES .............................................. 18

        12.1.  Confidentiality .............................................................................. 18

        12.2.  Appeal of Approval ....................................................................... 18

        12.3.  Public Statements ........................................................................ 19

        12.4.  Sale to Third Party ....................................................................... 19

        12.5.  Ute Indian Tribe's Costs ............................................................... 20

XIII.   ENVIRONMENTAL MATTERS ................................................................... 20

        13.1.  Access to the Ute Tribal Surface ................................................... 20

        13.2.  Environmental Liabilities ............................................................... 20

        13.3.  Assumed Environmental Liabilities ................................................ 20

        13.4.  NEPA Requirements ..................................................................... 20

XIV.    MEMORANDUM OF AGREEMENT .......................................................... 21

XV.     ASSIGNMENT ........................................................................................ 21

        15.1.  Limitations ................................................................................... 21

        15.2.  Exceptions ................................................................................... 21

XVI.    TRUST STATUS OF THE CONTRACT PREMISES ....................................... 22

XVII.   INDEMNIFICATION BY BBC ..................................................................... 22

XVIII.  NOTICES ............................................................................................... 22

XIX.    MISCELLANEOUS .................................................................................. 24

        19.1.  Waiver .......................................................................................... 24

        19.2.  Conflict ........................................................................................ 24

        19.3.  Headings ...................................................................................... 24

        19.4.  Regulatory Authority ..................................................................... 24

        19.5.  Survival ........................................................................................ 24

        19.6.  Severability .................................................................................. 24

**APPENDIX PAGE 288**

19.7.   Modification of Agreement ........................................................ 24

FORM OF APPROVAL (NEPA/BIA) ................................................. 28

**EXHIBITS TO EXPLORATION AND DEVELOPMENT AGREEMENT**

Exhibit A        Ute Tribal Minerals Acreage Description
Exhibit A-2      Ute Tribal Minerals Plat, Showing AMI Boundaries
Exhibit B        Agreement Lease Form
Exhibit C        Application for Grant of Right-of-Way
Exhibit D-1      Right-of-Way Form
Exhibit D-2      Facilities Lease Form
Exhibit E        Assignment Form
Exhibit F        Lease Operating Agreement Form (with COPAS)
Exhibit G        Memorandum of Agreement
Exhibit H        Production Operations Policies
Exhibit I        Memorandum of Lease

iv

2OG0005608

## EXPLORATION AND DEVELOPMENT AGREEMENT

This Agreement is made and entered into this 22nd day of December, 2006, in triplicate under authority of the Indian Mineral Development Act of 1982 (25 U.S.C. §§ 2101-2108), and other applicable acts, among the Ute Indian Tribe of the Uintah and Ouray Reservation, Utah ("Ute Indian Tribe"), pursuant to the Constitution and Bylaws of the Ute Indian Tribe, Bill Barrett Corporation, a Delaware corporation ("BBC"), and the Ute Distribution Corporation, a Utah corporation ("UDC"), organized with authority under the Ute Partition and Termination Act at 25 U.S.C. §§ 677-677aa (the "Ute Partition Act").  The Ute Indian Tribe, BBC and UDC are sometimes referred to individually as "Party" and collectively as "Parties."

WHEREAS, the Ute Indian Tribe, UDC, and BBC have reached an agreement for the exploration and development of oil and gas, as defined below, in and under and that may be produced from lands located in Duchesne County, Utah, such lands being particularly described in Exhibit A attached and made a part of this Agreement.

NOW, THEREFORE, in consideration of the mutual obligations and covenants contained herein, and of other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Ute Indian Tribe, UDC, and BBC hereby agree as follows:

## I. DEFINITIONS

For purposes of this Agreement, the terms and phrases set forth below are defined as follows:

1.1.    Additional Tribal Acreage.  Tribal net acres which become included in Ute Tribal Minerals pursuant to Article IX.

1.2.    Agency.  The Uintah and Ouray Agency of the Bureau of Indian Affairs and any successor office thereof of the Bureau of Indian Affairs.

1.3.    Agreement Lease.  An oil and gas lease from the Ute Indian Tribe and UDC to BBC covering all Ute Tribal Minerals within a governmental section (640-acre parcel, more or less), issued for a primary term of five (5) years.  Each lease shall contain only lands located within the AMI (defined below), and shall be issued on the form attached hereto as Exhibit B.

1.4.    Agreement Term.  Subject to BBC's Option to Extend (as described in Article VIII), this Agreement shall expire five (5) years from the Effective Date, subject to Article 4.4.A well bore restrictions, provided that any Agreement Leases, rights-of-way, or permits shall remain in effect according to their respective terms.

1.5.    AMI Lease.  An oil and gas lease or an interest in any oil and gas lease presently held or obtained by BBC or the Ute Tribe (or by any third party acting on their

1

behalf) in lands on non-Ute Tribal Minerals within the AMI, as further described in Article VI below.

1.6.  Area of Mutual Interest ("AMI").   The area within Duchesne County, Utah as depicted on Exhibit A-2.

1.7.  Commence or Commencement.  When used in relationship to the drilling of a well, the moment in time at which a well is spudded-in.

1.8.  Completion, Complete, or Completing.  Perforating, fracture stimulating (if conducted), and equipping a well through the tanks, in the case of an Oil well, or capable of flowing from the well into a gathering line, in the case of a Gas well (installation of a gathering line is not required for a well to be "completed").

1.9.  Deep or Deep Formation.  Those geologic strata lying below the Upper Black Shale Marker.

1.10.  Development Well.  Any Obligation Well which cannot be carried over and counted as an Obligation Well under Section 4.1 as a result of such well exceeding the number of Obligation Wells that may be carried over to the immediately following six-month period referenced in Section 4.1.

1.11.  Effective Date.  The Effective Date of this Agreement shall be the first day of the month immediately following the date of approval by the Secretary.  In the event the Secretary does not approve this Agreement within one hundred eighty (180) days of the date of this Agreement, any Party shall have the right to terminate this Agreement by providing written notice to the other Parties, in which case all Parties' rights and obligations shall thereupon terminate.

1.12.  Election to Participate.  The exercise by the Ute Indian Tribe of its right to participate as a cost-bearing working interest owner in a well drilled by BBC (including related facilities covered by such right to participate) and the related Agreement Lease, as further described in Article 5, below.

1.13.  Environmental Defect.  A condition in, on or under the portion of the surface of the Ute Tribal Minerals (including, without limitation, air, land, soil, surface and subsurface strata, surface water and ground water) that causes such surface to be in violation of an Environmental Law or that is the basis for a claim by a third party that such condition has caused and/or will cause damage to such third party, based on common law or any statute.

1.14.  Environmental Law.  Any federal, tribal, state, local or foreign law (including common law), statute, rule, regulation, requirement, ordinance and any writ, decree, bond, authorization, approval, license, permit, registration, binding criteria, standard, consent decree, settlement agreement, judgment, order, directive or binding policy issued by or entered into with a governmental authority pertaining or relating to: (a) pollution or pollution control; (b) protection of human health from exposure to pollutants or protection of the environment; (c) employee safety in the workplace; or (d)

the management, presence, use, generation, processing, extraction, treatment, recycling, refining, reclamation, labeling, transport, storage, collection, distribution, disposal or release or threat of release of pollutants.  "Environmental Laws" shall include, without limitation, the Comprehensive Environmental Response, Compensation and Liability Act, 42 U.S.C. § 9601 et seq., the Solid Waste Disposal Act (as amended by the Resource Conservation and Recovery Act), 42 U.S.C. § 6901 et seq., the Hazardous Materials Transportation Act, 49 U.S.C. § 1801 et seq., the Toxic Substances Control Act, 15 U.S.C. § 2601 et seq., the Federal Water Pollution Control Act, 33 U.S.C. § 1251 et seq., the Federal Safe Drinking Water Act, 42 U.S.C. §§ 300f-300, the Federal Air Pollution Control Act, 42 U.S.C. § 7401 et seq., the Oil Pollution Act, 33 U.S.C. § 2701 et seq., the Occupational Safety and Health Act, 29 U.S.C. § 651 et seq., the Endangered Species Act and the regulations and orders respectively promulgated thereunder, each as amended, or any equivalent or analogous state, tribal, or local statutes, laws or ordinances, any regulation promulgated thereunder and any amendments thereto.

1.15.  Extended Term.  Either of the two potential five-year periods commencing upon termination of the Agreement Term or upon termination of the first Extended Term, as further described in Article VIII.

1.16.  Facilities Lease.  An easement covering Ute Tribal Lands issued by the BIA with the consent of the Ute Indian Tribe for compressor sites, processing sites, handling sites, and similar uses in the form attached to this Agreement as Exhibit D-2.

1.17.  First Exploration Year.  The period commencing from the Effective Date of the Agreement and terminating at 11:59 (Mountain Time), December 31, 2007.

1.18.  Force Majeure.  An occurrence, situation or event as described in Article VII of this Agreement.

1.19.  Gas.  Natural gas deposits, either combustible or non-combustible, recovered at the surface in the gaseous state, including but not limited to helium gas, methane gas, coalbed methane gas, carbon dioxide gas, and sulfur gas; and hydrocarbons recovered at the surface as liquids which are the result of condensation caused by reduction of pressure and temperature of hydrocarbons originally existing in a reservoir in a gaseous state; excluding (a) gaseous or liquid substances manufactured from coal, unless such substances are produced in conjunction with or as a result of BBC's development of oil or gas pursuant to this Agreement; (b) oil shale and tar sands; and (c) any other hydrocarbons classified as synthetic hydrocarbons.

1.20.  Initial Well.  Each of the first Wells drilled by BBC on any governmental section within the AMI.

1.21.  Obligation Well.  Any well drilled to a total depth below the Upper Black Shale Marker and capable of testing the Wasatch Formation within the AMI.

1.22.  Oil.  Petroleum or liquid hydrocarbons originally existing in a reservoir in a liquid state.

1.23.  Operating Agreement.   The form of joint operating agreement attached hereto as Exhibit F, including COPAS and all other exhibits.

1.24.  Right-of-Way.  An easement covering Ute Tribal Lands issued by the BIA with the consent of the Ute Indian Tribe for roads, well sites, and pipelines, in the form attached to this Agreement as Exhibit D-1.

1.25.  Secretary.   The Secretary of the Interior or his duly authorized representative.

1.26.  Shallow or Shallow Formation.   Those geologic strata lying above the Upper Black Shale Marker.

1.27.  Shallow Well.  Any well drilled to a total depth above the Upper Black Shale Marker within the AMI.

1.28.  Superintendent.  The Superintendent of the Uintah and Ouray Agency of the Bureau of Indian Affairs.

1.29.  Uncompleted Well.  A well for which an AFE has been submitted, but which has not been completed, regardless of whether or not actual drilling operations on such well have been commenced.

1.30.  Upper Black Shale Marker.  The stratigraphic equivalent of the geologic horizon found at a measured depth of 4,010 feet on the Schlumberger Induction-Electrical openhole log dated July 18, 1970 run in the Gulf Oil Company #1 Buck Knoll well located 705 feet from the north line and 818 feet from the east line of the SW/4NE/4NE/4, Section 15, T.5S., R.6W., Duchesne County, Utah.

1.31.  Ute Tribal Lands.  Ute Tribal Minerals and Ute Tribal Surface, collectively.

1.32.  Ute Tribal Minerals.  Those lands described in Exhibit A and depicted in Exhibit A-2 which are jointly managed by the Ute Indian Tribe and UDC as of the Effective Date of this Agreement within the boundaries of the AMI.  Ute Tribal Minerals shall not include minerals owned by, or held by the United States in trust for, individual allottees.  Ute Tribal Minerals shall also not include lands subject to existing oil and gas leases or minerals agreements between the Ute Indian Tribe and UDC and third parties, in effect prior to the date of this Agreement.

1.33.  Ute Tribal Surface.  All lands within the boundaries of the AMI, the surface of which are owned by or held in trust for the Ute Indian Tribe.

II. REPRESENTATIONS OF THE UTE INDIAN TRIBE AND THE UDC

2.1.  Representations of the Ute Indian Tribe.  The Ute Indian Tribe represents and warrants that oil and gas in and under and that may be produced from the Ute Tribal Minerals is owned by the Ute Indian Tribe or held by the United States in trust for the Ute Indian Tribe subject to the provisions of the Ute Partition and Termination Act,

4

APPENDIX PAGE 293

2OG0005608

25 U.S.C. §§ 677-677aa.  The Ute Indian Tribe further represents and warrants that it has the authority to enter into this Agreement pursuant to the Indian Mineral Development Act, any other applicable federal and tribal laws.  This Agreement has been approved by the Venture Fund Board of the Ute Indian Tribe pursuant to Resolution No. 06- _010_ , and by the Business Committee of the Ute Indian Tribe pursuant to Resolution No. 06- _215_ , (copies of which have been provided to BBC) in accordance with the Ute Tribal Constitution and applicable Ordinances.  This Agreement is intended to be approved by the United States Department of the Interior and is intended to satisfy all legal provisons the Department administers, including those under the Indian Mineral Development Act of 1982, 25 U.S.C. §§ 2101-2108, and 25 U.S.C. § 81.

2.2.    Representations of the UDC.  The UDC represents and warrants that it is organized pursuant to the Ute Partition Act, and is authorized to enter into this Agreement.  This Agreement has been approved by the Board of Directors of UDC pursuant to Resolution _7-UDC_ , dated _12/21/06_ (copies of which have been provided to BBC and the Ute Indian Tribe).  UDC, to the extent it has such rights pursuant to the Ute Partition Act, enters into this Agreement to allow BBC to explore for, develop, produce, save, gather, and transport oil and gas from the Ute Tribal Minerals.

2.3.    Joint Management Process.  This Agreement shall be subject to the joint management process set forth at 25 C.F.R. Part 217.  The execution of this Agreement by the Ute Indian Tribe and the UDC shall be deemed the joint management by the Ute Indian Tribe and the UDC of oil and gas rights in the Ute Tribal Minerals retained in trust by the United States pursuant to 25 C.F.R. Part 217 and in accordance with the Ute Partition Act.  Any disputes between the Ute Indian Tribe and UDC concerning the joint administration of the Ute Tribal Minerals shall be subject to the joint management process set forth in 25 C.F.R Part 217.

2.4.    Authorization.  The Ute Indian Tribe represents and warrants that:  (a) it has obtained all requisite approvals and performed all steps necessary, pursuant to its own laws, bylaws, policies and resolutions to enter into this Agreement and perform all obligations required under this Agreement, subject only to approvals required by the federal government; and (b) regardless of the election or appointment, from time to time, of one or more new officials or representatives within the Ute Indian Tribe or Tribal administration, the Ute Indian Tribe has and will continue to exercise full authority to perform its obligations under this Agreement, and this Agreement will remain in full force and effect.

2.5.    Pending Claims.  The Ute Indian Tribe represents and warrants that to its current knowledge, there are no claims, proceedings or investigations pending or threatened against the Ute Indian Tribe or the Bureau of Indian Affairs that could have a material adverse impact on any Party's rights or obligations under this Agreement.

APPENDIX PAGE 294

**3.2.** **Grant by and Obligations of the Ute Indian Tribe.**

**A.** **Grant of Access to Ute Tribal Minerals and of the Right to Explore for, Develop and Produce Oil and Gas.** In addition to the grant of access for environmental due diligence pursuant to Section 12.1, the Ute Indian Tribe grants to BBC during the Agreement Term or any applicable Extended Term of this Agreement the exclusive right to go upon Ute Tribal Surface to conduct operations for the drilling of one or more wells on Ute Tribal Minerals, drilled pursuant to Article IV of this Agreement, and to operate any such wells so drilled for the production of oil and gas. The Ute Indian Tribe shall use its commercially reasonable efforts to extend to BBC the benefits of any surface access rights it may have with third parties, or arrange for use of Tribally-owned facilities, within the AMI where such uses are reasonably necessary for the conduct of exploration and development activities under this Agreement. Upon drilling a well such that an Agreement Lease is required to be issued to BBC, but prior to issuance of the Agreement Lease and approval thereof by the Secretary, the right of BBC granted herein to operate such well for the production of oil and gas shall be governed by the provisions of the Agreement Lease attached hereto as Exhibit B. Upon receipt by the Agency of an application from BBC for a Right-of-Way on the form attached hereto as Exhibit C covering the Ute Tribal Surface to be used by BBC for drilling any well pursuant to this Agreement, the Ute Indian Tribe hereby gives its consent for, and shall cause the issuance of, a Right-of-Way to BBC in the form attached to this Agreement as Exhibit D-1, which shall include provision for the Throughput Fee described in Section 3.3 of this Agreement. Nothing in this Agreement shall be interpreted to affect BBC's continuing rights under the terms of any Agreement Lease, Right-of-Way, Operating Agreement, or any other permit or agreement which is in effect at the end of the Agreement Term or applicable Extended Term.

**B.** **Issuance of Drilling Permits.** During the ninety (90) day period commencing on the date of BBC's notice to the Ute Indian Tribe of BBC's application to the BLM pursuant to Section 3.1.E., the Ute Indian Tribe and UDC shall use their reasonable efforts to have the Vernal Office of the Bureau of Land Management issue to BBC a permit allowing BBC to enter upon the Ute Tribal Lands for the purpose of drilling the well for which the application is made. Failure of the Bureau of Land Management ("BLM") to issue the permit within the ninety (90) day period shall be an instance of *Force Majeure* relating to that particular well or drilling activity to which the provisions of Article VIII shall apply. Such failure of the BLM to issue a permit shall not, however, excuse performance of drilling obligations that may be accomplished through use of other available permits.

**C.** **Approval of Leases.** After issuance of each Agreement Lease pursuant to Article IV, the Ute Indian Tribe and UDC shall submit to and use reasonable efforts to obtain the approval of any such Lease by the Superintendent. The effective date of the Agreement Lease shall be the date of approval by the Superintendent.

**3.3.** **Throughput Fee.**

A.    <u>Fee</u>.    BBC shall pay a fee (the "Throughput Fee") to the Ute Indian Tribe monthly in the amount of five cents ($.05) per thousand cubic feet ("Mcf") of Gas, or thirty cents ($.30) per barrel of Oil, produced and sold by BBC in the prior month from wells within the AMI, with such volumes measured at the wellhead. For purposes of calculating the Throughput Fee, natural gas liquids will convert to a gas equivalent at a 1:6 ratio. As set forth in the Agreement Lease, the Throughput Fee shall not be deemed an allowance to be deducted prior to calculation of Royalty. Each working interest owner in a well shall be responsible for and shall pay directly to the Ute Indian Tribe its proportionate share of the Throughput Fee based on its working interest share in the well. Subject to Sections 3.4 and 3.5, below, in consideration for BBC's obligation to pay the Throughput Fee and for BBC's other obligations herein, the Ute Indian Tribe shall grant to BBC, without any further costs or fees those rights over the Ute Tribal Surface that are related, incidental, and reasonably necessary for the normal and customary surface operations on Ute Tribal Minerals, including construction, drilling location, and production facilities. The Tribe's grant of surface access to be provided under this Agreement shall include access for the conduct of seismic operations, provided that BBC shall provide to the Tribe copies of all processed data resulting from any such seismic operations. In addition, upon written request from UDC, BBC shall make available for review by the Board of Directors of the UDC or its designated agent all processed seismic data, which UDC shall maintain as confidential as provided in Section 12.1 below. Such surface rights may not be separately or individually assigned or subcontracted by BBC, except to its affiliated companies. Such surface rights shall be in accordance with the provisions of Section 3.3.B, below in addition to other applicable provisions of this Agreement.

B.    <u>Pipeline Rights-of-Way and Surface Use</u>. Upon application in accordance with Exhibit C, BBC shall be entitled to obtain upon request, and the Ute Indian Tribe, or the Agency shall issue, a Right-of-Way for the use of Ute Tribal Surface, on the form attached hereto as Exhibit D, or in the case of a compressor site, yard, central battery or similar facility, a Facilities lease on a form attached as Exhibit D-2. Such Rights-of-Way shall be provided whenever BBC desires to use any portion of the surface of such lands in conjunction with gathering oil or gas produced from the AMI, including without limitation, flow lines, gathering lines, pipelines, and related compressors and other similar equipment and facilities used solely in connection with its operations under this Agreement. BBC agrees to construct and use any such access rights and Rights-of-Way so granted subject to and in accordance with the conditions set forth by the Right-of-Way Agreement and applicable Federal and Tribal law. This Agreement does not provide the right to BBC to gather or transport oil or gas across the Ute Tribal Surface where (i) such oil or gas is produced from lands other than the AMI, or (ii) such oil or gas is produced by or owned by third parties from wells other than those drilled under this Agreement.

3.4.    <u>Road Rights-of-Way and Surface Use</u>. Notwithstanding Section 3.3 above, BBC shall be entitled to obtain upon request, and the Ute Indian Tribe or the Agency shall issue, a Right-of-Way on the form attached hereto as Exhibit D-1 from the Ute Indian Tribe or the Agency for well sites, well facilities, compressors and access roads exclusively dedicated to well sites, well facilities, compressors or tank batteries,

10

preference requirements of the Ute Indian Tribe. For purposes of this Agreement, "proprietary" interests means those rights and obligations of the Tribe under this Agreement that are not derived from the Tribe's status as a sovereign authority. Proprietary interests shall be deemed to exclude the Tribe's rights to bonus and option payments, Throughput Fees, royalties, severance taxes, and any other applicable governmental fees and taxes. Proprietary interests shall also exclude the Tribe's obligations respecting the review and issuance of Tribal permits and licenses, Agreement Leases, and rights-of-way.

## XVI. TRUST STATUS OF THE CONTRACT PREMISES

Nothing contained in this Agreement shall operate to delay or prevent a termination of federal trust responsibilities over Ute Tribal Lands during the term of this Agreement. However, termination of federal trust responsibility shall not serve to abrogate this Agreement, or any Agreement Leases issued pursuant to this Agreement. The Ute Indian Tribe shall notify BBC of any such change in the status of the lands. The Ute Indian Tribe shall notify the UDC in the event that the Ute Indian Tribe acts to change the trust status of the Ute Tribal Minerals while this Agreement remains in effect.

## XVII. INDEMNIFICATION BY BBC

BBC, for itself and its successors, subrogees, assigns, representatives and related or affiliated entities, covenants and agrees to indemnify and hold harmless the Ute Indian Tribe, the UDC and the United States for and from any and all liabilities, rights, claims, demands, damages, costs, expenses, actions, causes of action, suits or controversies of every kind and description whatsoever at law or equity asserted by persons not parties to this Agreement, arising as a result of BBC's actions or omissions under this Agreement. The foregoing indemnity shall not apply to those claims arising from the conduct of joint operations under a Joint Operating Agreement (JOA) or otherwise in which the Ute Indian Tribe has elected to participate as a working interest owner for which it is jointly liable under the provisions of such JOA or otherwise.

## XVIII. NOTICES

All notices, requests, demands, directions and other communications ("Notices") concerning this Agreement shall be in writing and shall be mailed, delivered personally, or sent by facsimile to the applicable Party at the address of such Party set forth below in this Article XVIII. When mailed, each such Notice shall be sent by first class, certified mail, return receipt requested, enclosed in a postage prepaid wrapper, and shall be effective on the fifth business day after it has been deposited in the mail. When delivered personally, each such Notice shall be effective when delivered to the address for the respective party set forth in this Article XVIII, provided that it is delivered on a business day and further provided that it is delivered prior to 3:00 p.m., local time of the party to whom the Notice is being delivered, on that business day; otherwise, each such Notice shall be effective on the first business day occurring after the Notice is delivered. When sent by facsimile, each such Notice shall be effective on the day on which it is

## APPENDIX PAGE 297

2OG0005608

WHEREFORE, the Ute Indian Tribe, UDC and BBC do hereby make and enter into this Agreement on the date set forth above, to be effective as of the Effective Date, on the date set forth by its signature below.

ATTEST:                          UTE INDIAN TRIBE

_____        By: _____
Name: _____         Name: T. SMILEY ARCOWCHIS
Date: _____         Title: UICB CHAIRMAN
                          Date: 12-22-06


ATTEST:                          BILL BARRETT CORPORATION

_____        By: _____
Name: _____         Name: KURT REINECKE
Date: 12/22/06            Title: Senior VP Exploration
                          Date: 12/22/06


ATTEST:                          UTE DISTRIBUTION CORPORATION

_____        By: Lynn McClure
Name: _____         Name: LYNN MCCLURE
Date: _____         Title: PRESIDENT
                          Date: 12-22-06

26

**APPENDIX PAGE 298**

**EXPLORATION AND DEVELOPMENT AGREEMENT**
**Among**
**THE UTE INDIAN TRIBE,**
**BILL BARRETT CORPORATION,**
**and**
**THE UTE DISTRIBUTION CORPORATION.**

A P P R O V A L

It has been determined that approval of this document is not such a major federal action significantly affecting the quality of the human environment as to require the preparation of an environmental impact statement under Section 10-3(2)(c) of the National Environmental Policy Act of 1969 (42 U.S.C. §4332(s)(c); Environmental Assessment of Oil and Gas Development, Duchesne River Area; Environmental Assessment No. 3, Bureau of Land Management, Vernal District, Vernal, Utah prepared April, 1982.

DATED AND APPROVED this _23rd_ day of _February_, 200_7_, by the United States of America, acting through the Bureau of Indian Affairs, and delegated to the Superintendent by Phoenix Area Redelegation Order No. 3, Amendment 6, Section 2.17 (34 Fed. Reg. 11109), _and_ pursuant to authority delegated to the Assistant Secretary - Indian Affairs by 209 DM 8, 230 DM 1, and to the Western Regional Director by 3 IAM 4 (Release No. 99-03), and to the Superintendent/Field Representative by 10 BIAM 11, as amended by Western Regional Release No. 97-1, and any further delegations needed to effectuate the reorganization embodied in DM Releases dated April 21, 2003.

acting)

Superintendent
Bureau of Indian Affairs
Uintah and Ouray Agency
Fort Duchesne, Utah 84026

ACKNOWLEDGEMENT OF SUPERINTENDENT

STATE OF UTAH          )
                       ) ss.
COUNTY OF UINTAH       )

BEFORE ME, a Notary Public, in and for said county and State, on this _23rd_ day of _February_, 2007, personally appeared _Lynn NHansel_ whose name is subscribed to the foregoing Exploration and Development Agreement as Superintendent, Uintah and Ouray Agency, Bureau of Indian Affairs, and who acknowledged that he now is and was at the time of signing the same Superintendent of the Uintah and Ouray Agency, Bureau of Indian Affairs, and he personally acknowledged to me that he executed this said document in his official capacity and pursuant to authority delegated to him for the use and purpose set forth therein.

Notary Public
SARAH A. JACK
988 S 7500 E., P.O. Box 130
Fort Duchesne, UT 84026
My Commission Expires
June 16, 2010
State of Utah

_Sarah a Jack_
NOTARY PUBLIC

My Commission expires: _State of Utah 2010_

29



**UTE INDIAN TRIBE**
P.O. Box 190
Fort Duchesne, Utah 84026
Phone: (435) 722-5141· Fax: (435) 722-2374

State Institutional Trust Lands Administration
675 East 500 South, Suite 500
Salt Lake City, Utah 84102
Att'n: John Andrews

**Re: Extension of Letter of Intent -- Hill Creek Extension Agreement**

The Ute Indian Tribe of the Uintah and Ouray Indian Reservation ("Ute Tribe") and the State of Utah, School & Institutional Trust Lands Administration ("SITLA") (collectively, the "Parties") entered into a Letter of Intent concerning the Hill Creek Extension Agreement dated February 13, 2006 (the "Letter of Intent"). The Letter of Intent had an initial term running through December 31, 2006. The Letter of Intent was renewed February 2, 2007 to December 31, 2007, again December 31, 2007 to December 31, 2008, and most recently until December 31, 2010.

The Ute Tribe wishes to extend the term of the Letter of Intent through December 31, 2011, and understands that SITLA agrees. Please confirm the agreement of SITLA to extend the term of the Letter of Intent through December 31, 2011 by countersigning this letter agreement as indicated below. The Ute Tribe and SITLA intend that all provisions of the Letter Agreement shall remain in full force and effect through that date.

Thank you for your continued attention to this matter.

Sincerely,

Richard Jenks Jr.,
Chairman, Ute Indian Tribal Business Committee

AGREED:

State Institutional Trust Lands Administration

_____

By:

Its:

Date:

**APPENDIX PAGE 300**



**UTE INDIAN TRIB**
P.O. Box 190
Fort Duchesne, Utah 84026
Phone: (435) 722-5141 • Fax: (435)

## Letter of Intent

<mark>Hill Creek Extension Agreement</mark>

The Ute Indian Tribe of the Uintah and Ouray Indian Reservation ("Ute Tribe") and the State of Utah, School & Institutional Trust Lands Administration ("SITLA") (collectively, the "Parties") have had preliminary discussions concerning SITLA's relinquishment of certain lands to the United States for the benefit of the Ute Tribe, and selection by SITLA of lands in lieu thereof from the Bureau of Land Management ("BLM") in the State of Utah, all within the exterior boundaries of the Hill Creek Extension of the Uintah and Ouray Reservation ("HCE").

Based on those discussions, the Parties are entering into this non-binding Letter of Intent to document the relationship between SITLA and the Ute Tribe with respect to the terms for such relinquishment and selection. This Letter of Intent simply sets forth the terms and provisions that will form the basis of further good faith negotiations between the Parties. This Letter of Intent is not binding on any Party, and cannot be enforced in any legal forum, provided, however, that the Parties shall be bound by the confidentiality obligations set forth in Section 4 of this Letter of Intent.

Based on discussions between the Ute Tribe and SITLA to date, the Ute Tribe and SITLA will pursue the relinquishment of SITLA lands within the HCE and their replacement from BLM lands within the HCE. Such efforts will be pursued in the following manner:

1. <u>Definitions</u>

"Area of Mutual Interest" or "AMI" means those lands covered by a Prospect Area along with certain surrounding BLM lands, as will be more specifically identified by the Parties subsequent to this Letter of Intent.

<mark>"Lease" means an oil and gas lease from SITLA to the Ute Tribe on the lease form currently being used by SITLA at the time of lease issuance, provided that such leases reflect the terms of, and shall be controlled by, the Definitive Agreement for mineral development contemplated by this Letter of Intent.</mark>

<mark>"Prospect Areas" means those areas to be identified by the Parties subsequent to this Letter of Intent for selection as In-Lieu Lands within the HCE, based on geological considerations relating to oil and gas potential.</mark>

APPENDIX PAGE 301

**2.**    <u>Relinquishment and Selection In Lieu</u>

SITLA and the Ute Tribe will pursue the relinquishment of State of Utah trust lands managed by SITLA to the United States for the benefit of the Ute Tribe, and the replacement of those lands from BLM lands within the exterior boundary of the HCE. The State of Utah owns lands within the exterior boundary of the HCE as set forth on Exhibit A (the "Trust Lands"). SITLA and the Ute Tribe will cooperate and jointly pursue BLM's approval of selections that would allow SITLA to replace certain relinquished mineral lands within the HCE with BLM lands within the HCE that are similar in mineral character (the "In Lieu Lands").

The Ute Tribe and SITLA agree that the In Lieu Lands shall be made available to the Ute Tribe for mineral development, pursuant to Leases between SITLA and the Ute Tribe and a definitive agreement for mineral development of those lands ("Definitive Agreement") under terms and conditions as set out in this Letter of Intent.

The Ute Tribe shall appoint a representative to work with SITLA on pursuing the aforementioned agreements who shall have authority to negotiate on behalf of the Ute Tribe and direct the activity necessary to carry out the intent of this Letter of Intent, subject to final approval by SITLA or the Tribe, as the case may be.

**3.**    <mark>Mineral Development</mark>

<mark>Upon execution of this letter by both Parties, the Parties will promptly begin to negotiate, in good faith, the terms of a Definitive Agreement for the mineral development of the In Lieu Lands.</mark>

The Definitive Agreement shall include a requirement that the In Lieu Lands be leased to the Ute Tribe and will incorporate the following terms and conditions, among others:

(a)    SITLA and the Ute Tribe will define one or more Areas of Mutual Interest ("AMI") within which the terms contained in this Letter of Intent shall apply as incorporated into the Definitive Agreement. Neither Party will have the right to any interest of whatsoever nature by virtue of this Letter of Intent in any agreements, leases or other business arrangements entered into by either Party outside the AMI, nor in any existing leases within the AMI.

(b)    <mark>Every section of the In Lieu Lands within the AMI shall be leased by the SITLA to the Ute Tribe.</mark> Each Lease will cover one section of land, being 640 acres, or the sum of the aliquot parts therein, unless more acreage per Lease is deemed by both parties to be in the best interest of the project. Leases will be for a primary term of ten (10) years.

(c)    Within the AMI, the Ute Tribe shall pay no cash lease bonus for the lease of the In Lieu Lands, but shall provide (i) access to ___TBD___ miles of 2D seismic data and ___TBD___ miles of 3D seismic data over or across the In

-2-

Lieu Lands as shown on the shotpoint map attached hereto as Exhibit "B", and (ii) a 1/32 (3.125 percent) overriding royalty interest to SITLA on any other lands leased during the term of the Definitive Agreement by the Ute Tribe from the BLM within the AMI. The overriding royalty interest due SITLA shall be proportionately reduced if the Ute Tribe and its affiliates or bidding partners acquires less than 100% of the working interest in a BLM lease. The area in which this overriding royalty interest shall apply shall be more particularly described in detail in the Definitive Agreement between SITLA and the Ute Tribe. The Ute Tribe will use its commercially reasonable efforts to enter into contractual, cooperative, bidding arrangements designed to enhance the opportunity for the Ute Tribe to participate in mineral leases in this area.

(d)     The Ute Tribe shall reserve the right to assign all or a portion of the Leases on the In Lieu Lands to third parties, including its affiliated oil and gas company, Ute Energy LLC. In such assignments, the Ute Tribe or its affiliates may participate as a lessee or otherwise take a commercial interest in the Lease or agreement.

(e)     Subject to Section (f) below, the total royalty on each Lease upon issuance shall be 18.75 percent, shared by SITLA and the Ute Tribe as follows:

   (i)     SITLA will issue Leases to the Ute Tribe on the In Lieu Lands at a royalty rate of 12.5 percent (.125). The Tribe will burden the SITLA Leases with an additional 6.25 percent (.0625) overriding royalty for a total of 18.75 percent royalty.

   (ii)    Subject to Section (f), on the second anniversary of each Lease, if no well has been commenced on such Lease, SITLA's royalty on lands covered by the undrilled Lease shall increase by 1.5625 percent to a total of 14.0625 percent. The Tribe's overriding royalty shall be decreased to 4.6875 percent.

   (iii)   Subject to Section (f), on the fifth anniversary of each Lease, if no well has been commenced on such Lease, SITLA's royalty on lands covered by the undrilled Lease shall increase by 1.5625 percent to a total of 15.625 percent. The Ute Tribe's overriding royalty shall decrease to 3.125 percent.

   (iv)    There shall be no further adjustment to the sharing of royalty between the State and the Ute Tribe beyond what is set out in 2(e)(i) through 2(e)(iii) above.

(f)     Notwithstanding the adjustment to royalty set forth in Section (e) above, if at any time the Ute Tribe or its sublessees or assigns drill or cause a well to be drilled on a leased section (including a commitment well pursuant to section (g) below), the section, being 640 acres or the sum of its aliquot

-3-

**APPENDIX PAGE 303**

parts, surrounding that well shall bear the royalty sharing arrangement in effect at the time the well was spudded. This fixed royalty sharing shall apply for so long as hydrocarbons are capable of being produced from the section. If, for example, a lessee spuds a well during the first two years of the Lease term, then the allocation of royalty between the Ute Tribe and the State shall be as set forth in Section 3(e)(i).

(g)  The Definitive Agreement shall include a commitment by the Ute Tribe to drill (or cause to be drilled) at least one exploration well in each of the separate Prospect Areas during the first two years of the SITLA Leases' primary terms. SITLA and the Ute Tribe expect there to be at least three prospect areas identified within the area of the In Lieu Lands, and SITLA and the Ute Tribe will design the Leases to assure that one exploration well will be drilled in each prospect.

(h)  The Tribe will negotiate additional development terms with exploration and development partners. The Tribe expects each mineral development agreement to include additional exploration and development commitments, including a commitment to drill at least one well per Prospect Area per year ("Annual Commitment") after the initial exploration well commitment is fulfilled. Beginning with the sixth year of the primary terms of the SITLA Leases, failure to meet the Annual Commitment shall result in the loss of one undrilled leased section per Prospect Area for each unmet Annual Commitment in such Prospect Area. The Annual Commitment may be met in advance by drilling additional wells in a Prospect Area beyond that year's Annual Commitment. Failure to meet the Annual Commitment in a year, however, cannot be cured through the drilling of additional wells in subsequent years.

(i)  The Ute Tribe shall continue to work with BLM to create a master plan for mineral development in the HCE.

(j)  Subject to the provisions of Section 4 below, the Ute Tribe shall make available to SITLA geologic data relating to SITLA Trust Lands currently in its ownership and the proposed In Lieu Lands. This data will be available for viewing by SITLA or its designee at the offices of the geologic consultant for the Ute Tribe. SITLA's designee must be approved by the Ute Tribe prior to viewing any geologic data.

(k)  At the end of the ten-year primary term of the SITLA Leases, if any Lease has not been drilled and does not have a well producing commercial quantities of hydrocarbon or capable of producing commercial quantities of hydrocarbons on it, the Lease will expire by its own terms and be of no further force or effect. The lands covered by the expired Lease will no longer be subject to this agreement. SITLA will be then free to offer the lands for lease to other third parties not subject to this agreement.

-4-

**APPENDIX PAGE 304**

     (I)    For purposes of this Section 3, the bottom-hole location of a well (as opposed to the location of well spud) shall define the section in which that well is located.

4.    <u>Confidentiality</u>

To assist SITLA in the evaluation of the transactions contemplated by this Letter of Intent, the Ute Tribe shall disclose to SITLA certain confidential information, including but not limited to geologic data concerning the potential In Lieu Lands (the "Confidential Information"). All right, title and interest in and to the Confidential Information shall remain the exclusive property of the Ute Tribe and shall not become the property of SITLA by reason of its disclosure hereunder.

The Confidential Information that SITLA obtains from the Ute Tribe shall be used for the sole purpose of evaluating transactions contemplated in this Letter of Intent, and shall be treated by SITLA in confidence, and SITLA shall not to disclose any of the Confidential Information to any third party without the prior written consent of the Ute Tribe; <u>provided, however</u>, that such prior written consent and such limitations on use and disclosure shall not be required with respect to disclosures of Confidential Information:

    (a)    to any trustee, employee, affiliate, subsidiary, attorney, accountant, consultant, contractor or subcontractor of SITLA who or which has a bona fide need to be informed in order to assist SITLA in evaluating the potential transactions contemplated in this Letter of Intent; <u>provided, however</u>, that SITLA shall notify any such recipient of the existence of this Agreement and the confidential nature of the Confidential Information, and <u>provided, further</u>, that any breach of the obligation of confidentiality in this Agreement by such persons or entities shall be a breach by SITLA disclosing the Confidential Information, which shall be responsible for the maintenance of confidentiality by such persons or entities;

    (b)    which at the time of disclosure, SITLA can demonstrate is already readily available to SITLA or the public or thereafter becomes readily available to SITLA or the public through no fault of SITLA or any person obtaining such Confidential Information from SITLA.

    (c)    which at the time of disclosure is already in SITLA's possession; or

    (d)    which is required to be disclosed by applicable law or stock exchange rules or in connection with any judicial, administrative or governmental proceeding; <u>provided, however</u>, that in such event, SITLA shall immediately notify the Ute Tribe prior to such disclosure in order to allow the Ute Tribe the opportunity to seek a protective order or other appropriate remedy. In the absence of any such protective order or other

APPENDIX PAGE 305

remedy, SITLA shall disclose only that portion of the Confidential Information required to be disclosed and shall make all reasonable efforts to preserve the confidentiality thereof.

SITLA shall return to the Ute Tribe all Confidential Information furnished by the Ute Tribe hereunder, and destroy any copies thereof, promptly upon receipt of written demand by the Ute Tribe at any time.

SITLA hereby acknowledges that the Ute Tribe makes no representation or warranty as to the accuracy or completeness of the Confidential Information provided hereunder, and the Ute Tribe shall have no liability resulting from any use by SITLA of any such Confidential Information; but the Ute Tribe does represent and warrant to SITLA that it has the right and authority to disclose all of the Confidential Information to SITLA.

SITLA acknowledges that the Ute Tribe could be irreparably damaged if any of the provisions of this Section were not performed by SITLA. Accordingly, the Ute Tribe shall be entitled to seek an injunction or injunctions to prevent breaches of this Section and may seek to specifically enforce the provisions hereof. The right to seek those specific remedies is in addition to any other remedy to which the Ute Tribe may be entitled by law or in equity.

5.    Access to SITLA's Bookcliffs Block.

SITLA has a large block of land lying east of the HCE in Townships 17-19 South, Ranges 20-21 East, SLM. The only access to the block is across an existing road across Ute Tribal surface in Section 16, Township 19 South, Range 20 East, SLM. The Ute Tribe agrees to work on a road access agreement with SITLA to allow SITLA or its lessees or assigns to use the road to access the SITLA lands outside the HCE.

6.    Termination of this Letter of Intent.

The Parties intend to use their commercially reasonable efforts to execute a Definitive Agreement as soon as practicable. If the relinquishment and selection of In Lieu Lands is not consummated before the BLM accepts bids for lands that would be In Lieu Lands, then this Letter of Intent shall terminate; provided, however, that this Letter of Intent shall remain effective until December 31, 2006 for any potential In-Lieu Lands not subject to lease by BLM. If a Definitive Agreement is not signed by that date, this Letter of Intent will terminate and will be of no further force or effect (except for the confidentiality provisions of Section 4). Either Party may abandon negotiations by written notice sent to the other Party by certified mail, without liability to any other Party in any respect whatsoever at any time (except liability arising under the confidentiality provisions of Section 4).

APPENDIX PAGE 306

7.   Public Announcements

No public announcement relating to this transaction shall be made by SITLA or the Ute Tribe or any affiliate thereof without the prior written consent of all Parties.

8.   Counterparts

This Letter of Intent may be executed in counterparts, each of which shall be deemed an original but all of which together shall constitute one and the same document.

9.   Entire Agreement

This Letter of Intent supersedes all prior letters of intent, discussions, representations, arrangements and understandings between the Parties relating to the subject matter hereof. No alteration, modification, interpretation or amendment hereto shall be valid unless signed by each of the Parties.

10.   Governing Law

This letter of intent will be governed by the laws of the State of Utah without giving effect to principles of conflicts of laws.

11.   Waiver of Sovereign Immunity

Each of the State of Utah and the Ute Tribe hereby waive any defense of sovereign immunity to the extent necessary to allow the enforcement of this Agreement.

[THIS SPACE LEFT INTENTIONALY BLANK]

-7-

12.    Final Approval

The Definitive Agreement contemplated in this Letter of Intent is subject to the final approval of SITLA's Board of Trustees and the Business Committee of the Ute Tribe, such approval to be in the sole discretion of each entity.

Made this 13th day of February, 2006.

UTE INDIAN TRIBE OF THE UINTAH AND OURAY RESERVATION

Name

Chairman
Title

2-10-06
Date


STATE OF UTAH
SCHOOL AND INSTITUTIONAL
TRUST LANDS ADMINISTRATION

Name

Kevin S. Carter, Director
Title

February 13, 2006
Date

Approved as to Form
Mark L. Shurtleff
ATTORNEY GENERAL

By:

-8-

APPENDIX PAGE 308

Resolution No. 0 6 . 2 1 6

**WHEREAS,** the Tribal Business Committee ("Business Committee") of the Ute Indian Tribe of the Uintah and Ouray Reservation ("Tribe") is empowered by Article VI, Sections 1 (c) and 1 (f) of the Constitution and By-Laws of the Tribe to regulate the economic affairs of the Tribe;

**WHEREAS,** through Ute Tribal Ordinance 01-007, the Business Committee enacted a long-term Financial Plan for the Tribe, which Ordinance was then ratified and approved by referendum vote of the Tribal membership on December 20, 2001;

**WHEREAS,** as a constituent component of the Tribe's Financial Plan, the Tribe has taken a more active role in the development and management of Tribal natural resources;

**WHEREAS,** the Tribe, through its Financial Advisor, The Jurrius Ogle Group, has negotiated with Dominion Exploration & Production, Inc. ("Dominion") for the creation of a new exploration and development opportunity on one-hundred sixty acres of Reservation lands within the area known as Little Canyon;

**WHEREAS,** the Tribe, through its Financial Advisor and legal counsel, has worked with Dominion to prepare the Exploration and Development Agreement ("Little Canyon EDA" or "EDA") attached hereto as Exhibit A, which captures the terms and conditions under which Dominion would conduct operations on the Little Canyon lands;

**WHEREAS,** the Little Canyon EDA is for a term of two years, and requires that Dominion drill two initial wells on the EDA lands within one-hundred twenty days of the effective date of the agreement;

**WHEREAS,** in addition to compensation from royalties, rentals, and bonus payments, Dominion will pay the Tribe a throughput fee as consideration for surface access to the EDA lands;

**WHEREAS,** the EDA also provides the Tribe the right under certain conditions to participate as a working interest owner in wells drilled by Dominion on the contract premises, and requires that Dominion carry the Tribe's costs to casing point with respect to a twenty percent Tribal working interest in the two initial wells ;

**WHEREAS,** the Tribe's Venture Fund Board, in its Resolution 06-011, recommended approval of the Little Canyon EDA in substantially the same form as that attached to this Resolution;

**WHEREAS,** the Business Committee has reviewed the Little Canyon EDA and finds it in the best interests of the Tribe to approve the same;

1

**APPENDIX PAGE 309**

06.216

NOW, THEREFORE, BE IT RESOLVED BY THE UINTAH AND OURAY TRIBAL BUSINESS COMMITTEE OF THE UTE INDIAN TRIBE that it hereby approves and authorizes execution of the Little Canyon EDA in substantially the same form as that attached to this Resolution as Exhibit A;

BE IT FINALLY RESOLVED that the Chairman or, in her absence, the Vice-Chairman, is authorized to execute any and all documents as may be necessary and appropriate to carry out the terms, conditions and intent of this Resolution.

_____        _____
Maxine Natchees, Chairman                 T. Smiley Arrowchis, Vice-Chairman

_____        _____
Absent                                    Ronald Groves, Member
Irene C. Cuch, Member

_____        _____
Absent                                    Frances Poowegup, Member
Richard Jenks, Jr., Member

## CERTIFICATION

I HEREBY CERTIFY THAT THE FOREGOING Resolution was adopted by the Tribal Business Committee of the Ute Indian Tribe of the Uintah and Ouray Reservation pursuant to the Constitution and By-Laws of the Ute Indian Tribe of the Uintah and Ouray Reservation at a duly called meeting in _Ft. Duchesne_, Utah on the 25th_ day of _October_, 2006, at which time a quorum was present and voted _4_ for and _0_ against, _0_ abstaining and 2 absent.

_____
Dana West, Secretary, Tribal Business Committee
Ute Indian Tribe, Uintah & Ouray Reservation

2

**APPENDIX PAGE 310**

# EXPLORATION AND DEVELOPMENT AGREEMENT

This Agreement is made and entered into this ___ day of October, 2006, in triplicate under authority of the Indian Mineral Development Act of 1982 (25 U.S.C. §§ 2101-2108), and other applicable acts, among the Ute Indian Tribe of the Uintah and Ouray Reservation, Utah ("Ute Indian Tribe"), pursuant to the Constitution and Bylaws of the Ute Indian Tribe, Dominion Exploration & Production, Inc., a Delaware corporation ("DEPI"), and the Ute Distribution Corporation, a Utah corporation ("UDC"), organized with authority under the Ute Partition and Termination Act at 25 U.S.C. §§ 677-677aa (the "Ute Partition Act"). The Ute Indian Tribe, DEPI and UDC are sometimes referred to individually as "Party" and collectively as "Parties."

WHEREAS, the Ute Indian Tribe, UDC, and DEPI have reached an agreement for the exploration and development of oil and gas, as defined below, in and under and that may be produced from lands located in Uintah County, Utah, such lands being particularly described in Exhibit A attached and made a part of this Agreement.

NOW, THEREFORE, in consideration of the mutual obligations and covenants contained herein, and of other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Ute Indian Tribe, UDC, and DEPI hereby agree as follows:

## I. DEFINITIONS

For purposes of this Agreement, the terms and phrases set forth below are defined as follows:

1.1.    Agency. The Uintah and Ouray Agency of the Bureau of Indian Affairs and any successor office thereof of the Bureau of Indian Affairs.

1.2.    Agreement Lease. An oil and gas lease from the Ute Indian Tribe and UDC to DEPI covering all Ute Tribal Minerals, issued for a primary term of two (2) years. The lease shall contain only the lands described in Exhibit A and shall be issued on the form attached hereto as Exhibit B.

1.3.    Agreement Term. This Agreement shall expire two (2) years from the Effective Date, provided that any Agreement Leases, rights-of-way, or permits shall remain in effect according to their terms.

1.4.    Casing Point. The depth at which drilling a section of a particular diameter hole of an Initial Well ceases and casing is run and cemented.

1.5.    Completion, Complete, or Completing. Perforating, fracture stimulating (if conducted), and equipping a well through the tanks, in the case of an Oil well, or capable of flowing from the well into a gathering line, in the case of a Gas well (installation of a gathering line is not required for a well to be "completed").

1

**APPENDIX PAGE 311**

1.6.    Development Well.    Any well drilled subsequent to the Initial Wells on any quarter-quarter section of the lands described in Exhibit A.

1.7.    Effective Date.    The Effective Date of this Agreement shall be the first day of the month immediately following the date of approval by the Secretary.  In the event the Secretary does not approve this Agreement within six (6) months of the date of this Agreement, any Party shall have the right to terminate this Agreement by providing written notice to the other Parties, in which case all Parties' rights and obligations shall thereupon terminate.

1.8.    Election to Participate.    The exercise by the Ute Indian Tribe of its right to participate as a cost-bearing working interest owner in a well drilled by DEPI and the related Agreement Lease, as further described in Article V, below.

1.9.    Environmental Defect.    A condition in, on or under the portion of the surface of the Ute Tribal Minerals (including, without limitation, air, land, soil, surface and subsurface strata, surface water and ground water) that causes such surface to be in violation of an Environmental Law or that is the basis for a claim by a third party that such condition has caused and/or will cause damage to such third party, based on common law or any statute.

1.10.    Environmental Law.    Any federal, tribal, state, or local law (including common law), statute, rule, regulation, requirement, ordinance and any writ, decree, bond, authorization, approval, license, permit, registration, binding criteria, standard, consent decree, settlement agreement, judgment, order, directive or binding policy issued by or entered into with a governmental authority pertaining or relating to:  (a) pollution or pollution control; (b) protection of human health from exposure to pollutants or protection of the environment; (c) employee safety in the workplace; or (d) the management, presence, use, generation, processing, extraction, treatment, recycling, refining, reclamation, labeling, transport, storage, collection, distribution, disposal or release or threat of release of pollutants.  "Environmental Laws" shall include, without limitation, the Comprehensive Environmental Response, Compensation and Liability Act, 42 U.S.C. § 9601 et seq., the Solid Waste Disposal Act (as amended by the Resource Conservation and Recovery Act), 42 U.S.C. § 6901 et seq., the Hazardous Materials Transportation Act, 49 U.S.C. § 1801 et seq., the Toxic Substances Control Act, 15 U.S.C. § 2601 et seq., the Federal Water Pollution Control Act, 33 U.S.C. § 1251 et seq., the Federal Safe Drinking Water Act, 42 U.S.C. §§ 300f-300, the Federal Air Pollution Control Act, 42 U.S.C. § 7401 et seq., the Oil Pollution Act, 33 U.S.C. § 2701 et seq., the Occupational Safety and Health Act, 29 U.S.C. § 651 et seq., the Endangered Species Act and the regulations and orders respectively promulgated thereunder, each as amended, or any equivalent or analogous state, tribal, or local statutes, laws or ordinances, any regulation promulgated thereunder and any amendments thereto.

1.11.    Force Majeure.    An occurrence, situation or event as described in Article VI of this Agreement.

1.12.    Gas.    Natural gas deposits, either combustible or non-combustible, recovered at the surface in the gaseous state, including but not limited to helium gas, methane gas, coalbed methane gas, carbon dioxide gas, and sulfur gas; and hydrocarbons recovered at the surface as liquids which are the result of condensation caused by reduction of pressure and temperature of

2

hydrocarbons originally existing in a reservoir in a gaseous state; excluding (a) gaseous or liquid substances manufactured from coal, unless such substances are produced in conjunction with or as a result of DEPI's development of oil or gas pursuant to this Agreement; (b) oil shale and tar sands; and (c) any other hydrocarbons classified as synthetic hydrocarbons.

1.13.   Initial Well.   Either of the first two wells drilled by DEPI within the lands described on Exhibit A which wells are drilled to a depth sufficient to test the Mesaverde formation.

1.14.   Oil. Petroleum or liquid hydrocarbons originally existing in a reservoir in a liquid state.

1.15.   Operating Agreement.   The form of joint operating agreement attached hereto as Exhibit C, including COPAS and all other exhibits.

1.16.   Right-of-Way.   An easement covering Ute Tribal Lands issued by the BIA with the consent of the Ute Indian Tribe for the purposes authorized and contemplated by 25 C.F.R. Subpart 169 (2006), including, but not limited to, well sites, pipelines, power lines, and telephone lines in support of the operations authorized hereunder; provided however that a road easement may only be issued to DEPI if the existing roads located with the lands described on Exhibit A do not provide reasonable access to DEPI's operations. 

1.17.   Secretary.   The Secretary of the Interior or his duly authorized representative.

1.18.   Superintendent.   The Superintendent of the Uintah and Ouray Agency of the Bureau of Indian Affairs.

1.19.   Uncompleted Well.   A well for which an AFE has been submitted, but which has not been completed, regardless of whether or not actual drilling operations on such well have been commenced.

1.20.   Ute Energy. Ute Energy, LLC, a Delaware limited liability company in which the Ute Indian Tribe holds a majority interest.

1.21.   Ute Tribal Lands.   Ute Tribal Minerals and Ute Tribal Surface.

1.22.   Ute Tribal Minerals.   Those lands described in Exhibit A which are jointly managed by the Ute Indian Tribe and UDC as of the Effective Date of this Agreement.  Ute Tribal Minerals shall not include minerals owned by, or held by the United States in trust for, individual allottees.  Ute Tribal Minerals shall also not include lands subject to existing oil and gas leases or minerals agreements.

1.23.   Ute Tribal Surface.   All lands within the boundaries of those lands described in Exhibit A, the surface of which is owned by or held in trust for the Ute Indian Tribe.

3

**APPENDIX PAGE 313**

## II. REPRESENTATIONS OF THE UTE INDIAN TRIBE AND THE UDC

2.1.    Representations of the Ute Indian Tribe.    The Ute Indian Tribe represents and warrants that oil and gas in and under and that may be produced from the Ute Tribal Minerals owned by the Ute Indian Tribe or held by the United States in trust for the Ute Indian Tribe is subject to the provisions of the Ute Partition and Termination Act, 25 U.S.C. §§ 677-677aa.  The Ute Indian Tribe further represents and warrants that it has the authority to enter into this Agreement pursuant to the Indian Mineral Development Act.  This Agreement has been approved by the Venture Fund Board of the Ute Indian Tribe pursuant to Resolution No. 06-_____, and by the Business Committee of the Ute Indian Tribe pursuant to Resolution No. 06-_____, (copies of which have been provided to DEPI) in accordance with the Ute Tribal Constitution and applicable Ordinances.  This Agreement is intended to be approved by the United States Department of the Interior and is intended to satisfy all legal provisons the Department administers, including those under the Indian Mineral Development Act of 1982, 25 U.S.C. §§ 2101-2108, and 25 U.S.C. § 81.

2.2.    Representations of the UDC.    The UDC represents and warrants that it is organized pursuant to the Ute Partition Act, and is authorized to enter into this Agreement.  This Agreement has been approved by the Board of Directors of UDC pursuant to Resolution _____, dated _____ (copies of which have been provided to DEPI and the Ute Indian Tribe).  UDC, to the extent it has such rights pursuant to the Ute Partition Act, enters into this Agreement to allow DEPI to explore for, develop, produce, save, gather, and transport oil and gas from the Ute Tribal Minerals.

2.3.    Joint Management Process.    This Agreement shall be subject to the joint management process set forth at 25 C.F.R. Part 217.  The execution of this Agreement by the Ute Indian Tribe and the UDC shall be deemed the joint management by the Ute Indian Tribe and the UDC of oil and gas rights in the Ute Tribal Minerals retained in trust by the United States pursuant to 25 C.F.R. Part 217 and in accordance with the Ute Partition Act.  Any disputes between the Ute Indian Tribe and UDC concerning the terms of this Agreement or the administration of this Agreement shall be subject to the joint management process set forth in 25 C.F.R Part 217.

### III. OBLIGATIONS

3.1.    Obligations of DEPI.

A.    Corporate Information.    DEPI has furnished, or shall furnish, to the Superintendent all corporate information required by 25 C.F.R. § 225.29.

B.    Bonds.    DEPI shall supply such bonds for performance and reclamation as the Superintendent may reasonably require, or as otherwise may be required under 25 C.F.R. § 225.30, to the extent it has not already satisfied such requirements.

C.    Bonus and Rentals Due Under Agreement Leases.    Within thirty (30) days of the effective date of the Agreement Lease, DEPI shall pay a one-time lease bonus in the amount of $100.00 per net acre of Ute Tribal Minerals covered by such lease.  In addition, the Agreement lease shall carry a required annual rental in the amount of $1.25 per net acre of Ute

4

**APPENDIX PAGE 314**

Tribal Minerals covered by such lease. Payment to the Ute Indian Tribe shall be in the form of a check or wire transfer to the Minerals Management Service (MMS), for benefit of the Ute Indian Tribe, in the amount of 72.83814% of the Bonus and Rental. Payment to the UDC shall be in the form of a check or wire transfer to the BIA in the amount of 27.16186% of the Bonus and Rental.

      D.    Royalties Due Under Agreement Leases. The obligation of DEPI to pay royalty pursuant to the terms and provisions of the Agreement Lease issued to DEPI under this Agreement shall commence with the first production and sale of oil or gas from any well located upon the Ute Tribal Minerals and shall be remitted in accordance with the provisions of 30 C.F.R. Parts 202, 210 and 218, as supplemented by Part 206, Valuation of Lease Products. The royalty rate under the Agreement Lease shall be 18.75%. The first royalty payment for any such well is due within ninety (90) days of the date of delivery by the Ute Indian Tribe and UDC to DEPI of the approved Agreement Lease covering the land upon which the well is located, or ninety (90) days after the date of first production and sale, whichever is later. All subsequent royalty payments shall be made monthly in accordance with the applicable Agreement Lease. The Agreement Lease allows the Tribe or UDC to take their royalty in kind. For the avoidance of doubt, the decision of the Tribe to take its royalty in kind shall not require UDC to take its share of royalty in kind.

      E.    Drilling Permit. Prior to commencing operations for the drilling of any well on Ute Tribal Minerals, DEPI shall apply to the Vernal Office of the Bureau of Land Management (or any other applicable BLM office) for a permit to conduct operations upon such lands. DEPI shall satisfy all lawful requirements for the issuance of a permit made by the Bureau of Land Management. DEPI shall notify the Ute Indian Tribe and BIA of all applications submitted by DEPI pursuant to this subsection 3.1.E.

      F.    Conduct of Operations. All operations associated with the exploration, development and production of oil and gas pursuant to this Agreement shall be conducted in accordance with 43 C.F.R. Part 3160. As to any well drilled upon the Ute Tribal Minerals, DEPI agrees to comply with the operational provisions of the Agreement Lease, which is attached as Exhibit B and is hereby incorporated by reference. DEPI shall, to the greatest extent possible, utilize the personnel of Ute Energy, LLC to conduct production operations within the lands described in Exhibit A.

      G.    Call on Production. In the event that the Ute Indian Tribe participates in a project designed to alleviate the current shortage of refining capacity in the Uinta Basin, the Ute Indian Tribe shall retain the option and exclusive right, at all times and from time to time, to place a call upon DEPI's share of any Oil which may be produced and saved by DEPI from the Leased Premises and dedicate such production to the Ute Indian Tribe's refining capacity project. Payment for any Oil purchased hereunder shall be made at the prevailing price offered by purchasers for production of similar kind and quality in the area where produced at the time such production is taken for purchase. The Ute Indian Tribe shall exercise this option by giving DEPI sixty (60) days written notice of its exercise of said option, which exercise is to remain in operation and effect until canceled by written notice from Ute Indian Tribe to DEPI. If at the time such election notice is given, DEPI has entered into a contract for the sale of the Oil, the term of which extends past the above stated sixty (60) day time period, then the election to

5

**APPENDIX PAGE 315**

purchase any Oil shall only take effect at the end of such contract term.  DEPI shall not extend or enter into any new contract for the sale of either oil production after DEPI has received such written notice from the Ute Indian Tribe regarding its exercise of this call on production, nor shall DEPI enter into any new contract for the sale of any oil produced pursuant to this Agreement which contract carries a term of greater than one year.  Notwithstanding the foregoing, all gas produced pursuant to this Agreement, or replacement volume, shall be committed to the pipeline known as the "East-West Header" for the time this Agreement is in existence, subject to available capacity and the contractual obligations of the Parties in existence as of the Effective Date of this Agreement.  DEPI's obligation to transport gas on the East-West Header shall be subject to DEPI obtaining such transportation services under the same or substantially similar commercial terms as Ute Energy LLC.

H.    Drilling Standards.  Each well drilled under this Agreement shall be drilled in a diligent and workmanlike manner in accordance with all applicable laws, rules, regulations and orders.  Each well shall be completed as a well capable of production or shall be plugged and abandoned in accordance with the applicable procedures of the BLM, unless the Operator of such well determines that it should be reserved as a possible salt water disposal well, water source well, water injection well, or a well to be re-entered (temporarily abandoned), subject to the terms of the applicable Agreement Lease.

3.2.    Grant by and Obligations of the Ute Indian Tribe.

A.    Grant of Access to Ute Tribal Minerals and of the Right to Explore for, Develop and Produce Oil and Gas.  The Ute Indian Tribe grants to DEPI and its contractors during the Agreement Term of this Agreement the exclusive right to go upon Ute Tribal Minerals to explore for, develop, and produce oil and gas from the lands described in Exhibit "A.".  This grant contemplates the drilling of one or more wells, drilled pursuant to Article IV of this Agreement, and to operate any such wells so drilled for the production of oil and gas.  The right of DEPI granted herein to operate such well for the production of oil and gas shall be governed by the provisions of the Agreement Lease attached hereto as Exhibit B.  Nothing in this Agreement shall be interpreted to affect DEPI's continuing rights under the terms of the Agreement Lease, Right-of-Way, Operating Agreement, or any other permit or agreement which is in effect at the end of the Agreement Term.  DEPI's contractors shall be governed by, and shall conduct their operations in accordance with, the terms and provisions of this Agreement and the Operating Agreement.

B.    Issuance of Drilling Permits.  During the ninety (90) day period commencing on the date of DEPI's notice to the Ute Indian Tribe of DEPI's application to the BLM pursuant to Section 3.1.E., the Ute Indian Tribe shall use its reasonable efforts to have the Vernal Office of the Bureau of Land Management issue to DEPI a permit allowing DEPI to enter upon the Ute Tribal Lands for the purpose of drilling the well for which the application is made.  Failure of the Bureau of Land Management ("BLM") to issue the permit within the ninety (90) day period shall be an instance of *Force Majeure* relating to that particular well or drilling activity to which the provisions of Article VI shall apply.  Such failure of the BLM to issue a permit shall not, however, excuse performance of drilling obligations that may be accomplished through use of other available permits.

6

    C.    Approval of Leases. After issuance of the Agreement Lease, the Ute Indian Tribe and UDC shall submit to and use reasonable efforts to obtain the approval of such Lease by the Superintendent. The effective date of the Agreement Lease shall be the date of approval by the Superintendent.

    3.3.    Throughput Fee. DEPI shall pay a fee (the "Throughput Fee") to the Ute Indian Tribe monthly in the amount of five cents ($.05) per thousand cubic feet ("Mcf") of Gas, or thirty cents ($.30) per barrel of Oil, produced and sold by DEPI in the prior month from wells within the lands described in Exhibit A, with such volumes measured at the wellhead. For purposes of calculating the Throughput Fee, natural gas liquids and oil will convert to a gas equivalent at a 1:6 ratio. As set forth in the Agreement Lease, the Throughput Fee shall not be deemed an allowance to be deducted prior to calculation of Royalty. Each working interest owner in a well shall be responsible for and shall pay directly to the Ute Indian Tribe its proportionate share of the Throughput Fee based on its working interest share in the well. In consideration for DEPI's obligation to pay the Throughput Fee,those obligations set forth in Section 3.3.A. and 3.3.B. below, and for DEPI's other obligations herein, the Ute Indian Tribe shall grant to DEPI, without any further costs or fees, those rights over the Ute Tribal Surface that are related, incidental, and reasonably necessary for the normal and customary surface operations on Ute Tribal Lands, including, but not limited to, construction, drilling location, and production facilities, well sites, well facilities, compressors and access roads exclusively dedicated to well sites, compressors, tank batteries, flow lines, gathering lines and pipelines. Such surface rights may not be separately or individually assigned or subcontracted by DEPI, except to its affiliated companies. Such surface rights shall include, without limitation, the following:

    A.    Pipeline Rights-of-Way and Surface Use. Upon application, DEPI shall be entitled to obtain from the Ute Indian Tribe, or the Agency shall issue, a Right-of-Way for the use of Ute Tribal Surface. Such Rights-of-Way shall be provided whenever DEPI desires to use any portion of the surface of such lands in conjunction with gathering oil or gas produced from the lands described in Exhibit A, including without limitation, flow lines, gathering lines, pipelines, and related compressors and other similar equipment and facilities used solely in connection with its operations under this Agreement. DEPI agrees to construct and use any such access rights and Rights-of-Way so granted subject to and in accordance with the conditions set forth by the Right-of-Way Agreement and applicable Federal and Tribal law. This Agreement does not provide the right to DEPI to gather or transport oil or gas across the Ute Tribal Surface where (i) such oil or gas is produced from lands other than those described in Exhibit A, or (ii) such oil or gas is produced by or owned by third parties from wells other than those drilled under this Agreement.

    B.    Road Rights-of-Way and Surface Use. Notwithstanding Section 3.3. above, DEPI shall be entitled to obtain, and the Ute Indian Tribe or the Agency shall issue, a Right-of-Way from the Ute Indian Tribe or the Agency for well sites, well facilities, compressors and existing access roads exclusively dedicated to well sites, well facilities, compressors or tank batteries, for DEPI's operations on the Ute Tribal Minerals pursuant to this Agreement, excluding all Rights-of-Way and other rights obtained by DEPI pursuant to Section 3.3, by paying to the Ute Indian Tribe a one time payment of $500 per net mineral acre for each area to be used (after construction) for such facilities and roads. Contractors and subcontractors

7

engaged by DEPI to perform operations under this Agreement shall be entitled to use Rights-of-Way issued to DEPI pursuant to this Section 3.3.B. to the extent necessary to perform such operations in accordance with this Agreement.

3.4.    Throughput Fee Downstream.  To the extent that the Ute Indian Tribe receives or will receive a throughput fee from DEPI for the same Gas or Oil volumes that otherwise would be subject to the Throughput Fee pursuant to Section 3.3, above, then the Throughput Fee payable under Section 3.3 above shall be reduced to the extent of such downstream throughput fee (i.e. a maximum fee of $0.05 per Mcf will be paid to the Tribe as a throughput fee for gas produced and sold from the lands subject to this Agreement and/or a maximum fee of $.30 per barrel of Oil will be paid to the Tribe as a throughput fee for oil produced and sold from the lands subject to this Agreement).

## IV.  EXPLORATION AND DEVELOPMENT

4.1.    Initial Wells.  DEPI shall commence the drilling of two Initial Wells on the lands described in Exhibit A on or before 120 days from the effective date of this Agreement or the effective date of the Lease Agreement, whichever is the later.  The Initial Wells shall be drilled to the depth sufficient to test the Mesaverde formation or a total depth of _____, whichever is lesser, and shall be drilled on two different quarter-quarter sections.  DEPI's failure to timely commence, and to drill to the required depth, one Initial Well will result in the release of the other three quarter-quarter sections of the lands described in Exhibit A.  DEPI's failure to drill two Initial Wells will result in the release of the remaining undrilled Leased Premises.  In the event the Initial Wells:. (i) fail to reach the objective depth due to mechanical difficulties or because of encountering conditions which are normally considered in the industry to be impenetrable or which, in DEPI's opinion, would make further drilling impractical by ordinary drilling methods, or (ii) is completed as a commercial producer at a depth shallower than that required by this Section 4.1 because further drilling operations would place the well in jeopardy, DEPI shall have the right within ninety (90) days after good faith discontinuance of operations on such well, to commence actual drilling of a substitute well at the location of its choice, or to sidetrack the existing well, under the terms and conditions prescribed for the original well.  A substitute well shall be treated for purposes of the Agreement Lease as if it was one of the Initial Wells for which it is substituted, and shall be deemed to have been commenced on the date such Initial Wells were commenced.

4.2.    Development Wells.  In the event that DEPI completes both of the Initial Wells as a well (or wells) capable or production, DEPI shall drill two additional wells ("Development Wells") to the depth described in Section 4.1 on or before 210 days from the effective date of this Agreement or of the Agreement Lease, whichever is the later. .  Each Development Well shall be drilled within a remaining undrilled quarter-quarter section of the lands described in Exhibit A.  DEPI shall thereafter drill such wells as would a reasonably prudent operator under the same circumstances, including any wells necessary to protect said lands from being drained by adjacent wells not located on Ute Tribal Minerals, unless the drilling of said protection well(s) would not be economic pursuant to the requirements of 43 C.F.R. Subpart 3162.  In lieu of drilling such protective well(s), DEPI may at its option elect to relinquish lands subject to such drainage pursuant to Article VII of this Agreement.  DEPI's failure to timely commence, and to drill to the required depth, one or both of the Development Wells described in this Section 4.2

8

## APPENDIX PAGE 318

shall result in the release of all undrilled quarter-quarter sections of the lands described in Exhibit A.

    4.3.   Issuance of Agreement Lease.  The Ute Indian Tribe and UDC shall cause the BIA to issue to DEPI the Agreement Lease on the lease form attached hereto as Exhibit B, which covers the lands described in Exhibit A.

        A.   Effective Date of Lease.  The Agreement Lease shall be executed by the Ute Indian Tribe and UDC and provided to the BIA within fifteen (15) days of the execution of this Agreement, and shall be issued effective as of the date of approval by the Superintendent.

    4.4.   Existing Infrastructure.  If the Ute Indian Tribe participates in an Initial Well or Development Well, and wishes to use any oil or gas pipeline, processing facility, compression facility or similar oil and gas infrastructure owned by DEPI within the Uinta Basin for the transportation or processing of production from any such well, then DEPI and the Ute Indian Tribe agree to a fixed fee to allow such use by the Ute Indian Tribe which shall be the lesser of (i) the least cost charged by DEPI to third parties for the same or similar services or (ii) the actual cost of operating such infrastructure, pro rated based on the actual use of that infrastructure by the Ute Tribe compare to all other use.  The Ute Indian Tribe shall have the right to assign the right to use infrastructure at this fee to Ute Energy.

## V. PARTICIPATION BY UTE INDIAN TRIBE

    5.1.   Participation Right.  DEPI shall carry, and the Ute Indian Tribe shall be deemed to have participated, as to 20% of the actual costs of drilling the two Initial Wells through Casing Point(referred to in this Section as the "Carried Interest").  Upon reaching the Casing Point of either Initial Well, the Ute Indian Tribe shall have the option to participate in the completion as to 20% of the actual costs of Completing such well.  If the Ute Indian Tribe does not choose to participate in the well at that time, then the Ute Indian Tribe shall have no further right to participate in that well.  The Ute Indian Tribe shall have the option to participate as a 25% cost-bearing working interest owner in the drilling and Completion of any Development Well under Article IV of this Agreement.

        A.   Notice to Tribe.  Prior to commencing the completion of any Initial Well or drilling and completion of any Development Well on the lands described in Exhibit A, DEPI shall provide a Notice of Election to Participate, a well drilling prognosis, a geological presentation, and an authorization for expenditure (collectively, an "AFE") to the Ute Indian Tribe as the estimate of the costs of drilling and/or completing the well, or plugging and abandoning the well as a dry hole.  Within fifteen (15) days after the Ute Indian Tribe's receipt of the AFE, it shall provide written notice to Lessee, stating (a) whether the Ute Indian Tribe elects to participate for its 20% share of the actual costs of Completing an Initial Well, or (b) whether the Ute Indian Tribe elects to participate for its 25% share of the actual costs of drilling and Completing (or plugging and abandoning) any Development Well.  The Ute Indian Tribe's election to so participate shall be referred to herein as its "Election to Participate."  In the event that DEPI submits an AFE for a well to be located in a quarter-quarter section in which an Uncompleted well is located, then the Ute Indian Tribe shall not be required to submit its

**APPENDIX PAGE 319**

Election to Participate until thirty (30) days following completion or testing of any such uncompleted well. "Actual costs" shall be determined in a manner consistent with the Council of Petroleum Accountants Societies' accounting procedures, and as further specified in the Operating Agreement, and shall include without limitation all costs relating to the determination of title to the lands, except Ute Tribal Minerals.

        B.    <u>Exercise of Election to Participate</u>.  If the Ute Indian Tribe exercises its Election to Participate, the Parties' rights and obligations with respect to all operations regarding that well shall be governed by an Operating Agreement, which the Ute Indian Tribe and DEPI shall execute prior to commencement of the first well in which the Ute Indian Tribe participates.

        5.2.    <u>Participation Costs and Assignment—Wells on Ute Tribal Minerals</u>.  If the Ute Indian Tribe elects to participate in the completion of any Initial Well drilled on Ute Tribal Minerals, the Ute Indian Tribe shall reimburse DEPI for the Ute Indian Tribe's proportionate share of any actual costs for completing (or plugging and abandoning) such Initial Well and DEPI shall deliver an assignment in the form attached hereto as <u>Exhibit D</u> assigning to the Ute Indian Tribe an undivided 20% leasehold working interest in the Initial Well and quarter-quarter section for said Initial Well.  If the Ute Indian Tribe elects to participate in the drilling and completion of any Development Well drilled on Ute Tribal Minerals, the Ute Indian Tribe shall reimburse DEPI for the Ute Indian Tribe's proportionate share of any actual costs of drilling and completing (or plugging and abandoning) such well and DEPI shall deliver an assignment in the form attached hereto as <u>Exhibit D</u>, assigning a 25% leasehold working interest in the Development Well and quarter-quarter section for said Development Well, including applicable proportionate reductions to such ownership, based on a Party owning less than 100% interest in the minerals and/or the acreage contributed to such well, to the Ute Indian Tribe ,

        5.3.    <u>Assignment to Ute Energy</u>.  UDC and DEPI acknowledge that the Ute Indian Tribe shall have the right to assign any or all of the rights and obligations set forth in this Article V, and all other terms and conditions of this Agreement, to Ute Energy.

VI.  FORCE MAJEURE

        If DEPI, the Ute Indian Tribe or UDC is prevented from complying with any of its obligations as imposed herein (except for the payment of monies) by reason of any cause or causes beyond DEPI's, the Ute Indian Tribe's or UDC's control, which may include, but are not limited to lack of water, fire, storm, flood, explosion, or act of God, rebellion, act of terrorism, insurrection or riot, differences with the workmen or material suppliers or labor disputes (including strikes and walkouts), failure to receive timely delivery of supplies or material, failure of carriers to transport or to furnish facilities for transportation, or any order of court, or rule or regulation of governmental authority, or lack of federal, Tribal, state or local permits, or extreme weather conditions, while so prevented, this Agreement shall not terminate in whole or in part and performance under this Agreement shall be temporarily excused.  The inability of a Party to market Oil or Gas produced pursuant to this Agreement shall not constitute Force Majeure.  The Parties further agree that any delays caused by the failure of the Ute Indian Tribe or its agencies to respond when requested or required pursuant to the provisions of this Agreement, or delay occasioned by the county, state or federal government or their agencies in granting any permit

10

**APPENDIX PAGE 320**

9.3.   Public Statements.   Prior to making any press releases or other public announcements concerning this Agreement and the matters related thereto, the party desiring to make such public announcement shall obtain the written consent of the other party, which shall not be unreasonably withheld. DEPI retains the right to make any disclosure deemed necessary by DEPI's counsel under any federal securities laws or rules of any stock exchange. Further, as part of its governmental function, the Ute Indian Tribe shall have the right to communicate information about this Agreement to its members or federal agencies, and shall use all reasonable efforts to cause the members or agencies to comply with Section 9.1.

## X. ENVIRONMENTAL MATTERS

10.1.   Access to the Ute Tribal Surface.   The Ute Indian Tribe agrees to grant DEPI access to the Ute Tribal Surface during reasonable business hours, so DEPI may conduct, at its sole risk and expense, on-site inspections and environmental assessments of the Ute Tribal Surface. In connection with any such on-site inspections, DEPI agrees to indemnify the Ute Indian Tribe and its members against all liabilities and obligations, including without limitation, personal injury, death and/or property damage, arising from DEPI's activities on the Ute Tribal Surface, except to the extent such liabilities or damages are caused by the Ute Indian Tribe's negligence or willful misconduct.

10.2.   Environmental Liabilities.   The Parties acknowledge that DEPI shall have no responsibility for claims, cost, expenses, liabilities and obligations accruing or relating to (i) Environmental Defects on Ute Tribal Lands in existence prior to the Effective Date of this Agreement or (ii) Environmental Defects caused solely and exclusively by the actions of the Ute Indian Tribe and/or UDC.

10.3.   Assumed Environmental Liabilities.   DEPI agrees to assume and pay, perform, fulfill and discharge all claims, cost, expenses, liabilities and obligations accruing or relating to and release the Ute Indian Tribe and UDC from all losses and damages resulting from Environmental Defects caused by DEPI anytime during the period of DEPI's ownership or operations under this Agreement.

10.4.   NEPA Requirements.   DEPI is solely responsible for fulfilling any and all National Environmental Policy Act requirements concerning its proposed or continuing activities on the Ute Tribal Lands. Upon request by the DEPI, the Ute Indian Tribe agrees to provide copies of existing Bureau of Land Management environmental documents pertinent to the Ute Tribal Lands for DEPI's use. Archaeological activities of DEPI will include participation of the Ute Tribal Cultural Resource Protection Program and, when warranted, the Tribal Preservation Officer.

## XI. ASSIGNMENT

11.1.   Limitations.   The rights and benefits granted and the obligations assumed pursuant to this Agreement shall extend to and be binding upon the successors or assigns of the Parties hereto. DEPI agrees not to assign or transfer its rights under this Agreement, or any leases which may be issued according to the provisions hereof, without the prior written consent

13

**APPENDIX PAGE 321**

WHEREFORE, the Ute Indian Tribe, UDC and DEPI do hereby make and enter into this Agreement on the date set forth above, to be effective as of the Effective Date, on the date set forth by its signature below.

ATTEST:                                    UTE INDIAN TRIBE

_____          By:_____
Name:                                      Maxine Natchees, Chairman
Date: _____              Chairman
                                           Date: _____


ATTEST:                                    DOMINION EXPLORATION & PRODUCTION, INC.

_____          By:_____
Name:                                      Name:_____
Date: _____              Title:_____
                                           Date:_____


ATTEST:                                    UTE DISTRIBUTION CORPORATION

_____          By:_____
Name:                                      Name:_____
Date:_____               Title:_____
                                           Date:_____

18

**APPENDIX PAGE 322**

## EXPLORATION AND DEVELOPMENT AGREEMENT
### Among
### THE UTE INDIAN TRIBE,
### DOMINION EXPLORATION & PRODUCTION, INC.
### and
### THE UTE DISTRIBUTION CORPORATION

### *A P P R O V A L*

It has been determined that approval of this document is not such a major federal action significantly affecting the quality of the human environment as to require the preparation of an environmental impact statement under Section 10-3(2)(c) of the National Environmental Policy Act of 1969 (42 U.S.C. §4332(s)(c); Environmental Assessment of Oil and Gas Development, Duchesne River Area; Environmental Assessment No. 3, Bureau of Land Management, Vernal District, Vernal, Utah prepared April, 1982.

DATED AND APPROVED this _____ day of _____, 2006, by the United States of America, acting through the Bureau of Indian Affairs, and delegated to the Superintendent by Phoenix Area Redelegation Order No. 3, Amendment 6, Section 2.17 (34 Fed. Reg. 11109), *and* pursuant to authority delegated to the Assistant Secretary - Indian Affairs by 209 DM 8, 230 DM 1, and to the Western Regional Director by 3 IAM 4 (Release No. 99-03), and to the Superintendent/Field Representative by 10 BIAM 11, as amended by Western Regional Release No. 97-1, and any further delegations needed to effectuate the reorganization embodied in DM Releases dated April 21, 2003.

_____
Superintendent
Bureau of Indian Affairs
Uintah and Ouray Agency
Fort Duchesne, Utah 84026

## ACKNOWLEDGEMENT OF SUPERINTENDENT

STATE OF UTAH                    )
                                 ) ss.
COUNTY OF UINTAH)

BEFORE ME, a Notary Public, in and for said county and State, on this _____ day of _____, 2006, personally appeared Chester D. Mills, whose name is subscribed to the foregoing Exploration and Development Agreement as Superintendent, Uintah and Ouray Agency, Bureau of Indian Affairs, and who acknowledged that he now is and was at the time of signing the same Superintendent of the Uintah and Ouray Agency, Bureau of Indian Affairs, and he personally acknowledged to me that he executed this said document in his official capacity and pursuant to authority delegated to him for the use and purpose set forth therein.

_____
NOTARY PUBLIC

20

**APPENDIX PAGE 323**





Resolution No. 0 5 · 2 8 3

**WHEREAS,** the Tribal Business Committee ("Business Committee") of the Ute Indian Tribe of the Uintah and Ouray Reservation ("Tribe") is empowered by Article VI, Sections 1 (c) and 1 (f) of the Constitution and By-Laws of the Tribe to regulate the economic affairs of the Tribe;

**WHEREAS,** the Tribe has sought out opportunities to create unique partnerships with industry relating to the exploration and development of mineral resources on and around the Uintah and Ouray Reservation;

**WHEREAS,** the Tribe now has the opportunity to participate in the development of a natural gas pipeline joint venture with Questar Gas Management Company ("QGM") and FIML Natural Resources LLC ("FNR"), both directly and through its affiliated oil and gas company, Ute Energy, LLC;

**WHEREAS,** the pipeline joint venture will be operated through a Delaware limited liability company, Uintah Basin Field Services, L.L.C.

**WHEREAS,** in furtherance of that business opportunity, the Business Committee, in its Resolution 05-118, approved a Letter of Intent describing the basic terms under which the Tribe, QGM and FNR would establish the proposed pipeline joint venture, and authorized the Tribe's Financial Advisor, the Jurrius Ogle Group LLC to negotiate a formal agreement governing the creation and operation of the pipeline joint venture;

**WHEREAS,** the formal agreements include (1) a Limited Liability Company Operating Agreement for Uintah Basin Field Services, L.L.C., (2) a Project Agreement and Dedication, (3) an Administrative and Field Services Agreement, and (4) related documents, approvals and instruments (collectively, the "Pipeline Agreements").

**WHEREAS,** the Limited Liability Company Operating Agreement for Uintah Basin Field Services, L.L.C., Project Agreement and Dedication, and Administrative and Field Services Agreement are attached to this Resolution as exhibits;

**WHEREAS,** the Tribe has established a Tribally-owned oil and gas exploration and development company, known as Ute Energy LLC, to exercise certain commercial interests the Tribe has obtained in oil and gas development projects on and around the Uintah and Ouray Reservation;

**WHEREAS,** in order to more effectively exercise its commercial interests in the pipeline joint venture, the Business Committee finds that it is in the best interests of the Tribe to negotiate the transfer of the Tribe's commercial interests in the pipeline joint venture into Ute Energy LLC;

**WHEREAS,** the assignment of the Tribe's interests in the pipeline joint venture to Ute Energy LLC contemplated in this Resolution shall not include any governmental rights the Tribe may possess with respect to activities contemplated by the pipeline joint venture;

**WHEREAS,** the Venture Fund Board of the Ute Indian Tribe reviewed the Pipeline

1

**APPENDIX PAGE 324**

Resolution No. **0 5 · 2 8 3**

Agreements and approved entering into the Pipeline Agreements by Resolution 05-016;

**WHEREAS,** the decision of the Venture Fund Board to approve the Pipeline Agreements stands unless vetoed by the Business Committee;

**WHEREAS,** the Business Committee has reviewed the terms of the attached Pipeline Agreements, and the Venture Fund Board's Resolution 05-016, and finds it in the best interests of the Tribe to approve the Pipeline Agreements and to proceed with the formation and operation of the pipeline joint venture described therein;

**NOW, THEREFORE, BE IT RESOLVED BY THE UINTAH AND OURAY TRIBAL BUSINESS COMMITTEE OF THE UTE INDIAN TRIBE** that it hereby approves the Pipeline Agreements for the formation of a pipeline joint venture with QGM and FNR;

**BE IT FURTHER RESOLVED** that the Tribe further authorizes the participation of Ute Energy, LLC in the pipeline joint venture, as set forth in the Pipeline Agreements;

**BE IT FURTHER RESOLVED** that the Tribe further authorizes a limited waiver of the Tribe's sovereign immunity in relation to the proposed pipeline joint venture, but solely to the extent set forth in the Pipeline Agreements;

**BE IT FINALLY RESOLVED** that the Chairman or, in her absence, the Vice Chairman, is authorized to execute any and all documents as may be necessary and appropriate to carry out the terms, conditions and intent of this Resolution.

Maxine Natchees, Chairman

Irene C. Cuch, Member

Richard Jenks, Jr., Member

T. Smiley Arrowchis, Vice Chairman

Ronald Groves, Member

Frances Poowegup, Member

## CERTIFICATION

I **HEREBY CERTIFY THAT THE FOREGOING** Resolution was adopted by the Tribal Business Committee of the Ute Indian Tribe of the Uintah and Ouray Reservation pursuant to the Constitution and By-Laws of the Ute Indian Tribe of the Uintah and Ouray Reservation at a duly called meeting in Ft. Duchesne, Utah on the 30th day of ___August___, 2005, at which time a quorum was present and voted __6__ for and _0_ against, _0_ abstaining, and _0_ absent.

Dana West, Secretary, Tribal Business Committee

2

**APPENDIX PAGE 325**



---

## **UTE INDIAN TRIBE'S COSTS AND OVERHEAD -- ESTIMATES November 15, 2005**

---

**FIML COSTS AND OVERHEAD:**

- Description of "Hard Asset" Costs accrued by FIML for pipeline:

| | |
|---|---|
| 4" Poly Pipe | $ 45,114.07 |
| Separator & Treater | $ 13,734.24 |
| Dehydration Unit | $ 121,790.21 |
| Meter Run | $ 27,310.86 |
| Water Tank | $ 8,088.47 |
| Gas Sales Gathering Line | $ 61,931.75 |
| Fences/Guards/Culverts | $ 87.00 |
| Misc. Parts | $ 172,294.92 |
| Pipeline – 12 ¾" pipe | $ 8,321.20 |
| Pipeline – 8 5/8" pipe | $ 360,451.03 |
| Pipeline – 4" pipe | $ 55,222.68 |
| **TOTAL:** | $ 874,346.43 |

**Tribe's Share:** $ 291,157.36 (874,346.43 * 1/3 (33.3%))

- Description of Overhead Amounts accrued by FIML for pipeline:

| | |
|---|---|
| Build Tank Battery | $ 2,156.00 |
| Gas Sales Gathering Labor | $ 368,988.99 |
| Misc. Labor/Installation | $ 20,989.31 |
| Misc. Eqp. Transportation | $ 3,561.90 |
| Construction Overhead | $ 70,341.84 |
| Engineering | $ 51,560.10 |
| Environmental Consultants | $ 7,260.04 |
| Surveying | $ 18,724.75 |
| Permits and Fees | $ 15.00 |
| Archeological Studies | $ 34,227.50 |
| Pileline [sic] ROW | $ 2,606.10 |
| Insurance | $ 3,090.00 |
| **TOTAL:** | **$ 583,521.53** |

**Tribe's Share:** $ 140,045.17 ($583,521.53 * 24%)

#679005.1

- **Description of "Hard Asset" Costs accrued by FIML for compressor site:**

| | |
|---|---|
| Compressor Site and Ftgs | $ 105,922.00 |
| Tank Battery Connections | $ 11,600.83 |
| **TOTAL:** | $ 117,522.83 |

**Tribe's Share**: $ 39,135.10 ($117,522.83 * 1/3 (33.3%))

- Description of Overhead Amounts accrued by FIML for compressor site:

| | |
|---|---|
| Build Tank Battery | $ 11,030.57 |
| Misc. Labor/Installation | $ 6,674.00 |
| Misc. Eqp. Transportation | $ 6,240.00 |
| Environmental Consultants | $ 270.00 |
| Permits and Fees | $ 3,596.60 |
| Supervision | $ 21,634.18 |
| **TOTAL:** | $ 49,445.35 |

**Tribe's Share**: $ 11,866.88 ($49,445.35 * 24%)

**TRIBE'S TOTAL AMOUNT OWED TO FIML: $ 482,204.51**

**QUESTAR COSTS:**

- Description of Costs accrued by Questar:

Total Costs/Overhead expended for all pipeline "hard assets" and services: $386,631.20

**Tribe's Share**: $92,791.49 ($386631.20 * 24%)

**TRIBE'S TOTAL AMOUNT OWED TO QUESTAR: $ 92,791.49**

**Estimated Grand Total: 574,996.00**

**APPENDIX PAGE 327**

 

FIML Natural Resources, UTE/FNR LLC

1. Amended and Restated Exploration and Development Agreement between the Ute Indian Tribe and UTE/FNR LLC, dated effective March 2, 2004, as amended (UIT EMD No. EDA -001-000).

2. Natural Gas Transportation Agreement by and between Comet Resources, LLC, as Transporter and UTE/FNR LLC as Producer dated effective August 1, 2004.

3. Gas Pipeline Guaranty Agreement by and between Comet Resources, LLC and FIML Natural Resources, LLC dated effective September 15, 2004.

Questar Companies

1. Concession Agreement between the Ute Indian Tribe and Questar Corporation and its affiliates, dated effective January 1, 2005.

2. Letter Agreement granting surface access in the Flat Rock Field between the Ute Indian Tribe and Questar Exploration & Production Co., dated August 31, 2004, as amended.

3. Exploration and Development Agreement dated effective May 1, 2005 by and between the Ute Indian Tribe, the Ute Distribution Corporation and Questar Exploration & Production Co. (BIA No. 14-20-H62-5521).

Contract No. 14-20-H62-5571

**Project Agreement and Dedication**

**among**

**Questar Gas Management Company,**

**FIML Natural Resources, LLC,**

**Ute Energy LLC,**

**The Ute Indian Tribe of the Uintah and Ouray Reservation,**

**Questar Exploration and Production Company**

**and**

**Uintah Basin Field Services, L.L.C.**

**December 1, 2005**



## PROJECT AGREEMENT AND DEDICATION

This Project Agreement and Dedication ("Agreement") is made this 1st day of December, 2005 among Questar Gas Management Company ("QGM"), a Utah corporation; FIML Natural Resources, LLC ("FNR"), a Delaware limited liability company; Ute Energy LLC ("Ute Energy"), a Delaware limited liability company; the Ute Indian Tribe of the Uintah and Ouray Reservation ("Ute Indian Tribe"), a federally-recognized Indian Tribe reorganized pursuant to the Act of June 18, 1934 (48 Stat. 987, 25 U.S.C. § 476, *et seq.*); Questar Exploration and Production Company ("QEP"), a Texas corporation; and Uintah Basin Field Services, L.L.C. (the "Company"), a Delaware limited liability company, each a "Party" and collectively, the "Parties."

### RECITALS

WHEREAS, QGM, FNR, and Ute Energy LLC are members of the Company (collectively, the "Members" and each a "Member");

WHEREAS, the Company was formed to allow its Members to construct and operate natural gas pipelines and related facilities in the Uintah Basin, Utah;

WHEREAS, the Members have and will continue to develop and construct certain pipelines and related facilities for the benefit of the Company;

WHEREAS, the Ute Indian Tribe wishes to be involved in the establishment of infrastructure supporting development of its lands in a manner that ensures such activities account for the environmental and cultural sensitivities of its lands;

WHEREAS, the Parties wish to dedicate gas production to the facilities of the Company;

WHEREAS, the Members wish to document certain commitments made among them for their mutual benefit and the benefit of the Company and the Ute Indian Tribe;

NOW THEREFORE, in consideration of the mutual premises and covenants contained in this Agreement, and of other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties to this Agreement, intending to be legally bound, hereby agree as follows:

### ARTICLE 1
### DEFINITIONS AND INTERPRETATION

1.1    Definitions.

"Affiliate" means, as to the Person specified, any Person controlling, controlled by or under common control with such Person, with the concept of control in such context meaning the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of another through the ownership of voting securities.

-1-

**APPENDIX PAGE 330**



"Agreement" means this Agreement, the recitals, and all exhibits and schedules to this Agreement.

"Area of Dedication" is defined in Section 3.1.

"Business Days" means all days other than any Saturday, Sunday or legal holiday on the Uintah and Ouray Reservation, as further set forth on Exhibit H.

"Company" means Uintah Basin Field Services, L.L.C., a Delaware limited liability company.

"Company Facilities" means the Pipeline, the Connecting Pipeline, the Interconnect Line, the Interconnect, and the Plant.

"Connecting Pipeline" is defined in Section 2.1(b).

"Costs to Date" means the actual costs incurred to date by QGM or FNR in the construction of Company Facilities, as set forth in Exhibits B and C.

"Effective Date" means March 22, 2005.

"Gas Services Agreement" means an agreement substantially in the form attached as Exhibit G to this Agreement.

"Interconnect" is defined in Section 2.1(d).

"Interconnect Line" is defined in Section 2.1(c).

"LLC Operating Agreement" means the limited liability operating agreement of the Company, of even date herewith.

"MCF" means one thousand cubic feet of gas.

"MMBTU" means one million British Thermal Units.

"Member" means a member of the Company.

"NOSR2" is defined in Section 2.6.

"Parties" means QGM, FNR, Ute Energy, QEP, the Ute Indian Tribe, and the Company and "Party" refers to any one of them.

"Person" means any corporation, partnership (whether general, limited or otherwise), limited liability company, trust, association, joint venture, unincorporated organization, governmental entity, agency or branch or department thereof, or any other legal entity, or any natural person.

"Pipeline" is defined in Section 2.1(a).

**APPENDIX PAGE 331**

"Plant" is defined in Section 2.1(e).

"QGM System" is defined in Section 2.1(c).

"QGM System Facilities" is defined in Section 2.2(a).

"Second Expansion" is defined in Section 2.2(a).

"Shippers" means QEP, QGM, the Ute Indian Tribe, Ute Energy, and FNR.

1.2     Terms denoting the singular only shall include the plural, and vice versa.

1.3     Unless otherwise stated, a reference to a Recital, Article, Section, Schedule or Exhibit is a reference to a Recital, Article, Section, Schedule or Exhibit of this Agreement.

1.4     Section numbers and headings are for convenience of reference only, and shall not affect the interpretation of this Agreement.

1.5     Reference to any gender includes the other.

1.6     Reference to "including" means including, but not by way of limitation.

1.7     Unless otherwise expressly provided in this Agreement, reference to an agreement (including this Agreement), document, or instrument is the same as amended, modified, novated or replaced from time to time.

1.8     Reference to a statute or other legislative act, by-law, rule, regulation, or order is to the same as amended, modified or replaced from time to time and to any rule, regulation or order promulgated pursuant to such law.

## ARTICLE 2
## CONSTRUCTION OF FACILITIES

2.1     Facilities Owned by the Company.  The Company shall develop the following facilities (the "Company Facilities"):

(a)     construct a twelve inch in diameter pipeline and related gathering, compression and dehydration facilities (the "Pipeline") from an area south of the Naval Oil Shale Reserve No. 2 to Questar Pipeline Company's Mainline 40;

(b)     construct a pipeline from the QEP wells in Section 31, Township 14 South, Range 20 East north to a point on the Comet Pipeline Extension pipeline near the NW/4 of Section 29, Township 14 South, Range 20 East and/or continue until the pipeline can connect with the Pipeline (the "Connecting Pipeline");

(c)     construct, using commercially reasonable efforts to complete construction within six months from the date the Interconnect is in place, a twelve inch in diameter pipeline interconnect of approximately ten miles from QGM's Red Wash Processing Plant to the

-3-


Northwest Pipeline System that will allow, for a period of not less than ten (10) years from the Effective Date up to 50,000 MMBTU per day of gas from the existing pipeline system operated by QGM (the "QGM System") to be displaced with gas from the facilities constructed by the Company pursuant to this Section 2.1 and be delivered to the Northwest Pipeline System, provided a like volume is nominated and confirmed on QGM's System for deliveries to QPC by third parties (the "Interconnect Line");

        (d)    purchase an interconnection point on the Northwest Pipeline mainline (the "Interconnect");

        (e)    evaluate the economic feasibility of constructing a gas processing and/or treatment plant near map point 303 on the Questar Mainline 40 (the "Plant").

The Pipeline, the Connecting Pipeline, the Interconnect Line, the Interconnect, the Plant, and any expansion, additions or modifications to any of those facilities shall be the "Company Facilities."

2.2    <u>Facilities Owned by QGM</u>.

        (a)    <u>QGM System Facilities</u>.  In order to provide the service contemplated herein, QGM shall expand the facilities listed below beyond that which was originally intended ("Second Expansion").  Shippers' priority as set forth in Section 2.3 below shall be restricted to the Second Expansion.  QGM has begun the design and permitting to construct the following facilities (the "QGM System Facilities"):

        (i)    Expansion of the diameter of a pipeline that QGM is constructing which is approximately ten miles in length that will allow gas to flow from the QGM Chapita compressors to the sixteen inch pipeline which delivers to the inlet of the QGM Red Wash Plant,

        (ii)    Expansion of QGM's Coyote Wash compression capacity,

        (iii)    Expansion of an interconnect being constructed between the QGM System and the Colorado Interstate Gas (CIG) System,

        (iv)    Expansion of an incremental increase in the throughput capacity of the Red Wash Plant.

        (b)    The QGM System Facilities are as further described in Exhibit A.

2.3    <u>Use of QGM System Facilities</u>.  The Shippers and the Company shall have first priority for the use of the Second Expansion of QGM System Facilities described in Section 2.2. Such use shall be subject to the conditions set forth in Article 2.1(c).  QGM shall charge a service fee for such use as set forth in Article 4.5.  QGM shall have an on-going and affirmative obligation to maintain sufficient capacity on the QGM System Facilities, subject to the conditions set forth in Article 2.1(c), and Articles 4.5, 4.6, and 4.7, for all of the future requirements of the Company.  Shippers' gas from lands located outside the Area of Dedication

**APPENDIX PAGE 333**



and/or not gathered by the Company shall not have priority on the QGM's System Facilities pursuant to this agreement.

2.4    Interconnect.  QGM shall take all steps necessary to construct the Interconnect and the Interconnect Line.

2.5    Plant.  QGM shall advise the Members of any proposal to build any facilities similar to those contemplated for the Plant, and if QGM decides to move forward with the construction of the Plant, QGM shall have the obligation to offer to sell the Plant at cost to the Company.

2.6    The Pipeline.  FNR is constructing that portion of the Pipeline located within the boundaries of the Naval Oil Shale Reserve No. 2 in Townships 12 and 13 South, Ranges 18 and 19 East ("NOSR2").  FNR is performing ground and archaeological surveys and permitting of a pipeline corridor from NOSR2 north to the Questar Mainline 40.  QGM will provide permitting and construction of that portion of the Pipeline from the southern terminus of the FNR portion of the Pipeline within the boundaries of the NOSR2 to a mutually agreed to point south of NOSR2.

2.7    Costs to Date and Budgets.

(a)    Costs to Date incurred by QGM in relation to the Company Facilities that QGM is responsible for constructing are attached as Exhibit B.  QGM shall be deemed to have made a capital contribution to the Company in an amount equal to the total of all such Costs to Date expended by QGM on such facilities.  QGM will submit to the Company a budget relating to the Company Facilities that QGM is responsible for constructing, which shall be subject to the approval of the Company.  The Company, upon approval of that budget, shall become responsible for construction of such facilities.

(b)    Costs to Date incurred by FNR in relation to the Company Facilities that FNR is responsible for constructing are attached as Exhibit C.  FNR shall be deemed to have made a capital contribution to the Company in an amount equal to the total of all such Costs to Date expended by FNR on such facilities.  FNR will submit to the Company a budget relating to the Company Facilities that FNR is responsible for constructing, which shall be subject to the approval of the Company.  The Company, upon approval of that budget, shall become responsible for construction of such facilities.

(c)    QGM and FNR shall convey to the Company contemporaneously with the execution of this Agreement all right, title, and interest in the Company Facilities constructed under Subsections (a) and (b) above.

(d)    The Members shall cause a reconciliation and normalization of all costs expended and equipment contributed, within the Company to develop the Company Facilities in accordance with the Capital Accounts and Membership Interests of the Members within 30 days of the execution of this Agreement and shall have periodic reconciliations and normalizations as needed thereafter until such time as the contemplated Company Facilities are constructed.  The value of equipment under this Section 2.7(d) shall be the actual cost of such equipment to the Member contributing the same, unless otherwise agreed by the Members.

-5-



2.8    <u>Future Facilities and Their Use</u>.

(a)    Each Member shall have the right to propose to the other Members the construction of additional pipelines and facilities to be constructed by the Company in accordance with the terms of this Agreement.

(b)    The Shippers shall have capacity priority over any and all third parties for any desired services on any of the facilities of the Company.

## ARTICLE 3
## AREA OF DEDICATION.

3.1    The Members, the Ute Indian Tribe, and QEP hereby form an "Area of Dedication" extending from (i) Questar Mainline 40 as the northern border, (ii) the range line between Range 22 and 23 East as the eastern border, (iii) the Bookcliffs/I-70 corridor as the southern border and (iv) the Green River as the western border, as further depicted and described in Exhibit D.

3.2    To the extent not restricted by those contractual arrangements in existence prior to the Effective Date as scheduled on Exhibit E, the Members, the Ute Indian Tribe, and QEP shall dedicate to the Company Facilities (i) all equity gas of the Members, the Ute Indian Tribe, and QEP within the Area of Dedication (ii) all royalty in-kind gas of the Members, the Ute Indian Tribe, and QEP within the Area of Dedication, (iii) all third party gas any Member, the Ute Indian Tribe, and QEP has a contractual right to gather, where that contractual right is obtained after the Effective Date and (iv) all contractual rights of the Members, the Ute Indian Tribe, and QEP with Comet Resources, LLC on the Comet Pipeline. The Parties shall have the right to amend or replace those contractual arrangements in existence prior to the Effective Date described in Exhibit E without said agreements becoming subject to the dedication set forth herein, provided that, except as required to satisfy an existing capital commitment, no such agreement may be extended beyond the dedicated lands in existence as of the Effective Date.

3.3    The Area of Dedication described in Section 3.1 and the dedication described in Section 3.2 shall terminate upon termination of the LLC Operating Agreement.

3.4    The Company shall satisfy the volume delivery obligations of UTE/FNR LLC under that certain Natural Gas Transportation Agreement dated effective August 1, 2004 between UTE/FNR LLC and Comet Resources, LLC and, the Company shall receive the same level of service provided for in that Natural Gas Transportation Agreement.

3.5    The Ute Indian Tribe shall facilitate the prompt issuance of rights-of-way and other permits for the Company with respect to the services and facilities contemplated by the Company. The issuance of rights-of-ways and other permits for the Company shall be executed in accordance with the Ute Indian Tribe's tribal policies. Further, the Ute Indian Tribe agrees that it shall not execute any future access permit or right-of-way on Tribal lands for the production of natural gas within the Area of Dedication, except those executed pursuant to agreements in existence prior to the Effective Date and listed on Exhibit E, unless the permittee/grantee agrees that any gas production from those lands by any producer will be




4.7    The Company's service fee shall be credited four (4) cents per MMBTU up to $60,800 per month for volumes transported by third party shippers which use the QGM System Facilities set forth in Section 2.2. Notwithstanding the aforementioned, the Company shall not receive credits for volumes transported by companies which have entered into agreements with QGM for service on QGM's pipeline system prior to the Effective Date unless such volumes are transported using the expanded capacity from the QGM System Facilities defined in Section 2.2. The aforementioned agreements shall include agreements which are amended or replaced after the Effective Date where the original agreement was entered into prior to the Effective Date.

**ARTICLE 5**
**MISCELLANEOUS**

5.1    Notices.  Except as otherwise provided in this Agreement, whenever it is provided in this Agreement that any notice, demand, request, consent, approval, declaration or other communication shall or may be given to or served upon any of the Parties by any other Party, or whenever any of the Parties desires to give or serve upon any other communication with respect to this Agreement, each such notice, demand, request, consent, approval, declaration or other communication shall be in writing and either shall be delivered in person with receipt acknowledged or sent by registered or certified-mail, return receipt requested, postage prepaid, or by overnight mail or courier, or delivery service or by facsimile and confirmed by facsimile answer back, addressed as follows:

IF TO QGM:

    Questar Gas Management Company
    1050 Seventeenth Street, Suite 500
    Denver, CO  80265
    Attention:  Perry Richards
    Phone:  303-672-6986
    Fax:  303-308-3610

IF TO FNR:

    FIML Natural Resources, LLC
    410 17th Street, Suite 900
    Denver, CO  80202
    Attention:  Mark D. Bingham
    Phone:  303-893-5077
    Fax:  303-573-0386

**APPENDIX PAGE 336**



Legal Matters:

     Fidelity Investors Management Corp.
     82 Devonshire Street, R7E
     Boston, MA 02109
     Attention: Seth Berry
     Phone: 617-563-4791
     Fax: 617-385-0760

IF TO UTE ENERGY:

     Ute Energy LLC
     7074 East 900 South
     P.O. Box 789
     Ft. Duchesne, UT 84026
     Attention: Chief Executive Officer
     Phone: 435-722-0291
     Fax: 435-722-3902

Legal Matters:

     Davis Graham & Stubbs LLP
     Charles L. Kaiser, Esq.
     1550 Seventeenth Street, Suite 500
     Denver, CO 80202
     Phone: 303-892-9400
     Fax: 303-893-1379

IF TO THE UTE INDIAN TRIBE:

     Ute Indian Tribe
     P.O. Box 190
     Ft. Duchesne, UT 84026
     Attention: Director, Energy & Minerals
     Phone: 435-722-5161
     Fax: 435-722-2374

Legal Matters:

     Davis Graham & Stubbs LLP
     Charles L. Kaiser, Esq.
     1550 Seventeenth Street, Suite 500
     Denver, CO 80202
     Phone: 303-892-9400
     Fax: 303-893-1379

APPENDIX PAGE 337



**IF TO QUESTAR EXPLORATION AND PRODUCTION COMPANY:**

    Questar Exploration and Production Company
    1050 Seventeenth Street
    Suite 500
    Denver, CO  80265
    Attention: Jay Neese
    Phone:  303-672-6933
    Fax:  303-294-0632

or at such other address as may be substituted by written notice given as in this Section 5.1. The furnishing of any notice required under this Agreement may be waived in writing by the Party entitled to receive such notice. Every notice, demand, request, consent, approval, declaration or other communication under this Agreement shall be deemed to have been duly given or served on (i) the date on which personally delivered, with receipt acknowledged, (ii) the date on which sent by facsimile and confirmed by answer back, (iii) the next Business Day if delivered by overnight or express mail, courier or delivery service, or (iv) three Business Days after the same shall have been deposited in the United States mail, as the case may be.

    5.2    <u>Successors and Assigns</u>. This Agreement shall be binding upon the Parties and their respective successors and assigns, and shall inure to the benefit of the Parties and, their respective successors and assigns, however no assignment of any rights or obligations under this Agreement shall be made by any Party (except to an Affiliate of a Party) without the prior written consent of the other Parties, which consent shall not be unreasonably withheld.

    5.3    <u>Applicable Law</u>. This Agreement shall be governed by, construed and enforced in accordance with the laws of the State of Utah, applicable to contracts to be made, executed, delivered and performed wholly within such state, and in any case, without regard to the conflict of laws principles of such state.

    5.4    <u>Dispute Resolution</u>.

    (a)    <u>Amicable Resolution and Notice</u>. The Parties shall seek to resolve any disputes or claims arising between any Parties in connection with this Agreement amicably through discussions between the Parties. No breach shall be deemed to occur hereunder until the Party alleged to be in breach is given at least thirty (30) days' prior written notice describing such dispute or claim.

    (b)    <u>Federal Court Jurisdiction</u>. The Parties unequivocally submit to the jurisdiction of the U.S. District Court for the District of Utah, and appellate courts therefrom. The court or courts so designated shall have, to the extent the Parties can so provide, original and exclusive jurisdiction, concerning all disputes and claims arising from or related to this Agreement. Each of the Parties consents to service of process for any such legal proceeding filed in the court or courts so designated. If, and only if, such courts lack jurisdiction over such case, the Parties hereby submit and agree to arbitration of disputes and claims arising under or related to this Agreement.

**APPENDIX PAGE 338**



IN WITNESS WHEREOF, the Parties have duly executed and delivered this Agreement, as of the day and year first above written.

**Questar Gas Management Company**

By: _____

Name:  C.B. Stanley

Title:  President and Chief Executive Officer

**\* Questar Exploration and Production Company**

By: _____

Name:  J.B. Neese

Title:  Executive Vice President

\* Subject to Letter Agreement dated December 8, 2005 between QEP and the Ute Indian Tribe

**FIML Natural Resources, LLC**

By: _____

Name:  Mark D. Bingham

Title:  Senior Vice President

**Ute Energy LLC**

By: _____

Name:  Maxine Natchees

Title:  Chairman

**Ute Indian Tribe of the Uintah and Ouray Reservation**

By: _____

Name:  Maxine Natchees

Title:  Chairman

-13-

**APPENDIX PAGE 339**

**Uintah Basin Field Services, L.L.C.**

By: _____

Name:   Perry Richards

Title:    Manager

-14-

# APPROVAL

It has been determined that approval of this document is not such a major federal action significantly affecting the quality of the human environment as to require the preparation of an environmental impact statement under Section 102 (c) of the National Environmental Policy Act of 1969 (42 U.S.C. §4332(s)(c).

DATED AND APPROVED this **19th** day of **April, 2006,** by the United States of America, acting through the Bureau of Indian Affairs, and delegated to the Superintendent by Phoenix Area Redelegation Order No. 3, Amendment 6, Section 2.17 (34 Fed. Reg. 11109), *and* pursuant to authority delegated to the Assistant Secretary - Indian Affairs by 209 DM 8, 230 DM 1, and to the Western Regional Director by 3 IAM 4 (Release No. 99-03), and to the Superintendent/Field Representative by 10 BIAM 11, as amended by Western Regional Release No. 97-1, and any further delegations needed to effectuate the reorganization embodied in DM Releases dated April 21, 2003.

_____

Acting Superintendent
Bureau of Indian Affairs
Uintah and Ouray Agency
Fort Duchesne, Utah 84026

**ACKNOWLEDGEMENT OF SUPERINTENDENT**

STATE OF UTAH            )
                         ) ss
COUNTY OF UINTAH         )

BEFORE ME, a Notary Public, in and for said county and State, on this **19th** Day of **April 2006,** personally appeared **Dinah M. Peltier,** whose name is subscribed to the foregoing **Contract Number 14-20-H62-5571, Project Agreement and Dedication** as Acting, Superintendent, Uintah and Ouray Agency, Bureau of Indian Affairs, and who acknowledged that she now is and was at the time of signing the same Acting, Superintendent of the Uintah and Ouray Agency, Bureau of Indian Affairs, and she personally acknowledged to me that she executed this said document in her official capacity and pursuant to authority delegated to her for the use and purpose set forth therein.



_____
**NOTARY PUBLIC**

**My Commission Expires: April 7, 2007**

**THIS LEASE IN ITS ENTIRETY MAY NOT BE ALTERED WITHOUT PRIOR APPROVAL OF THE SECRETARY**

Resolution No. 0 5 · 1 1 6

**WHEREAS,** the Tribal Business Committee ("Business Committee") of the Ute Indian Tribe of the Uintah and Ouray Reservation ("Tribe") is empowered by the Constitution and By-Laws of the Tribe to regulate the economic affairs of the Tribe;

**WHEREAS,** through the passage of Ordinance 01-007, the Business Committee enacted a long-term Financial Plan for the Tribe, which Ordinance was then ratified and approved by referendum vote of the Tribal membership on December 20, 2001.

**WHEREAS,** in furtherance of the goals set forth in the Financial Plan, the Tribe has taken a proactive approach to the management of its natural resources, and has sought out opportunities to create unique partnerships with industry relating to the exploration and development of mineral resources on and around the Uintah and Ouray Reservation;

**WHEREAS,** the Tribe's proactive approach to its mineral estate has enabled it to obtain valuable rights and assets, particularly the Tribe's ownership interest in Ute/FNR LLC and the related development rights in the Naval Oil Shale Reserve No. 2 and Brundage Canyon, as well as the Tribe's acquisition of direct working interests in the Lake Canyon Exploration and Development Agreement and the anticipated Wolf Flat project (collectively, the "Working Interests");

**WHEREAS,** the Business Committee, in its Resolution 04-242, took the next step in realizing the full potential value of its Working Interests by authorizing and directing the Board and the Tribe's Financial Advisor to engage in preliminary negotiations with representatives of the capital markets to secure the investment capital needed to establish a Tribally-owned oil and gas operating company;

**WHEREAS,** the Board and the Tribe's Financial Advisor have pursued those negotiations, and the Tribe now stands poised to capitalize upon those valuable Working Interests by creating, financing and operating an oil and gas exploration and development company known as Ute Energy LLC;

**WHEREAS,** Ute Energy will be capitalized first through the contribution of the Tribe's Working Interests into a Tribally-owned holding company known as Ute Energy Holdings LLC ("Ute Holdings");

**WHEREAS,** the Working Interests held by Ute Holdings will, in turn, be contributed into Ute Energy, and in return Ute Holdings will obtain an 90% ownership interest in Ute Energy;

**WHEREAS,** the Jurrius Ogle Group will contribute one-third of its interest in the Working Interests directly into Ute Holdings in return for a 5% ownership interest in Ute Holdings, and will then contribute its remaining two-thirds interest directly into Ute Energy in return for a 10% ownership interest in Ute Energy;

1

**APPENDIX PAGE 342**

UIT_001290

05·116

**WHEREAS,** both Ute Energy and Ute Holdings have now been formed as Delaware limited liability companies by the filing of a *Certificate of Formation* in Delaware for each company;

**WHEREAS,** the operations of Ute Energy LLC will be conducted in accordance with the *LLC Operating Agreement* that has been provided to the Business Committee for review;

**WHEREAS,** the various parties holding an equity interest in Ute Energy will execute an *Investor Rights Agreement*, which sets out the rights of the parties to participate in the management of the company, and also creates rights to participate in different types of sales of additional equity in the company, or other sales of membership interests in the company.

**WHEREAS,** Ute Energy will have available to it a $75 million line of credit with Laminar Direct Capital LP ("Laminar"), in accordance with the *Credit Agreement* provided to the Business Committee for review;

**WHEREAS,** the Credit Agreement provides that the assets of Ute Energy will be pledged as collateral for funds advanced by Laminar, but does not make the Tribe a guarantor of any debts of Ute Energy;

**WHEREAS,** the Credit Agreement will include as exhibits forms of agreements that will be used to create that security interest, including a *Pledge Agreement*, a *Mortgage*, a *Security Agreement*, and a *Guarantee*; these agreements will allow the Lender, Laminar, to look to the assets of Ute Energy to cure any default under the Credit Agreement;

**WHEREAS,** because the Tribe is currently the party to the agreements being assigned to Ute Energy Holdings and Ute Energy, the Tribe will execute a *Contribution Agreement* setting out the agreements being contributed, and the equity that the Tribe and Ute Energy Holdings will receive in return;

**WHEREAS,** as part of Laminar's financing of Ute Energy, Laminar will purchase a 10% equity interest in Ute Energy for the sum of $4 million, and will be provided the opportunity to purchase an additional 5% equity interest in Ute Energy;

**WHEREAS,** because Laminar is purchasing an interest in Ute Energy, Laminar will enter into an *LLC Interest Purchase Agreement* with Ute Energy, and will also sign an *Equity Option Agreement* setting out the terms and conditions under which Laminar may purchase an additional five percent interest in the company;

**WHEREAS,** in order to make possible the financing provided in the Credit Agreement, the Tribe is to make certain covenants and representations regarding the Working Interests under the *Master Agreement* that has been provided to the Business Committee for review;

**WHEREAS,** the Venture Fund Board has considered the various transactions involved in establishing, financing, and operating Ute Energy and Ute Energy Holdings and, in its Resolution _05-009_ voted to approve the transactions;

2

**APPENDIX PAGE 343**

UIT_001291

05·116

**WHEREAS,** the Business Committee has reviewed the terms of the Credit Agreement, Master Agreement, LLC Operating Agreement, and other related document contemplated in the transactions described in this Resolution, as well as the Venture Fund Board's Resolution 05-009, and finds it in the best interests of the Tribe to approve the transactions contemplated therein;

**NOW THEREFORE, BE IT RESOLVED BY THE UINTAH AND OURAY TRIBAL BUSINESS COMMITTEE OF THE UTE INDIAN TRIBE** that it hereby approves of the formation, funding, and operation of the Ute Energy LLC and Ute Energy Holdings LLC as contemplated in the Credit Agreement, Master Agreement, LLC Operating Agreement, and related documents described in this Resolution;

**BE IT FURTHER RESOLVED** as part of the transactions contemplated in this Resolution, the Tribe approves the contribution of the Working Interests to Ute Energy LLC by way of Ute Energy Holdings LLC, and the establishment of a $75 million credit facility through Laminar using as collateral the Working Interests being assigned to Ute Energy;

**BE IT FINALLY RESOLVED** that the Chairman or, in her absence, the Vice Chairman, is authorized to execute any and all documents as may be necessary and appropriate to carry out the terms, conditions and intent of this Resolution.

_____        _____
Maxine Natchees, Chairman               T. Smiley Arrowchis, Vice Chairman

_____        _____Absent_____
O. Roland McCook, Sr., Member           Richard Jenks, Jr., Member

_____        _____
Fabian Jenks, Member                    Ridley Eaglechief, Member

### CERTIFICATION

I hereby certify that the above resolution was adopted by the Uintah and Ouray Tribal Business Committee under the authority of the Constitution and By-Laws of the Ute Indian Tribe at a meeting held in Ft. Duchesne, Utah, on the 31st  day of  March  , 2005, at which time a quorum was present and voted   5   for,   0   against, and   1   absent.

_____
Business Committee Secretary

**APPENDIX PAGE 344**

UIT_001292

Resolution No. _07-124_

**WHEREAS,** the Tribal Business Committee ("Business Committee") of the Ute Indian Tribe of the Uintah and Ouray Reservation ("Tribe") is empowered by Article VI, Sections 1 (c) and 1 (f) of the Constitution and By-Laws of the Tribe to regulate the economic affairs of the Tribe;

**WHEREAS,** through Ute Tribal Ordinance 01-007, the Business Committee enacted a long-term Financial Plan for the Tribe, which Ordinance was then ratified and approved by referendum vote of the Tribal membership on December 20, 2001, and amended by referendum vote on January 4, 2007;

**WHEREAS,** in furtherance of the goals set forth in the Financial Plan, the Tribe has taken a proactive approach to the management of its natural resources, and has sought out opportunities to create unique partnerships with industry relating to the exploration and development of mineral resources on and around the Uintah and Ouray Reservation;

**WHEREAS,** the Tribe's proactive approach to its mineral estate has enabled it to reach a Letter of Intent with the Utah School & Institutional Trust Lands Administration ("SITLA") dated February 13, 2006, describing the manner in which the Tribe and the State will pursue the relinquishment of certain State trust lands to the United States for the benefit of the Tribe, and for the State to replace those relinquished lands with in lieu selections from lands administered by the Bureau of Land Management (the "SITLA LOI");

**WHEREAS,** the SITLA LOI contemplates that the Tribe and SITLA will enter into a definitive agreement for the exploration and development of mineral lands obtained by SITLA through the in lieu selection process, including the issuance of leases for such acquired minerals to the Tribe;

**WHEREAS,** the Tribe has also negotiated a separate Letter Agreement dated March 22, 2005 for the joint acquisition and development of federal, state and fee oil and gas leases within a specified Area of Mutual Interest ("AMI") by Questar Exploration & Production Company ("QEP") and FIML Natural Resources, LLC ("FNR") and the Tribe (the "AMI Agreement");

**WHEREAS,** the AMI Agreement also anticipates that QEP, FNR, and the Tribe will jointly acquire seismic data within the AMI, which seismic data may be transferred to third parties upon the written consent of the other parties to the AMI Agreement;

**WHEREAS,** the Tribe, through its Venture Fund, has already contributed to the acquisition of seismic data within the AMI;

**WHEREAS,** the Tribe has also taken a new step in its economic affairs to capitalize upon the valuable interests it has worked to acquire by creating, financing and operating an oil and gas exploration and development company known as Ute Energy LLC ("Ute Energy");

**WHEREAS,** Ute Energy has been capitalized, in part, through the contribution of prior working interests and rights of participation similar to those described above that were held by the Tribe and the Jurrius Ogle Group;

1

**APPENDIX PAGE 345**

UIT_001295

**WHEREAS,** in order to further promote the success of Ute Energy, and to increase energy development on the Reservation, the Business Committee finds that it will benefit the Tribe and its members to contribute the Tribe's commercial interests in the SITLA LOI and AMI Agreement to Ute Energy;

**WHEREAS,** the Tribe's commercial interests under the SITLA LOI consist primarily of the Tribe's right to receive oil and gas leases of the in lieu lands selected by SITLA, and the transfer of such interests to Ute Energy are contemplated by the terms of the SITLA LOI;

**WHEREAS,** the Tribe's commercial interests under the AMI Agreement concern the acquisition of federal, state and fee leases, the opportunity to participate in development on leases within the AMI, and acquisition and use of seismic data;

**WHEREAS,** the interests to be contributed to Ute Energy will consist solely of commercial rights under the respective agreements, and will exclude any governmental rights to regulate the conduct of activities on Reservation lands as well as the rights of the Tribe as a landowner and lessor (collectively, the "Governmental Rights");

**WHEREAS,** the Business Committee also recognizes that the Tribe's Financial Consultant, the Jurrius Ogle Group ("JOG"), was granted certain rights to participate in oil and gas transactions or projects identified and developed by JOG for the benefit of Tribe pursuant to the Financial Consulting Agreement between JOG and the Tribe;

**WHEREAS,** by assigning these commercial interest to Ute Energy, the Business Committee acknowledges that JOG will participate in the oil and gas projects through its equity ownership in Ute Energy, as anticipated under the Financial Consulting Agreement;

**WHEREAS,** contribution of commercial interests under the SITLA LOI and AMI Agreement will be subject to final preparation of instruments of transfer capturing the terms and intent described above in this Resolution, as well as a recommendation for approval of the same by the Tribe's Financial Advisor;

**NOW, THEREFORE, BE IT RESOLVED BY THE UINTAH AND OURAY TRIBAL BUSINESS COMMITTEE OF THE UTE INDIAN TRIBE** that it hereby approves the assignment of the Tribe's commercial interests under the SITLA LOI and AMI Agreement to Ute Energy, provided that such transfer shall affect only the Tribe's commercial interests, and shall exclude any of the Tribe's Governmental Rights in the affected lands;

**BE IT FURTHER RESOLVED** that the transfer of the aforementioned commercial rights shall be contingent upon final preparation of instruments of transfer capturing the terms and intent of this Resolution described above, and upon a recommendation for approval of the same by the Tribe's Financial Advisor;

**BE IT FURTHER RESOLVED** that the Tribe's Venture Fund shall be reimbursed by Ute Energy for any reasonable out of pocket expenses associated with the SITLA LOI or AMI

2

**APPENDIX PAGE 346**

UIT_001296

Agreement, including expenditures for seismic operations within the AMI, provided that the transfer of, or reimbursement for, seismic data shall be contingent upon obtaining the prior written consent of FNR and QEP to such transfer;

**BE IT FINALLY RESOLVED** that the Chairman or, in her absence, the Vice-Chairman, is authorized to execute any and all documents as may be necessary and appropriate to carry out the terms, conditions and intent of this Resolution.

_____
Maxine Natchees, Chairman

_____
T. Smiley Arrowchis, Vice-Chairman

_____
Irene C. Cuch, Member

_____
Ronald Groves, Member

_____
Richard Jenks, Jr., Member

_____
Frances Poowegup, Member

## CERTIFICATION

**I HEREBY CERTIFY THAT THE FOREGOING** Resolution was adopted by the Tribal Business Committee of the Ute Indian Tribe of the Uintah and Ouray Reservation pursuant to the Constitution and By-Laws of the Ute Indian Tribe of the Uintah and Ouray Reservation at a duly called meeting in Fort Duchesne____, Utah on the _2_ day of ___May_____, 2007, at which time a quorum was present and voted _6_ **for** and _0_ **against,** _0_ **abstaining** and **absent.** _0_

_____
Dana West, Secretary, Tribal Business Committee
Ute Indian Tribe, Uintah & Ouray Reservation
Denene Kane, Tribal Secretary

3

UIT_001297

Resolution No. **0 7 · 1 8 3**

**WHEREAS,** the Tribal Business Committee ("Business Committee") of the Ute Indian Tribe of the Uintah and Ouray Reservation ("Tribe") is empowered by Article VI, Sections 1(c) and 1(f) of the Constitution and By-Laws of the Tribe to regulate the economic affairs of the Tribe;

**WHEREAS,** through Ute Tribal Ordinance 01-007, the Business Committee enacted a long-term Financial Plan for the Tribe, which Ordinance was then ratified and approved by referendum vote of the Tribal membership on December 20, 2001, and amended by referendum vote on January 4, 2007;

**WHEREAS,** in furtherance of the goals set forth in the Financial Plan, the Tribe has taken a proactive approach to the management of its natural resources, and has sought out opportunities to create unique partnerships with industry relating to the exploration and development of mineral resources on and around the Uintah and Ouray Reservation;

**WHEREAS,** as part of that effort, the Tribe participated in the formation of Ute Energy Holdings, LLC and Ute Energy, LLC on May 4, 2005;

**WHEREAS,** in return for equity ownership in Ute Energy Holdings and Ute Energy, the Tribe contributed to Ute Energy its commercial interests in (1) the Exploration and Development Agreement dated July 13, 2004 among Bill Barrett Corporation, Berry Petroleum Company and the Tribe covering lands in the Lake Canyon area (the "Lake Canyon EDA"), (2) the Exploration and Development Agreement dated March 31, 2005 between Questar Exploration and Production Company and the Tribe covering lands in the Wolf Flat area (the "Wolf Flat EDA"); and (3) the membership interest of the Tribe in UTE/FNR, LLC formed pursuant to a limited liability company agreement dated July 10, 2002 between FIML Natural Resources, LLC ("FNR") and the Tribe, as amended.

**WHEREAS,** UTE/FNR holds certain interests in (1) the Amended and Restated Exploration and Development Agreement for the Naval Oil Shale Reserve area dated May 10, 2001 ("NOSR EDA") and (2) the Exploration and Development Agreement dated August 20, 2003 between the Tribe and UTE/FNR, as amended by the First Amendment to Exploration and Development Agreement dated April 27, 2004 between the Tribe and UTE/FNR (the "Brundage Canyon EDA");

**WHEREAS,** effective December 1, 2005, Ute Energy became a member of Uintah Basin Field Services, LLC, which owns and operations a natural gas pipeline on Tribal lands;

**WHEREAS,** the original members of Ute Energy were (1) Ute Holdings, (2) The Jurrius Ogle Group, LLC ("JOG"), and (3) Laminar Direct Capital L.P. ("Laminar");

**WHEREAS,** certain participation rights held by JOG pursuant to its contracts with the Tribe are acknowledged and implemented through the equity ownership of JOG in Ute Energy and Ute Energy Holdings;

1

**APPENDIX PAGE 348**

UIT_001298

07.183

**WHEREAS,** Ute Holdings, JOG and Laminar entered into a series of agreements contemporaneously with the formation of Ute Energy affecting the equity ownership of Ute Energy, including (1) a Master Agreement, (2) an Investor's Rights Agreement, (3) an Equity Option Agreement, (4) an Initial Option Grant Acknowledgement, and (5) an LLC Interest Purchase Agreement (collectively, the "Laminar Equity Agreements");

**WHEREAS,** Laminar provided a credit facility to Ute Energy contemporaneously with the formation of Ute Energy to allow Ute Energy to exercise and exploit the commercial interests assigned to Ute Energy by the Tribe, the terms of which are set forth in, among other documents, (1) a Credit Agreement, (2) a Promissory Note, (3) a Pledge Agreement from Ute Energy, (4) a Pledge Agreement by the members of Ute Energy, and (5) a Security Agreement, all dated May 4, 2005 (collectively, the "Credit Agreements").

**WHEREAS,** at present, Ute Energy has borrowed approximately $40.2 million under the Credit Agreements, and Laminar has indicated that it does not wish to make further funds available under the Credit Agreements;

**WHEREAS,** the Tribe and the Boards of Ute Energy and Ute Energy Holdings have determined that it is in the interest of Ute Energy and Ute Energy Holdings to (1) terminate the Credit Agreements by paying off and fully discharging all obligations under the Laminar credit facility and (2) seek a partner in Ute Energy to allow the further exercise and exploitation of the commercial interests currently held by Ute Energy;

**WHEREAS,** the Tribe has determined that securing a new partner in Ute Energy will allow the further exercise and exploitation of additional commercial interests developed by the Tribe since the formation of Ute Energy, and therefore the Ute Tribe intends to assign to Ute Energy its commercial interests in the following agreements, as previously approved by the Business Committee:

a) Exploration and Development Agreement among the Ute Indian Tribe, Dominion Exploration & Production, Inc., and the Ute Distribution Corporation, dated December 22, 2006 ("Little Canyon EDA");

b) Exploration and Development Agreement among the Ute Indian Tribe, Newfield Production Company, and the Ute Distribution Corporation, dated December 22, 2006 ("Monument Butte EDA");

c) Pooling Agreement and Joint Operating Agreement between Questar and Ute Energy dated September 15, 2006 ("Section 36 Agreement");

d) Exploration and Development Agreement among the Ute Indian Tribe, Bill Barrett Corporation, and the Ute Distribution Corporation," dated December 22, 2006 ("Black Tail Ridge EDA");

2

**APPENDIX PAGE 349**

UIT_001299

e)  Certain lease rights available to the Tribe pursuant to a Letter of Intent with the Utah School & Institutional Trust Lands Administration ("SITLA") dated February 13, 2006 (the "SITLA LOI");

f)  Letter Agreement dated March 22, 2005 for the joint acquisition and development of federal, state and fee oil and gas leases within a specified Area of Mutual Interest ("AMI") by Questar Exploration & Production Company ("QEP") and FIML Natural Resources, LLC ("FNR") and the Tribe (the "AMI Agreement");

g)  Letter Agreement allowing the Tribe to participate in a farmout agreement between Questar Exploration and Production Company and CDX GAS, LLC dated April 1, 2006 (the "CDX Farmout Agreement");

h)  Letter Agreement between the Tribe and Westport Field Services LLC dated February 6, 2007 concerning participation in the Westport Field Services LLC Gas Processing Plant ("Gas Plant Agreement"); and

i)  Letter of Intent between the Tribe and Questar Gas Management Company dated May 11, 2007 concerning the formation of Three Rivers Gathering LLC and construction and operation of a gas gathering pipeline.

Collectively, these Tribal commercial interests are the "Newly Contributed Interests."

**WHEREAS,** to allow the further growth and development of Ute Energy, the Tribe entered into a series of negotiations designed to secure further capital investment in Ute Energy to allow the company to exercise its participation rights under exploration and development agreement and participate in midstream gas transportation and processing projects, while assuring that the Tribe would not need to increase its financial risk and exposure by contributing cash to Ute Energy;

**WHEREAS,** these negotiations resulted in the execution of a Letter Agreement and Term Sheet between Ute Energy, Quantum Energy Partners IV, LP ("QEP") and Quantum Resources, LP ("QR") (QEP and QR and their affiliates are collectively, "Quantum") (the "Quantum Letter Agreement and Term Sheet," attached to this Resolution as Exhibit A), as considered and endorsed by the Business Committee in Resolution _____;

**WHEREAS,** under the terms of the Quantum Letter Agreement and Term Sheet, among other things, (1) QEP and QR will each invest $20 million in common equity in Ute Energy, for a total of $40 million, which will be used to pay off and terminate the Laminar credit facility, (2) QEP and QR will each acquire a 25 percent ownership interest in Ute Energy; (3) the remaining 50 percent interest in Ute Energy will continue to be held by Ute Energy Holdings, Laminar and JOG, in percentage ownership (including Laminar equity options) proportional to their current ownership; (4) certain decisions will require the approval of Ute Energy Holdings and either QEP or QR, but not both; (5) QEP and QR will each provide an additional $20 million in cash (for a total of $40 million) to Ute Energy for the exploitation of the commercial interests assigned to Ute Energy, in return for redeemable preferred units in Ute Energy; (6) QEP and QR will each provide an additional $5 million (for a total of $10 million) of capital to Ute Energy

3

**APPENDIX PAGE 350**

UIT_001300

upon request of the company; (7) Ute Energy will create non-voting management incentive units to allow the managers of Ute Energy to share in potential profits of the company, equal to ten percent of the economic return to Ute Energy;

**WHEREAS,** the Tribe requires that the Board of Ute Energy shall be composed of ten members, five of which shall be allocated to Ute Energy Holdings;

**WHEREAS,** Ute Energy has been engaged in negotiations to implement the terms of the Quantum Letter Agreement and Term Sheet, and those negotiations have resulted in a draft "Amended and Restated Operating Agreement of Ute Energy, LLC" and a "Unit Purchase Agreement for Ute Energy, LLC" (attached to this Resolution as Exhibits B and C, respectively);

**WHEREAS,** the Amended and Restated Operating Agreement of Ute Energy, LLC is an amendment to the existing LLC Operating Agreement for Ute Energy, and has been amended primarily (although not exclusively) to provide for the new capitalization of Ute Energy pursuant to the terms of the Quantum Letter Agreement and Term Sheet;

**WHEREAS,** the Unit Purchase Agreement sets forth various terms and conditions related to the purchase by Quantum of an equity interest in Ute Energy;

**WHEREAS,** because the Quantum investment will be used to pay off and fully discharge the obligations of Ute Energy under the Laminar credit facility, Ute Energy and Laminar desire to execute a series of instruments, including a Consent and Termination Agreement substantially in the form attached as Exhibit D, designed to assure that the Credit Agreements will be of no further force and effect, and that Laminar shall have no further lien on the assets or membership interests of Ute Energy;

**WHEREAS,** the equity investment of Laminar shall be governed entirely by the Amended and Restated Operating Agreement of Ute Energy, and therefore the Consent and Termination Agreement shall also require termination of the Laminar Equity Agreements concurrently with the Quantum investment in Ute Energy, and set forth a process for addressing Laminar equity options;

**WHEREAS,** the existing members of Ute Energy (Ute Holdings, JOG and Laminar) will enter into a Governance Agreement setting forth how decisions will be made among the existing members after the investment by Quantum (a copy of the current draft of the Governance Agreement is attached as Exhibit E).

**WHEREAS,** the Tribe currently holds a majority interest in Ute Energy Holdings, and through Ute Energy Holdings a indirect majority interest in Ute Energy;

**WHEREAS,** a significant element of the transaction contemplated by the Quantum Letter Agreement and Term Sheet is the contribution of the Newly Contributed Interests to Ute Energy;

**WHEREAS,** the Venture Fund Board of the Tribe has considered the transaction contemplated by the Quantum Letter Agreement and Term Sheet, and found that transaction to be in the best

4

**APPENDIX PAGE 351**

UIT_001301

interest of the Tribe and its members, as well as Ute Energy and Ute Energy Holdings, as set forth in Venture Fund Board Resolution No. 07-008;

**WHEREAS**, the Tribe has considered the transaction contemplated by the Quantum Letter Agreement and Term Sheet, and finds that transaction to be in the best interest of the Tribe and its members, as well as Ute Energy and Ute Energy Holdings;

**NOW, THEREFORE, BE IT RESOLVED BY THE UINTAH AND OURAY TRIBAL BUSINESS COMMITTEE OF THE UTE INDIAN TRIBE** that it approves the transaction contemplated by the Quantum Letter Agreement and Term Sheet;

**BE IT FURTHER RESOLVED** that the Tribe approves and authorizes the execution by Ute Energy Holdings or Ute Energy, as the case may be, of (1) the Amended and Restated Operating Agreement for Ute Energy, (2) the Unit Purchase Agreement, (3) the Consent and Termination Agreement, and (4) the Governance Agreement, all in a form substantively similar to the exhibits attached to this Resolution, as well as such other instruments, agreements, and documents necessary or appropriate to assure completion of the transaction contemplated by the Quantum Letter Agreement and Term Sheet;

**BE IT FURTHER RESOLVED** that the Tribe shall, to assure completion of the transaction contemplated by the Quantum Letter Agreement and Term Sheet, assign the Newly Contributed Interests to Ute Energy;

**BE IT FURTHER RESOLVED** that the Tribe shall take such steps as necessary or appropriate to assure completion of the transaction contemplated by the Quantum Letter Agreement and Term Sheet;

**BE IT FINALLY RESOLVED** that the Chairman or, in his absence, the Vice-Chairman, is authorized to execute any and all documents as may be necessary and appropriate to carry out the terms, conditions and intent of this Resolution.

_____
Curtis Cesspooch, Chairman

ABSENT
_____
Irene C. Cuch, Vice-Chairman

_____
Steven Cesspooch, Member

_____
Phillip Chimburas, Member

5

**APPENDIX PAGE 352**

UIT_001302

07.183

_Ronald Groves, Member_                    _Frances Poowegup, Member_

## **CERTIFICATION**

**I HEREBY CERTIFY THAT THE FOREGOING** Resolution was adopted by the Tribal Business Committee of the Ute Indian Tribe of the Uintah and Ouray Reservation pursuant to the Constitution and By-Laws of the Ute Indian Tribe of the Uintah and Ouray Reservation at a duly called meeting in ___Ft. Duchesne___, Utah on the _26_ day of ___June___, 2007, at which time a quorum was present and voted _5_ **for** and _0_ **against**, _0_ **abstaining** and **absent**._1_

Secretary, Tribal Business Committee
Ute Indian Tribe, Uintah & Ouray Reservation

6

**APPENDIX PAGE 353**

UIT_001303

# SUMMARY EXHIBIT AS PERMITTED BY RULE 18 OF THE UTE INDIAN RULES OF CIVIL PROCEDURE AND RULE 1006 OF THE FEDERAL RULES OF EVIDENCE

## SCHEDULE OF UTE TRIBE'S ASSETS TRANSFERRED INITIAL INTEREST IN UTE ENERGY HOLDINGS, LLC.

| CONTRACT | DATE OF AGREEMENT | PARTIES | RIGHTS, TITLE & INTEREST | TRANSFER DATE |
|---|---|---|---|---|
| UTE/FNR LLC | July 10, 2001 | FIML<br>Ute Tribe | 33% Member interest in all projects | May 4, 2005 |
| LAKE CAYNON EDA | July 2004 RESTATED September 2004 | Bill Barrett<br>Berry Petroleum<br>Ute Tribe | 25% Participation in development of 124,555 net mineral acres + right to 25% ownership in all gathering an pipeline facilities within the Lake Canyon EDA area, (lake Canyon Transportation and Gathering, LLC (organized April 12, 2006) | May 4, 2005 |
| WOLF FLAT EDA | March 31, 2005 | Questar Exploration<br>Ute Tribe | Upto a 50% working interest in oil and gas development | May 4, 2005 |

**APPENDIX PAGE 354**

UIT_001304

## SCHEDULE OF UTE TRIBE'S ASSETS TRANSFERRED TO UTE ENERGY ON MAY 7, 2007

| CONTRACT | DATE OF AGREEMENT | PARTIES | RIGHTS, TITLE & INTEREST | TRANSFER DATE |
|---|---|---|---|---|
| MONUMENT BUTTE EDA | December 22, 2006 | Newfield<br>Ute Tribe | Right to participate for a 25% working interest in oil and gas development | May 7, 2007 |
| LITTLE CANYON EDA | December 22, 2006 | Bill Barrett<br>Ute Tribe | Right to participate for a 25% working interest in oil and gas development | May 7, 2007 |
| SITLA | February 2, 2007 | State of Utah School & Institutional Trust Lands Administration<br>Ute Tribe | Land exchange or lease with right to develop minerals | May 7, 2007 |
| DOMINON LITTLE CANYON EDA | December 12, 2006 | Dominion Exploration<br>Ute Tribe | Right to participate for a 25% working interest in oil and gas development | May 7, 2007 |

**APPENDIX PAGE 355**

UIT_001305

## SCHEDULE OF UTE TRIBE'S ASSETS TRANSFERRED

| CONTRACT | DATE OF AGREEMENT | PARTIES | RIGHTS, TITLE & INTEREST | TRANSFER DATE |
|---|---|---|---|---|
| Three Rivers Gathers (East West Header) | April, 2007 | Questar Gas Ute Tribe | 50% membership interest in Three Rivers Gathers Pipeline, LLC | July 2, 2007 |
| Uintah Basin Field Services, LLC | December 1, 2005 | Questar Gas UTE/FNR, LLC (Ute Tribe & FIML) | 33% interest in UTE/FNR, LLC's interest in UBFS, LLC (construction and ownership in pipeline, gas gathering systems and compressor station from NORS II to Questar mainline (Tribes held a 24% interest) | July 2, 2007 |

**APPENDIX PAGE 356**

UIT_001306

Frances C. Bassett, *Admitted Pro Hac Vice*
Jeremy J. Patterson, *Admitted Pro Hac Vice*
Thomasina Real Bird, *Admitted Pro Hac Vice*
**FREDERICKS PEEBLES & MORGAN LLP**
1900 Plaza Drive
Louisville, Colorado 80027-2314
Telephone: (303) 673-9600
Facsimile: (303) 673-9155
Email: fbassett@ndnlaw.com
Email: jpatterson@ndnlaw.com
Email: trealbird@ndnlaw.com

J. Preston Stieff (4764)
**J. PRESTON STIEFF LAW OFFICES**
110 South Regent Street, Suite 200
Salt Lake City, Utah 84111
Telephone: (801) 366-6002
Email: jps@stiefflaw.com

*Attorneys for Plaintiffs*

---

**UNITED STATES DISTRICT COURT**
**DISTRICT OF UTAH, CENTRAL DIVISION**

---

| | |
|---|---|
| UTE INDIAN TRIBE OF THE UINTAH & OURAY RESERVATION, a federally recognized Indian tribe, et al., <br><br> Plaintiffs, <br><br> v. <br><br> HONORABLE BARRY G. LAWRENCE, District Judge, Utah Third Judicial District Court, in his Individual and Official Capacities, and LYNN D. BECKER, <br><br> Defendants. | **DECLARATION OF RONALD L. SEIGNEUR** <br><br><br> CASE No. 2:16-cv-00579 <br><br> **Judge Robert J. Shelby** |

---

I, Ronald L. Seigneur, am over 18 years of age. I have personal knowledge of the facts set forth herein, and if called upon, I will testify to the facts and opinions set forth herein and in my attached expert report.

1.    I am a certified public accountant (CPA), a senior appraiser in business valuation (ASA), accredited in business valuation (ABV), a certified valuation analyst (CVA), and certified in Financial Forensics (CFF). *See* Attachment A.

2.    I am an expert witness retained by the Ute Indian Tribe, the Tribe's governing body, its Tribal Business Committee, and Ute Energy Holdings LLC, a wholly tribally-owned commercial entity (collectively referred to herein as the "Tribe" or "Ute Tribe"), in *Becker v. Ute Indian Tribe, et al.*, case number 140908394, Third Judicial District Court, Salt Lake County, Utah, and related litigation.

3.    Pursuant to Rule 26(a)(4)(B) of the Utah Rules of Civil Procedure, I was asked to prepare an expert report in the case, a copy of which is attached hereto as Attachment B.

4.    My expert report contains the findings and opinions I reached following my review of the various financial, audit, and tax records that are listed in my expert report. My findings and opinions are based on my professional education, knowledge, training, experience and credentials, to a reasonable degree of professional certainty.

5.    In arriving at these findings and opinions, I adhered to generally accepted accounting principles (GAAP), and the methodologies that are generally accepted within the field of professional accounting.

2

**APPENDIX PAGE 358**

6.    The contents and conclusions in my expert report are my own, based on my work as an expert witness for the Ute Indian Tribe.

Pursuant to 28 U.S.C. § 1746, I hereby declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Executed this 20th day of October, 2017.

_____

Ronald L. Seigneur

3

**APPENDIX PAGE 359**

# ATTACHMENT A

## Ron Seigneur

Ronald L. Seigneur, MBA, CVA, ASA, CPA•ABV•CFF holds a B.A. in Hotel, Restaurant and Institutional Management from Michigan State University and an M.B.A. in Corporate Policy and Accounting from the University of Michigan. Ron is past chair of the American Institute of Certified Public Accountants (AICPA) ABV Credential Committee and just completed a three year term on the National Accreditation Commission. He is a past chair of the National Association of Certified Valuation Analysts (NACVA) Professional Standards Committee and the Colorado CPA Society Professional Development Board. Ron and was the chair of the Board of the Colorado Society of CPAs for the fiscal year ending April 30, 2010.

Ron is a Senior Appraiser (ASA) with the American Society of Appraisers, is a Certified Valuation Analyst (CVA) from NACVA and also holds the Accredited in Business Valuation (ABV) and Certified in Financial Forensics (CFF) designations from the AICPA. He has been involved for over 25 years in business valuation and litigation matters and has been qualified and provided testimony as an expert witness in several jurisdictions on a wide range of issues ranging from complex business and intellectual property valuations, financial forensic investigations, accounting malpractice claims, and various forms of economic damages. Ron also maintains an active practice as a Certified Public Accountant serving the needs of a broad array of businesses and individuals. In prior work experience, Ron has been a controller of a diversified family owned oil and gas company, a legal administrator for a 50 attorney Denver based law firm and has served on the board of directors or trustees of several organizations, including a 17th Street Denver bank, where he also served on the senior loan committee. Ron has served appointments as trustee, mediator, arbitrator, adjudicator and special master of the court. He is co-author of the 1300+ page treatise on business valuation topics titled Financial Valuation: Applications and Models 3rd Edition, published by John Wiley & Sons in 2011; and is co-author of Reasonable Compensation: Application and Analysis for Appraisal, Tax and Management Purposes, published by Business Valuation Resources in 2010. Ron was inducted into the AICPA ABV Hall of Fame in December 2006, as one of only 28 ABVs so recognized.

Ron is the managing partner at Seigneur Gustafson LLP where he is responsible for audit and tax compliance services, in addition to his primary focus on business valuation and related litigation support services. He has been an adjunct professor at the University of Denver, College of Law for over 20 years, where he teaches finance, leadership and management classes. Ron is nationally recognized as a consultant to law firms on valuation and practice management issues; and as an instructor, author, and course developer on business valuation science, leadership and professional firm management topics. He was inducted as a Fellow into the College of Law Practice Management in 2002 and has been a featured speaker at several national AICPA and NACVA conferences, as well as state bar associations, the Law Education Institute, 20 state CPA societies and the Environmental Protection Agency. Ron was honored to become a Charter Member of the Forensic & Business Valuation Division of the American Academy of Matrimonial Lawyers in August 2014.

Seigneur Gustafson LLP publishes **Valuation & Forensic/Litigation Support News** and is a member firm of Integra International, a global association of over 120 CPA and financial services firms in over 60 countries worldwide (www.integra-international.net). Ron's firm provides tax planning & compliance, financial reporting, and management advisory services to select clients of high integrity.

*Ron can be reached at:*
**Seigneur Gustafson LLP**
**940 Wadsworth Boulevard, Suite 200**
**Lakewood, Colorado 80214**
➢ **(303) 980-1111**
➢ **(303) 308-6969** *fax*
**ron.seigneur@cpavalue.com** *email*
**www.cpavalue.com**

## APPENDIX PAGE 361

# ATTACHMENT B

# Expert Report

### in the matter of

## Ute Indian Tribe of the Uintah and Ouray Reservation et al v. Lynn D. Becker
### Case No.  140908394
### Salt Lake County, Utah Third Judicial District Court

### as of
### April 20, 2017

**Prepared by:**

**Seigneur Gustafson LLP**
**Certified Public Accountants**



*Member of*
**INTEGRA INTERNATIONAL®**
*Your Global Advantage*



Expert
Resource
Connection, LLC



SEIGNEUR
GUSTAFSON LLP
CERTIFIED PUBLIC ACCOUNTANTS & ADVISORS
Beyond the Numbers®

April 20, 2017

Frances C. Bassett, Esq.
Fredericks Peebles & Morgan LLP
1900 Plaza Drive
Louisville, CO 80027

Re:  Ute Indian Tribe v. Lynn Becker
      Salt Lake County, Utah Third Judicial District Court
      Case No. 140908394

Dear Ms. Bassett:

We have been engaged to perform an independent review and provide this expert report to assist you in the determination of the various matters with regard to the captioned litigation. This report provides a summary of our expert findings and related disclosures.

Our report was prepared in connection with the above referenced matter and is solely for use in this matter, and is not to be used for any other purpose without the express written consent of Seigneur Gustafson LLP. We reserve the right to update this report and our conclusions in the event that additional information is provided or made known to us, but are under no obligation to do so.

Sincerely,

SEIGNEUR GUSTAFSON LLP

Ronald L. Seigneur, MBA, CVA, ASA, CPA/ABV/CFF
Accredited in Business Valuation
Certified Valuation Analyst

Ute Indian Trive v. Lynn Becker
Case No. 140908394
Salt Lake Countty, Utah Third Judicial District Court
April 20, 2017

# Table of Contents

REPORT CERTIFICATION ................................................................................................ 1

DESCRIPTION OF THE ASSIGNMENT ........................................................................... 2

QUALIFICATIONS ............................................................................................................. 2

BACKGROUND .................................................................................................................. 3

WORK STEPS ...................................................................................................................... 4

FINDINGS ............................................................................................................................ 4

CONCLUSIONS ................................................................................................................... 12

**Appendices**

*Statement of Assumptions and Limiting Conditions*
*Sources of Information*
*Qualifications of the Appraiser*



## REPORT CERTIFICATION

Matter/Report:    Ute Indian Tribe v. Lynn Becker
as of April 20, 2017

We certify that, to the best of our knowledge and belief:

- The statements of fact contained in our letter and/or report are true and correct.

- Our analysis, opinions, and conclusions are limited only by the reported assumptions and limiting conditions, and are our personal, unbiased professional analyses, opinions and conclusions.

- We have <u>no</u> present or prospective interest in the economic claims that are the subject of our testimony/report(s), and we have <u>no</u> personal interest or bias with respect to the parties involved.

- Our compensation for completing this assignment is fee-based and is not contingent upon the development or reporting of a predetermined result that favors the cause of the client, the outcome of the litigation, the amount of the opinion, the attainment of a stipulated result, or the occurrence of a subsequent event directly related to the intended use of this report.

- The parties for which the information and use of this expert report is restricted are identified herein; the report is not intended to be and should not be used by anyone other than such parties.

- We have no obligation to update the report or our opinions for information that comes to our attention after the date of the report, but reserve the right to do so.

- The report, inclusive of all accompanying schedules, exhibits, appendices should be considered only in its entirety and inclusive of the assumptions and limiting conditions as stated within.

Respectfully submitted,

_____    4/20/17
Ronald L. Seigneur, MBA, CVA, ASA, CPA/ABV/CFF    Date

Expert Report
Seigneur Gustafson LLP



**APPENDIX PAGE 366**

Ute Indian Trive v. Lynn Becker
Case No. 140908394
Salt Lake Countty, Utah Third Judicial District Court
April 20, 2017
Page 2

## DESCRIPTION OF THE ASSIGNMENT

Ronald L. Seigneur and the firm of Seigneur Gustafson LLP (collectively, "we") have been retained by the law firm of Fredericks Peebles & Morgan LLP to perform an independent review and analysis of the September 7, 2016 Expert Witness Report of Brian D. Cadman and Mr. Cadman's March 9, 2017 deposition in conjunction with certain litigation between the Ute Indian Tribe of the Uintah and Ouray Reservation (Ute Indian Tribe), Defendants, and Lynn D. Becker, Plaintiff. In addition, we have been retained to perform an independent review of the financial and tax records of Ute Energy LLC and Ute Energy Holdings LLC, and to determine the amount, if any, of "net revenue distributed to Ute Energy Holding, LLC from Ute Energy, LLC (and net of any administrative costs of Ute Energy Holdings)" per the Participation Plan in Mr. Becker's Independent Contractor Agreement.

## QUALIFICATIONS

I, Ronald L. Seigneur, am the author of this report and a licensed Certified Public Accountant in the state of Colorado and the managing partner of a CPA firm, Seigneur Gustafson LLP, engaged in the practice of public accounting, located in Lakewood, Colorado. I have been actively involved in public accounting since 1980 and have emphasized analysis and determinations of financial and economic related matters within my professional practice for over 25 years on a wide range of matters, including oil and gas operations, compensation related matters, independent contractor relationships, and related issues.

I have experience with oil and gas related matters. I have authored and taught continuing education courses on oil and gas accounting and appraisal, and was employed as the controller of a family owned oil and gas exploration and production company. I serve clients within my professional practice that invest in and hold investments in oil and gas.

I have taught a course titled Applied Leadership and Management Theory for Law Firms within the University of Denver, Sturm College of Law for 18 years and have been an Adjunct Professor within the Sturm Masters of Science of Legal Administration program for over 24 years. My professional experience includes being legal administrator and



**APPENDIX PAGE 367**

Ute Indian Trive v. Lynn Becker
Case No. 140908394
Salt Lake Countty, Utah Third Judicial District Court
April 20, 2017
Page 3

Chief Operating Officer for a 50 attorney law firm in the 1980s, where a significant portion of the practice was focused on serving oil and gas clientele. I am a Fellow of the College of Law Practice Management and a frequent speaker and author on economic damages, financial analysis, financial forensics and related topics.

I am the co-author of <u>Financial Valuation: Applications and Models</u>, a well-recognized treatise on business and intellectual property appraisal, 4th edition published in April 2017; and <u>Reasonable Compensation: Analysis and Application for Appraisal, Tax and Management Purposes</u>, a treatise published in 2010 for use as a reference guide when making determinations of reasonable/replacement compensation related issues.

I am a prior chair of the AICPA Accredited in Business Valuation Credential Committee, a prior member of the AICPA Consulting Services Executive Committee, and a prior chair of the Professional Standards Board of the National Association of Certified Valuation Analysts. Also refer to my Curriculum Vitae, attached as an appendix to this report.

## BACKGROUND

The cornerstone issue in this litigation matter pertains to the definition and calculation of the term "net revenue distributed", as found in the Exhibit B – Participation Plan, as part of the April 27, 2005 Independent Contractor Agreement (the Agreement), between Mr. Lynn Becker and the Ute Indian Tribe of the Uintah and Ouray Reservation in Utah.

We have been asked to:

- Determine the amount, if any, of the net revenue distributed from Ute Energy LLC (UELLC) to Ute Energy Holdings LLC (UEH);
- Comment on the generally accepted definition, if any, of net revenue distributed within the oil and gas industry and the accounting field;
- Comment on the differences between the valuation of oil and gas interests based on net revenue, as compared to net revenue distributed;

We reserve the right to supplement the comments and opinions provided herein, upon receipt of any additional information, but are not under any obligation to do so.

Expert Report
Seigneur Gustafson LLP



**APPENDIX PAGE 368**

Ute Indian Trive v. Lynn Becker
Case No. 140908394
Salt Lake Countty, Utah Third Judicial District Court
April 20, 2017
Page 4

## WORK STEPS

In connection with our research and analysis we undertook certain work steps, including:

- We reviewed the documents and information included in the Sources of Information section of this report.

- We had discussions with legal counsel to the Ute Indian Tribe

- We considered prior engagements and 30+ years of work experience involving oil and gas industry accounting and taxation related matters, incentive compensation matters, use of independent contractor relationships and related issues.

We have been asked to read, analyze, and rebut Mr. Cadman's expert witness report, dated September 7, 2016, and his deposition testimony of March 9, 2017, and to provide our expert opinion regarding the net revenues distributed to Ute Energy Holdings LLC from Ute Energy LLC over the years 2005 through 2015.

## FINDINGS

The Exhibit B - Participation Plan of the Independent Contractor Agreement between the Ute Indian Tribe of the Uintah and Ouray Reservation, Utah, and its subsidiaries and affiliates, and Lynn D. Becker, dated April 27, 2005 (the "Agreement"),  states:

> 1. In recognition of Contractor's services, Contractor shall receive a beneficial interest of two percent (2%) of **net revenue distributed** to Ute Energy Holdings, LLC from Ute Energy, LLC (and net of any administrative costs of Ute Energy Holdings) ("Contractor's Interest"). (Emphasis added)

> 2. In the future, a) if the Tribe participates in any projects involving the development, exploration and/or exploitation of minerals in which the Tribe has any participating interest and/or earning rights, or similar commercial interests and Contractor is providing services under this agreement, and b) the Tribe elects not to place such interests in Ute Energy Holdings, LLC, then Contractor shall receive a two percent (2%) beneficial net revenue interest in such assets, provided however, that in the event the Tribe should enter into an agreement under which

Expert Report
Seigneur Gustafson LLP



**APPENDIX PAGE 369**

the Tribe would be required to pay any project costs or expenses without the benefit of financing or a form of carried interest, then Contractor agrees that in the event Contractor elects to participate in such projects, Contractor shall in the same manner as the Tribe pay two percent (2%) of any project costs and expenses and receive the . net revenue attributable to such participation interest.

3. Contractor shall receive no interests in or incentive payments or payments of any kind based on any fees or revenues paid to the Tribe that are regulatory in nature including, but not limited to, the following: royalties, severance tax, through-put fees, surface or rights-of-way payments, and lease bonuses.

4. If, at any time, Contractor wishes to sell the Contractor Rights, Contractor agrees to notify the Tribe of his intention. The Tribe shall have 60 days to exercise this preferential right to purchase with a bona fide, market value offer to purchase on the same terms and conditions that any legitimate offer would entail.

5. If Contractor either Resigns without Cause or is Terminated for Cause before the date that is 30 months from the Contract Date of this Agreement, then Contractor shall have the participation rights in this Participation Plan only for projects for which the Tribe has executed the contracts creating the project on or before the date of termination.

It is Dr. Cadman's opinion "that Ute Energy LLC transferred net revenue of $378,709,233.74 to Ute Energy Holdings" (Cadman Report, page 2).

It appears, based on representation in his report, that Dr. Cadman has only relied upon: the Contract and Resolution between Becker and the Ute Indian Tribe of the Uintah and Ouray Reservation dated April 27, 2005; Laurie Bales Declaration and Waterfall Accounting Spreadsheet; Laure Bales Declaration II; and Scott Trulock Declaration in reaching this conclusion.

We also reviewed these documents in our analysis, but find they do not contain sufficient information to determine the "net revenues distributed" from Ute Energy LLC to Ute Energy Holdings LLC over the years 2005 through 2015.

Expert Report
Seigneur Gustafson LLP



**APPENDIX PAGE 370**

Ute Indian Trive v. Lynn Becker
Case No. 140908394
Salt Lake Countty, Utah Third Judicial District Court
April 20, 2017
Page 6

We have also analyzed the complete Federal partnership returns for Ute Energy LLC for the tax yeas of 2005 through 2015, which included K-1s for all partners, as well as the audited financial statements prepared by EKS&H for the years 2005 through 2012 for Ute Energy LLC.

Dr. Cadman admits that "*a quantification of any net revenue would be more easily measured by an inspection of the audited financial reports alluded to in Mr. Trulock's Declaration, which have not been provided.*" (Cadman report, page 3)

Dr. Cadman did not analyze these documents, as he stated they were unavailable to him for his analysis in September 2016. We, on the other hand, did analyze the audited financial statements for 2005 through 2012, and believe our opinion is more reliable based on our thorough analysis of the audited financial statements and tax returns.

We note that in his report, Dr. Cadman is erroneously talking about *net revenues*, alone, which are very different from *net revenues distributed*. Indeed, net revenues distributed, as termed in the Agreement between Mr. Becker and the Tribe, are difficult to define, as, to the best of our knowledge, the full term, net revenue distributed, is not found in any accounting text book, reference material, or other research we conducted in an effort to define this term.

Dr. Cadman defines Net Revenue as "*the total revenue generated by a company through sales less the revenue given u through returns and allowances, and sales discounts.*" (page 4 of Cadman Report) He then goes on to say "*this means that the capitalization, financing, cash flows, and net income are not relevant to the calculation of net revenue.*" Cadman Report, page 4).

We agree that generally, Dr. Cadman's definition of Net Revenue is correct in the abstract. However, we also offer the following recognized definitions for consideration:

- "Revenues: inflows or other enhancements of assets or an entity or settlement of its liabilities (or a combination of both) during a period from delivering or producing goods, rendering services, or other activities **that constitute the entity's ongoing major or central operations**"[1] (emphasis added)

---

[1] Intermediate Accounting, Kieso & Weygandt, 7th edition, page 39

Expert Report
Seigneur Gustafson LLP



- "Net Sales Revenue: Sales revenue less sales discounts and allowances"[2]

- "Net Revenue Interest (oil and gas) – A share of production after all burdens, such as royalty and overriding royalty, have been deducted from the working interest. It is the percentage of production that each party actually receives." Schlumberger oilfield glossary, www.glossary.oilfield.slb.com

We note an explanatory paragraph from an Intermediate Accounting text book, which states "the distinction between revenues and gains and the distinction between expenses and losses depend to a great extent on the typical activities of the enterprise. For example, the sales price of investments sold by an insurance company such as Mutual of Omaha would generally be classified as revenue, whereas the sales price less book value on the sale of an investment by a manufacturing enterprise (such as Inland Steel Co.) would be classified as a gain or loss. The different treatment results because the sale of investments by an insurance company is part of its regular operations, whereas in a manufacturing enterprise it is not." [3]

We mention this paragraph to show that sales proceeds from the sale of the oil and gas assets of Ute Energy LLC in 2012 do not constitute revenues or net revenues, as they were not "derived from the typical activities of the company," nor were they derived from the "activities that constitute the entity's ongoing major central operations."

Dr. Cadman's reliance on the Bales Waterfall Accounting Spreadsheet, which shows the Net Cash from the sales proceeds of the Upstream and Midstream assets to the partners in Ute Energy LLC, is therefore an incorrect method for determining "Net Revenue Distributed", as per the Agreement.

Dr. Cadman states "*the net value of a firm represents the discounted future net cash flows expected to be generated by the firm, where the expected cash flows include the expected net revenues less the expected expenses. Therefore, the new value of the firm is often less than the discounted net revenue generated by the firm. With this in mind, I conclude from the Waterfall Valuation that Ute Energy provided Ute Energy Holdings net revenue of at*

---

[2] Financial and Managerial Accounting, Horngren, Harrison, Oliver; p g-13
[3] Intermediate Accounting, Kieso & Weygandt, 7th edition, page 135

[4] Pursuant to the audited financial statements for 2005 and 2006; this distribution was not shown in the 2005 tax return.

Expert Report
Seigneur Gustafson LLP



*least $378,709,233.74, which is the net value distributed by Ute Energy to Ute Energy Holdings that is highlighted by Ms. Bales in her declaration.*" (Cadman Report, page 4)

We agree that often the value of an entity is determined by analysis of expected future cash flows or earnings, and discounting those expected cash flows or earnings back to present value at a risk adjusted discount rate; this is known generally as the discounted future benefits method of valuation. The problem with Dr. Cadman's statement is that he correctly says "expected cash flows" and follows that with "expected revenues" and "expected expenses." Clearly, expected future revenues ARE NOT the same as net revenues distributed. Nowhere in the Agreement does it say that Mr. Becker is entitled to any of the "expected future revenue" of Ute Energy LLC. The Agreement states, in part, "In recognition of Contractor's services, Contractor shall receive **a beneficial interest of two percent (2%) of net revenue distributed to Ute Energy Holdings, LLC from Ute Energy, LLC (and net of any administrative costs of Ute Energy Holdings) ('Contractor's Interest').**" Dr. Cadman's attempt at defining the net value of a firm actually works against him, because it is clear that "expected future revenues" cannot be equivalent to net revenue distributed (past tense) from Ute Energy LLC to Ute Energy Holdings LLC.

If we are to rely on the specific language of the Agreement, that Mr. Becker is entitled to a beneficial interest of two percent of net revenue distributed to Ute Energy Holdings LLC from Ute Energy LLC, it is impossible to determine what Mr. Becker is entitled to, because Net Revenues do not get distributed to partners or shareholders. In simplest terms, expenses are paid from the revenues of an entity, and the remaining amount of revenue left after payment of expenses is the net income. Net income, after deducting the operating expenses of the enterprise, is the amount that can potentially be distributed to partners or shareholders.

It is possible that the Agreement meant "net income distributed" from Ute Energy LLC to Ute Energy Holdings LLC, in which case, we would analyze the allocation of net income on the partner's Schedule K-1 of the federal income tax return. A preliminary analysis based on Exhibit A shows cumulative ordinary business income of $38,726,420 allocated from Ute Energy LLC to Ute Energy Holdings, LLC on the schedule K-1s provided for the period October 1, 2005 through December 31, 2015. However, the same tax schedules show section 59 expenditures in excess of $245 million. There is other activity on the Schedule K-1s that relates to investment and capital gains income.

Expert Report
Seigneur Gustafson LLP



However, if we look at the definition of net revenue interest (above), which is used in the oil and gas industry, as well as the language in the Agreement, this would indicate that Mr. Becker is only entitled to that portion of revenue derived from the Ute Energy's working interests in oil and gas properties, and any other source of income would be excluded from Mr. Becker's 2% interest. If this is the case, a thorough analysis of revenue would have to be undertaken to determine the sources of all revenue, and even then, expenses would still have to be deducted to determine the amounts available for distribution to Ute Energy Holdings from Ute Energy. So, it is possible that the Agreement means the amount of income received by Ute Energy LLC from its net revenue interests, which is then distributed to UEH after expenses are paid.

The equity account on the balance sheet is made up of capital contributions, retained earnings (from prior years), and current year net income. Distributions of cash to equity holders come from one of these sources. Distributions could be a return of capital contributions, or they could be from the company's earnings, either from the current or previous years. Capital contributions are the amounts that the partners contributed to the company in return for their ownership interests. A distribution from the capital contribution is a return of capital, and not a distribution of profits. Only the distributions resulting from the net profits of the company could possibly be considered "net revenue distributed." Based on the Operating Agreement, the partners are to each receive distributions equal to their capital contributions before any partner receives additional distributions, which is essentially a return of the partners' capital contributions.

With regard to the opinion of Mr. Scott Trulock, Dr. Cadman states:

> "He then goes on to describe the viability of Ute Energy and their cash flows. Because this case centers on the net revenue distributed by Ute Energy to Ute Energy Holdings, the viability and profitability of Ute Energy are not relevant to the case. The discussion of irrelevant events is particularly poignant when Mr. Trulock opines that, 'Ute Energy had incurred losses of 'almost $17 million through the date of the report'". This conclusion has two important weaknesses with respect to this case. First, Mr. Trulock supports this statement by making reference to audited balance sheets which have not been disclosed. Second, the profitability of Ute Energy is irrelevant because the terms of the Contract and Resolution, Document 7-1, paragraph 1 of Exhibit B focus on "net revenue."(Cadman report, page 5)



**APPENDIX PAGE 374**

Dr. Cadman's statement fails to include the term "net revenue distributed," which is precisely what the Agreement focuses on, not simply "net revenue." Dr. Cadman admits in his deposition that he cannot define the term "net revenue distributed." In his report, he has focused on the term "net revenue," but fails to understand that net revenue does not get distributed unless there are no expenses underlying the entity. He argues that the profitability of Ute Energy is irrelevant, but he is wrong because the Agreement talks about "net revenue distributed" to Ute Energy Holdings from Ute Energy. We reiterate, net revenues cannot be distributed in whole. Expenses of the entity are paid from net revenues. Any amount left over, after expenses have been paid, can be distributed if the entity chooses to do so. For illustrative purposes, assume an entity has net revenues of $100,000 and expenses of $150,000. The net income, after payment of expenses is minus $50,000. This entity would not be able to distribute net revenues or net income in this case, because all of the revenue was used on paying expenses of the entity. This is not an unusual situation with a start-up enterprise or one that is developing projects.

Any distribution amounts from Ute Energy LLC to Ute Energy Holdings LLC were from either profits (net income) or capital contributions, but net revenues were not distributed and could not be distributed under these circumstances.

We have analyzed the tax returns of Ute Energy LLC for the years 2005 through 2015, and the audited financial statements for the years 2005 through 2012. Our analysis of distributions from Ute Energy LLC to Ute Energy Holdings indicates that $3,600,000 was distributed in 2005 as of the formation of the entity[4] in accordance with section 8.3.2 of the Operating Agreement of Ute Energy LLC, when another partner (Laminar) bought into the partnership and paid $4,000,000 for its Class B interest; in 2010, $500,000 was distributed to Ute Energy Holdings[5]; in years 2012 through 2015, and a total of $290,816,753[6] was distributed from the proceeds of selling all of the assets of the company. This amount included a return of Ute Energy Holdings capital contribution of $158,350,000[7]. The net amount, $290,816,753 - $158,350,000, or $132,466,753 is the gain on the sale of the assets. This, however, is not net revenue, as described above. This

[4]  Pursuant to the audited financial statements for 2005 and 2006; this distribution was not shown in the 2005 tax return.

[5]  Pursuant to the audited financial statements for 2010 and 2011, as well as the tax return for 2010.

[6]  Pursuant to the Federal tax returns of Ute Energy LLC and the K-1s for Ute Energy Holdings LLC for the respective years.

[7]  The amount of capital contribution by Ute Energy Holdings LLC based on the 2005 through 2015 tax returns and the initial contribution of $40,000,000. We note that the amount of capital contributions stated in Ms. Bales' Waterfall Valuation is $156,538,180.

Expert Report
Seigneur Gustafson LLP



Ute Indian Trive v. Lynn Becker
Case No. 140908394
Salt Lake Countty, Utah Third Judicial District Court
April 20, 2017
Page 11

distribution of cash was not generated by the ongoing business activities of the company, and is therefore, by definition, not revenue.

Mr. Becker would not be entitled to 2% of the $3,600,000 distribution in 2005, as this was capitalization of Ute Energy, not net revenues.

The closest thing we can define as net revenue distributed would be the distributions of $500,000 made from Ute Energy LLC to Ute Energy Holdings LLC in 2010[8]. While Ute Energy LLC was recapitalized in 2010 and the $500,000 distribution could have resulted from the recapitalization, we see that Ute Energy had positive net income in 2010 and this $500,000 distribution could have been a distribution of net profits. If this is the correct interpretation, it is our opinion that Mr. Becker would be entitled to 2% of the $500,000 distribution received by Ute Energy Holdings in 2010, which would be $10,000. These are the only distributions made by Ute Energy to Ute Energy Holdings that were potentially derived from net revenues and positive net income over the years from 2005 through 2015.

To further rebut Dr. Cadman's conclusion that Mr. Becker is entitled to 2% of the sales proceeds, presumably because Dr. Cadman reviewed no additional financial information to use in his analysis, we note that the total revenue from oil and gas sales received by Ute Energy LLC from 2005 through 2015, was $167,658,690 according to the audited financial statements. As of the 2010 recapitalization, Ute Energy Holdings LLC was a 51% member of Ute Energy LLC. If Ute Energy Holdings LLC received a pro-rata share of the oil and gas revenues (which we have previously explained it did not, due to the expenses of Ute Energy LLC), the maximum share of net revenues would have been approximately 51% of $167,658,690, or $85,505,932. Further, we are not aware how much of these revenues were derived from royalties, severance tax, through-put fees, surface or rights-of-way payments, and lease bonuses, all of which are amounts that Mr. Becker would not be entitled to, according to the Agreement, as stated previously in this report. Presumably, analysis of the source of oil and gas revenues would further reduce the amount of net revenue to which Mr. Becker could potentially be entitled to 2%, and the portion of such revenues ultimately distributed to Ute Energy Holdings LLC. We reiterate that these revenues were not, and could not have been distributed from Ute

---

[8] While both the tax returns and financial statements reflect this $500,000 distribution, we note that pursuant to Ms. Bales' second declaration, and as stated by Mr. Trulock, the company made no dividend payments or other distributions of cash in 2010 and 2011.

Expert Report
Seigneur Gustafson LLP



Energy LLC to Ute Energy Holdings LLC, because the related operating expenses of Ute Energy LLC had to be paid from the oil and gas revenues generated.

Also reference our Statement of Assumptions and Limiting Conditions, which is an integral part of this report.

## CONCLUSIONS

Based upon the above analysis, we have determined that:

- The amount of net revenue distributed from Ute Energy LLC (UELLC) to Ute Energy Holdings LLC (UEH) for years 2005 to 2015, is $500,000 and 2% of this amount is $10,000;

- To the best of our knowledge, there is no generally accepted definition of the term "net revenue distributed" within the recognized accounting literature or the oil and gas industry;

- Valuation of oil and gas interests is a complex issue and cannot be derived by reference to only net revenue of the enterprise; and

- We do not believe Dr. Cadman had sufficient information and facts to support his opinion of the net revenue distributed in his expert witness report of September 7, 2016 and his March 9, 2017 deposition.

We reserve the right to update this report and our conclusions in the event that additional information is provided or made known to us.

Expert Report
Seigneur Gustafson LLP



**APPENDIX PAGE 377**

Ute Indian Trive v. Lynn Becker
Case No. 140908394
Salt Lake Countty, Utah Third Judicial District Court
April 20, 2017
Page 13

## Statement of Assumptions and Limiting Conditions

This valuation report is subject to the following additional limitations:

* Information, estimates and opinions contained in this report are obtained from sources considered reliable; however, Seigneur Gustafson LLP, assumes no liability for such sources. We have no reason to believe that any of the representations made to us are other than true and accurate.

* Possession of this report, or a copy thereof, does not carry with it the right of publication of all or part of it, nor may it be used for any purpose other than as expressly stated herein by anyone without the previous written consent of Seigneur Gustafson LLP in any event, only with proper attribution.

* Seigneur Gustafson LLP and its personnel may be required to give testimony in court and be in attendance during any hearings or depositions, with reference to the matter associated with our expert report, and such efforts will be provided at our normal and customary hourly rates.

* In all matters that may potentially be challenged by the Court, we do not take responsibility for the degree of reasonableness of contrary positions that others may choose to take, nor for the costs or fees that may be incurred in the defense of our recommendations against challenge(s). We will, however, retain our supporting work papers for your matter(s), and will be available to assist in active defense of our professional positions taken, at our then current rates, plus direct expenses at actual and according to our then current engagement agreement.

* This report, and the work that we performed, in no way constitutes an audit, review, compilation, or forecast/projection assignment, as performed by a CPA or member of the AICPA. We are not responsible for the detection of fraud or similar activities.

* Seigneur Gustafson LLP reserves the right to update and revise this report in the event additional information is obtained or made known to us, but we are under no obligation to do so.

Expert Report
Seigneur Gustafson LLP



**APPENDIX PAGE 378**

Ute Indian Trive v. Lynn Becker
Case No. 140908394
Salt Lake Countty, Utah Third Judicial District Court
April 20, 2017
Page 14

### Sources of Information

In order to perform this assignment, a number of documents were reviewed and relied upon. We did not perform an audit of any of the materials reviewed, and we have relied on such materials, and the responses to our inquiries, as being substantially true and correct. The following is a list of the primary information that was relied upon for this report:

- Complaint and Jury Demand, dated December 11, 2014
- Answer, dated August 7, 2015
- Second Amended Answer to the Complaint, Counterclaim, and Third-Party Complaint, dated September 24, 2016
- Operating Agreement of Ute Energy LLC, effective May 4, 2005
- Addendum to Second Amended and Restated Operating Agreement of Ute Energy LLC, dated June 1, 2010
- Becker Independent Contractor Agreement, dated April 27, 2005
- Expert witness report of Dr. Brian Cadman, dated September 7, 2016
- Declaration of Laurie Bales, dated June 29, 2016
- Laurie Bales Exhibit 14 Waterfall and Accounting Spreadsheet, dated April 15, 2016
- Declaration of Scott S. Trulock, dated July 14, 2016
- Declaration of Irene C. Cuch, dated July 8, 2016
- Declaration of Frances C, Bassett, Esq., dated September 2, 2016
- Devin Pehrson Rule 30(b)(6) Deposition, dated November 9, 2016
- Ute Energy LLC Schedule K-1s for the years 2007 to 2015
- Summary schedule of Ute Energy Holdings LLC, Schedule K-1s
- Ute Energy, LLC Federal income tax returns for the years ended September 30, 2006 and 2007, and December 31, 2007 to 2015
- Ute Energy Audited Financial Statements for the years ended September 30, 2006 and 2007, and December 31, 2007 through 2012
- Email from Scot Anderson to Brett Painter, dated February 11, 2004

Expert Report
Seigneur Gustafson LLP



**APPENDIX PAGE 379**

- Memo from John Jurrius to Brett Painter and Lynn Becker, dated February 9, 2004

- Draft deposition transcript of Dr. Brian Cadman, dated March 9, 2017

- Various treatises on oil and gas definitions


In addition, I have relied on my work experience of 30+ years as a licensed Certified Public Accountant working with matters involving independent contractor arrangements, incentive compensation, oil and gas operations and complex partnership accounting and taxation.    See my CV, attached, for more complete information on publications, presentations and articles.

Expert Report
Seigneur Gustafson LLP



**APPENDIX PAGE 380**

EXHIBIT A

**Lynn D. Becker v. Ute Indian Tribe of the Uintah and Ouray Reservation, et al.**
Ute Energy Holding LLC K-1 Analysis
*Based on Complete Federal Tax Returns for Ute Energy LLC*

Source: Schedule K-1 for Ute Energy Holdings LLC from Federal Income Tax Return form 1065 for the respective years

*Business Started in May 4, 2005 according to 2005 Federal Income Tax Return

| Tax Year ending: | 2005 Tax Year 9/30/2006 | 2006 Tax Year 9/30/2007 | 2007 Tax Year 12/31/2007 | 2008 Tax Year 12/31/2008 | 2009 Tax Year 12/31/2009 | | 2010 Tax Year 12/31/2010 | | | 2011 Tax Year 12/31/2011 | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Class A Units | Class A Units | Class A Units | Class A Units | Redeemable Units | Common Units | Class A Units | Class B Units | Class C Units | Class A Units | Class B Units | Class C Units |
| Ordinary Business Income (Loss) | $ 106,844 | $ (4,183,747) | $ (4,250,067) | $ 3,935,173 | $ - | $ (17,078,942) | $ - | $ - | $ 2,601,517 | $ - | $ 9,076,472 | $ 6,427,083 |
| Interest Income | $ 39,760 | $ 80,387 | $ 65,458 | $ 99,964 | $ - | $ 126,464 | $ - | $ - | $ 40,663 | $ - | $ 7,767 | |
| Other Income (Loss) | $ - | $ 76,587 | $ 109,136 | $ 51,697 | $ - | | $ - | $ - | | $ - | $ (9,149,899) | $ 16,870,364 |
| Net Section 1231 Gain (Loss) | | | | | | $ (100,187) | | | | | | |
| Other Deductions | | | | | | | | | | | | |
| Cash Contributions | $ (3,915) | $ (4,530) | $ (4,597) | $ (7,198) | $ - | $ (3,366) | $ - | $ - | $ (5,567) | $ - | $ (36,517) | |
| Section 59(e)(2) Expenditures | $ (7,184,453) | $ (15,725,135) | $ (5,510,905) | $ (17,538,421) | $ - | $ (6,661,890) | $ - | $ - | $ (41,415,669) | $ - | $ (72,566,093) | $ (18,791,096) |
| Distributions - Cash | $ - | $ - | $ - | $ - | $ - | | $ - | $ - | $ 500,000 | $ - | | $ - |
| Distributions - Other Property | $ - | | | | | | | | | | | |
| Capital Contributed during Year | $ - | | | | $ 3,850,000 | | $ - | $ 61,000,000 | | $ 2,500,000 | $ 51,000,000 | |

Seigneur Gustafson LLP
April 20, 2017

**APPENDIX PAGE 381**

EXHIBIT A

**Lynn D. Becker v. Ute Indian Tribe of**
Ute Energy Holding LLC K-1 Analysis
*Based on Complete Federal Tax Return*

Source: Schedule K-1 for Ute Energy Ho

*Business Started in May 4, 2005 acco

| Tax Year ending: | 2012 Tax Year 12/31/2012 | | | 2013 Tax Year 12/31/2013 | | | 2014 Tax Year 12/31/2014 | | | 2015 Tax Year 12/31/2015 | | | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Class A Units | Class B Units | Class C Units | Class A Units | Class B Units | Class C Units | Class A Units | Class B Units | Class C Units | Class A Units | Class B Units | Class C Units | |
| Ordinary Business Income (Loss) | $ 931,640 | $ 32,172,909 | $ 9,705,540 | $ (10,606) | $ (261,763) | $ (93,487) | | $ (40,500) | $ (14,464) | $ (5,518) | $ (136,183) | $ (48,637) | $ 38,726,420 |
| Interest Income | $ 150 | $ 4,612 | $ 1,466 | $ 288 | $ 7,119 | $ 2,542 | | $ 2,415 | $ 862 | $ 98 | $ 2,415 | $ 862 | $ 443,532 |
| Other Income (Loss) | | $ - | | $ 122,259 | $ 3,017,294 | $ 1,077,604 | | | | | | | $ 12,175,042 |
| Net Section 1231 Gain (Loss) | $ 3,971,568 | $ 123,340,368 | $ 50,622,993 | $ 733,980 | $ 18,086,494 | $ 10,323,138 | | | | | | | $ 206,978,354 |
| Other Deductions | | | | | | | | | | | | | |
| Cash Contributions | $ (170) | $ (5,892) | $ (1,777) | | | | | | | | | | $ (69,614) |
| Section 59(e)(2) Expenditures | $ (1,470,826) | $ (50,792,945) | $ (15,322,611) | | | | | | | | | | $ (245,795,591) |
| Distributions - Cash | $ 7,348,056 | $ 181,346,326 | $ 64,766,546 | $ 995,842 | $ 24,576,877 | $ 8,777,463 | | $ - | | $ 87,136 | $ 2,150,479 | $ 768,028 | $ 291,316,753 |
| Distributions - Other Property | $ 318,173 | $ 7,852,352 | $ 2,804,412 | $ - | $ - | $ - | | | | | | | $ 10,974,937 |
| Capital Contributed during Year | $ - | | $ - | | $ - | | | $ - | | | $ - | | $ 118,350,000 |

Frances C. Bassett, *Admitted Pro Hac Vice*
Jeremy J. Patterson, *Admitted Pro Hac Vice*
Thomasina Real Bird, *Admitted Pro Hac Vice*
**FREDERICKS PEEBLES & MORGAN LLP**
1900 Plaza Drive
Louisville, Colorado 80027-2314
Telephone: (303) 673-9600
Facsimile: (303) 673-9155
Email: fbassett@ndnlaw.com
Email: jpatterson@ndnlaw.com
Email: trealbird@ndnlaw.com

J. Preston Stieff (4764)
**J. PRESTON STIEFF LAW OFFICES**
110 South Regent Street, Suite 200
Salt Lake City, Utah 84111
Telephone: (801) 366-6002
Email: jps@stiefflaw.com

*Attorneys for Plaintiffs*

## UNITED STATES DISTRICT COURT
## DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| UTE INDIAN TRIBE OF THE UINTAH & OURAY RESERVATION, a federally recognized Indian tribe, et al.,<br><br>Plaintiffs,<br><br>v.<br><br>HONORABLE BARRY G. LAWRENCE, District Judge, Utah Third Judicial District Court, in his Individual and Official Capacities, and LYNN D. BECKER,<br><br>Defendants. | **DECLARATION OF MICHAEL J. WOZNIAK**<br><br>CASE No. 2:16-cv-00579<br><br>**Judge Robert J. Shelby** |

**APPENDIX PAGE 383**

I, Michael J. Wozniak, am over 18 years of age. I have personal knowledge of the facts set forth herein, and if called upon, I will testify to the facts and opinions set forth herein and in my attached expert report.

1.      I have been a licensed attorney since 1980. I am currently the founding shareholder and president of Beatty & Wozniak, P.C. in Denver, Colorado, a law firm that specializes in energy and natural resources law. Over the course of my career, I have negotiated and drafted hundreds of assignments and conveyance documents related to oil and gas and other minerals, and I am familiar with the customs, usage and practice in the oil and gas industry relating to assignments and conveyances of interests in oil and gas properties, including participation rights, assignments and leases. A copy of my curriculum vitae is attached hereto. *See* Attachment A.

2.      I am an expert witness retained by the Ute Indian Tribe, the Tribe's governing body, its Tribal Business Committee, and Ute Energy Holdings LLC, a wholly tribally-owned commercial entity (collectively referred to herein as the "Tribe" or "Ute Tribe"), in *Becker v. Ute Indian Tribe, et al.*, case number 140908394, Third Judicial District Court, Salt Lake County, Utah, and related litigation.

3.      Pursuant to Rule 26(a)(4)(B) of the Utah Rules of Civil Procedure, I was asked to prepare an expert report in the case, a copy of which is attached hereto as Attachment B.

4.      My expert report contains the findings and opinions I reached following my review of the materials that are listed in my expert report. My findings and opinions are

**APPENDIX PAGE 384**

based on my professional education, knowledge, training, experience and credentials, to a reasonable degree of professional certainty.

5.    In arriving at these findings and opinions, I have adhered to the principles, practices and methodologies that are generally recognized and accepted within the oil and gas industry.

6.    The contents and conclusions in my expert report are my own, based on my work as an expert witness for the Ute Indian Tribe.

Pursuant to 28 U.S.C. § 1746, I hereby declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Executed this 20th day of October, 2017.


Michael J. Wozniak

3

**APPENDIX PAGE 385**

# ATTACHMENT A



**BEATTY&WOZNIAK, P.C.**
ENERGY IN THE LAW

**Michael J. Wozniak**
**Managing Shareholder**

**Beatty & Wozniak, P.C.**
**216 Sixteenth Street**
**Suite 1100**
**Denver, CO 80202-5115**
**303-407-4462**
**mwozniak@bwenergylaw.com**

## BIOGRAPHY: Michael J. Wozniak

### AREAS OF CONCENTRATION

- Oil and Gas Commission Practice Group
- Oil and Gas Mergers/Acquisitions/Divestitures
- Midstream Practice – crude/natural gas gathering, processing, transportation, marketing
- Arbitration and Mediation

### EXPERIENCE

| | |
|---|---|
| 2005 – Present | **Beatty & Wozniak, P.C.**, President and Managing Shareholder |
| 2001 – 2005 | Dorsey & Whitney, LLP, Partner-in-Charge of Denver Office and Head of Colorado Energy Regulatory Group |
| 1980 – 2001 | Clanahan, Tanner, Downing & Knowlton, Managing Partner and Chair of Natural Resources Group |

### ADMISSIONS

- Admitted to practice law in the States of Colorado and Wyoming; and before the U. S. District Court for the Districts of Colorado and Wyoming; the U. S. Court of Appeals for the District of Columbia, 10th Circuit; and the Southern Ute Tribal Court; Arapahoe/Shoshone Tribal Court (inactive).

### EDUCATION

- University of Colorado School of Law, J.D., 1980
- Indiana University, B.A., 1976
  Phi Beta Kappa, graduated with distinction

### REPRESENTATIVE MATTERS

- Represented DJ Basin producers in multi-day hearings to adopt and revise Rule 318A and 318B at the COGCC.
- Represented E&P company in $600 million divestiture of its Rocky Mountain properties; worked on significant acquisitions and divestitures in the Piceance Basin, the Jonah Field in Wyoming, the Bakken Field in North Dakota, the San Juan Basin and in the DJ Basin.
- Represented multiple natural resources companies in numerous spacing, pooling, unitization and all related types of hearings before the Colorado Oil and Gas Conservation Commission and the Wyoming Oil and Gas Conservation Commission.
- Represented management of multiple midstream private equity companies from formation through ultimate sale.

**APPENDIX PAGE 387**



## BIOGRAPHY: Michael J. Wozniak

### PROFESSIONAL ACTIVITIES, HONORS, AND MEMBERSHIPS

- American Bar Association; Member, Natural Resources Section
- Colorado and Denver Bar Associations, Natural Resources & Energy Law Section
- Federal Energy Bar Association
- Rocky Mountain Mineral Law Foundation – former Trustee at Large
- *10 consecutive year award---Best Lawyers in America-* for Energy Law, Natural Resources Law, and Oil and Gas Law, The Best Lawyers in America, 2015
- *"World's Leading Practitioners"* for the Energy field, one out of six awarded in Colorado, Who's Who in America-Legal, 2014
- *"Lawyer of the Year"* for Oil & Gas Law, Best Lawyers in America, 2011
- Mayor, City of Cherry Hills Village (three terms), 2006-2012
- Elected Member, City Council, City of Cherry Hills Village, 2004-2006
- Member, Executive Council, Colorado Bar Association, Natural Resources & Energy Law Section, 2002-2008
- Member, Board of Directors, Petroleum/Pinnacle Club, 2001-2004
- Chair, Board of Adjustment and Appeals, City of Cherry Hills Village, 1999-2003
- Commissioner, Cherry Hills Village Planning and Zoning Commission, 1994-1999
- Served on Board of Directors/Managers of both public and private companies

### PUBLICATIONS AND SPEECHES

Mr. Wozniak has presented and chaired numerous Natural Resource Seminars and authored a number of publications. A few highlights includes:

- Co-Chair Rocky Mountain Mineral Law Foundation Special Institute regarding Horizontal Development, November 2012
- *"Fundamentals of Drilling and Spacing Units and Statutory Pooling,"* Nuts and Bolts of Mineral Title Examination Special Institute, Rocky Mountain Mineral Law Foundation, presenter (co-author with Matthew Lepore), February 2012
- *"Horizontal Drilling: Why it's Much Better to 'Lay Down' then to 'Stand Up' and What's an 18° Azimuth anyway?"* 57th Annual Rocky Mountain Mineral Law Institute, July 2011



**BIOGRAPHY: Michael J. Wozniak**

- Chair and presenter at the Law of Federal Oil & Gas Leasing – Short Course, Rocky Mountain Mineral Law Institute, 2005, 2007 & 2009

- *"Surface Management Requirements and Special Stipulations - Limitations on Lessee's Right to Develop; 'Access to Leasehold;' and 'State and Local Regulations of Activities on Federal Oil and Gas Leases.'"* Federal Oil and Gas Leasing – Short Course, Rocky Mountain Mineral Law Institute

- *"Expanding Authority of Oil and Gas Conservation Commissions,"* 52th Annual Rocky Mountain Mineral Law Institute, July 2006

- *"Local Government Jurisdiction over Oil and Gas Operations: Is there still a Home Court Advantage?"* Denver Association of Petroleum Landmen, 2003

- *"Home Court Advantage? – Local Government Jurisdiction Over Oil and Gas Operations,"* 48th Annual Rocky Mountain Mineral Law Institute, 2002

# **ATTACHMENT B**

## BEATTY & WOZNIAK, P.C.

ATTORNEYS AT LAW

216 SIXTEENTH STREET, SUITE 1100
DENVER, COLORADO 80202-5115
TELEPHONE 303-407-4499
FAX 1-800-886-6566
www.bwenergylaw.com

COLORADO

NEW MEXICO

NORTH DAKOTA

UTAH

WYOMING

MICHAEL J. WOZNIAK

303-407-4466
MWOZNIAK@BWENERGYLAW.COM

June 12, 2017

Fredericks, Peebles & Morgan LLP
1900 Plaza Drive
Louisville, CO  80027

Attn:  Frances C. Bassett

Re:  Lynn D. Becker v. Ute Indian Tribe of the Uintah and Ouray Reservation, et al., Third Judicial District Court, Salt Lake County, State of Utah, Case No. 140908394 (the "Litigation")

Ladies and Gentlemen:

At your request, I have been asked to provide an opinion based upon my education, training, and experience concerning legal and industry practices relating to certain elements in the Litigation referenced above.  More specifically, I was employed by the attorneys representing the Ute Indian Tribe of the Uintah and Ouray Reservation (the "Tribe") to provide the Court with background on the custom and usage related to various written instruments used in the oil and gas industry including assignments, working and revenue interests, and participation plans.  More specifically, I have been retained as a rebuttal expert to Kelly Williams, Esq., who testified and offered opinions concerning the meaning of "Exhibit B – Participation Plan," which is an attachment to the April 27, 2005 Independent Contractor Agreement by and between the Tribe and Lynn D. Becker (the "Agreement").

MATERIALS EXAMINED

I examined the following documents supplied by counsel for the Tribe:

1. Independent Contractor Agreement dated April 27, 2005 effective March 1, 2004 by and between the Ute Indian Tribe of the Uintah and Ouray Reservation, Utah and its subsidiaries and affiliates and Lynn D. Becker.

2. December 30, 2003 letter from Lynn D. Becker CPL addressed to The Jurrius Group.

3. Memorandum dated February 11, 2003 to John Jurrius from Lynn Becker regarding "Comments on Your Employment Memo."

BEATTY & WOZNIAK, P.C.
APPENDIX PAGE 391
*Energy in the Law*

BEATTY & WOZNIAK, P.C.

June 12, 2017
Page 2

4. Memo dated February 9, 2004 addressed to Brett Painter and Lynn Becker from John P. Jurrius regarding "Employment Contract 'Contract'".

5. Complaint and Jury Demand filed on December 11, 2014, and the Amended Answer filed on April 11, 2017 in this Litigation.

6. Transcript of the deposition of Ms. Kelly Williams, Esq. dated April 26, 2017.

BACKGROUND AND EXPERIENCE

As noted in my previously submitted curriculum vitae, I have been engaged in the practice of oil and gas law since 1980. I am currently the founding shareholder and president of Beatty & Wozniak, P.C. in Denver, CO and have conducted extensive oil and gas title examinations throughout the Rocky Mountain region, as well as preparation and examination of oil and gas assignments and agreements. In addition, I have negotiated and drafted hundreds of assignments and conveyance documents related to oil and gas and other minerals, and as outside general counsel for oil and gas corporations, I have examined many employee participation plans. As a result of my experience and education, I am familiar with the customs, usage and practice in the oil and gas industry relating to assignments and conveyances of interests in oil and gas properties including participation rights, assignments and leases. I have also drafted many purchase and sale agreements, farmout agreements, earning agreements and joint operating agreements and have written scores of instruments assigning interests in leases, royalty interests and overriding royalties. A glossary of oil and gas terms I will use in this report is attached hereto.

My law firm is being compensated at the rate of $450.00 per hour. My compensation is not dependent on the outcome of this Litigation.

OPINIONS, BASIS AND REASONS

1. During certain times over the past four decades, the custom and practice of the oil and gas industry is that in certain circumstances and in certain basins, especially with start-up companies or private equity backed companies, executives and/or senior land supervisory personnel negotiate for the right to participate in oil and gas leases, wells or production during the time they are employed. The terms of such participation are varied. Often times, an overriding royalty or other non-cost bearing participation interest is awarded or assigned to senior land personnel during the term of their employment. Such interest may be limited to specific leasehold interests acquired in specific basins or project areas during their term or may be broader or more generic in their geographic extent. The area in which interests are earned may be specific leases, specific townships, specific basins or may be in all interests acquired by the company or entity during the employment relationship.

Under the Agreement, Mr. Becker was entitled to an extensive list of remuneration for his services. These included a signing bonus, a tribal vehicle, expense

BEATTY & WOZNIAK, P.C.
Energy in the Law

BEATTY & WOZNIAK, P.C.

June 12, 2017
Page 3

reimbursement, cellular phone, fax machines and related expenses.  Mr. Becker was also entitled to $16,666.67 per month for each month during the contract term. Finally, Mr. Becker was also entitled to the "Participation Plan" benefits described on Exhibit B to the Agreement.

2.  In order to fully understand the intent of the provisions of the Participation Plan, the memos and correspondence respecting its negotiation are important to review.  In the initial negotiations evidenced by the December 30, 2003 memo from Mr. Becker to John P. Jurrius, under the heading "Participation in Success in Growth (quarterly dividend)", Mr. Becker proposes that he receive a "percentage of **gross energy related production**, pipeline and severance revenues excluding all lease-based income such as royalties, rentals, shut-in payments, etc." (emphasis added)  This provision clearly evidences that Mr. Becker's intent was to receive a percentage of the "gross energy – related production ... revenues".  These "production" interests are necessarily derived from oil and gas wells generating oil and gas production.  Mr. Becker specifically proposes to exclude royalties which are revenues paid to the Tribe under development agreements or leases, rentals which are annual payments under oil and gas leases, shut-ins which are payments that are made to postpone exploration and production, usually on an annual basis.  Therefore, it is abundantly clear from paragraph 1 under this subsection that Mr. Becker intended that his payments under the Participation Plan were based upon energy related production which is derived from oil and gas leases and wells as such "production" revenues can only emanate from well production.

3.  Under paragraph 2 of this subsection in this same December 30, 2003 memo, Mr. Becker proposes that he be permitted to invest "on a carried basis" with the Tribe. This means that when the Tribe elected to pay for a share of costs of drilling a well, Mr. Becker could "participate" but he would not be charged for the costs of drilling and completing the wells.  In other words, the Tribe would "carry" or pay Mr. Becker's costs.  (This proposal was not adopted in the final Participation Plan.) Paragraph 2 goes on to provide that Mr. Becker would have the option to participate on the same terms as the Tribe at his own expense.  This provision means that Mr. Becker proposed that should the Tribe invest as a working interest owner in a well or group of wells or a prospect, that Mr. Becker would be entitled, on the same basis, to participate by paying his share of the working interest expenses and would receive his corresponding proportionately reduced share of the net revenue interest from wells from which he and the Tribe participated as co-working interest owners.

4.  As the negotiations continued, Mr. Jurrius responded to Mr. Becker through the February 9, 2004 memo.  The salient portion of the reply is described under the "Incentive Plan" heading.  Under paragraph 1, Mr. Jurrius proposes that Mr. Becker would have the right to participate in two specific prospects, the NOSR2 and the Brundage Canyon Project, on the same terms as the Tribe.  The crucial sentence evidencing the parties intent is as follows:

June 12, 2017
Page 4

> For example if the Tribe had a 33% working interest and Mr. Becker could
> participate for 2% of that interest (2% x 33%).

This proposal clearly evidences the parties' intent that if the Tribe participated in
either of these two identified leasehold prospects, by paying for a 33% working
interest (cost-bearing), Mr. Becker could also pay his share of costs and earn 2% of
the Tribe's 33% working interest. This interest is clearly intended to be a working
interest that is tied to specific wells and leases in these two projects. Mr. Becker then
would be entitled to his net revenue that was attributable to his 2% of 33% working
interest after the payments of his proportionate share of royalties, overrides and other
lease burdens. Mr. Becker, as a working interest owner would be entitled to propose
or drill wells, conduct operations and operate on the Tribal prospects all in
accordance with the terms of any joint operating agreement executed by the working
interest owners. Paragraph 3 of this subsection also makes it evident that Mr. Becker
would not be entitled to any other fees that the Tribe would receive by granting
leases, i.e. royalties, severance taxes, throughput fees, and rights-of-way damages.
These are termed "governmental" in nature and are normally associated with
revenues received by the mineral interest owner who grants a lease or permits
development of its oil and gas.

5. In light of the background of the negotiation, the provisions of Exhibit B Participation
   Plan to the Agreement become clearer.

6. Under paragraph 1 of the Participation Plan, Mr. Becker was entitled to the
   "beneficial interest of two percent (2%) of net revenue distributed to Ute Energy
   Holding, LLC from Ute Energy, LLC" net of any administrative costs. The concept
   of "net revenue" is clearly intended in the oil and gas industry to be a share of
   production from oil and gas wells, leases or prospects. The only net revenue that
   would be distributed to Ute Energy Holding, LLC, is from production revenues
   produced from wells from which Ute Energy, LLC drilled or participated in.

7. Moreover, paragraph 2 of the Participation Plan further supports the negotiation
   correspondence and memoranda described above. This paragraph provides for two
   additional different ways in which Mr. Becker would have been compensated. In
   subparagraphs (a) and (b), if the Tribe were to participate in projects involving the
   "development, exploration and/or exploitation of minerals" for which the Tribe elects
   not to place the interest into Ute Energy Holding, LLC then Mr. Becker was entitled
   to receive 2% of the beneficial net revenue interest in such assets. Both the reference
   to participating interests and/or earning rights in the development, exploitation or
   exploration of minerals connotes that the Tribe would have to "participate" in oil and
   gas exploration through leases or wells by paying its share of costs. Correspondingly,
   Mr. Becker was entitled to assert a claim against the working interest of the Tribe.

8. Paragraph 2 of the Participation Plan provides that if the Tribe would be required to
   pay any project costs or expenses without financing or a carried interest, (i.e.

June 12, 2017
Page 5

participate in the form of paying for a working interest) then as evidenced in the negotiation memoranda and confirmed in the Participation Plan, Mr. Becker would be entitled to "participate" by paying 2% of those costs and expenses and thereby become a working interest owner entitled to receive the net revenue interest attributable to such participation interest. Mr. Becker would have had to pay his 2% of costs and expenses and after payments of royalties and overrides would be entitled to the "net revenue interest attributable to such participation interest." This is the same concept explained in paragraph 4 above, as the example provided: (2% x 33%) working interest.

9. The Participation Plan in paragraph 3 also confirms that should the Tribe grant oil and gas leases or development agreements through which it is entitled to royalties or severance taxes or throughput fees or rights-of-way or bonuses, Mr. Becker was not entitled to receive any compensation for those regulatory payments.

10. Interestedly, paragraph 4 of the Participation Agreement provides that Mr. Becker's "Contractor Rights" are fully alienable. This means that Mr. Becker could convey his net revenue interest or his rights to participate as a working interest owner (which would include the right to produce minerals) to third-parties evidencing the free transferability of his interest. Moreover, the Tribe retained a preferential right to purchase these rights. In the oil and gas context, often under standard form joint operating agreements, should one party decide to convey its interest in wells or leases, another party retains what is called "right of first refusal" or a "preferential right to purchase." The Tribe reserved the right to match any offer Mr. Becker received to purchase the property rights and interests granted under the Participation Plan. The parties contemplated buying and selling Mr. Becker's rights under the Participation Plan.

11. Finally, paragraph 5 of the Participation Plan makes it clear that Mr. Becker was only entitled to participation rights for oil and gas projects for which the Tribe executed contracts on or before the date of termination.

12. While customary, oil and gas leases or wells are not required to be listed on an exhibit to which executive personnel are entitled to participate. While it would be clearer if specific projects were actually listed such that specific development agreements, leases or wells would be contemplated, the broad nature of the Participation Plan would entitle Mr. Becker to his participation rights in any of the projects contemplated whereby Ute Energy, LLC distributed production revenues to the Tribe during the term of the Agreement. The specific reference to the NOSR2 and Brundage Canyon Project further illustrates the parties' intent to include specific projects in which Mr. Becker could participate.

13. The Participation Plan does not need to be recorded in the county records to be effective between the parties. Recording of this document would serve to provide

BEATTY & WOZNIAK, P.C.

June 12, 2017
Page 6

notice to third-parties of its existence but would not validate or invalidate the terms and conditions agreed to by the parties.

14. The interests created by the Participation Plan include cost-bearing working interests if Mr. Becker elected to participate with the Tribe in any project costs and expenses. This gave Mr. Becker the right to assert a claim against the working interest of the Tribe. Mr. Becker would then be entitled to receive the net revenue interest attributable such participation interest. One would expect a specific assignment to be delivered to Mr. Becker after he elected to participate and paid his monetary obligation. It is clearly contemplated that this interest could then be sold with all the property rights attendant thereto subject to the Tribe's retained preferential right to purchase under paragraph 4 of the Participation Plan.

15. Moreover, Mr. Becker was entitled to receive a beneficial interest of 2% of the net revenue distributed to Ute Energy Holding, LLC under paragraph 1 of the Participation Plan. As evidenced by the negotiations between the parties, it is abundantly clear that the only way Ute Energy Holding, LLC received net revenue was through leases, development agreements or prospects in which Ute Energy, LLC drilled and distributed production revenue. One familiar with the custom and practices in the industry would understand that the Participation Plan was in essence a net revenue interest in leases, wells or projects through which one party would participate and Mr. Becker then would be entitled to his proportionate revenue share. The fact that certain leasehold and development agreement type benefits were excluded (royalties and throughput fees, etc.) and the fact that sale and preferential rights were contemplated further evidences the parties' intent that this document intended to create a property interest in oil and gas development projects.

16. Exhibit A attached hereto includes a definition of oil and gas terms that may be helpful to the trier of fact in understanding the scope, nature and intent of the Participation Agreement.

17. Based upon the above analysis, it is in my opinion that Mr. Becker was entitled to numerous benefits under the Agreement and Participation Plan which entitled him to participate as a working interest owner under the circumstances in which the Tribe also participated and also was entitled to 2% of the net revenue that was distributed to Ute Energy Holding, LLC from wells, projects or agreements in which Ute Energy, LLC drilled and/or participated. By owning working interests, Mr. Becker earned the right to drill and produce the mineral interests.

18. In reviewing the deposition of Ms. Williams, I disagree with the conclusion provided on pages 147 and 148 which states as follows:

A. Because my assessment of the contract, Independent Contractor Agreement, is that on its face, it does not implicate mineral interests. It doesn't implicate any – the alienation of any – any interests.

BEATTY & WOZNIAK, P.C.

June 12, 2017
Page 7

19. It is my opinion that this conclusion is incorrect. In reading the Independent Contractor Agreement as a whole, the Participation Plan would be meaningless if it "does not implicate mineral interests." The only way net revenue interest is distributed is through production from oil and gas wells. Similarly, Mr. Becker's right to participate, to pay 2% of project costs and expenses in order to receive net revenue attributable to such participation interest also requires participation in oil and gas interests. As evidenced by the correspondence and memoranda between the parties, it was specifically contemplated that Mr. Becker would have the right to participate as set forth in that example of a working interest of "2% of 33%". Similarly, paragraph 4 of the Participation Plan supports my conclusion that Mr. Becker may sell his rights and that the Tribe may exercise its preferential purchase rights to reacquire these oil and gas interests.

Very truly yours,

BEATTY & WOZNIAK, P.C.

Michael J. Wozniak

MJW:tlp

Attachment

## Glossary of Oil and Gas Terms

1. **Carried Working Interest ("CWI")** – A working interest generally paid in consideration for work related to a prospect. This interest is paid, or carried, for the drilling and or completion costs as specified in the contract between the parties, by another working interest owner typically until casing point is reached, or through the tanks, meaning through completion of the well, as agreed upon contractually.

2. **Concession** – A grant extended by a governmental unit to permit a company to explore for and produce oil, gas, or mineral resources within a strictly defined geographic area, typically beneath government-owned lands or lands in which the government owns the rights to produce oil, gas, or minerals. The grant is usually awarded to a company in consideration for some type of bonus or license fee and royalty or production sharing provided to the host government for a specified period of time.

3. **Lease** – The act of acquiring acreage for exploration and production activity or the contract that conveys the rights to explore and produce from the owner of the mineral rights (lessor) to a tenant (lessee), usually for a fee and with a specified duration. A lease includes a provision for sharing production.

4. **Mineral Estate** – An estate in real property granting the owner the right to exploit, mine, or produce all minerals lying beneath the surface of a property. Land ownership includes two distinct set of rights or "estates": the surface estate and the mineral estate. Initially, these two estates are owned by the same individual and may continue to be owned together by the same individual; however, it is common for the mineral estate and the surface estate to be owned by different individuals or entities. This division, or "severance," of the mineral estate from the surface estate occurs when an owner sells the surface and retains all or part of the minerals.

5. **Mineral Interest** – Ownership of the right to exploit, mine, or produce all minerals lying beneath the surface of a property. Unless otherwise limited, minerals include all hydrocarbons. Mineral interests are real property interests that include the following:

   a. the right to use as much of the surface as is reasonably necessary to access the minerals,

   b. the right to execute any conveyances of mineral rights, and

   c. the right to receive bonus consideration, delay rentals, and royalties.

   Any or all of the above rights of mineral ownership may be conveyed by the mineral owner.

6. **Net Revenue Interest ("NRI")** – A share of production from oil and gas wells after all burdens, such as royalty and overriding royalty, have been deducted from the working interest. It is the percentage of production that each party actually receives.

7. **Nonparticipating Royalty** – A percentage share of production, or the value derived from production, which is free of the costs of drilling and producing, created by the lessor or

**APPENDIX PAGE 398**

royalty owner and borne by the lessor or royalty owner out of the lessor royalty. This royalty is paid to nonparticipating interest holders who do not share or participate in bonus or rentals, or a right to explore, or a right to execute oil and gas leases.

8. **Overriding Royalty Interest ("ORRI")** – A percentage share of production, or the value derived from production, which is free of all costs of drilling and producing, and is created by the lessee or working interest owner and paid by the lessee or working interest owner.

9. **Participating Interest -** The percentage of cost and benefits under a unit operating agreement borne and to be received by various parties. A fractional undivided interest or right of participation in the oil or gas or in the proceeds from the sale of oil or gas, produced from a specified tract or tracts, or wells(s) which right is limited in duration to the terms of any existing lease and which is subject to any portion of the expense of development, operation, or maintenance.

10. **Preferential Rights to Purchase** – The right that nonselling participating parties have in a lease, well, or unit to proportionately acquire the interest that a participating party proposes to sell to a third party. *See **Right of First Refusal***.

11. **Right of First Refusal** – The right that other parties to a lease, well, unit, and/or concession have to acquire the interest that a selling party owns prior to selling to any third party.

12. **Royalty** – Percentage share of production, or the value derived from production, paid from a producing well.

13. **Royalty Interest ("RI")** – Ownership of a percentage of production or production revenues produced from leased acreage. The owner of this share of production does not bear any of the cost of exploration, drilling, producing, operating, marketing, or any other expense associated with drilling and producing an oil and gas well.

14. **Severance Tax** – A tax imposed on the removal of nonrenewable resources such as crude oil, condensate and natural gas, coalbed, methane, and carbon dioxide. Severance tax is charged to producers, or anyone with a working or royalty interest, in oil or gas operations in the imposing states.

15. **Shut-in Royalty** – A payment when a well, capable of producing in paying quantities, is shut-in for lack of market, lack of pipeline connection, etc. A shut-in gas clause is a typical lease clause allowing a lessee to pay the lessor a shut-in payment and thereby keep the lease alive without actual production.

16. **Working Interest ("WI")** – A percentage of ownership in an oil and gas lease granting its owner the right to explore, drill, and produce oil and gas from a tract of property. Working interest owners are obligated to pay a corresponding percentage of the cost of leasing, drilling, producing, and operating a well or unit. After royalties are paid, the working interest also entitles its owner to share in production revenues with other working interest owners, based on the percentage of working interest owned.

2

**APPENDIX PAGE 399**

### Royalty interest

The property interest created in oil and gas after a SEVERANCE (*q.v.*) by ROYALTY DEED (*q.v.*). Its duration is like that of common law estates, namely, in fee simple, in fee simple determinable, for life or for a fixed term of years. It is distinguished from a MINERAL INTEREST (*q.v.*) by the absence of operating rights. The owner of a royalty interest is entitled to a share of production, if, as and when there is production, free of the costs of production.

The cost-free interest in production of a lessor under an oil and gas lease or of a nonoperating party under another type of instrument severing operating and nonoperating interests. OXY USA, Inc. v. Colorado Interstate Gas Co., 20 Kan. App. 2d 69, 883 P.2d 1216, 132 O.&G.R. 44 (1994) discussed as well in the entry for WORKING INTEREST (*q.v.*). *See* TREATISE §§ 301; 327–330.

*See also* NONPARTICIPATING ROYALTY; PARTICIPATING ROYALTY; PER CENT INTEREST; ROYALTY; SEVERED ROYALTY INTEREST; TERM MINERAL OR ROYALTY INTEREST.

### Royalty lease

A lease with an unspecified or very long term and providing for payments to the lessor only if there is production. Such leases have from time to time been held void for want of mutuality. ICG Natural Resources, LLC v. BPI Energy, Inc., 399 Ill. App. 3d 554, 339 Ill. Dec. 214, 926 N.E.2d 446 (2010); Berry v. Walton, 366 S.W.2d 173, 18 O.&G.R. 448 (Ky. 1963).

### Royalty oil auction

A December 1980 auction of contracts to buy Alaskan royalty share of Prudhoe Bay production. The oil was offered in lots, each lot representing a one-year contract for 4,963 barrels per day, beginning July 1, 1981. Approximately 95 valid bids were received, with an average premium of $1.11. The highest bid for a lot offered a premium of $3.29. The average premium offered by the seventeen high bidders who won contracts was about $2.57. The sale realized about $77 million for the state. *Wall St. Journal,* Dec. 22, 1980, at 14.

*See also* SIGNATURE BONUS.

### Royalty oil (or gas)

Oil or gas payable "in kind" to the lessor under the terms of an oil and gas lease. Plateau, Inc. v. Department of the Interior, 603 F.2d 161 (10th Cir. 1979), invalidated a regulation limiting distribution of federal royaltyoil to small business enterprises on the ground that the regulation adopted by the Department of the Interior was unauthorized by the governing statute.

*See also* EXEMPT ROYALTY OIL; OCS ROYALTY OIL.

### Royalty owner

A person who owns a royalty interest in production.

A pooling or unitization agreement, or one of the agreements incident to pooling or unitization, may define the term in manner as follows: "Royalty owner is defined as one who signs or ratifies the royalty owners agreement and who, subject to an operator's right to search for and produce oil, gas or other hydrocarbons, owns lands, mineral rights, royalties, overriding royalties, gas payments, oil payments, or other rights in the unitized substances that may be produced from the . . . field. The interest so owned by a royalty owner is herein referred to as 'royalty' or 'royalty interest.' " *See* Myers, *The Law of Pooling and Unitization* § 4.07 (2d ed. 1967).

In some instances this term is defined in such a way as to exclude the owner of an overriding royalty or other payment carved out of the working interest. *See* North Dakota Statutes 1981, c. 612, H.B. No. 1651, § 4, 69 O.&G.R. 612, adopting definitions for the Oil Extraction Tax law.

### Royalty owners agreement

The agreement among owners of royalty production in properties included within a pooling or

## APPENDIX PAGE 400

promoting inefficiency in exploration or by allowing excess private profits." Crommelin, *Offshore Oil and Gas Rights: A Comparative Study*, 14 Nat. Res. J. 457, 494 (1974).

*See also* LEASE BIDDING SYSTEMS.

## Work contract

A term employed to describe a type of government-company relationship in which the company, instead of being a property owner as under the concession concept, is simply a service contractor to the government, receiving the right to purchase a certain percentage of the oil produced in exchange for providing the capital and expertise necessary for exploration, development and production of the host country's oil reserves. Ely, "Changing Concepts of the World's Mineral Development Laws," in International Bar Ass'n, *World Energy Laws* (Proceedings of the IBA Seminar on World Energy Laws held in Stavanger, Norway) 4, 34 (1975).

*See also* CONCESSION; CONTRACT OF WORK.

## Working agreement

An agreement between or among concurrent owners of a leasehold concerning the method of operating the premises, the division of responsibility and allocation of costs. *See* Discussion Notes, 3 O.&G.R. 1479 (1954).

## Working date

A term used in certain lease forms with reference to the last day of the period during which the lessee must commence drilling operations, pay rentals, or quit-claim and surrender the lease.

## Working gas

The term applied to gas stored for varying periods of time in an underground gas storage reservoir pending its further transportation and delivery to customers. Mississippi River Transmission Corp. v. Simonton, 442 So. 2d 764 (La. Ct. App. 1983), *writ denied*, 444 So. 2d 1240 (La. 1984), *cert. denied*, 469 U.S. 803 (1984); United Gas Pipe Line Co. v. Whitman, 390 So. 2d 913 (La. Ct. App. 1980).

Working gas is sometimes referred to as Topgas. Arkla, Inc. v. United States, 592 F. Supp. 502, 83 O.&G.R. 209 (W.D. La. 1984), *rev'd and remanded*, 765 F.2d 487, 85 O.&G.R. 431 (5th Cir. 1985), *reh'g denied*, 772 F.2d 904 (5th Cir. 1985), *cert. denied*, 475 U.S. 1064 (1986).

"'Working gas' is any gas in the [storage] facility above and beyond the amount of cushion gas." AEP Energy Services Gas Holding Co. v. Bank of America, 2007 U.S. Dist. LEXIS 93022 (S.D.N.Y. Dec. 18, 2007). On appeal the Second Circuit affirmed in part, reversed in part, and remanded in part the district court opinion, AEP Energy Services Gas Holding Co. v. Bank of America, 626 F.3d 699 (2d Cir. 2010), and referred to the gas using the contractual term storage gas.

*See also* CUSHION GAS; GAS IN STORAGE; GAS STORAGE, SUBSURFACE; NATIVE GAS; NATIVE GAS ENTITLEMENT.

## Working interest

The operating interest under an oil and gas lease. The owner of the working interest has the exclusive right to exploit the minerals on the land; the interest may exist in concurrent ownership with others.

The definition in this MANUAL was quoted in *In re* Platinum Oil Properties, LLC, 2013 Bankr. LEXIS 5024 (Bankr. D.N.M. Nov. 26, 2013).

"A working interest owner has the right to explore and develop the lease for oil and gas and generally pays the costs of drilling and completing a well." Elm Ridge Exploration Co., LLC v. Engle, 721 F.3d 1199, 1204 (10th Cir. 2013).

A working interest "provides the interest holder with the right to drill, produce, and otherwise exploit the minerals encompassed by it." MCT Energy, Ltd. v. Collins, 2014 Tex. App. LEXIS 11585, at *4 (Tex. App.—Amarillo Oct. 21, 2014).

In the simple situation of a lessor who executes a lease, reserving 1/8th royalty, to a lessee who

# Williams & Meyers
# OIL AND GAS LAW

## VOLUME 8

**Howard R. Williams**

*Robert E. Paradise Professor of Natural Resources Law, Emeritus
Stanford University*

**Charles J. Meyers
(1925–1988)**

*The late Richard E. Lang Professor and Dean of the School of Law, Emeritus
Stanford University*

Updated and Revised by

**Patrick H. Martin**

*Campanile Professor of Mineral Law Emeritus
Paul M. Hebert Law Center, Louisiana State University
Baton Rouge, Louisiana*

**Bruce M. Kramer**

*Maddox Professor of Law Emeritus
Texas Tech University School of Law
Lubbock, Texas*

2016



**QUESTIONS ABOUT THIS PUBLICATION?**

For questions about the **Editorial Content** appearing in these volumes or reprint permission, please call:
Linda J. Folkman, J.D. at .................................................................. (908) 673-1548
Email: .................................................................. Linda.Folkman@lexisnexis.com
For assistance with replacement pages, shipments, billing or other customer service matters, please call:

Customer Services Department at . . . . . . . . . . . . . . . . . . . . . . . . . . . . (800) 833-9844
Outside the United States and Canada, please call . . . . . . . . . . . . . . . . . (518) 487-3000
Fax Number . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . (518) 487-3584
Customer Service Website . . . . . . . . . . . . . . . . . . . . . http://www.lexisnexis.com/custserv/
For information on other Matthew Bender publications, please call

Your account manager or . . . . . . . . . . . . . . . . . . . . . . . . . . . . (800) 223-1940
Outside the United States and Canada, please call . . . . . . . . . . . . . . . . . (518) 487-3000

Library of Congress Card Number: 60-665
ISBN: 978-0-8205-2148-0 (print)

*Cite this publication as:*

Patrick H. Martin and Bruce M. Kramer, Williams & Meyers, Oil and Gas Law, § [sec. no.] (LexisNexis Matthew Bender 2016).

*Example:*

Patrick H. Martin and Bruce M. Kramer, Williams & Meyers, Oil and Gas Law, § 1.01 (LexisNexis Matthew Bender 2016).

This publication is designed to provide authoritative information in regard to the subject matter covered. It is sold with the understanding that the publisher is not engaged in rendering legal, accounting, or other professional services. If legal advice or other expert assistance is required, the services of a competent professional should be sought.

LexisNexis and the Knowledge Burst logo are registered trademarks of Reed Elsevier Properties Inc., used under license. Matthew Bender and the Matthew Bender Flame Design are registered trademarks of Matthew Bender Properties Inc.

Copyright © 2016 Matthew Bender & Company, Inc., a member of LexisNexis. All Rights Reserved.
Originally published in: 1959

No copyright is claimed by LexisNexis or Matthew Bender & Company, Inc., in the text of statutes, regulations, and excerpts from court opinions quoted within this work. Permission to copy material may be licensed for a fee from the Copyright Clearance Center, 222 Rosewood Drive, Danvers, Mass. 01923, telephone (978) 750-8400.

Editorial Office
230 Park Ave., 7th Floor, New York, NY 10169 (800) 543-6862
www.lexisnexis.com

MATTHEW⬥BENDER

## Net profits royalty

A payment of a specified portion of the net profits from production, sometimes offered in Saskatchewan in lieu of a cash bonus payment for a Crown lease at public land sales. Matthews, "Operating Methods in the Oil and Gas Industry," in Harbeau (Ed.), *Oil and Gas Production and Taxes* 92, 102 (1963).

Continental Potash, Inc v. Freeport-McMoran, Inc., 115 N.M. 690, 858 P.2d 66, 125 O.&G.R. 565 (N.M. 1993), was concerned with a net profits overriding royalty conditioned upon realizing a net profit during each fiscal year on production of potash from pooled interests. Whenever the operator was in a net profit posture, all royalty holders would receive payments without regard to whose potash was being mined, milled, and sold. The agreement also included what the parties called a "net loss carry-forward," which meant that if the operator began production on the mining lands, it was required to pay a net profit royalty in any given fiscal year only if the net loss that had accumulated prior to that year had been overcome. 858 P.2d at 70.

For a discussion of the usage of this term in Australia, see Ryan, "Australia: Petroleum Royalties—Part I," [1985/86] 5 *OGLTR* 121; Part II, [1985/86] 6 *OGLTR* 160.

*See also* BONUS.

## Net profits status

As used in a letter agreement providing for conversion of an overriding royalty to a net profits interest when the property reached a "net profits status," Aminoil USA, Inc. v. OKC Corp., 629 F. Supp. 647, 648, 90 O.&G.R. 234 (E.D. La. 1986), *aff'd sub nom.* Phillips Oil Co. v. OKC Corp., 812 F.2d 265, 95 O.&G.R. 85 (5th Cir. 1987), *cert. denied*, 484 U.S. 851 (1987), defined this term as follows: ". . . in general terms, when the income from this mineral property exceeded the costs and expenses of exploration and production."

## Net prospect acreage

A term employed in a limited partnership agreement for "the number of acres in each Designated Prospect in which [the general partner] or its Affiliates presently own an interest multiplied by the percentage of working interest available to [the general partner] in such Prospect."

*See also* DESIGNATED PROSPECT; GROSS PROSPECT ACREAGE; PROSPECT.

## Net realization accounting method

A method of accounting for the value of gas based on the value of component parts of the gas stream derived by processing gas through a gasoline extraction plant, with allowance made for the cost of manufacturing such component parts. Jicarilla Apache Tribe v. Supron Energy Corp., 782 F.2d 855, 88 O.&G.R. 519, *opinion modified*, 793 F.2d 1171, 88 O.&G.R. 531 (10th Cir. 1986), *cert. denied*, 479 U.S. 970 (1986); Supron Energy Corp., 46 IBLA 181, IBLA 79-374, GFS (O&G) 1980-75 (March 21, 1980).

*See also* ACCOUNTING METHODS.

## Net revenue interest

(1) A term which has been used to describe a share of the working interest not required to contribute to, nor liable for, any portion of the expense of drilling and completing the initial well on the premises. This definition is rarely used currently.

(2) This term has also been employed in reference to the lessee's share of production after satisfaction of all royalty, overriding royalty, oil payments, or other nonoperating interests. Thus, if a lease is burdened by a 1/8th royalty and a 1/8th of 8/8ths overriding royalty, the net revenue interest of the lessee is 6/8ths of production. *See* Scott, *How to Prepare an Oil and Gas Farmout Agreement*, 33 Baylor L. Rev. 63, 73 (1981).

(3) The share of unit production attributable to an interest bound by the unit agreement. *See, e.g.*, Gillring Oil Co. v. Hughes, 618 S.W.2d 874, 71 O.&G.R. 415 (Tex. Civ. App. 1981) (contributor of 25 net acres to 320-acre unit providing for 25 percent royalty has a net revenue interest of 25/320 of 25



# Schlumberger

- Services & Products
- About Us
- Investors
- Newsroom
- HSE
- Careers
- Alumni
- Resources

# Oilfield Glossary

## Oilfield Glossary

Search for Term:

Language:

◉ English ○ Español  Search

Search by Discipline

All Disciplines ▾  Go

More search options

Terms beginning with:

| # | A | B | C | D | E | F |
| G | H | I | J | K | L | M |
| N | O | P | Q | R | S | T |
| U | V | W | X | Y | Z | |

## Resource Links

Schlumberger Oilfield Services
Oilfield Review
Curve Mnemonic Dictionary
Schlumberger Excellence in Education
Development (SEED)

## Credits and Administration

Schlumberger Oilfield Glossary Credits
Glossary Administration

## Tools

🖨 Print          🖺 Share

## net revenue interest

English | Español

### 1. n. [Oil and Gas Business]

A share of production after all burdens, such as royalty and overriding royalty, have been deducted from the working interest. It is the percentage of production that each party actually receives.

**See:** overriding royalty, royalty, working interest

© 2017 Schlumberger Limited. All rights reserved. | Privacy | Terms | Help | Site Map | Contact ·

# Calendar No. 668

| 97TH CONGRESS | | SENATE | | REPORT |
|---|---|---|---|---|
| 2d Session | } | | { | No. 97-472 |

---

## PERMITTING INDIAN TRIBES TO ENTER INTO CERTAIN AGREEMENTS FOR THE DISPOSITION OF TRIBAL MINERAL RESOURCES, AND FOR OTHER PURPOSES

---

JUNE 10 (legislative day, JUNE 8), 1982.—Ordered to be printed

---

Mr. COHEN, from the Select Committee on Indian Affairs, submitted the following

# REPORT

### [To accompany S. 1894]

The Select Committee on Indian Affairs, to which was referred the bill (S. 1894) to permit Indian tribes to enter into certain agreements for the disposition of tribal mineral resources, and for other purposes, having considered the same, reports favorably thereon with an amendment in the nature of a substitute and recommends that the bill as amended do pass.

The amendment in the nature of a substitute is as follows: Strike out all after the enacting clause and insert:

That (a) any recognized Indian tribe, band or other group of Indians subject to the jurisdiction of the United States may enter into any joint venture agreement, operating agreement, production sharing agreement, service agreement, managerial agreement, lease agreement, or other agreement approved by the Secretary of the Interior (hereinafter referred to as the "Secretary") for the disposition of oil and gas, geothermal, coal, or other energy or non-energy mineral resources, owned by a tribe, or for the sale of the production of such tribal minerals. Any such agreement shall be for such term and be subject to such conditions as the Secretary may require by regulation.

(b) Unless the Secretary finds that an agreement is not in the best interest of the tribe, the Secretary shall approve such agreement within (1) 180 days of its submission to him or (2) 30 days after compliance, if required, with Sec. 102(2) (C) of the National Environmental Policy Act of 1969, 42 U.S.C. 4332, or any other requirement of law, whichever is later. Any party to such agreement may enforce the provisions of this subsection pursuant to 28 U.S.C. 1361.

(c) Whenever the Secretary approves or disapproves an agreement pursuant to subsection (a), he shall state his findings in writing at least thirty days before making his decision. Such findings shall be made available to the tribe.

(d)(1) Upon Secretarial disapproval of such agreement, the parties involved therein shall have standing, without regard to the requirements of the Administrative Procedures Act, to bring a cause of action in federal district court.

89–010 O

2

(2) The district court of the United States shall have jurisdiction to review the Secretary's disapproval action and shall determine the matter *de novo*. The burden is on the Secretary of the Interior to sustain his action.

(3) Except as to other cases the court considers of greater importance, proceedings before the district court, as authorized by this section, and appeals therefrom, take precedence on the docket over all cases and shall be assigned for hearing and trial or for argument at the earliest practicable date and expedited in every way.

(4) The court may assess against the United States reasonable attorney fees and other reasonable litigation costs incurred in any case under this section in which the complainant has substantially prevailed.

SEC. 2. Individual Indians owning trust or restricted minerals may join with a tribe in an agreement entered into pursuant to section 1 of this Act, subject to the approval of the Secretary of the Interior.

SEC. 3. The Secretary shall review, within 90 days of enactment of this Act, any existing non-lease agreement approved between June, 1975 and April, 1981, to determine if they comply with the purposes of this Act and any other provisions of law.

SEC. 4. Upon the request of any Indian tribe or any individual Indian owning trust or restricted mineral resources, the Secretary of the Interior shall provide qualified, independent, expert advice to such tribe or individual for determination of potential mineral values, for social, environmental and economic analyses, for legal assistance, and for such other technical services that such tribe or individual may request relating to the valuation, development, production and sale of such minerals as are defined in Section 1 of this Act. Costs for such services may be reimbursed pursuant to the provisions of the first section of the Act of February 14, 1920 (41 Stat. 415; 25 U.S.C. 413), as amended.

SEC. 5. Nothing in this Act shall affect the validity of any lease approved or hereafter approved pursuant to the Act of May 11, 1938, as amended (52 Stat. 347; 25 U.S.C. 396a et. seq.).

SEC. 6. Within one hundred and eighty days of the date of enactment of this Act, the Secretary of the Interior shall promulgate rules and regulations to facilitate implementation of this Act. The Secretary shall, to the extent practicable, consult with national and regional Indian organizations and Tribes with expertise in mineral development both in the initial formulation of rules and regulations and any future revision or amendment of such rules and regulations.

## PURPOSE

S. 1894 is designed to provide Indian tribes flexibility for the development and sale of their mineral resources. The objective is two-fold: first, to further the policy of self-determination and second, to maximize the financial return tribes can expect for their valuable mineral resources.

## BACKGROUND AND NEED

An Indian tribe's ability to negotiate agreements for minerals that it owns may be limited by certain statutes. The Secretary of the Interior has approved several non-lease venture agreements. However, no new agreements have been approved since April, 1981, pending enactment of legislation to clarify tribal authority to enter into agreements other than leases under the 1938 Indian Mineral Leasing Act.

### *Statutes*

*The Non-Intercourse Act of the Indian Trade and Intercourse Act of 1970* (25 U.S.C. 177) says that tribes may not alienate an interest in land except when authorized to do so by treaty or an Act of Congress. Unsevered minerals of all kinds are deemed to be an interest in land and, therefore, cannot be sold without appropriate authorization.

25 U.S.C. 81 governs services contracts, including services connected with Indian lands. Section 81 could be read to authorize a services con-

3

tract to extract minerals for a tribe, though it does not specifically authorize the sale of minerals. The only regulations promulgated pursuant to this section are those governing contracts with tribes for attorneys service. (25 C.F.R. 72).

*The 1934 Indian Reorganization Act* (IRA) authorized the tribes to establish Federally chartered business corporations and to give tribal corporations authority to lease tribal lands up to ten years. The provision applies only to those tribes that that organized under IRA and subsequently were granted a corporate charter. Many Indian tribes did not do so. Further, tribal corporations are limited to "leases" and for "ten years". Additionally, there is a Solicitor's Opinion in the Department of the Interior to the effect that a tribal business corporation cannot convey an interest in tribal minerals unless the tribe first conveys the land to the corporation.

*The Indian Mineral Leasing Act of 1938* (25 U.S.C. 396 (a)), permits tribes to lease their trust lands for mining purposes. The statutory lease term is ten years and for so long thereafter as minerals are produced in paying quantities. Leases are subject to the approval of the Secretary of the Interior. Section 396b requires that *oil and gas leases* be offered for sale by advertisement followed by competitive bidding. Regulations implementing the 1938 Act are found in 25 C.F.R. 171.

*The Act of 1909* (25 U.S.C. 396) authorized mineral leases of *allotted lands* (those owned by individual Indians but held in trust by the United States). Regulations are found in 25 C.F.R. 172. Authority for oil and gas leasing of allotted lands is arguably broader than that for tribal lands but allotted minerals are restricted by regulation to the same advertising and competitive bidding procedures that pertain to tribal lands.

The 1938 Act has been treated as the basic authority for mineral leases of tribal lands. While leases for minerals other than oil and gas are not restricted by statute to competitive bidding, regulations provide that this process be used for all minerals unless the Secretary grants advance permission to the tribe or individual Indian owner to *negotiate* for a lease to dispose of these other minerals. If the Secretary rejects the negotiated agreement, then the minerals may be advertised for bid. In any case, the statute limits leases for all minerals to ten-year terms and for as long as they produce in paying quantities. Thus the need for S. 1894 arises by focusing on two main concerns: the 1938 Act limits development of oil, gas and other minerals to "leases"; and, oil and gas leases are further restricted to a regulated advertisement/competitive bidding procedure.

The statutory scheme is designed to protect Indian tribes and allottees against exploitation of their mineral estates. However, tribes are presently developing more beneficial arrangements for mineral sales through negotiated agreements.

*Joint venture and other agreements*

Several tribes are now participating directly in mineral production through joint venture equity partnerships with energy production companies. Other tribes have recently submitted nonlease venture contracts for mineral development to the Secretary of the Interior for approval but because of questions about tribal authority to enter into

4

such agreements, the agreements are being held in abeyance pending enactment of legislation like S. 1894.

The Department's position is that, since the 1938 Act speaks only of development by lease, the possibilities for tribal joint ventures, partnerships, and other non-lease ventures common in mineral development today are limited. Many tribes believe they are able to determine which kinds of contracts are in their own best interest and to tailor agreements to their own particular needs. Such ventures can give a tribe greater participation in the profits of the venture and a larger role in managing the resource development, as well as Indian employment and training opportunities at all levels.

Of course, the Secretary, as trustee, needs to maintain a strong role in monitoring agreements for overall fairness and terms. However, tribal autonomy and self-determination certainly should include the right to negotiate terms of contracts like any owner of valuable resources. Non-lease ventures can provide a variety of opportunities that would benefit the long-term tribal socio-economic development such as involvement in resource management, training of tribal members for management positions, and participation in the decision-making process. For many tribes, their financial security remains underground in the form of undeveloped and untapped oil, coal, gas, geothermal and other resources.

### LEGISLATIVE HISTORY

S. 1894 was introduced by Senator Melcher on November 30, 1981, and referred to the Select Committee on Indian Affairs. The Committee held a hearing in Billings, Mont., on February 12, 1982, at which testimony was received from many western tribes with energy resources as well as two energy companies. A second hearing was held in Washington, D.C., on March 16, 1982. The Departments of the Interior and Justice testified in favor of the bill and other witnesses included representatives of tribes, allottees, and energy development companies.

### COMMITTEE RECOMMENDATION AND TABULATION OF VOTE

The Select Committee on Indian Affairs, in open business session on May 13, 1982, with a quorum present recommends by unanimous vote that the Senate pass S. 1894 as amended.

### COMMITTEE AMENDMENTS

The Committee recommends an amendment in the nature of a substitute.

### SECTION-BY-SECTION ANALYSIS AND EXPLANATION OF COMMITTEE AMENDMENTS

S. 1894 is designed to provide much greater flexibility in the conditions and manner under which tribes can enter into mineral resource development. Regulations should provide guidelines on the procedures under which agreements will be approved, with emphasis on fair and reasonable financial returns. Regulations can be flexible to respond to new requirements or to adapt to changes in the mineral industry. The

**APPENDIX PAGE 409**

5

Secretary's trust responsibility would remain intact and the bill requires the Secretary to use a "best interest" test in reviewing tribal agreements. The 1938 Indian Mineral Leasing Act would be unchanged by S. 1894, so that tribes that prefer to use the existing competitive leasing process can do so.

The Secretary approved some non-lease type ventures between January 1, 1975, and April 1981, either under a tribe's general contracting authority or under the premise that "leases" in today's mineral industry parlance can mean much more than the traditional BIA lease form. However, for oil and gas particularly, the approval may rest on authority that could be challenged, causing financial harm to the tribes, to the Federal Government as trustee, and to the individual companies involved. S. 1894 clarifies the right of tribes to enter into such agreements and also provides for Secretarial review of existing non-lease agreements to be sure they meet the purposes of this Act, or comply with the provisions of any other applicable law.

SEC. 1 (a): Provides that any Federally recognized Indian tribe may develop its tribally owned minerals through various types of negotiated agreements. This section is similar to section 1 of S. 1894 as introduced but clarifies that the bill's authority extends to those tribes who are recognized by the Federal government. Further, the section includes any minerals owned by a tribe, not just those on reservation or trust lands. Thus, tribes owning fee lands with underlying mineral rights can negotiate for the development of such minerals, as can tribes owning mineral rights but not surface rights. The types of permissible agreements are also more clearly identified by the use of terms commonly used in the parlance of the mineral industry but the enumeration of agreements is not meant to restrict the types of agreements that can be entered into.

This section also provides that the Secretary may promulgate regulations governing the terms and conditions of agreements. It is anticipated that such regulations will require a showing by a tribe that it has solicited offers from more than one development company to insure competition and fair remuneration. Regulations may also require a showing that negotiations truly represent arm's length bargaining and that the agreement provides for periodic renegotiation of contract terms, if applicable. Regulations should be broad enough to insure maximum flexibility for tribes in negotiating contract terms. As to any proposed non-lease agreements submitted to the Secretary for approval before the date of enactment of this Act, the Secretary is not precluded by this section from approving any such non-lease agreement prior to adoption of final regulations, providing his approval of an agreement includes a finding that the agreement is in the best interest of the tribe as provided in section 1 (b) and (c).

(b) Provides that, unless the Secretary finds an agreement is not in a tribe's "best interest", he shall approve it within 180 days of submission or 30 days after compliance with NEPA, whichever is later. Originally, the approval period was 1 year but many tribes testified that this was much too long, particularly for oil and gas agreements, which may only require environmental assessments. On the other hand, completion of a full environmental impact statement for a coal development proposal, for example, may take longer than a year. Thus the

6

new language will shorten the time but will allow for whatever additional time may be necessary to meet NEPA requirements.

In the event an agreement is not approved within the prescribed time limit, any party may seek a writ of mandamus to compel the Secretary to act. Thus, agreements are not deemed to be automatically approved if the Secretary takes no action.

In determining the tribe's best interest, the Committee intends that the Secretary should assess, among other things, (1) recent, similar agreements—tribal, state and private—involving the same type of minerals, (2) the probability that production will occur, (3) the fair market value of the minerals that are the subject of the agreement, and (4) the social, environmental and economic impacts of development on the tribes.

It is the intent of the Committee that such agreements should be evaluated or the basis of the best interests of the tribe as a whole, giving due regard to the long term economic development and employment opportunities for Indian tribal members. The Committee is aware that a potential for conflict of interest may arise in the negotiation of contracts or agreements authorized by this Act. In evaluating an agreement for "best interests" of a tribe, the Committee intends that the Secretary assure that no one individual or faction of a tribe should gain an unfair advantage or be unjustly enriched at the expense of the remaining members of the tribe.

(c) Provides that the Secretary shall state his findings in writing to the tribe at least 30 days prior to making a final decision. This is a new provision recommended by the Department of the Interior to be sure that tribes are fully apprised of potential risks, as well as potential benefits. Having the opportunity to review the Secretary's findings in advance of a decision, tribes will have time to reassess and perhaps reconsider before final approval or disapproval.

(d)(1) Upon disapproval of an agreement by the Secretary, gives parties to an agreement standing to bring suit in Federal district court.

(2) Gives the federal district court jurisdiction to review cases *de novo*, the Secretary's action.

(3) Provides for expedited review cases brought under this section.

(4) Provides for assessment of reasonable attorney and litigation fees if the complainant prevails.

Section 1 (d) is new and replaces the Presidential review provision of S. 1894, as introduced. While there are existing administrative review procedures, the Committee prefers expedited judicial review for several reasons. First, the only appeal available within the administration would, in reality, be a review by the Secretary of his own decision, though made by Departmental personnel under delegated authority. Second, time is often of the essence in contracts involving minerals production and a cumbersome and lengthy administrative review, followed perhaps by a lengthy court review, would work against the timeliness of the agreement. Last, Indian tribes have often experienced frustration in their attempts to make their own decisions. The Department of the Interior, the very agency that is responsible for the advancement of Indian tribes, is often regarded as a roadblock to tribal self-determination. This negative experience argues for an-

**APPENDIX PAGE 411**

7

other avenue for redress if a tribe is dissatisfied with the Secretary's decision.

SEC. 2. Provides that individual allottees owning trust minerals may join with a tribe in an agreement. The former section 2(b) was deleted because considerable testimony was presented to the effect that individuals are not adequately protected now under competitive bidding requirements. They are often subject to intimidation and misleading promises made by unscrupulous representatives of some energy companies. The BIA has done a very poor job as trustee for these individuals and a provision allowing for direct negotiations between an individual and energy company representatives would further exacerbate an already serious problem. The Committee understands the need to allow allottees more flexibility than they now have, particularly those groups of allottees who want to block their land for mineral production and have competent negotiators to represent them. However, at this point, there is no sure way to devise such flexibility while at the same time insuring the protection that allottees need and are even now not receiving. It is, of course, expected that tribes are in the best position to protect their own members from exploitation and thus this section does retain the Secretary's authority to approve the inclusion of allottees in a tribe's negotiated agreement.

SEC. 3. Provides for Secretarial review of certain existing non-lease agreements to be certain that they comply with the purposes of this Act and other provisions of law. This review is provided to insure that those non-lease agreements now in place are in the tribe's best interest and that the tribe actively desired to enter into such agreement. Such review must be completed within 90 days of enactment of this Act.

SEC. 4. Provides that the Secretary, at the request of a tribe or individual, shall make available independent expert advice on all phases of mineral development and that costs may be recovered under existing law. This section is new and was included at the request of many witnesses who testified about the lack of expertise and assistance available to them. The Secretary has discretion, at the request of a tribe, to contract with private sources to provide such technical assistance and discretion to recover some of the costs of such assistance in the event that production of minerals results in revenue or proceeds to a tribe or individual.

SEC. 5. Provides that the bill does not affect the validity of any lease under the 1938 Indian Mineral Leasing Act, whether entered into before or after enactment of this Act.

SEC. 6. Provides that regulations shall be promulgated within 180 days and that tribes and organizations with mineral expertise shall be included in the formulation and amendment of such regulations. As noted in the discussion of section 1(b) above, issuance of regulations is not to be interpreted to affect the effective date of this Act and pending agreements can be approved prior to issuance of final regulations. The Committee included the provision for consultation with tribes and organizations to help insure that regulations are in accord with the realities facing tribes seeking to engage in non-lease ventures.

COST AND BUDGETARY CONSIDERATION

The cost estimate for S. 1894, as amended, as provided by the Congressional Budget Office is outlined below:

**APPENDIX PAGE 412**

8

U.S. CONGRESS,
CONGRESSIONAL BUDGET OFFICE,
*Washington, D.C., May 20, 1982.*

Hon. WILLIAM S. COHEN,
*Chairman, Select Committee on Indian Affairs, U.S. Senate, Senate Office Building, Washington, D.C.*

DEAR MR. CHAIRMAN: Pursuant to Section 403 of the Congressional Budget Act of 1974, the Congressional Budget Office has reviewed S. 1894, a bill to permit Indian tribes to enter into certain agreements for the disposition of tribal mineral resources, and for other purposes, as ordered reported by the Senate Select Committee on Indian Affairs, May 13, 1982.

Based on this review, it is expected that enactment of this bill would not result in any additional cost to the government. The bill would allow any Indian tribe to enter into joint venture agreements for the disposition of natural resources in its possession, subject to the approval of the Secretary of the Interior. The bill also provides for specific appeals procedures should the Secretary disapprove any venture proposed.

Should the Committee so desire, we would be please to provide further details on this estimate.

Sincerely,

RAYMOND C. SCHEPPACH
(For Alice M. Rivlin, Director).

## REGULATORY IMPACT STATEMENT

Paragraph 11(b) of rule XXVI of the Standing Rules of the Senate requires each report accompanying a bill to evaluate the regulatory and paperwork impact that would be incurred in carrying out the bill.

S. 1894, as amended, will require that regulations be promulgated but they will apply only to those tribes with mineral resources that seek to negotiate development agreements and will thus affect only a very specific and small population. Therefore the Committee believes that S. 1984 will have no substantial regulatory or paperwork impact.

## EXECUTIVE COMMUNICATIONS

The Committee received the following Executive communication from the U.S. Department of the Interior giving the Administration's views on S. 1894:

U.S. DEPARTMENT OF THE INTERIOR,
OFFICE OF THE SECRETARY,
*Washington, D.C., March 15, 1982.*

Hon. WILLIAM S. COHEN,
*Chairman, Select Committee on Indian Affairs, U.S. Senate, Washington, D.C.*

DEAR MR. CHAIRMAN: This responds to your request for our views on S. 1894, "To permit Indian tribes to enter into certain agreements for the disposition of tribal mineral resources, and for other purposes."

We recommend that the legislation be enacted if amended as suggested herein.

9

S. 1894 would allow any Indian tribe to enter into any joint venture agreement or other agreement described in the first section of the bill approved by the Secretary of the Interior for the disposition of oil and gas, geothermal, or other mineral resources of tribal lands, or for the sale of production from operations on tribal lands. Such agreements would conform to regulations prescribed by the Secretary. The Secretary would approve any agreement within one year of submission unless the Secretary found that the agreement was not in the best interest of the tribe. Upon disapproval, the Secretary would state his findings in writing within thirty days of his decision. The tribe would then have thirty days in which to file a request for Presidential review of the decision.

S. 1894 would also provide that individual Indians owning trust or restricted minerals within the boundaries of a reservation subject to an agreement entered into pursuant to the Act may join in the agreement with the tribe, subject to Secretarial approval. The Secretary, at his discretion, could also approve joint venture agreements or other agreements for individual Indians owning trust or restricted minerals.

Finally, S. 1894 would ratify, as of its date of enactment, agreements of the types described in the first section that were approved prior to enactment and would provide that enactment of this legislation, would not affect the validity of any lease previously approved or approved after enactment pursuant to the Act of May 11, 1938. It would also direct the Secretary to promulgate rules and regulations to implement the above provisions within 180 days of its enactment.

At the present time, the most frequently used authority for the development of Indian tribal mineral resources is the Omnibus Indian Mineral Leasing Act of May 11, 1938 (52 Stat. 347; 25 U.S.C. 396a *et seq.*). Section 396a of title 25 permits the leasing of tribal land for mining purposes for a term not to exceed ten years and so long thereafter as minerals are produced in paying quantities. Leases are executed by the tribe subject to the approval of the Secretary. Section 396a requires, in most instances, that oil and gas leases be offered for sale by advertisement followed by competitive bidding.

We believe that the maximum term for leases prescribed by section 396a is undesirable for two reasons. First, with many mining leases, the ten year exploratory period is insufficient for development to begin. Second, the "production in paying quantities" clause, in effect, gives lessees a perpetual lease when minerals are discovered. This latter aspect was identified as a major problem with current leasing practices for tribal lands by the American Indian Policy Review Commission in its "Report on Reservation and Resources Development and Protection," Task Force Seven, Final Report to the American Indian Policy Review Commission, 48 (1976).

Experience has shown that the requirement in section 396a of competitive bidding for the leasing of tribal oil and gas does not always work to the advantage of the tribes. Certain tribes which have been able to negotiate oil and gas development agreements appear to have received greater compensation than they had been receiving under competitive bidding. Since the bill does ont eliminate the current 1938 Act requirement for competitive bidding procedure for oil and gas development on tribal land before other types of agreements can be made, both tribes and allottees would have the option of negotiation or competitive

10

bidding under the procedures envisioned for implementation of S. 1894. Competitive bidding would continue to be required for most tribal oil and gas leases issued under the authority of the 1938 Act.

The most serious problem with section 396a, however, is that it authorizes development of tribal oil and gas resources only by leasing, ignoring the possibility of joint ventures, joint production agreements, risk service contracts and other non-lease ventures which are commonly used in mineral development today. Such non-lease ventures can provide the vehicle by which tribes can become directly involved in management decisions. The normal lease arrangements merely turns over responsibility for all development decisions to the lessee. The bill would facilitate tribes' direct involvement in such decisions, thereby enabling them to gain management experience and contributing significantly to the goal of self-determination.

Since 1975, the Department has approved a number of non-lease ventures involving the development of mineral resources, pursuant to section 81 of Title 25 (R.S. section 2103). The section requires the approval of the Secretary of the Interior and the Commissioner of Indian Affairs for contracts for services relative to Indian lands. We believe section 81 is inadequate to solve the problems posed by the 1938 Act discussed above. First, because section 81 does not apply to leases, it leaves intact the limitations in the 1938 Act. Second, the approval procedure for non-lease ventures under section 81 requires a rather cumbersome case-by-case analysis to determine whether the document submitted for approval is a service agreement within the purview of section 81 and does not convey a leasehold estate within the purview of the 1938 Act, or an interest in land within the purview of the Indian Non-Intercourse Act (R.S. 2116; 25 U.S.C. 177). Third, with the proliferation and hybridization of non-lease ventures, it is increasingly difficult to make the determination described. Without clarification of the Secretary's authority and ratification of existing ventures, some non-lease ventures previously approved may be called into question. Moreover, because of the confusion concerning the Secretary's authority to approve non-lease ventures the Department is reluctant to approve a number of proposed agreements which are pending.

We believe that enactment of S. 1894 with our proposed amendments would provide a means for the United States to promote tribal self-determination in the development of Indian mineral resources. The bill would leave to regulations the establishment of maximum terms for, the conditions of, and the manner of entering into non-lease agreements. We support this procedure because it permits the authority granted by the legislation to adapt to changes in the minerals industry and to respond to the particular requirements of numerous types of non-lease ventures.

We would like to offer, however, the following recommended amendments.:

1. Section 1(a) authorizes tribes to enter into joint ventures for the disposition of "oil and gas, geothermal or other mineral resources" of tribal lands. We are advised that a number of recent cases have interpreted similar language quite narrowly, e.g., a reference to oil, gas and other minerals was held to apply only to energy minerals under the principle of ejusdem generis. In order to prevent such an interpretation and to clarify the legislative intention that the bill applies to

**APPENDIX PAGE 415**

11

all mineral resources, we suggest that line 1 of page 2 be amended to read "of oil and gas, geothermal, coal, or other energy or nonenergy mineral resources. . . ."

2. Section 1(a) provides for approval within one year by the Secretary of any agreement submitted to him unless the Secretary finds it is not in the best interests of the tribe. We do not believe the Secretary should be bound to approve an agreement within one year of submission because in many instances, compliance with requirements of the National Environmental Policy Act (P.L. 91–190; 83 Stat. 852), as amended, would take more than a year. In addition, the current language could be construed as giving automatic approval within one year. Such an automatic approval may not be in the best interests of Indian mineral owners. Therefore, we recommend that this be clarified.

3. Section 1(b) provides for "Presidential review" of disapproval of a tribal proposal. We are not aware of any statutory requirement or procedures for such a review. Lease approval decisions are normally made by BIA field officials under delegated authority. Thus, administrative review procedures currently exist, and we believe those should be followed. We therefore recommend that the second sentence of section 1(b) be deleted from the bill.

4. One of the purposes of S. 1894 is to provide for legislative ratification of certain Indian mineral resources development agreements previously approved by the Secretary. As noted above, since 1975 the BIA has approved a number of tribal mineral development agreements which did not purport to be leases, and thus were not treated as being subject to the 1938 Act. Since questions remain about the adequacy of the Secretary's authority to approve such non-lease mineral development agreements, there is a need to ratify these past agreements which were approved in good faith and at the urging of the affected tribes. Section 3 of S. 1894 was no doubt designed to achieve this purpose by ratifying all prior "agreements of the type described in the first section of this Act." However, this language is unnecessarily broad since section 1 of S. 1894 also authorizes leases. As a result, all past leases of tribal minerals which may have been approved by a BIA official would be ratified by S. 1894—no matter how old or legally defective the lease may be. We are certain this result was not intended. To narrow the scope of this ratification provision, we recommend the following language:

"Sec. 3. Any agreement for the development of tribally owned minerals (1) which was previously approved by the Secretary or his authorized delegate, between January 1, 1975, and the date of the enactment of this Act, and (2) which did not purport to be a lease when it was presented to the Department of the Interior for approval, is hereby considered approved as of the date of such previous approval.".

Use of the phrase, "did not purport to be a lease," is designed to avoid future inquiries over whether one of the agreements approved during 1975–1981 was or was not a lease, the very inquiry which this legislation makes unnecessary for all future tribal mineral development agreements. We believe less than a dozen approved agreements fall within the scope of this proposed alternative language for section 3.

5. Section 4 of the bill requires that the Secretary promulgate rules and regulations to implement the Act within 180 days. We suggest

12

that the phrase "of the date of enactment of this Act" could be added. More important, we believe the legislative history should indicate that this requirement is not to be interpreted to affect the effective date of the Act, and that the Secretary is not precluded from approving any proposed agreements pending in the Department on the date of enactment until final rules and regulations have been adopted.

6. We believe that a provision should be added to the bill holding the Secretary harmless in the event a tribe suffers damages alleged to have arisen as a consequence of approval by the Secretary of an agreement authorized by this legislation. The kinds of tribal profit-sharing agreements envisioned by S. 1894 may involve substantial risks which we understand tribes would be willing to assume to provide an opportunity to maximize tribal profits and control over operations. Since the Secretary will be advising tribes on the consequences of these agreements, pursuant to his approval authority, we believe it is the tribes, as the parties to these agreements, who should assume the risks, and that the federal taxpayer should not be a guarantor of the wisdom of the tribes' and the Secretary's business judgment. Accordingly, we also believe that the Secretary should be required to make findings concerning the best interest of the Tribe whether he approves or disapproves a lease. These findings should be stated thirty days before his final decision is made, in the event that a tribe might want to reconsider entering into an agreement as a result of those findings. We therefore recommend that section 1(b) be amended to read as follows:

"(b) Whenever the Secretary approves or disapproves an agreement pursuant to subsection (a), he shall state his findings in writing at least thirty days before making his decision. Such findings shall be made available to the tribe, but shall otherwise be considered exempt from disclosure under the Freedom of Information Act.".

The provision for exemption from disclosure under the Freedom of Information Act would insure that a tribe is not done competitive harm by the release of an economic assessment of its proposed agreement, transmitted in confidence and exclusively for the tribe's benefit.

We also recommend that the following new section 6 be added:

"Sec. 6. No provision of this Act shall be construed to constitute a jurisdictional act, to confer jurisdiction to sue, or to grant implied consent to any person or Indian tribe to sue the United States or any of its officers for any damages alleged to have arisen as a consequence of an approval by the Secretary of the Interior pursuant to section 1 of this Act.".

The Office of Management and Budget has advised that there is no objection to the presentation of this report from the standpoint of the Administration's program.

Sincerely,

KEN SMITH,
*Assistant Secretary.*

CHANGES IN EXISTING LAW

In compliance with subsection 12 of Rule XXVI of the Standing Rules of the Senate, the Committee notes that no changes in existing law are made by S. 1894, as amended.

H.R. REP. 97-746, H.R. REP. 97-746 (1982)

H.R. REP. 97-746, H.R. Rep. No. 746, 97TH Cong., 2ND Sess. 1982, 1982 U.S.C.C.A.N. 3465, 1982 WL 25121
(Leg.Hist.)
P.L. 97-382, INDIAN MINERAL DEVELOPMENT ACT OF 1982
SEE PAGE 96 STAT. 1938
SENATE REPORT (INDIAN AFFAIRS COMMITTEE) NO. 97-472, JUNE
10, 1982 (TO ACCOMPANY S. 1894)
HOUSE REPORT (INTERIOR AND INSULAR AFFAIRS COMMITTEE)
NO. 97-746, AUG. 13, 1982 (TO ACCOMPANY S. 1894)
CONG. RECORD VOL. 128 (1982)
DATES OF CONSIDERATION AND PASSAGE
SENATE JUNE 30, DECEMBER 8, 1982
HOUSE AUGUST 17, DECEMBER 10, 1982
THE HOUSE REPORT IS SET OUT.

(CONSULT NOTE FOLLOWING TEXT FOR INFORMATION ABOUT OMITTED MATERIAL. EACH COMMITTEE
REPORT IS A SEPARATE DOCUMENT ON WESTLAW.)

HOUSE REPORT NO. 97-746

AUG. 13, 1982

*1 **3465 THE COMMITTEE ON INTERIOR AND INSULAR AFFAIRS, TO WHOM WAS REFERRED THE BILL (S.
1894) TO PERMIT INDIAN TRIBES TO ENTER INTO CERTAIN AGREEMENTS FOR THE DISPOSITION OF
TRIBAL MINERAL RESOURCES, AND FOR OTHER PURPOSES, HAVING CONSIDERED THE SAME, REPORT
FAVORABLY THEREON WITH AN AMENDMENT AND RECOMMEND THAT THE BILL AS AMENDED DO
PASS.

* * * *

**3 PURPOSE**

THE PURPOSE OF S. 1894 IS TO PERMIT INDIAN TRIBES TO ENTER INTO VARIOUS KINDS OF AGREEMENTS
FOR THE DEVELOPMENT AND DISPOSITION OF THEIR ENERGY AND NON-ENERGY MINERAL RESOURCES.

BACKGROUND

THE DEVELOPMENT AND DISPOSITION OF AN INDIAN TRIBE'S INTEREST IN THE MINERAL RESOURCES OF
ITS TRUST OR RESTRICTED LANDS IS SUBJECT TO SEVERAL EXISTING FEDERAL LAWS. IN RECENT
YEARS, AS SOME TRIBES HAVE SOUGHT TO DEAL MORE EFFECTIVELY WITH THEIR MINERAL
RESOURCES AND REALIZE A GREATER RETURN ON THOSE RESOURCE THROUGH INNOVATIVE, FLEXIBLE
BUSINESS ARRANGEMENTS, THOSE LAWS HAVE PROVEN TO BE OBSTACLES IN SOME CASES.

AT THE PRESENT TIME, THE MOST FREQUENTLY USED AUTHORITY FOR THE DEVELOPMENT OF INDIAN
TRIBAL MINERAL RESOURCES IS THE OMNIBUS INDIAN *4 **3466 MINERAL LEASING ACT OF MAY 11, 1938
(52 STAT. 347; 25 U.S.C. 396A ET SEQ.). SECTION 396A OF TITLE 25 PERMITS THE LEASING OF TRIBAL LAND
FOR MINING PURPOSES FOR A TERM NOT TO EXCEED 10 YEARS AND SO LONG THEREAFTER AS
MINERALS ARE PRODUCED IN PAYING QUANTITIES. LEASES ARE EXECUTED BY THE TRIBE SUBJECT TO
THE APPROVAL OF THE SECRETARY. SECTION 396B REQUIRES, IN MOST INSTANCES, THAT OIL AND GAS
LEASES BE OFFERED FOR SALE BY ADVERTISEMENT FOLLOWED BY COMPETITIVE BIDDING.

WESTLAW    © 2016 Thomson Reuters. No claim to original U.S. Government Works.    1

THE MAXIMUM LEASE TERM PRESCRIBED BY SECTION 396A MAY BE UNDESIRABLE FOR TWO REASONS. FIRST, WITH MANY MINING LEASES, THE 10 YEAR EXPLORATORY PERIOD IS INSUFFICIENT FOR DEVELOPMENT TO BEGIN; THE LEAD TIMES REQUIRED TO CONDUCT PRELIMINARY ASSESSMENTS, ACQUIRE THE NECESSARY PERMITS AND FINANCIAL BACKING, OUTLINE THE DEPOSIT AND PREPARE THE SITE FOR DEVELOPMENT FREQUENTLY TAKE LONGER THAN 10 YEARS.

SECOND, THE 'PRODUCTION IN PAYING QUANTITIES' CLAUSE IS A TERM OF ART BORROWED FROM OIL AND GAS LAW. THE 1938 ACT APPLIED THE TERM TO HARDROCK MINERALS AND THEREBY CREATED OCCASIONAL UNANTICIPATED PROBLEMS, BECAUSE HARDROCK MINERAL MARKETS ARE SUBJECT TO CONSIDERABLE FLUCTUATION. AS A RESULT, LESSEES HAVE SOMETIMES FOUND THAT THEY ARE NO LONGER PRODUCING 'IN PAYING QUANTITIES' AFTER THE TENTH ANNIVERSARY OF THE LEASE, MERELY BECAUSE OF A CYCLICAL DIP IN THE MARKET FOR THE MINERAL BEING PRODUCED. WHEN THIS HAPPENS, THE LEASE MAY TERMINATE, AGAINST THE WISHES OF LESSOR AND LESSEE, EVEN THOUGH A LARGE DEPOSIT STILL REMAINS AND PRODUCTION WOULD NORMALLY RESUME WHEN MARKET CONDITIONS IMPROVE.

EXPERIENCE HAS ALSO SHOWN THAT THE REQUIREMENT IN SECTION 396B OF COMPETITIVE BIDDING FOR THE LEASING OF TRIBAL OIL AND GAS DOES NOT ALWAYS WORK TO THE ADVANTAGE OF THE TRIBES. CERTAIN TRIBES WHICH HAVE BEEN ABLE TO NEGOTIATE OIL AND GAS DEVELOPMENT AGREEMENTS APPEAR TO HAVE RECEIVED GREATER COMPENSATION THAN THEY HAD BEEN RECEIVING UNDER COMPETITIVE BIDDING.

THE MOST SERIOUS PROBLEM WITH SECTION 396A, HOWEVER, IS THAT IT AUTHORIZES DEVELOPMENT OF TRIBAL OIL AND GAS RESOURCES ONLY BY LEASING. THIS REQUIREMENT IGNORES THE POSSIBILITY OF JOINT VENTURES, JOINT PRODUCTION AGREEMENTS, RISK SERVICE CONTRACTS AND OTHER NON-LEASE VENTURES WHICH ARE COMMONLY USED IN MINERAL DEVELOPMENT TODAY. SUCH NON-LEASE VENTURES CAN PROVIDE THE VEHICLE BY WHICH TRIBES CAN BECOME DIRECTLY INVOLVED IN MANAGEMENT DECISIONS. THE NORMAL LEASE ARRANGEMENT MERELY TURNS OVER RESPONSIBILITY FOR ALL DEVELOPMENT DECISIONS TO THE LESSEE.

SINCE 1975, THE DEPARTMENT OF THE INTERIOR HAS APPROVED A NUMBER OF NON-LEASE VENTURES INVOLVING THE DEVELOPMENT OF MINERAL RESOURCES, PURSUANT TO SECTION 81 OF TITLE 25 (R.S. SECTION 2103). THAT SECTION REQUIRES THE APPROVAL OF THE SECRETARY OF THE INTERIOR AND THE COMMISSIONER OF INDIAN AFFAIRS FOR CONTRACTS FOR SERVICES RELATIVE TO INDIAN LANDS. SECTION 81 IS INADEQUATE TO SOLVE THE PROBLEMS POSED BY THE 1938 ACT DISCUSSED ABOVE.

FIRST, BECAUSE SECTION 81 DOES NOT APPLY TO LEASES, IT LEAVES INTACT THE LIMITATIONS IN THE 1938 ACT. SECOND, THE APPROVAL PROCEDURE FOR NON-LEASE VENTURES UNDER SECTION 81 REQUIRES A RATHER CUMBERSOME CASE-BY-CASE ANALYSIS TO DETERMINE WHETHER THE DOCUMENT SUBMITTED FOR APPROVAL IS A SERVICE AGREEMENT WITHIN THE PURVIEW OF THE 1938 ACT, OR AN INTEREST IN LAND WITHIN THE PURVIEW OF THE INDIAN NON-INTERCOURSE ACT (R.S. 2116; 25 U.S.C. 177). THIRD, WITH THE PROLIFERATION AND *5 **3467 HYBRIDIZATION OF NON-LEASE VENTURES, IT IS INCREASINGLY DIFFICULT TO MAKE THE DETERMINATION DESCRIBED. WITHOUT CLARIFICATION OF THE SECRETARY'S AUTHORITY FOR APPROVAL OF EXISTING VENTURES, BECAUSE OF THE CONFUSION CONCERNING THE SECRETARY'S AUTHORITY TO APPROVE NON-LEASE VENTURES, THE DEPARTMENT IS RELUCTANT TO APPROVE A NUMBER OF PROPOSED AGREEMENTS WHICH ARE PENDING.

## SECTION-BY-SECTION ANALYSIS

### SECTION 1

SECTION 1 PROVIDES THAT THE ACT MAY BE CITED AS THE 'INDIAN MINERAL DEVELOPMENT ACT OF

WESTLAW   © 2016 Thomson Reuters. No claim to original U.S. Government Works.    2

1982.ʻ

## SECTION 2

SECTION 2 DEFINES THE TERMS 'INDIANʻ, 'INDIAN TRIBEʻ, AND 'SECRETARYʻ AS USED IN THE ACT.

## SECTION 3

SUBSECTION (A) AUTHORIZES INDIAN TRIBES, IF PERMITTED BY THEIR OWN INTERNAL GOVERNING DOCUMENTS AND SUBJECT TO THE APPROVAL OF THE SECRETARY OF THE INTERIOR, TO ENTER INTO VARIOUS KINDS OF COMMERCIAL AGREEMENTS FOR THE DEVELOPMENT OF THEIR ENERGY AND NON-ENERGY MINERAL RESOURCES. THE COMMITTEE DOES NOT MEAN, BY ENUMERATING VARIOUS KINDS OF AGREEMENTS, TO LIMIT THE SCOPE OF THIS AUTHORITY. THE SUBSECTION PERMITS THE SALE OR OTHER DISPOSITION OF SUCH MINERAL RESOURCES, BUT ONLY AS A PART OF AN OVERALL DEVELOPMENT PLAN APPROVED UNDER THIS ACT AND NOT A SIMPLE SALE IN SITU.

SUBSECTION (B) PROVIDES THAT AN INDIAN INDIVIDUAL MAY INCLUDE HIS MINERAL RESOURCES IN A TRIBAL MINERALS AGREEMENT IF THE OTHER PARTIES CONCUR AND THE SECRETARY APPROVES. THE SECRETARY MUST FIND THAT SUCH PARTICIPATION IS IN THE BEST INTEREST OF THE INDIAN.

## SECTION 4

SUBSECTION (A) PROVIDES THAT THE SECRETARY MUST APPROVE OR DISAPPROVE A MINERALS AGREEMENT SUBMITTED TO HIM EITHER 180 DAYS AFTER SUBMISSION OR, IF AN ENVIRONMENTAL IMPACT STATEMENT IS REQUIRED, 60 DAYS AFTER COMPLIANCE, WHICHEVER IS LATER. THE SUBSECTION ALSO PROVIDES THAT AN AFFECTED PARTY MAY SEEK A WRIT OF MANDAMUS UNDER SECTION 1361 OF TITLE 28, U.S.C. IS IN THE EVENT THE SECRETARY FAILS TO ACT WITHIN THE TIME ALLOTTED. A FAILURE TO ACT WITHIN THE TIME REQUIRED WILL NOT RESULT IN AN AUTOMATIC APPROVAL NOR WOULD THE SECRETARY'S POWER TO APPROVE LAPSE FOR FAILURE TO ACT WITHIN THE TIME LIMIT.

A PROVISION IN THE AMENDMENT IN THE NATURE OF A SUBSTITUTE ADOPTED BY THE COMMITTEE CONTAINED A REQUIREMENT THAT THE TRIBE INFORM ITS GENERAL MEMBERSHIP OF ITS INTENT TO EXECUTE A MINERALS AGREEMENT BEFORE THE SECRETARY COULD APPROVE OF THE AGREEMENT. THE DELETION OF THIS PROVISION SHOULD NOT BE TAKEN AS A COMMITTEE DENIGRATION OF THE IMPORTANCE OF AN INFORMED TRIBAL MEMBERSHIP WITH RESPECT TO THESE AGREEMENTS.

SUBSECTION (B) REQUIRES THE SECRETARY, WHERE HE HAS FORMED AN INTENT TO APPROVE OR DISAPPROVE A MINERALS AGREEMENT SUBMITTED TO HIM, TO GIVE THE TRIBE HIS WRITTEN FINDINGS SUPPORTING HIS PROPOSED DECISION 30 DAYS BEFORE HE FORMALLY APPROVES OR DISAPPROVES THE AGREEMENT. IT ALSO PROVIDES THAT THESE FINDINGS AND ALL OTHER INFORMATION OF A BUSINESS OR *6 **3468 FINANCIAL CHARACTER RELATING TO SUCH AGREEMENTS SHALL BE DEEMED PRIVILEGED PROPRIETARY INFORMATION.

SUBSECTION (C) PROVIDES THAT THE AUTHORITY TO DISAPPROVE AGREEMENTS MAY NOT BE DELEGATED TO THE SECRETARY BELOW THE ASSISTANT SECRETARY OF THE INTERIOR FOR INDIAN AFFAIRS AND THAT A DECISION OF THE SECRETARY OR ASSISTANT SECRETARY TO DISAPPROVE AN AGREEMENT SHALL BE CONSIDERED A FINAL AGENCY ACTION FOR PURPOSES OF ANY APPROPRIATE JUDICIAL REVIEW.

THE BILL, AS REFERRED TO THE COMMITTEE, CONTAINED LANGUAGE WHICH ESSENTIALLY ELIMINATED ANY ADMINISTRATIVE REVIEW OR APPELLATE PROCEDURE ON A DISAPPROVAL AND

PROVIDED FOR IMMEDIATE, DE NOVO JUDICIAL REVIEW BY THE FEDERAL DISTRICT COURT. THIS LANGUAGE WAS INCLUDED TO PREVENT LONG, DRAWN-OUT ADMINISTRATIVE AND JUDICIAL PROCESSES WHICH WOULD BE INIMICAL TO THE ORDERLY DEVELOPMENT AND IMPLEMENTATION OF COMMERCIAL TRANSACTIONS. THE COMMITTEE DETERMINED THAT THIS SOLUTION WAS TO RESTRICTIVE IN MEETING A LEGITIMATE GOAL.

THE NEW SUBSECTION (C) WILL LIMIT THE LENGTH OF ADMINISTRATIVE REVIEW BY REDUCING THE ADMINISTRATIVE LEVELS WITH RESPECT TO DISAPPROVAL AND BY PROVIDING IMMEDIATE JUDICIAL REVIEW OF SUCH ACTIONS. THE LANGUAGE WOULD PERMIT THE AUTHORITY TO APPROVE AGREEMENTS TO BE DELEGATED TO A LOWER LEVEL WHICH MIGHT RESULT IN EARLIER APPROVALS.

## SECTION 5

SECTION 5 PROVIDES THAT, IN APPROVING OR DISAPPROVING AN AGREEMENT, THE SECRETARY SHALL DETERMINE IF IT IS IN THE OVERALL BEST INTEREST OF THE TRIBE. THE SECTION SETS OUT SIX NON-EXCLUSIVE CRITERIA THE SECRETARY SHALL APPLY IN EVALUATING AGREEMENTS. THE COMMITTEE DOES NOT INTEND THAT THE MERE PRESENCE OR ABSENCE OF AN ELEMENT SET OUT IN THESE CRITERIA SHOULD RESULT IN AN AUTOMATIC APPROVAL OR DISAPPROVAL. THE INCLUSION OF THESE CRITERIA IN THE STATUTE IS MERELY MEANT TO REFLECT THE IMPORTANCE THE COMMITTEE ATTACHES TO THESE CONSIDERATIONS.

## SECTION 6

SUBSECTION (A) PROVIDES THAT NON-LEASE AGREEMENTS OF THE KIND AUTHORIZED BY THIS ACT WHICH HAVE BEEN ENTERED INTO AFTER JANUARY 1, 1975, BUT PRIOR TO THE DATE OF ENACTMENT OF THIS ACT SHALL BE PROCESSED AS PROVIDED IN SUBSECTIONS (B) AND (C).

SUBSECTION (B) WOULD PROVIDE AN AUTOMATIC RATIFICATION OF THE SECRETARY'S PREVIOUS APPROVAL OF SUCH AGREEMENTS WHERE THE TRIBE NOTIFIES THE SENATE SELECT COMMITTEE ON INDIAN AFFAIRS AND THE HOUSE COMMITTEE ON INTERIOR AND INSULAR AFFAIRS AFTER JULY 27, 1982, BUT BEFORE ENACTMENT, OR NOTIFIES THE SECRETARY WITHIN 30 DAYS OF ENACTMENT THAT IT DESIRES THE APPROVAL TO BE RATIFIED. THE COMMITTEE INTENDS THAT A LETTER FROM THE CHIEF EXECUTIVE OF A TRIBE TOGETHER WITH ANY PAST TRIBAL RESOLUTIONS SUPPORTING THE AGREEMENT WOULD BE SUFFICIENT FOR THIS PURPOSE. THE SUBSECTION ALSO MAKES CLEAR THAT ANY RATIFICATION OF A PREVIOUS APPROVAL BY THE SECRETARY UNDER THIS SECTION SHALL NOT BE DEEMED A CONGRESSIONAL DETERMINATION THAT THE ACTUAL PROVISIONS OR TERMS OF SUCH AN AGREEMENT ARE VALID OR LEGAL.

SUBSECTION (C) PROVIDES THAT WHERE AN AFFECTED TRIBE DOES NOT NOTIFY THE COMMITTEES OR THE SECRETARY AS PROVIDED IN SUBSECTION (B), THE SECRETARY SHALL REVIEW THE SUBJECT AGREEMENTS WITHIN 120 DAYS AFTER ENACTMENT AND APPROVE OR DISAPPROVE THEM BASED UPON THE PURPOSES OF THIS ACT AND OTHER APPROPRIATE LAW. FAILURE OF THE SECRETARY TO ACT *7 **3469 WITHIN THAT TIME WOULD RESULT IN THE PREVIOUS SECRETARIAL APPROVAL BEING RATIFIED AS PROVIDED IN SUBSECTION (B).

## SECTION 7

SECTION 7 PROVIDES THAT NOTHING IN THIS ACT SHALL AFFECT THE PROVISIONS OF THE 1938 INDIAN MINERAL LEASING ACT OR ANY OTHER LAW AUTHORIZING THE DEVELOPMENT OR DISPOSITION OF TRIBAL OR INDIVIDUAL INDIAN MINERAL RESOURCES NOR SHALL ANYTHING IN THOSE LAWS AFFECT A MINERALS AGREEMENT APPROVED UNDER THIS ACT.

H.R. REP. 97-746, H.R. REP. 97-746 (1982)

## SECTION 8

SECTION 8 AUTHORIZES AN INDIAN TRIBE, SUBJECT TO THE APPROVAL OF THE SECRETARY, TO PLEDGE OR HYPOTHECATE ITS INTEREST IN TRIBAL MINERAL RESOURCES WHICH HAVE OTHERWISE BEEN LAWFULLY SEVERED FROM THE LAND OR THE PROSPECTIVE PRODUCTION, PRODUCTS OR PROCEEDS OF SUCH MINERALS UNDER ANY APPROVED DEVELOPMENT PLAN AS SECURITY FOR THE REPAYMENT OF LOANS OR OTHER ADVANCES TO PERMIT THE TRIBE TO DEVELOP ITS MINERAL RESOURCES. THE PLEDGE OR HYPOTHECATION AGREEMENT MAY BE ENFORCED ONLY WITH RESPECT TO THE SPECIFIC MINERAL RESOURCES OR INTEREST SET OUT IN THE AGREEMENT AND ONLY ACCORDING TO THE TERMS OF THE AGREEMENT. WHERE ENFORCEMENT ENTAILS JUDICIAL ACTION WHICH IS AUTHORIZED UNDER EXISTING LAW, THE UNITED STATES SHALL NOT BE DEEMED A NECESSARY PARTY.

## SECTION 9

SECTION 9 PROVIDES THAT THE SECRETARY, IN CARRYING OUT HIS TRUST RESPONSIBILITY, SHALL ENSURE THAT THE TRIBES ARE PROVIDED, TO THE EXTENT OF AVAILABLE RESOURCES, NECESSARY ADVICE AND ASSISTANCE IN NEGOTIATION OF MINERALS AGREEMENTS.

## SECTION 10

SUBSECTION (A) PROVIDES THAT THE SECRETARY SHALL PROMULGATE RULES AND REGULATIONS IMPLEMENTING THIS ACT WITHIN 180 DAYS AFTER ENACTMENT AFTER CONSULTATION WITH APPROPRIATE INDIAN TRIBES AND ORGANIZATIONS. IT ALSO PROVIDES THAT, WHERE THERE IS PENDING BEFORE THE SECRETARY MINERALS AGREEMENTS SUBMITTED BEFORE THE PASSAGE OF THIS ACT, THE SECRETARY SHALL EVALUATE AND APPROVE OR DISAPPROVE SUCH AGREEMENTS BASED UPON THE PROVISIONS OF SECTION 4(B) AND SECTION 5, BUT THAT HE SHALL NOT WITHHOLD SUCH ACTION SOLELY ON THE GROUNDS THAT NO RULES AND REGULATIONS HAVE BEEN PROMULGATED.

SUBSECTION (B) PROVIDES THAT, WHERE THE SECRETARY HAS APPROVED AN AGREEMENT UNDER THE TERMS OF THIS ACT AND OTHER APPLICABLE LAWS, THE UNITED STATES SHALL NOT BE LIABLE FOR ANY LOSSES SUSTAINED BY A TRIBE OR INDIAN AS A RESULT OF MARKET CHANGES OR BUSINESS DECISIONS OF THE PARTIES IN CARRYING OUT THE AGREEMENT. THE SUBSECTION ALSO PROVIDES, HOWEVER, THAT THE SECRETARY SHALL CONTINUE TO HAVE A TRUST RESPONSIBILITY TO INSURE THAT THE OTHER PARTY OR PARTIES DO NOT VIOLATE THE TERMS OF THE AGREEMENT TO THE DETRIMENT OF THE INDIAN PARTIES.

IN ITS REPORT ON THIS LEGISLATION, THE ADMINISTRATION STRONGLY RECOMMENDED THAT THE BILL BE AMENDED TO INCLUDE LANGUAGE HOLDING THE UNITED STATES HARMLESS FOR ANY LOSS TO AN INDIAN PARTY TO AN AGREEMENT BECAUSE OF THE SECRETARY'S APPROVAL. AS FAR AS THE COMMITTEE IS CONCERNED, THIS SIMPLY RESTATES THE LAW AS IT EXISTS TODAY. IF THE SECRETARY, ACTING AS TRUSTEE, APPROVES A LEASE OR AN AGREEMENT OR OTHERWISE ACTS IN RELATION TO THE TRUST RESOURCES OF AN INDIAN TRIBE AND ACTS  *8 **3470 RESPONSIBLY AND WITHIN HIS DISCRETION IN DOING SO, THE UNITED STATES WOULD NOT BE LIABLE FOR ANY LOSS OR IMPAIRMENT OF THE TRUST RESOURCES. ON THE OTHER HAND, IF THE SECRETARY ACTS RECKLESSLY AND IN ABUSE OF HIS DISCRETION AS TRUSTEE, THE UNITED STATES CANNOT AVOID LIABILITY. THE ADMINISTRATION'S RECOMMENDATION, ADOPTED BY THE COMMITTEE, SIMPLY RESTATES THAT LAW.

REPRESENTATIVES OF CONCERNED INDIAN TRIBES WERE ALARMED AT THE ADMINISTRATION'S RECOMMENDATION AND VIEWED IT AS A TOTAL RELEASE OF THE UNITED STATES' RESPONSIBILITY AS TRUSTEE. WHILE THIS WAS NOT THE CASE, THE COMMITTEE SOUGHT TO ALLAY THEIR CONCERNS BY ADDING THE PROVISO CONTAINED IN SUBSECTION (B). THIS, TOO, SIMPLY RESTATES THE EXISTING LAW. THE UNITED STATES CANNOT BE HELD TO BE A GUARANTOR OF THE BUSINESS ENTERPRISES OF AN INDIAN TRIBE NOR AN INSUROR AGAINST BUSINESS LOSSES FROM THE IMPLEMENTATION OF AN

**APPENDIX PAGE 422**

AGREEMENT NOR AGAINST ACTS OF GOD. NEVERTHELESS, THE SECRETARY RETAINS AN OBLIGATION TO SEE THAT THE NON-INDIAN PARTIES DO NOT VIOLATE OR VARY THE TERMS OF THE AGREEMENT TO THE DETRIMENT OF THE INDIAN PARTIES. THE COMMITTEE HAS HAD RECENT EXAMPLES OF THIS IN THE ALLEGATIONS OF LOSS OF ROYALTIES UNDER FEDERAL AND TRIBAL OIL AND GAS LEASES BECAUSE OF INADEQUATE MONITORING AND REVIEW OF COMPANY ACTIVITIES AND REPORTING.

THE COMMITTEE WISHES TO MAKE CLEAR THAT, IN ADOPTING THE LANGUAGE OF SUBSECTION (B) TO ALLAY THE CONCERNS OF BOTH THE ADMINISTRATION AND THE INDIAN TRIBES, IT IS NOT INTENDING EITHER TO EXPAND OR CONTRACT THE TRUST RESPONSIBILITY OF THE UNITED STATES TO INDIANS AND INDIAN TRIBES.

SUBSECTION (C) SIMPLY PROVIDES THAT NOTHING IN THIS ACT SHALL ALTER THE RESPONSIBILITY OF THE UNITED STATES TO INDIANS DERIVING FROM ANY OTHER SOURCE.

## SECTION 11

SECTION 11 PROVIDES THAT NOTHING IN THIS ACT SHALL IMPAIR ANY INDEPENDENT RIGHT A TRIBE ORGANIZED UNDER THE INDIAN REORGANIZATION ACT OF 1934 MAY HAVE WITH RESPECT TO THE DEVELOPMENT OF ITS MINERAL RESOURCES.

## COMMITTEE AMENDMENT

HEARINGS BY THE COMMITTEE ON S. 1894 DISCLOSED CERTAIN GAPS IN THE LANGUAGE OF THE BILL WITH RESPECT TO AUTHORIZATION, APPROVAL AND IMPLEMENTATION OF THESE MINERALS AGREEMENTS. IN ADDITION, TESTIMONY FROM THE INDIAN TRIBES AND ORGANIZATIONS, THE ADMINISTRATION, AND MINERAL DEVELOPMENT COMPANIES INDICATED FURTHER CONCERNS ABOUT THE PROVISIONS.

IN RESPONSE TO THESE GAPS AND CONCERNS, THE COMMITTEE, WORKING WITH THE CONCERNED PARTIES, DEVELOPED AN AMENDMENT IN THE NATURE OF A SUBSTITUTE TO S. 1894. WHILE THE SUBSTITUTE MAINTAINED THE BASIC PURPOSE AND PROVISIONS OF THE BILL, AS REFERRED, IT DID MAKE NUMEROUS CHANGES AND ADDITIONS WHICH ARE FULLY EXPLAINED IN THE SECTION-BY-SECTION ANALYSIS.

IN A STATEMENT SUBMITTED FOR THE RECORD, THE GOVERNOR OF THE STATE OF MONTANA RECOMMENDED AN AMENDMENT WHICH WOULD HAVE HAD THE EFFECT OF AUTHORIZING STATE TAXATION OF THE NON-INDIAN PORTIONS OF, OR ACTIVITY UNDER, MINERALS AGREEMENT. THE COMMITTEE DECLINED TO RECOMMEND THE AMENDMENT.

THE SUPREME COURT, IN RECENT YEARS, HAS BEGUN TO ILLUMINATE THIS ISSUE UNDER EXISTING LAW WITHOUT DIFFICULTY. IN FACT, THIS ISSUE *9 **3471 NOW PENDING BEFORE THE SUPREME COURT ON A PETITION FOR CERTIORARI IN THE CROW TRIBE OF INDIANS V. STATE OF MONTANA, 650 F.2D 1104 (1982). IF THERE WAS A NEED FOR CONGRESSIONAL CLARIFICATION OF THE LAW IN THIS AREA, THE COMMITTEE DETERMINED THAT THIS WAS NOT THE APPROPRIATE VEHICLE.

## COST AND BUDGET ACT COMPLIANCE

S. 1894 DOES NOT AUTHORIZE THE APPROPRIATION OF ANY FUNDS AND ITS ENACTMENT WILL NOT RESULT IN ANY ADDITIONAL COST TO THE UNITED STATES. BECAUSE OF TIME CONSTRAINTS BEYOND ITS CONTROL, THE COST ANALYSIS OF THE CONGRESSIONAL BUDGET OFFICE WAS NOT RECEIVED AT THE TIME OF THE FILING OF THIS REPORT.

WESTLAW    © 2016 Thomson Reuters. No claim to original U.S Government Works.    6

## INFLATIONARY IMPACT STATEMENT

ENACTMENT OF S. 1894, AS AMENDED, WOULD HAVE NO NEGATIVE INFLATIONARY IMPACT. AS THE PURPOSE OF THE BILL IS TO FACILITATE THE DEVELOPMENT OF TRIBAL ENERGY AND NON-ENERGY RESOURCES, IT WOULD THEREBY INCREASE THE AVAILABILITY OF THE DOMESTIC SUPPLY OF THESE RESOURCES AND MIGHT HAVE SOME MINIMAL POSITIVE INFLATIONARY IMPACT.

## OVERSIGHT STATEMENT

NO SPECIFIC OVERSIGHT ACTIVITIES WERE UNDERTAKEN BY THE COMMITTEE AND NO RECOMMENDATIONS WERE SUBMITTED TO THE COMMITTEE PURSUANT TO RULE X, CLAUSE 2(B)2.

## COMMITTEE RECOMMENDATION

BY A VOICE VOTE, THE COMMITTEE APPROVED THE AMENDMENT IN THE NATURE OF A SUBSTITUTE TO S. 1894, AND THE COMMITTEE RECOMMENDS THE ENACTMENT OF THE BILL, AS AMENDED, BY THE HOUSE.

## DEPARTMENTAL REPORT

THE REPORT OF THE DEPARTMENT OF THE INTERIOR, DATED AUGUST 9, 1982, FOLLOWS:

U.S. DEPARTMENT OF THE INTERIOR,

OFFICE OF THE SECRETARY,

WASHINGTON, D.C., AUGUST 9, 1982.

HON. MORRIS K. UDALL,

CHAIRMAN, COMMITTEE ON INTERIOR AND INSULAR AFFAIRS,

HOUSE OF REPRESENTATIVES, WASHINGTON, D.C.

DEAR MR. CHAIRMAN: THE FOLLOWING ARE OUR VIEWS ON S. 1894, A BILL 'TO PERMIT INDIAN TRIBES TO ENTER INTO CERTAIN AGREEMENTS FOR THE DISPOSITION OF TRIBAL MINERAL RESOURCES, AND FOR OTHER PURPOSES.'

WE OPPOSE ENACTMENT OF THIS LEGISLATION UNLESS IT IS AMENDED AS RECOMMENDED HEREIN AND IN OUR EARLIER TESTIMONY. THESE AMENDMENTS ARE ESSENTIAL TO MAKE THE LEGISLATION ACCEPTABLE TO THE DEPARTMENT.

THE FIRST SECTION OF S. 1894, IF ENACTED, WOULD ALLOW ANY RECOGNIZED INDIAN TRIBE, BAND OR OTHER GROUP OF INDIANS SUBJECT TO THE JURISDICTION OF THE UNITED STATES TO ENTER INTO ANY JOINT AGREEMENT, OPERATING AGREEMENT, PRODUCTION SHARING AGREEMENT, SERVICE AGREEMENT, MANAGERIAL AGREEMENT, LEASE AGREEMENT OR OTHER AGREEMENT APPROVED BY THE SECRETARY OF THE INTERIOR FOR (1) THE DISPOSITION OF OIL AND GAS, *10 **3472 GEOTHERMAL, COAL AND OTHER ENERGY OR NON-ENERGY MINERAL RESOURCES OWNED BY A TRIBE OR (2) THE SALE OR PRODUCTION OF SUCH TRIBAL MINERALS. ANY SUCH AGREEMENT WOULD BE FOR SUCH TERM AND SUBJECT TO SUCH CONDITIONS AS THE SECRETARY MAY REQUIRE BY REGULATION. UNLESS THE SECRETARY WERE TO FIND THAT THE AGREEMENT WAS NOT IN THE BEST INTERESTS OF THE TRIBE, HE WOULD HAVE TO APPROVE THE AGREEMENT WITHIN 180 DAYS OF ITS SUBMISSION TO HIM OR WITHIN

30 DAYS OF COMPLIANCE WITH THE NATIONAL ENVIRONMENTAL POLICY ACT OF 1969 (42 U.S.C. 4332) OR ANY OTHER REQUIREMENT OF LAW, WHICHEVER WAS LATER. HIS FINDINGS WOULD HAVE TO BE IN WRITING AND BE MADE AVAILABLE TO THE AFFECTED TRIBE AT LEAST 30 DAYS BEFORE HIS FINAL DECISION.

IF THE SECRETARY DISAPPROVED THE PROPOSED AGREEMENT, THE PARTIES INVOLVED WOULD HAVE STANDING TO BRING A CAUSE OF ACTION IN FEDERAL DISTRICT COURT, NOTWITHSTANDING THE REQUIREMENTS OF THE ADMINISTRATIVE PROCEDURE ACT. HEARING OF SUCH CASES WOULD BE GIVEN EXPEDITED PROCEDURE BY THE COURT. IF THE COMPLAINING PARTY PREVAILED, THE COURT COULD ASSESS REASONABLE ATTORNEY FEES AND LITIGATION COSTS AGAINST THE UNITED STATES.

SECTION 2 WOULD ALLOW INDIVIDUAL INDIANS OWNING TRUST OR RESTRICTED MINERALS WITHIN THE BOUNDARIES OF A RESERVATION TO JOIN WITH THE TRIBE IN AN AGREEMENT LISTED IN SECTION 1, SUBJECT TO THE APPROVAL OF THE SECRETARY.

SECTION 3 WOULD DIRECT THE SECRETARY TO REVIEW, WITHIN 90 DAYS OF ENACTMENT OF THE BILL, ANY EXISTING NON-LEASE AGREEMENT APPROVED BETWEEN JUNE 1975 AND APRIL 1981, TO DETERMINE IF IT COMPLIES WITH THE PROVISIONS OF THE ACT.

SECTION 4 WOULD PROVIDE THAT ANY TRIBE OR INDIVIDUAL INDIAN, UPON REQUEST TO THE SECRETARY, BE GIVEN QUALIFIED, INDEPENDENT, EXPERT ADVICE FOR: DETERMINATION OF POTENTIAL MINERAL VALUES; SOCIAL, ENVIRONMENTAL AND ECONOMIC ANALYSES; LEGAL ASSISTANCE; AND OTHER TECHNICAL SERVICES RELATING TO THE VALUATION, DEVELOPMENT, PRODUCTION AND SALE OF MINERALS, AS DEFINED IN SECTION 1. COSTS WOULD BE REIMBURSED PURSUANT TO THE PROVISIONS OF THE ACT OF MARCH 1, 1933 (25 U.S.C. 413).

SECTION 5 WOULD PROVIDE THAT NOTHING IN THIS BILL, IF ENACTED, WOULD AFFECT ANY LEASE APPROVED OR HEREAFTER APPROVED PURSUANT TO THE ACT OF MAY 11, 1938, AS AMENDED (52 STAT. 347; 25 U.S.C. 396A ET SEQ.).

SECTION 6 WOULD PROVIDE FOR PROMULGATION OF RULES AND REGULATIONS TO IMPLEMENT THE TERMS OF THIS BILL WITHIN 180 DAYS OF ENACTMENT. INDIAN TRIBES, TO THE EXTENT PRACTICABLE, WOULD BE CONSULTED IN THE INITIAL FORMULATION AND FUTURE REVISION OR AMENDMENT OF SUCH RULES AND REGULATIONS.

AT THE PRESENT TIME, THE MOST FREQUENTLY USED AUTHORITY FOR THE DEVELOPMENT OF INDIAN TRIBAL MINERAL RESOURCES IS THE OMNIBUS INDIAN MINERAL LEASING ACT OF MAY 11, 1938 (52 STAT. 347; 25 U.S.C. 396A ET SEQ.). SECTION 396A OF TITLE 25 PERMITS THE LEASING OF TRIBAL LAND FOR MINING PURPOSES FOR A TERM NOT TO EXCEED TEN YEARS AND SO LONG THEREAFTER AS MINERALS ARE PRODUCED IN PAYING QUANTITIES. LEASES ARE EXECUTED BY THE TRIBE SUBJECT TO THE APPROVAL OF THE SECRETARY. SECTION 396B REQUIRES, IN MOST INSTANCES, THAT OIL AND GAS LEASES BE OFFERED FOR SALE BY ADVERTISEMENT FOLLOWED BY COMPETITIVE BIDDING.

WE BELIEVE THE MAXIMUM LEASE TERM PRESCRIBED BY SECTION 396A IS UNDESIRABLE FOR TWO REASONS. FIRST, WITH MANY MINING LEASES, THE TEN YEAR EXPLORATORY PERIOD IS INSUFFICIENT FOR DEVELOPMENT TO BEGIN; THE *11 **3473 LEAD TIMES REQUIRED TO CONDUCT PRELIMINARY ASSESSMENTS, ACQUIRE THE NECESSARY PERMITS AND FINANCIAL BACKING, OUTLINE THE DEPOSIT AND PREPARE THE SITE FOR DEVELOPMENT FREQUENTLY TAKE LONGER THAN TEN YEARS.

SECOND, THE 'PRODUCTION IN PAYING QUANTITIES' CLAUSE IS A TERM OF ART BORROWED FROM OIL AND GAS LAW. THE 1938 ACT APPLIED THE TERM TO HARDROCK MINERALS AND THEREBY CREATED OCCASIONAL UNANTICIPATED PROBLEMS, BECAUSE HARDROCK MINERAL MARKETS ARE SUBJECT TO CONSIDERABLE FLUCTUATION. AS A RESULT, LESSEES HAVE SOMETIMES FOUND THAT THEY ARE NO LONGER PRODUCING 'IN PAYING QUANTITIES' AFTER THE TENTH ANNIVERSARY OF THE LEASE,

WESTLAW   © 2016 Thomson Reuters. No claim to original U.S. Government Works.   8

MERELY BECAUSE OF A CYCLICAL DIP IN THE MARKET FOR THE MINERAL BEING PRODUCED. WHEN THIS HAPPENS, THE LEASE MAY TERMINATE, AGAINST THE WISHES OF LESSOR AND LESSEE, EVEN THOUGH A LARGE DEPOSIT STILL REMAINS AND PRODUCTION WOULD NORMALLY RESUME WHEN MARKET CONDITIONS IMPROVE.

EXPERIENCE HAS ALSO SHOWN THAT THE REQUIREMENT IN SECTION 396B OF COMPETITIVE BIDDING FOR THE LEASING OF TRIBAL OIL AND GAS DOES NOT ALWAYS WORK TO THE ADVANTAGE OF THE TRIBES. CERTAIN TRIBES WHICH HAVE BEEN ABLE TO NEGOTIATE OIL AND GAS DEVELOPMENT AGREEMENTS APPEAR TO HAVE RECEIVED GREATER COMPENSATION THAN THEY HAD BEEN RECEIVING UNDER COMPETITIVE BIDDING. UNDER S. 1894, TRIBES WOULD HAVE THE OPTION OF NEGOTIATING AGREEMENTS OR SOLICITING COMPETITIVE BIDS UNDER THE PROCEDURES ENVISIONED FOR IMPLEMENTATION OF THE NEW ACT.

THE MOST SERIOUS PROBLEM WITH SECTION 396A, HOWEVER, IS THAT IT AUTHORIZES DEVELOPMENT OF TRIBAL OIL AND GAS RESOURCES ONLY BY LEASING. THIS REQUIREMENT IGNORES THE POSSIBILITY OF JOINT VENTURES, JOINT PRODUCTION AGREEMENTS, RISK SERVICE CONTRACTS AND OTHER NON-LEASE VENTURES CAN PROVIDE THE VEHICLE BY WHICH TRIBES CAN BECOME DIRECTLY INVOLVED IN MANAGEMENT DECISIONS. THE NORMAL LEASE ARRANGEMENT MERELY TURNS OVER RESPONSIBILITY FOR ALL DEVELOPMENT DECISION TO THE LESSEE. THE BILL WOULD FACILITATE TRIBES' DIRECT INVOLVEMENT IN SUCH DECISIONS, THEREBY ENABLING THEM TO GAIN MANAGEMENT EXPERIENCE AND CONTRIBUTING SIGNIFICANTLY TO THE GOAL OF SELF-DETERMINATION.

SINCE 1975, THE DEPARTMENT HAS APPROVED A NUMBER OF NON-LEASE VENTURES INVOLVING THE DEVELOPMENT OF MINERAL RESOURCES, PURSUANT TO SECTION 81 OF TITLE 25 (R.S. SECTION 2103). THAT SECTION REQUIRES THE APPROVAL OF THE SECRETARY OF THE INTERIOR AND THE COMMISSIONER OF INDIAN AFFAIRS FOR CONTRACTS FOR SERVICES RELATIVE TO INDIAN LANDS. WE BELIEVE SECTION 81 IS INADEQUATE TO SOLVE THE PROBLEMS POSED BY THE 1938 ACT DISCUSSED ABOVE.

FIRST, BECAUSE SECTION 81 DOES NOT APPLY TO LEASES, IT LEAVES INTACT THE LIMITATIONS IN THE 1938 ACT. SECOND, THE APPROVAL PROCEDURE FOR NON-LEASE VENTURES UNDER SECTION 81 REQUIRES A RATHER CUMBERSOME CASE-BY-CASE ANALYSIS TO DETERMINE WHETHER THE DOCUMENT SUBMITTED FOR APPROVAL IS A SERVICE AGREEMENT WITHIN THE PURVIEW OF THE 1938 ACT, OR AN INTEREST IN LAND WITHIN THE PURVIEW OF THE INDIAN NON-INTERCOURSE ACT (R.S. 2116; 25 U.S.C. 177). THIRD, WITH THE PROLIFERATION AND HYBRIDIZATION OF NON-LEASE VENTURES, IT IS INCREASINGLY DIFFICULT TO MAKE THE DETERMINATION DESCRIBED. WITHOUT CLARIFICATION OF THE SECRETARY'S AUTHORITY FOR APPROVAL OF EXISTING VENTURES, SOME NON-LEASE VENTURES PREVIOUSLY APPROVED MAY BE CALLED INTO QUESTION. FINALLY, BECAUSE OF THE CONFUSION CONCERNING THE SECRETARY'S AUTHORITY TO APPROVE NON-LEASE VENTURES, THE DEPARTMENT IS RELUCTANT TO APPROVE A NUMBER OF PROPOSED AGREEMENTS WHICH ARE PENDING.

*12 **3474 WE BELIEVE ENACTMENT OF S. 1894 WOULD PROVIDE A MEANS FOR THE UNITED STATES TO PROMOTE TRIBAL SELF-DETERMINATION IN THE DEVELOPMENT OF INDIAN MINERAL RESOURCES, IF IT IS AMENDED AS WE PROPOSE. THE BILL WOULD LEAVE TO REGULATIONS THE ESTABLISHMENT OF MAXIMUM TERMS FOR, THE CONDITIONS OF, AND THE MANNER OF ENTERING INTO NON-LEASE AGREEMENTS. WE SUPPORT THIS PROCEDURE BECAUSE IT PERMITS THE AUTHORITY GRANTED BY THE LEGISLATION TO ADAPT TO CHANGES IN THE MINERAL INDUSTRY AND TO RESPOND TO THE PARTICULAR REQUIREMENTS OF NUMEROUS TYPES OF NON-LEASE VENTURES.

AS NOTED PREVIOUSLY, WE HAVE SUGGESTED SEVERAL AMENDMENTS TO THE BILL. BRIEFLY, THEY ARE:

IN THE FIRST SECTION, AN AMENDMENT OF THE TIME PERIOD FOR ISSUANCE OF A SECRETARIAL DECISION, FOLLOWING COMPLIANCE WITH APPLICABLE STATUTES;

WESTLAW  © 2016 Thomson Reuters. No claim to original U.S. Government Works.

AMENDMENT OF SECTION 1(C) TO ASSURE PROTECTION OF INFORMATION PROVIDED TO THE TRIBES;

DELETION OF SECTION 1(D), AS WE DISCERN NO REASON FOR AVOIDING THE EXISTING ADMINISTRATIVE REVIEW PROCEDURES;

CLARIFICATION OF SECTION 3 TO PROVIDE FOR APPROVAL OF CERTAIN AGREEMENTS PREVIOUSLY APPROVED BETWEEN JANUARY 1, 1975, AND THE DATE OF ENACTMENT OF THIS BILL; AND

DELETION OF SECTION 4, BECAUSE AUTHORITY ALREADY EXISTS FOR US TO PROVIDE SUCH MINING, ANALYTICAL, LEGAL AND TECHNICAL ASSISTANCE AND TO RECOVER THE COST THEREOF.

WE WOULD LIKE TO ELABORATE ON THESE LAST TWO POINTS. SECTION 3, AS PASSED BY THE SENATE, REQUIRES THE SECRETARY TO REVIEW EXISTING NON-LEASE AGREEMENTS APPROVED BETWEEN JUNE 1975 AND APRIL 1981, TO DETERMINE IF THEY COMPLY WITH THE PROVISIONS OF THE ACT. NO GUIDANCE IS GIVEN AS TO WHAT WOULD BE THE EFFECT OF FINDING THAT AN AGREEMENT DOES NOT COMPLY WITH THE PROVISIONS OF THE ACT. PRESUMABLY, THIS PROVISION COULD BE CONSTRUED AS REQUIRING CANCELLATION OF THE AGREEMENT, IF IT IS FOUND NOT TO COMPLY IN SOME WAY WITH THE ACT. WE DO NOT BELIEVE THERE IS ANY BASIS FOR ENACTING A PROVISION WHICH MIGHT HAVE THE EFFECT OF QUESTIONING THE VALIDITY OF THE EXISTING AGREEMENTS.

SUCH AGREEMENTS WERE ENTERED INTO IN GOOD FAITH BY THE PARTIES, AND WERE APPROVED IN GOOD FAITH BY DEPARTMENTAL OFFICIALS WHO BELIEVED THEY HAD SUFFICIENT AUTHORITY TO DO SO. SIGNIFICANT INVESTMENTS HAVE BEEN MADE BY THE PARTIES, AND WE BELIEVE THE LANGUAGE OF SECTION 3, AS PASSED BY THE SENATE, MAY WELL GIVE RISE TO UNDESIRABLE LITIGATION CHALLENGING THE SECRETARY'S REVIEW OF SUCH AGREEMENTS. CONSEQUENTLY, WE RECOMMEND THAT THE FOLLOWING LANGUAGE BE SUBSTITUTED IN LIEU OF THE SENATE-PASSED LANGUAGE: 'SECTION 3. ANY AGREEMENT FOR THE DEVELOPMENT OF TRIBALLY OWNED MINERALS WHICH (1) WAS PREVIOUSLY APPROVED BY THE SECRETARY OR HIS AUTHORIZED DELEGATE, BETWEEN JANUARY 1, 1975, AND THE DATE OF ENACTMENT OF THIS ACT, AND (2) DID NOT PURPORT TO BE A LEASE WHEN IT WAS PRESENTED TO THE DEPARTMENT OF THE INTERIOR FOR ITS APPROVAL, IS HEREBY CONSIDERED APPROVED AS OF THE DATE OF SUCH PREVIOUS APPROVAL.'

USE OF THE PHRASE 'DID NOT PURPORT TO BE A LEASE' IS DESIGNED TO AVOID FUTURE INQUIRIES OVER WHETHER ONE OF THE AGREEMENTS APPROVED SINCE 1975 WAS OR WAS NOT A LEASE, THE VERY INQUIRY WHICH THIS LEGISLATION MAKES UNNECESSARY FOR ALL FUTURE TRIBAL MINERAL DEVELOPMENT AGREEMENTS. WE BELIEVE LESS THAN A DOZEN APPROVED AGREEMENTS FALL WITHIN THE SCOPE OF THIS PROPOSED ALTERNATIVE LANGUAGE FOR SECTION 3.

**\*13 \*\*3475** SECTION 4 WOULD REQUIRE THE SECRETARY, AT THE REQUEST OF A TRIBE, TO PROVIDE INDEPENDENT EXPERT ADVICE CONCERNING VALUATION, DEVELOPMENT, PRODUCTION AND SALE OF INDIAN MINERAL RESOURCES. THIS SECTION WOULD ALSO ALLOW THE SECRETARY TO SEEK REIMBURSEMENT FOR THESE SERVICES OUT OF THE PROCEEDS OF ANY MINERAL PRODUCTION. NOTWITHSTANDING THIS REIMBURSEMENT PROVISION, WE VIEW SECTION 4 AS UNWIELDY AND POTENTIALLY VERY COSTLY. APPARENTLY, IF A TRIBE WERE TO REQUEST LEGAL ASSISTANCE, FOR EXAMPLE, THE SECRETARY WOULD HAVE NO DISCRETION UNDER SECTION 4 TO REFUSE TO FUND THE PAYMENT OF TRIBAL ATTORNEYS. YET, SUCH REQUESTS FROM MANY TRIBES WILL NO DOUBT EXCEED AVAILABLE FUNDS APPROPRIATED FOR SUCH PURPOSES. THE DEPARTMENT ALREADY HAS AUTHORITY TO PROVIDE THESE SERVICES UNDER THE PROVISIONS OF THE ACT OF NOVEMBER 2, 1921 (25 U.S.C. 13; 42 STAT. 208), AND THERE IS ALSO EXISTING AUTHORITY UNDER 25 U.S.C. 413 FOR REIMBURSEMENT FOR SUCH SERVICES. CONSEQUENTLY, ADDITIONAL STATUTORY AUTHORIZATION IS NOT REQUIRED. WE RECOMMEND THAT THIS SECTION BE DELETED.

THREE ADDITIONAL CHANGES HAVE BEEN STRONGLY RECOMMENDED BY THE DEPARTMENT. SINCE WE

WESTLAW    © 2016 Thomson Reuters. No claim to original U.S. Government Works.    10

H.R. REP. 97-746, H.R. REP. 97-746 (1982)

ALL RECOGNIZE THAT THIS LEGISLATION WOULD BENEFIT THE INDIAN COMMUNITY, WE REQUEST THAT THESE CHANGES, AS WELL AS THE ONES NOTED ABOVE, BE MADE, LEST THE FAVORABLE PROSPECTS FOR THIS LEGISLATION BE ENDANGERED.

SECTION 1(D)(4), PERMITTING COURTS TO ASSESS CERTAIN ATTORNEY FEES AGAINST THE UNITED STATES, SHOULD BE DELETED IN ITS ENTIRETY. WE HAVE CONSISTENTLY OPPOSED SUCH AUTHORITY AND DO SO NOW, ON THE GROUNDS THAT IT FOSTERS AND ENCOURAGES UNNECESSARY LITIGATION, AND THAT OTHER LAWS ALREADY EXIST FOR THIS PURPOSE.

THE DEFINITION OF 'INDIAN TRIBE' IN THE FIRST SECTION MAY GIVE RISE TO QUESTIONS TO ELIGIBILITY, AND SHOULD BE AMENDED TO INCLUDE ONLY THOSE TRIBES RECOGNIZED BY THE SECRETARY OF THE INTERIOR AS ELIGIBLE FOR SERVICES PROVIDED TO INDIANS BY THE BUREAU OF INDIAN AFFAIRS.

A NEW SECTION 7 SHOULD BE ADDED, TO HOLD THE SECRETARY HARMLESS FROM ANY DAMAGES BASED UPON APPROVAL OF ANY AGREEMENT AUTHORIZED UNDER THE BILL, IF ENACTED. THIS LANGUAGE WAS PROVIDED EARLIER, DURING THE PRESENTATION OF OUR TESTIMONY ON S. 1894 TO THE COMMITTEE, AND WE ARE WILLING TO WORK WITH THE COMMITTEE TO PERFECT THE LANGUAGE.

WE STRESS THAT WE WOULD STRENUOUSLY OPPOSE ENACTMENT OF THE BILL WITHOUT THE ABOVE THREE ESSENTIAL AMENDMENTS. WITH RESPECT TO PROPOSED SECTION 7, THE KINDS OF TRIBAL-SHARING AGREEMENTS ENVISIONED BY S. 1894 WILL LIKELY INVOLVE SUBSTANTIAL RISKS WHICH TRIBES WOULD BE WILLING TO ASSUME, TO PROVIDE AN OPPORTUNITY TO MAXIMIZE TRIBAL PROFITS AND CONTROL OVER OPERATIONS. SINCE THE SECRETARY WOULD BE REQUIRED BY THE BILL TO GRANT GENERAL APPROVAL OF SUCH AGREEMENTS, UNLESS HE FINDS THAT IT IS NOT IN THE TRIBE'S BEST INTEREST, WE STRONGLY BELIEVE IT IS THE TRIBES, AS THE WILLING PARTIES TO THESE AGREEMENTS, WHO SHOULD RIGHTFULLY ASSUME THE RISKS. THE FEDERAL TAXPAYER SHOULD NOT BE A GUARANTOR OF THE WISDOM OF THE TRIBES' BUSINESS JUDGMENTS, ESPECIALLY FOR BUSINESS ACTIVITIES INVOLVING ACKNOWLEDGED RISKS.

THE OFFICE OF MANAGEMENT AND BUDGET HAS ADVISED THAT THERE IS NO OBJECTION TO THE PRESENTATION OF THIS REPORT TO CONGRESS AND THAT, UNLESS THE BILL IS AMENDED AS RECOMMENDED HEREIN, THE ENACTMENT OF S. 1894 WOULD NOT BE IN ACCORD WITH THE PROGRAM OF THE PRESIDENT.

SINCERELY,

ROY H. SAMPSEL,

ACTING ASSISTANT SECRETARY.

(Note: 1. PORTIONS OF THE SENATE, HOUSE AND CONFERENCE REPORTS, WHICH ARE DUPLICATIVE OR ARE DEEMED TO BE UNNECESSARY TO THE INTERPRETATION OF THE LAWS, ARE OMITTED. OMITTED MATERIAL IS INDICATED BY FIVE ASTERISKS: *****. 2. TO RETRIEVE REPORTS ON A PUBLIC LAW, RUN A TOPIC FIELD SEARCH USING THE PUBLIC LAW NUMBER, e.g., TO(99-495))

H.R. REP. 97-746, H.R. Rep. No. 746, 97TH Cong., 2ND Sess. 1982, 1982 U.S.C.C.A.N. 3465, 1982 WL 25121 (Leg.Hist.)

End of Document     © 2016 Thomson Reuters. No claim to original U.S. Government Works.

**APPENDIX PAGE 428**

MMS- 87-0244-IND (FE), 1989 WL 1712513

United States Department of the Interior

Bureau of Indian Affairs

**Long Royalty Co., Appellant**

MMS-87-0244-IND
Cheyenne-Arapaho Tribal Lease No. 14-20-205-8468; Blaine County, Oklahoma
**September 22, 1989**

Copyright © Rocky Mountain Mineral Law Foundation

**Appeal of Order to Pay Additional Amounts for Working Interest Share**
**\*1** Appeal Denied

Statement of Facts

Exhibit A of the lease provides that in lieu of a cash bonus and rental, the lessor shall be entitled to a 20 percent royalty interest and that:

> [I]n addition thereto, 3/8's of all working interest will revert back to the tribes, after payout of tangible and intangible costs of each well less the normal 3/8's operating costs * * *.

In accordance with guidelines set forth in the Council of Petroleum Accountants Societies of North America—1974 Accounting Procedure, the Minerals Management Service's (MMS) Royalty Management Program (RMP) conducted a review of expenses claimed by the operator in calculating working interest shares for each of the wells. By letter dated April 20, 1987, RMP notified the Appellant that its review of expenses posted to well accounts indicated that the three-eighth's working interest share for a period had been underpaid as follows:

| Well | Expenses Disallowed | Working Interest Underpayment |
|---|---|---|
| C.A.T.L. No. 1-6 | $42,040.00 | $15,567.94 |
| C.A.T.L. No. 2-6 | 51,365.00 | 19,021.10 |
| C.A.T.L. No. 3-6 | 44,090.00 | 16,327.08 |
| C.A.T.L. No. 4-6 | 3.620.00 | 1.340.53 |
| Total | $141,115.00 | $ 52,256.65 |

 © 2016 Thomson Reuters. No claim to original U.S. Government Works.

APPENDIX PAGE 429

The record indicates that for wells C.A.T.L. Nos. 1-6, 2-6, and 3-6, the Appellant had claimed drilling expenses in excess of contract prices. The Appellant was unable to provide adequate justification for the additional payments, and RMP disallowed the excess amounts of $39,540.00, $37,540.00, and $37,540.00, respectively.

For each of the wells, the Appellant had posted the amount of $3,000.00 as paid to an affiliated company for monthly "overhead charges" which the Appellant had also been paid to perform. The RMP reviewed prices charged by other firms in the area for comparable services and concluded that the $3,000.00 payments for the filing of routine reports were excessive. The RMP approved $500.00 for each well for the reporting services provided. The RMP also disallowed a duplicate overhead amount of $1,425.00 claimed for well C.A.T.L. No. 2-6.

**\*2** The RMP found that expenses had been claimed with respect to wells C.A.T.L. Nos. 2-6, 3-6, and 4-6 for drilling supervision services by an affiliated company during periods not supported by Daily Drilling and Completion Reports. The RMP approved as an expense the daily fee paid with respect to drilling activities for which reports had been prepared and disallowed unsupported supervision expenses in the amount of $15,070.00.

The RMP recalculated the working interest share and directed payment in the amount of $52,256.65. Long Royalty Co. filed an appeal.

Conclusions and Order

The Appellant contends that the drilling expenses in excess of the contract amounts represented acreage acquisition costs allocated to each of the wells.

However, RMP reports that acreage acquisition costs had previously been charged to the well accounts, and the Appellant has offered no justification for the duplicate posting.

With regard to the disallowance of $2,500.00 per well for "overhead charges," the Appellant claims that the amount of $3,000.00 per well is authorized by the applicable operating agreement. Nonetheless, the record indicates that the payments to the affiliate exceeded comparable prices charged in the area for the filing of such reports and on this basis, the RMP partial disallowance is sustained in all respects.

The RMP disapproval of expenses for "drilling supervision services" during periods unsupported by operations documentation was also proper. It is accepted industry practice to recognize charges for drilling supervision services only on days when drilling or completion activities are in process. In this instance, RMP approved the daily fee for those days where activity justifying the expense could be documented. Fees paid to the Appellant's affiliate for those days not supported by applicable reports were properly disallowed. With respect to the posting of $1,425.00 in overhead expenses for well C.A.T.L. No. 2-6, the record shows that a monthly overhead fee had also been charged to the well for administrative, supervision, and office services. The duplicate posting of the $1,425.00 amount was also properly disallowed.

The Appellant contends in its appeal that it is not within MMS's **trust** responsibility to supervise revenue collection under leases providing for a **working interest** to the **Indian** landowner.

This contention is wholly without merit.

The Federal courts have long recognized the existence of a trust relationship between the Federal Government and Indians. Cherokee Nation v. Georgia, 30 U.S. (5 Pet.) 1 (1831); United States v. Kagama, 118 U.S. 375 (1886); Lone Wolf v. Hitchcock, 187 U.S. 553 (1903); United States v. Sandoval, 231 U.S. 28 (1913); Lane v. Pueblo of Santa Rosa, 249 U.S. 110 (1919); Cramer v. United States, 261 U.S. 219 (1923); United States v. Creek Nation, 295 U.S. 103 (1935); Seminole Nation v. United States, 316 U.S. 286 (1942); Pyramid Lake Paiute Tribe of Indians, v. Morton, 354 F. Supp. 252 (D.D.C. 1972); Manchester Band of Pomo Indians, Inc. v. United States, 363 F. Supp. 1238 (N.D.Cal. 1973); and Passamaguoddy Tribe v. Morton, 528 F.2d 370 (1st Cir. 1975).

APPENDIX PAGE 430

Long Royalty Co., Appellant, MMS- 87-0244-IND (1989)

**\*3** More recently, the Congress has provided a clear and specific statutory basis for the trust responsibility of the Secretary of the Interior (Secretary) with respect to the collection of all oil and gas revenues earned from covered Indian lands. In this respect, section 2.(a)(4) of the Federal Oil and Gas Royalty Management Act of 1982 (FOGRMA), 30 U.S.C. 1701(a)(4) (1982) directs that the Secretary should "aggressively carry out his trust responsibility in the administration of Indian oil and gas." Congress states therein that the purposes of FOGRMA at 30 U.S.C.1701(b) (1982) are in relevant part:

(3) to require the development of enforcement practices that ensure the prompt and proper collection and disbursement of oil and gas revenues owed to the United States and Indian lessors and those inuring to the benefit of States; [and]

(4) to fulfill the trust responsibility of the United States for the administration of Indian oil and gas resources; * * *.

It is evident by its terms, that FOGRMA's requirements apply to working interest revenues as well as to royalties payable under this Indian lease. Section 102.(a), 30 U.S.C. 1712(a) (1982) states that a lessee is under a duty to make "any royalty or other payment" in the time and manner as specified by the Secretary. Moreover, section 3(14) thereof 30 U.S.C. 1702(14) (1982) prescribes that for these purposes:

> "royalty" means any payment based on the value or volume of production which is due to the United States or an Indian tribe or an Indian allottee on production of oil or gas from the Outer Continental Shelf, Federal, or Indian lands, or any minimum royalty owed to the United States or an Indian tribe or an Indian allottee under any provision of a lease; * * *.

It is evident from this authority that it is well within the Secretary's **trust** responsibilities to oversee the collection of revenues earned from a lessor's **working interest** in **Indian** oil and gas leases. The Appellant has provided no basis whatsoever for its contention that the working interest or "joint venture" arrangement authorized by this lease falls outside these responsibilities.

The appeal is denied.

This decision may be appealed to the Interior Board of Land Appeals pursuant to 30 CFR Part 290 (1988) and 43 CFR 4.411 and 4.413 (1988). A copy of 43 CFR 4.411 and 4.413(1988) is enclosed for reference. Notice of such appeal must be transmitted to the Deputy to the Assistant Secretary - Indians Affairs (Operations), Bureau of Indian Affairs, U.S. Department of the Interior, 18th and C Streets, N.W., Washington D.C. 20240, within 30 days after the date of service of the decision. Copies of any statement of reasons, written arguments, or briefs should also be served upon the Deputy to the Assistant Secretary - Indian Affairs (Operations). Copies of the notice of appeal and any statement of reasons, written arguments, or briefs should likewise be served upon the Associate Solicitor, Division of Energy and Resources, U.S. Department of the Interior, 18th and C Streets, N.W., Washington, D.C. 20240; and upon the Chief, Division of Appeals (MMS623), Office of Program Review, Minerals Management Service, U.S. Department of the Interior, Parkway Atrium Building, 381 Elden Street, Herndon, Virginia 22070-4817.

**\*4** (Illegible Signature)
Acting Deputy to the Assistant Secretary
Indian Affairs (Operations)

---

MMS- 87-0244-IND (FE), 1989 WL 1712513

© 2016 Thomson Reuters. No claim to original U.S. Government Works.

 © 2016 Thomson Reuters. No claim to original U.S. Government Works.    3

APPENDIX PAGE 431

Frances C. Bassett, *Admitted Pro Hac Vice*
Jeremy J. Patterson, *Admitted Pro Hac Vice*
Thomasina Real Bird, *Admitted Pro Hac Vice*
**FREDERICKS PEEBLES & MORGAN LLP**
1900 Plaza Drive
Louisville, Colorado  80027-2314
Telephone:  (303) 673-9600
Facsimile:  (303) 673-9155
Email:  fbassett@ndnlaw.com
Email:  jpatterson@ndnlaw.com
Email:  trealbird@ndnlaw.com

J. Preston Stieff (4764)
**J. PRESTON STIEFF LAW OFFICES**
110 South Regent Street, Suite 200
Salt Lake City, Utah  84111
Telephone:  (801) 366-6002
Email: jps@stiefflaw.com

*Attorneys for Plaintiffs*

## UNITED STATES DISTRICT COURT
## DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| UTE INDIAN TRIBE OF THE UINTAH & OURAY RESERVATION, a federally recognized Indian tribe,  et al., <br><br> Plaintiffs, <br><br> v. <br><br> HONORABLE BARRY G. LAWRENCE, District Judge, Utah Third Judicial District Court, in his Individual and Official Capacities, and LYNN D. BECKER, <br><br> Defendants. | **DECLARATION OF PILAR THOMAS** <br><br><br> CASE No. 2:16-cv-00579 <br><br> **Judge Robert J. Shelby** |

**APPENDIX PAGE 432**

I, Pilar Thomas, am over 18 years of age. I have personal knowledge of the facts set forth herein, and if called upon, I will testify to the facts and opinions set forth herein and in my attached expert report.

1.    I am a practicing attorney licensed in the state of Arizona, where my practice is focused almost exclusively in federal Indian law, tribal law, economic development, and energy development for Tribes on tribal lands. I graduated from the University of New Mexico School of Law in 2002, magna cum laude, with a certificate in Indian Law.

2.    I have served as Trial Attorney for the United States Department of Justice in the Environment and Natural Resources Division, Indian Resources Section, where my practice was concentrated on Indian treaty rights, water rights, land into trust, and Indian gaming matters. My primary responsibilities as a Department of Justice Trial Attorney focused on defending the Secretary of the Interior and other federal officials in administrative decisions made for and on behalf of Tribes.

3.    Subsequent to that, I was the interim Attorney General for the Pascua Yaqui Tribe, where my primary responsibility was to provide legal advice to the Tribal Council and the tribal government departments. For three years, I was responsible for ensuring that all Tribal Law was consistent and compliant with the Tribe's Constitution, as well as consistent with federal law and any other federal regulations.

4.    In September 2009, I was appointed by Secretary of the Interior Ken Salazar to be the Deputy Solicitor for Indian Affairs at the United States Department of Interior, where my primary responsibility was to provide legal advice to the Secretary

**APPENDIX PAGE 433**

and other department officials, including the Assistant Secretary for Indian Affairs, on legal matters related to Indian tribes. I was responsible for writing, managing, and approving legal opinions, both formal and informal, as requested by Department officials, on any matter related to the legal authority to take particular actions. I was also responsible for working with regional solicitors and field solicitors on legal advice and guidance to the regional or agency level Department employees on legal matters involving Indian tribes.

5.    In 2011, I was appointed Deputy Director of the Office of Indian Energy Policy and Programs at the Department of Energy, where I was responsible for developing and standing up the Office of Indian Energy. The Office of Indian Energy is responsible for promoting energy development on tribal lands. I worked with federally recognized tribes plus tribal enterprises on energy development and was primarily responsible for developing policies and programs that would ensure and promote energy development for tribes including, oil and gas development, coal development, and renewable energy development.

6.    I am currently in private practice in Tucson, Arizona, at Lewis Roca Rothgerber Christie, where my practice is focused on energy and economic development for tribes, and including regulatory review in assistance to tribes and developers doing projects on tribal lands. A copy of my biography is attached hereto. *See* Attachment A.

7.    I am an expert witness retained by the Ute Indian Tribe, the Tribe's governing body, its Tribal Business Committee, and Ute Energy Holdings LLC, a wholly

3

**APPENDIX PAGE 434**

tribally-owned commercial entity (collectively referred to herein as the "Tribe" or "Ute Tribe"), in *Becker v. Ute Indian Tribe, et al.*, case number 140908394, Third Judicial District Court, Salt Lake County, Utah, and related litigation.

8.    Pursuant to Rule 26(a)(4)(B) of the Utah Rules of Civil Procedure, I was asked to prepare an expert report in the case, a copy of which is attached hereto as Attachment B.

9.    My expert report contains the findings and opinions I reached following my review of the materials that are listed in my expert report.  My findings and opinions are based on my professional education, knowledge, training, experience and credentials, to a reasonable degree of professional certainty.

10.    In arriving at these findings and opinions, I have adhered to the principles, practices and methodologies that are generally recognized and accepted within the field of Federal Indian Law.

11.    The contents and conclusions in my expert report are my own, based on my work as an expert witness for the Ute Indian Tribe.

Pursuant to 28 U.S.C. § 1746, I hereby declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Executed this 20th day of October, 2017.

Pilar Thomas

4

**APPENDIX PAGE 435**

# ATTACHMENT A

×Close

Keyword Search

**Lewis Roca**
ROTHGERBER CHRISTIE



# Pilar Thomas

**Of Counsel**
pthomas@lrrc.com
520.629.4455 office
520.879.4714 fax

**Tucson**
One S. Church Avenue
Suite 700
Tucson, AZ 85701

## Overview

Pilar Thomas is Of Counsel in the firm's Tribal Lands and Natural Resources, Alternative Energy and Utilities, and Tribal Affairs and Gaming practice groups. Her practice is focused on Indian law, tribal renewable energy project development and finance, tribal economic development, and Indian gaming.

She assists clients with strategic legal advice on tribal energy policy and planning, renewable energy project development and finance, federal and state energy regulatory, programs, and policy efforts, tribal gaming regulations, gaming-related transactions, litigation, and other business and economic development efforts.

Prior to returning to the firm, Pilar was the Deputy Director for the Office of Indian Energy Policy and Programs at the U.S. Department of Energy, where she was responsible for developing and implementing policy and program efforts within the department and federal government to achieve the office's policy objectives, particularly the promotion of energy development, electrification, and infrastructure improvement on tribal lands. Working directly with tribes, tribal energy resource development organizations, tribal utilities, tribal enterprises, Alaska Native villages and corporations, Pilar provided hands-on technical assistance, including strategic energy planning, education and capacity building, market research and analysis, and federal program support. She spearheaded federal agency efforts to coordinate and collaborate on tribal energy development efforts, in partnership with the White House Council on Native American Affairs, the Departments of the Interior, Agriculture, Commerce and the Environmental Protection Agency.

She is the former Deputy Solicitor of Indian Affairs for the U.S. Department of the Interior, where she provided legal advice to the Secretary, Assistant Secretary-Indian Affairs, and other department officials on decisions related to tribes and matters related to federal Indian law, tribal law, administrative law, and Indian water rights. Pilar provided guidance and advice as needed in policy, program formulation and litigation strategies, interpreting existing laws, statutes, rules, regulations or other legal authority affecting actions proposed or taken under Departmental programs and operations.

A representative sample of the legal matters she handled include:

- Renewable energy projects lease and right of way reviews
- Indian gaming compact reviews
- Land into trust decisions, guidance, and Carcieri analysis
- Leasing regulation reform
- Tribal consultation policy formation
- Federal legislation, including the HEARTH Act and Tribal Law and Order Act
- United Nations Declaration on the Rights of Indigenous Peoples

She also served as the Interim Attorney General and Chief of Staff to Chairwoman Herminia Frias of the Pascua Yaqui Tribe, of which she is a member. As Interim Attorney General, Pilar provided legal advice and representation for the Tribe, Tribal Council, Divisions, Departments, Commissions, and Enterprises on extensive legal issues, including employment law, gaming law, environmental law, self-determination contracting, tribal constitutional law, and internal policies. Her responsibilities included drafting tribal resolutions and ordinances, negotiating and drafting business contracts, government contracts, intergovernmental agreements, and other transactional legal items. She also represented the Tribe on external intergovernmental issues, including federal and state legislation and administrative actions.

In 2002, Pilar was appointed to the position of trial attorney in the U.S. Department of Justice, Environment and Natural Resources Division, Indian Resources Section. Her practice included Indian treaty rights, water rights, and regulatory litigation. She was the recipient of the department's Service Award for her efforts in the *United States v. Michigan* treaty rights litigation.

Prior to her law practice, Pilar worked for fifteen years in the financial services industry as a marketing director and in operations management.

## Related Services

Gaming
Indian Law
Tribal Lands & Natural Resources

## Related Industries

Indian Tribal Nations
Real Estate

## Related News

03/30/2017
Tribal land development articles feature Thomas, Sjoberg
Attorneys quoted in two articles in AZRE – Arizona Commercial Real Estate magazine
01/26/2017
Indian Country land use contracts complex, challenging
Attorneys from Lewis Roca Rothgerber Christie to discuss strategies, challenges
08/15/2016
83 Lewis Roca Rothgerber Christie attorneys named in 'Best Lawyers'
11 partners also honored as 'Lawyer of the Year' in The Best Lawyers in America® 2017
08/10/2016
EPA draft rules on clean energy may benefit Indian tribes
Tribal lands contain nearly 6% of renewable energy resources in the U.S.
1/28/2015
Lewis Roca Rothgerber Welcomes the Return of Pilar Thomas to the Firm's Tribal Affairs and Gaming Practice

## Related Events

*Upcoming Events*
09/26/2017
Indian Law and Natural Resources: The Basics and Beyond
*Past Events*
04/03/2017
Tribal Energy in the Southwest
03/10/2017
Indian Country and the Trump Administration
Key Opportunities and Considerations
02/09/2017
Negotiating Contracts on Tribal Lands
10/21/2016
Cultural Resources Law Conference
Consulting with Tribes on Energy Projects

**APPENDIX PAGE 438**

10/11/2016
Welcome to Phoenix for the 73rd Annual NCAI Convention
4/7/2016
41st Annual Indian Law Conference
Federal Bar Association
3/22/2016
6th Tribal Land Staff National Conference
National Tribal Land Association
1/7/2016
EPA Clean Power Plan and Tribes
Webinar on Tribal Comments to the EPA Proposed Federal Implementation Plan for the Clean Power Plan

## Presentations

- Presenter, 14th Annual MSU Indigenous Law Conference, *In-House Counsel Association*, October 2017
- Presenter, Indian Law and Natural Resources: The Basics and Beyond, *Rocky Mountain Mineral Law Foundation*, September 2017
- Presenter, Tribal Energy in the Southwest, *Law Seminars International*, April 2017
- Presenter, Indian Country and the Trump Administration: Key Opportunities and Considerations, March 2017
- Presenter, Negotiating Contracts on Tribal Lands, *NBI Training Seminar*, February 2017
- Speaker, "Get Your Hands Off My Trust Responsibility? Debating the Federal Government's Role in the Trust Responsibility", *Federal Bar Association 41st Annual Indian Law Conference*, April 7th, 2016
- Panelist, "Market, Regulatory and Jurisdictional Considerations for Renewable Energy Development on Indian Lands," *Rocky Mountain Mineral Law Foundation Special Institute on Energy and Mineral Development in Indian Country,* November 2014
- Panelist, "Energy Sovereignty: Governance and Jurisdiction," *Federal Bar Association Indian Law Conference*, April 2014
- Panelist, "The Look Ahead: Key Market and Legal Developments in Renewable Energy Development in Indian Country," *Arizona State University Sandra Day O'Connor School of Law Conference*, November 2013
- Panelist, "Case Studies In Infrastructure Vulnerability to Climate Change: Tribal Perspective,"*Climate Change and America's Infrastructure: Engineering, Social and Policy Challenges,* January 2013
- Panelist, "Doing a Renewable Energy Project on an Indian Reservation: Top Ten Myths," *American Bar Association, Section on Environment and Energy Resources Conference*, August 2011
- Speaker, "Carcieri Fix: A View from Inside the Agency," *Federal Bar Indian Law Conference*, November 2010
- Speaker, "Legal Policy in the Obama Administration" *University of Washington School of Law*, September 2010

## Alert

- Author, "CLIENT ALERT: EPA Issues Draft Rules for Design Details for Clean Energy Incentive Plan; Tribal Projects are Eligible," *Lewis Roca Rothgerber Christie*, July 26, 2016

## Newsletter

- Author, "Governance and Jurisdiction Over Energy Development on Tribal Lands," *American Bar Association, Section on Environment and Energy Resources Newsletter*, January 2012

## Blog

- Author, "Court Approves Volkswagen Partial Consent Decree: Tribes Entitled to $50 Million for NOx Emission Mitigation," Energy & Natural Resources Blog, November 2016
- Author, "EPA Issues Draft Rules for Design Details for Clean Energy Incentive Plan; Tribal Projects are Eligible," Energy & Natural Resources Blog, July 2016

## Distinctions

- The Best Lawyers in America - Native American Law, 2017

## Other Info

**Blog(s)**

Energy & Natural Resources

## Education

J.D., *magna cum laude*, University of New Mexico School of Law, 2002, Order of the Coif
B.A., Stanford University, 1983

## Bar Admissions

Arizona, 2002

## Court Admissions

U.S. Court of Federal Claims

## Memberships & Affiliations

- Energy Bar Association, Member
- Native American Bar Association of DC, Member
- Native American Bar Association of Arizona, Member
- National Native American Bar Association, Member
- Federal Bar Association, Member

# ATTACHMENT B



Lewis Roca Rothgerber Christie LLP
One South Church Avenue          520.622.2090 main
Suite 700                        520.622.3088 fax
Tucson, AZ 85701                 lrrc.com

**Pilar Thomas**
Admitted in Arizona
520.629.4455 direct
520.879.4714 fax
pthomas@lrrc.com

June 16, 2017

Our File Number: 303329-00001

VIA E-MAIL FBASSETT@NDNLAW.COM

Frances Bassett
Partner
Fredericks Peebles & Morgan LLP
1900 Plaza Drive
Louisville, CO 80027

RE:    Becker v. Ute Indian Tribe

Dear Ms. Bassett:

     I have been asked to serve as an expert on the issue of the applicability of federal and tribal law in the above-referenced case. Specifically, I have been retained to provide opinions, based on my education, training, and experience concerning background principles of federal Indian law and federal approval requirements related to agreements with Indian tribes. More specifically, I have been hired to serve as a rebuttal expert to Kelly Williams, Esq., who testified and offered opinions concerning the applicability of federal law to the Independent Contractor Agreement by and between the Tribe and Lynn D. Becker ("The Becker Agreement).

     To prepare this report, I have reviewed in detail the documents provided below.

1.   Constitution and By-Laws of the Ute Indian Tribe of the Uintah and Ouray Reservation Utah, adopted on Dec. 19, 1936 and approved Jan. 19, 1937 (Exhibit 53)
2.   Corporate Charter of the Ute Indian Tribe of the Uintah and Ouray Reservation, Utah, approved July 6, 1938 and ratified August 10, 1938.
3.   Uintah and Ouray Tribal Business Committee of the Ute Indian Tribe, Resolution No. 05-147 (Apr. 27, 2005)
4.   Independent Contractor Agreement Between the Ute Indian Tribe and Lynn D. Becker
5.   Exhibit A – Services of the Independent Contractor Agreement
6.   Exhibit B – Participation Plan of the Independent Contractor Agreement
7.   Tribal Ordinance 03.003, To Provide for the Reorganization of the Energy and Minerals Department of the Ute Indian Tribe (Exhibit C of the Independent Contractor Agreement), adopted Oct. 27, 2003
8.   Transcript of Deposition for Kelly Williams, Esq, conducted on April 26, 2017
9.   Becker's Designation of Expert and Disclosure of Information, filed March 22, 2017
10.  Non-Intercourse Act, 25 U.S.C. § 177 (Exhibit 60)
11.  Indian Mineral Development Act, 25 U.S.C. § 2101 et. Seq. (Exhibit 61)
12.  Senate Report No. 97-472 (Exhibit 59)
13.  Oil and Gas, Geothermal and Solid Minerals Agreements, 25 CFR Part 225 (2005 ed.) (Exhibit 62)
14.  Transcript of Deposition for Robert Miller, Esq, conducted on March 17, 2017
15.  Transcript of Deposition for Alex Skibine, conducted on March 8, 2017
16.  Transcript of Deposition for Kevin Gambrell conducted on March 15, 2017.

17.    Letter dated 12/30/03 from Lynn Becker to the Jurrius Group.
18.    Memo dated 2/9/2004 from John Jurrius to Lynn Becker and Brett Painter.
19.    Letter dated 2/11/2003 [2/11/2004] from Lynn Becker to John Jurrius
20.    Letter from Dinah Peltier, Acting Superintendent, Ouray Agency to Chairman Curtis
       Cesspooch, Ute Indian Tribe Business Committee, dated July 2,2007 (Exhibit 45)
21.    Amended and Restated Operating Agreement of Ute Energy LLC, dated July 9, 2007

## I.    QUALIFICATIONS

I am a practicing attorney licensed in the state of Arizona, where my practice is focused
almost exclusively in federal Indian law, tribal law, economic development, and energy
development for Tribes. I graduated from the University of New Mexico, School of Law in 2002
magna cum laude with a certificate in Indian Law.

I have served as Trial Attorney for the United States Department of Justice in the
Environment and Natural Resources Division, Indian Resources Section, in Washington, DC,
where my practice was concentrated on Indian treaty rights, water rights, tribal land into trust,
and Indian gaming matters. My primary responsibilities as a Department of Justice Trial
Attorney focused on defending the Secretary of the Interior and other federal officials in
administrative decisions made for and on behalf of Tribes. I also participated in several Indian
water rights cases, litigating as well as negotiating water rights settlements, and several land
into trust cases.

Subsequent to the Department of Justice, I was the interim Attorney General for the
Pascua Yaqui Tribe in Tucson, Arizona, where my primary responsibility was to provide advice
and negotiate on behalf of the Tribal Council and the tribal government departments. For three
years, I was responsible for ensuring that all tribal law was compliant with the Tribe's
Constitution, as well as consistent with federal law and any other federal regulations.

I then became Of Counsel at Lewis and Roca in Phoenix, Arizona where my primary
clients were involved in tribal gaming and energy and economic development.    I was
responsible for assisting several tribes with establishing limited liability companies, negotiating
operating agreements, and ensuring compliance of those operating agreements with state,
federal and tribal laws.

In September 2009, I was appointed by Secretary Ken Salazar to be the Deputy Solicitor
for Indian Affairs at the Department of Interior, where my primary responsibility was to provide
legal advice to the Secretary and other department officials, including the Assistant Secretary
for Indian Affairs, on legal matters related to Indian tribes.    I provided legal advice for
Department decisions related to, among other things, tribal contracts, tribal charters, land into
trust, gaming compacts, regulations, and legislation. I was responsible to write, manage, and
approve legal opinions, both formal and informal, as requested by Department officials on any
matter related to the legal authority to take particular actions. I was also responsible for working
with regional solicitors and field solicitors on legal advice and guidance to the regional or agency
level Department employees on matters related to Indian tribes.

In 2011, I was appointed Deputy Director of the Office of Indian Energy Policy and
Programs at the Department of Energy, where I was responsible for developing and standing up
the Office of Indian Energy.  The Office of Indian Energy is responsible for promoting energy

101556428_4

## APPENDIX PAGE 443



development on tribal lands.   We worked with all federally recognized tribes plus tribal enterprises on energy development as primarily responsible for developing policies and most importantly programs that would ensure and promote energy development for tribes including, oil and gas development, coal development, and renewable energy development.

I returned to private practice at Lewis Roca Rothgerber Christie in 2015, where my practice for the last two and a half years has focused on energy development for tribes and economic development for tribes, including infrastructure development, transmission line development, clean energy projects, land into trust, gaming, and environmental review and regulatory review in assistance to tribes and developers doing energy projects on tribal lands.

My law firm is being compensated at the rate of $390.00 per hour. My compensation is not dependent on the outcome of the case.

## II.    SUMMARY OF OPINIONS

I hold the following opinions as will be outlined in more detail in the remainder of the report:

A.    The Becker Agreement should be interpreted in the context of federal Indian laws because it implicates real property mineral interests owned directly by the Ute Indian Tribe, and because federal law requires that the substance of an agreement, and not the form of the agreement, determines whether the agreement complies with federal law. Therefore, I disagree with the Plaintiff's Expert Witness, Kelly Williams, that federal law does not apply to the Becker Agreement, and that the form of the Becker Agreement controls the applicability of federal law.

B.    The Becker Agreement is subject to the Non-Intercourse Act, 25 U.S.C. § 177, because it creates a claim against the mineral interests owned directly by the Ute Indian Tribe, and therefore, I disagree with the Plaintiff's Expert Witness, Kelly Williams, that the Becker Agreement does not create an interest in Indian lands.

C.    The Becker Agreement is subject to the Indian Mineral Development Act, 25 U.S.C. § 2101 et. seq., because it is a Mineral Agreement under the Act that creates a claim against Indian mineral interests.

D.    The Ute Business Committee lacked the authority to enter into the Becker Agreement without the Secretary's approval because the Tribe's constitution and corporate charter requires Secretarial approval to convey interests in tribal assets.

## III.    BACKGROUND

## A.    The Contract

On or about April 27, 2005, the Ute Indian Tribe ("Tribe") entered into an Independent Contractor Agreement ("Becker Agreement") with Lynn Becker ("Contractor").   The Becker Agreement was approved by resolution of the Ute Tribal Business Committee on April 27, 2005, pursuant to its constitutional authority to regulate the economic affairs of the Tribe.

## APPENDIX PAGE 444



The purpose of the Becker Agreement was to retain the services of the Contractor to, amongst other things, continue to perform the duties of Land Division Manager in the Tribe's Energy and Minerals Department. The Contractor was designated as an independent contractor and not an employee of the Tribe. These duties also included "the implementation of the restructuring and development of the Tribal Energy and Minerals Department as set forth in Tribal Ordinance 03.003, attached hereto as "Exhibit C-Tribal Ordinance."

Pursuant to the Tribal Ordinance, the Land Division is "responsible for the administration and maintenance of leases, contracts, surface use, unitization and all other types of agreements covering Tribal energy, surface and minerals resources. . . . The Land Division shall also be responsible for . . . the supervision of all energy and/or mineral related field operations." The Land Division Manager is responsible for the "overall management of the Land Division."

The Contractor was compensated for these duties in two ways: 1) "Consulting Fees" in the amount of \$16,666.67 per month; and 2) "Participation Rights" as determined under the Participation Plan – Exhibit B. The Participation Plan – Exhibit B of the Becker Agreement – reads in relevant part:

> *In the future*, a) if the Tribe participates in any projects involving the *development*, *exploration and/or exploitation* of *minerals* in which the Tribe has any participating interest and/or earning rights, or similar commercial interests and Contractor is providing services under this agreement, and b) the Tribe elects not to place such interests in Ute Energy Holding LLC, then Contractor *shall receive* a two percent (2%) beneficial net revenue interest *in such assets* . . . (emphasis added)

## B. **Federal Law**

1. **Interpretation Principles.** **Federal case law consistently makes clear that agreements with Indian tribes that implicate or may implicate federal laws should be interpreted based on the substance of the agreement. Thus, federal courts have held that:**

*   An oil and gas development and operating agreement is actually a "lease." State of Utah v. Babbitt, 53 F.3d 1145 (10th Cir. 1995). In Babbitt, the primary issue was whether a development and operating agreement for oil and gas development was subject to the federal law requirement to share revenue from "leases" on the Utah portion of the Navajo reservation. The court held that the term lease was sufficiently broad, that the elements of the operating agreement should be interpreted to fall under the term "lease" to meet the intent of the federal law.

*   A bond trust indenture is actually a "management contract." Wells Fargo v. Lake of the Torches Economic Development Corp., 658 F.3d 684 (7th Cir. 2011). The court looked at several key provisions in a bond trust indenture that denoted a certain level of management control of a tribal gaming enterprise in the event of default on a bond (loan), and held that these provisions rendered the trust indenture a "management contract" under the Indian Gaming Regulatory Act.

*   Unapproved and illegal easements are not "permits." Gila River Indian Community v. Winkleman, 2006 WL 1418079 (D. Ariz. 2006). The court did not allow the conversion of unlawful easements into permits.

## APPENDIX PAGE 445



\*      Unapproved and illegal easements are not "licenses" United States v. Southern Pac. Transp. Co., 543 F.2d 676 (9th Cir. 1976). The court disagreed that federally unapproved railroad easements could be considered licenses, so as to allow for use of Indian lands without the federal government's approval.

2.      The Non-Intercourse Act (NIA). Originally adopted in 1790, and last amended under the Trade and Intercourse Act of 1834, the Non-Intercourse Act, 25 U.S.C. § 177, is long-standing federal Indian law that prohibits the conveyance of, and claims against, Indian lands without the approval of the federal government. See also Miller Deposition, pp. 67-69   The 1834 Act reflects the federal government's trust responsibility to protect tribal lands and resources and to ensure tribes are treated fairly in the conveyance of interests in tribal lands. The United States has long taken the position that the NIA is not limited to tribal trust lands. See Cass County v. Leech Lake Band of Chippewa Indians, 524 U.S. 103, 115 fn.5 (1998).

Federal courts have held that where a conveyance or claim against Indian land is sought, it must be done pursuant to either a treaty or federal law. Shoshone Indian Tribe v. United States, 672 F.23 1021 (Fed. Cir. 2012) (leases for oil and gas development required to be approved under the NIA and the Indian Mineral Leasing Act); Brown v. United States, 86 F.3d 1554 (Fed. Cir. 1996) (surface leases required to be approved under the NIA and the Long Term Leasing Act). For conveyance of, or claims against, Indian mineral interests, the Indian Mineral Leasing Act or the Indian Mineral Development Act are the relevant and applicable law to comply with the NIA. See also, Senate Report No. 97-472, p. 2 (discussing the applicability of the Non-Intercourse Act to unsevered mineral interests).

3.      The Indian Mineral Development Act (IMDA). The IMDA authorizes any Indian tribe to enter into Mineral Agreements, "subject to the approval of the Secretary and any limitations or provisions contained in its constitution or charter." 25 U.S.C. § 2102(a). Mineral Agreements are defined as:

"[A]ny joint venture, operating, production sharing, service, *managerial,* lease, or *other agreement,* or any amendment, supplement or other modification of such agreement . . . providing for the exploration for, or extraction, processing, or *other development of,* oil, gas, uranium, coal, geothermal, or other energy or non-energy mineral resources in which such Indian tribe owns a beneficial or restricted interest . . . ." (emphasis added)

According to the congressional record, Congress intended that these terms be interpreted broadly, so as to encompass any type of agreement tribes chose to negotiate with mineral interest developers. The primary issue before Congress was that the 1938 Indian Mineral Leasing Act appeared limited to "leases." Even though the Secretary was approving other types of agreements, there was uncertainty in the law. Thus, the need to explicitly authorize tribes to develop "more beneficial arrangements for mineral sales through negotiated agreements." Senate Report 97-457, at 3.

While Congress understood that tribes may be "better able to determine which kinds of contracts are in their own best interest and to tailor agreements to their own particular needs," the Secretary is still required to ensure overall fairness. Id. at 4. Further, while the list of the types of agreements in Section 1(a) of the IMDA "are also more clearly identified by the use of terms commonly used in the parlance of the mineral industry . . . the enumeration of

101556428_4



agreements is not meant to restrict the types of agreements that can be entered into." Id., at 5. Lastly, Congress also intended that the IMDA would include "any minerals owned by a tribe, not just those on reservation or trust lands. Id.

The federal regulations implementing the IMDA, 25 CFR Part 225, conform to this view of broadly interpreting the types of agreements subject to the Secretary's review. 25 CFR § 225.21(b) ("No particular form of minerals agreement is prescribed.")

## C. Tribal Law

The Ute Tribe is organized in two ways under the Indian Reorganization Act: as a tribal government and as a federal corporation. The Ute Tribe's Constitution, adopted under the IRA in 1937, establishes the Ute Tribe Government, and creates the Ute Indian Tribe Business Committee as the governing body. ART. III, SEC. 1. The Business Committee's powers are enumerated in ART. VI, but constrained by "any limitations imposed by the statutes or the Constitution of the United States, and subject further to all express restrictions upon such powers contained in this Constitution and By-laws . . . ."

Amongst the several enumerated powers of the Business Committee are the following two powers:

1.  The Business Committee has the power to "approve or veto any sale, disposition, lease or encumbrance of tribal lands, interest in tribal lands, or other tribal assets, which may be authorized or executed by the Secretary of the Interior . . . ." ART. VI, SEC. 1(c); and

2.  The Business Committee has the power to "regulate all economic affairs and enterprises in accordance with the terms of a Charter that may be issued to the Ute Indian Tribe . . . by the Secretary of the Interior." ART. VI, SEC. 1(f)

The Tribe adopted and ratified a Corporate Charter, which was approved by the Secretary on July 6, 1938. According to the terms of the Charter, the Business Committee exercises all corporate powers of the Tribe. Sec. 4. The Business Committee's corporate powers are limited by federal law, as well as any limitations in the Tribe's Constitution. Sec. 5. Specific corporate powers include:

3.  To hold, manage, operate and dispose of property of every description, real and personal, subject to the limitation that no sale or mortgage may be made of any land, or interests in land, including mineral rights Sec. 5(b)(1);

4.  To make and perform contracts and agreements of every description, not inconsistent with law and provided that any contract that requires payment from the corporation "shall not exceed $10,000 in total amount except with the approval of the Secretary of the Interior." Sec. 5(f);

5.  To pledge or assign chattels or future tribal income due or to become due to the Tribe and provided that "any such pledge or assignment shall be subject to the approval of the Secretary of the Interior or his duly authorized representative." Sec. 5(g)

101556428_4

## APPENDIX PAGE 447



## IV. OPINIONS

### A. The Becker Agreement is subject to federal law, because federal law looks to the substance, not the form, of the agreement

I disagree with Plaintiff's Expert Witness, Kelly Williams, that the Agreement is not subject to federal law. When asked about whether she was familiar with the federal approval process for Indian lands and whether federal approval was required for an agreement related to Indian lands, Ms. Williams testified that she would "make that determination on a case-by-case basis based on the document that [she] was reviewing." Williams Depo., p. 42. However, when questioned further about whether she looked to any federal law or regulations in assessing whether the Becker Agreement required such approval, she testified that she did not review any federal laws or regulations. Williams Depo., pp. 91, 93, 94, 147, 148, 155. She further testified that she did not review any federal case law. Williams Depo., p. 156.

Instead, Ms. Williams testified that, she and Plaintiff's Counsel compiled a list of various types of agreements, see Plaintiff's Expert Disclosure p.2; Williams Depo., p.99, 173, and because the Becker Agreement was not one of the types of agreement on that list, her opinion was that she did not need to review federal law to determine whether the Becker Agreement required federal approval. Williams Depo. pp. 98-99.

"Q: Well, is it an agreement that requires federal approval under the Indian Mineral Development Act?

A: You don't get to that question because it does not -- it doesn't - - it's not any of the items that were listed at mineral - - or, sorry, a lease, a lien - - I got the list in front of me. So whether - - what - - but no, I don't think it requires approval.".

Ms. Williams proceeded to testify that because the Becker Agreement was not like any agreements on the list, it was not subject to federal law. Williams Depo., p. 142, 147, 175 ("I stated before that in looking at the Independent Contractor Agreement to do the first part where is this an agreement that is a mineral lease, a lien, a deed of trust, and all of those things. It wasn't, in my opinion, and you don't get to the second step."). I disagree with Plaintiff's Expert, Ms. Williams, that the form of the agreement is dispositive of whether the federal law applies to the agreement.

It is my opinion that the appropriate analytical framework is to look to the substance of the Becker Agreement to determine if it implicates federal statutory requirements under the NIA and/or the IMDA relating to approvals of agreements with Indian tribes. The substance must be viewed, and interpreted, in the context of federal law requirements. The title of the agreement, or the lack of (or inclusion of) magic words is irrelevant to the question of whether the agreement is covered by federal law.

The Letter from the Acting Superintendent regarding federal approval of the Amended and Restated Operating Agreement for Ute Energy LLC ("Operating Agreement") (Deposition Exhibit 45), which Ms. Williams cites in support of her analysis, actually comports with my analytical framework. When asked to review the Operating Agreement for Ute Energy LLC, the BIA and Solicitor's Office did not look to the form or label on the document. Instead, they evaluated the substance to determine if the Operating Agreement conveyed any mineral

## APPENDIX PAGE 448



interests to invoke the Non-Intercourse Act, was a Mineral Agreement under the IMDA, or was a covered agreement under 25 U.S.C. § 81.

Ms. Williams' positive view of the BIA analysis of the Operating Agreement notwithstanding, there are several key differences between the Operating Agreement and the Becker Agreement. The BIA stated that the Operating Agreement: 1) did not convey any interest in tribal lands; 2) did not provide for exploration and development of mineral interests; and 3) was not signed by the Tribe. The Becker Agreement on the other hand: does convey an interest in the Tribe's mineral rights; does provide for the management of exploration and development of the Tribe's mineral interests; and was approved by the Tribe's Business Committee and signed by the Tribe.

For these reasons, in my opinion the Becker Agreement should be interpreted through the terms and purposes of the NIA and the IMDA.

## B.   The Becker Agreement is subject to the Non-Intercourse Act, 25 U.S.C. § 177

I disagree with Ms. Williams' testimony that the Becker Agreement does not create an interest in tribal lands or Indian lands. Williams Depo., pp. 123-124, 148. I further disagree with her testimony that Becker Agreement only "contemplates future potential opportunities" that doesn't create any obligations on the part of the Tribe, Williams Depo., p.137, and that the interest being created is merely a payment obligation. Williams Depo., p. 138.

Looking to the substance of the Becker Agreement, the operative language that establishes a claim against the Tribe's direct mineral interest is found in Paragraph 2 of the Participation Plan. Paragraph 2 entitles the Contractor to compensation based on the Tribe's participation in "the development , exploration and/or exploitation of minerals in which the Tribe has any participating interest . . . ." The Contractor "shall receive a two percent (2%) beneficial net revenue interest in such assets." Furthermore, this compensation claim is triggered for projects and rights held directly by the Tribe ("elects not to place such interests in Ute Energy Holding LLC").

"Shall receive" is a mandatory term that denotes entitlement and is sufficient to create a future claim. "Such assets" is a clear reference to mineral interest projects that develop, explore and/or exploit the Tribe's mineral assets. Together, these terms create a mandatory future claim against the Tribe's assets.

The memoranda that memorialize the negotiation of the Becker Agreement contemplate that the Contractor will be entitled to receive a percentage of the Ute Tribe's working interest. Because working interests are directly tied to mineral interests, such an entitlement is a claim on the Ute Tribe's mineral interest.

Because Paragraph 2 of the Participation Plan creates a claim against the Tribe's mineral interest, it is my opinion that the Becker Agreement is subject to the Non-Intercourse Act.

## APPENDIX PAGE 449



**C.** **The Becker Agreement is subject to the Indian Mineral Development Act, 25 U.S.C. § 2101 et. seq.**

Ms. Williams testified that, because the Becker Agreement was not the type of agreement listed in her disclosure, in her opinion it was not subject to the Indian Mineral Development Act. Williams Depo., pp. 99, 155, 160. She also testified that since, in her opinion, the Becker Agreement did not implicate tribal mineral interests, federal approval under the IMDA was not necessary, Williams Depo., p.159-160. Ms. Williams testified that she did not look to the IMDA, its regulations or federal case or administrative law to reach these opinions. Williams Depo., p. 155, 156, 158. I disagree with Ms. Williams that the Becker Agreement is not subject to the IMDA approval requirements.

The Becker Agreement's stated purpose was to retain the Contractor as the Land Division Manager in the Tribe's Energy and Minerals Department, and implement the "restructuring and development of the Tribal Energy and Minerals Department." Becker Agreement, Art. 1. In this role, the Contractor was responsible for the maintenance and administration of mineral agreements and to oversee and supervise field operations. Tribal Ord. 03.003; Becker Agreement Art. 4.3, 5.2. In fact, Ms. Williams testified that the Becker Agreement is managerial and related to management issues. Williams Depo., p. 67-68. The Becker Agreement is clearly related to the development and management of the Tribe's mineral interests.

In return for performing these duties, the Contractor was compensated not just through a monthly consulting fee, but also through the Participation Plan that entitled the Contractor to receive a 2% interest in the Ute Tribe's working interest of mineral development projects, thereby creating a claim against the Tribe's mineral interests.

Federal law, and Congress' intent, compels that the substance, not the title, of the Becker Agreement be evaluated under the requirements of the IMDA. Ms. Williams' testimony and opinion of what the Becker Agreement is not is directly contradicted by the intention of the Senate Committee to not limit mineral agreements under the IMDA to a "fixed list of permissible agreements."

The Becker Agreement falls within the scope of the IMDA because it can be fairly characterized as a service agreement, a managerial agreement, or other agreement for the development of the Ute Tribe's mineral interests. Furthermore, the Becker Agreement grants to the Contractor a claim against the Tribe's directly owned mineral interests. For these reasons, it is my opinion that the Becker Agreement is a Mineral Agreement under the IMDA, and was subject to the Secretary of Interior's approval.

**D.** **The Ute Business Committee lacked authority to enter into the Becker Agreement without the approval of the Secretary of the Interior.**

The resolution approving the Becker Agreement states that the Business Committee is acting pursuant to its authority to regulate the economic affairs of the Tribe. The legal actions of the Ute Business Committee are specifically authorized, and limited, by the governing documents of the Ute Tribe – the Tribe's Constitution and Corporate Charter. The Constitution provides three limitations relevant here: 1) Business Committee action may be limited based on federal law; 2) the authority of the Business Committee to "approve . . . any interest in tribal

101556428_4



lands, or other tribal assets, which may be authorized . . . by the Secretary of the Interior . . . ."
CONST. ART. VI, SEC 1(c); and 3) the regulation of economic activity subject to the terms of the
Charter. CONST. ART. VI, SEC. 1(f). The Ute Business Committee thus had to comply with its
Constitution, its Charter, and federal law for its actions in approving and entering into the Becker
Agreement to be lawful under the Constitution.

Under the Tribe's Corporate Charter, the Tribal Business Committee exercises corporate
power to regulate the Tribe's economic affairs subject to additional specific limitations. Those
limitations include: the lack of authority to sell or mortgage any mineral rights, Sec. 5(b)(1);
make or perform agreements greater than $10,000 that will be paid by the corporation without
the Secretary's approval, Sec. 5(f); and to pledge or assign any future tribal income without the
Secretary's approval, Sec. 5(g).

In my opinion, the Becker Agreement, as discussed above, is subject to the NIA and
IMDA, and thus required to be approved by the Secretary under federal law. It is undisputed
that the Business Committee did not receive the approval of the Secretary for the Becker
Agreement.

In my opinion, because the Participation Plan creates a claim against the Tribe's "net
revenue" from its mineral interests and participation rights, the Becker Agreement is a pledge or
assignment of the Tribe's future income from its mineral interest. It is undisputed that the
Business Committee did not get the Secretary's approval to pledge or assign the Tribe's future
income from its mineral interests, as required by the Charter.

Therefore, it is my opinion that the Business Committee lacked the authority to enter into
the Becker Agreement without the Secretary's approval.

Further support for this opinion is found in the fact that the Tribe submitted its Ute
Energy LLC Operating Agreement to the BIA for approval, as the Tribe apparently believed that
the Operating Agreement was subject to federal approval requirements. Once the Tribe
received the Letter from the Acting Superintendent, only then did the Tribe, acting through its
wholly owned company Ute Energy Holdings LLC, enter into the Operating Agreement.

## V.    Summary

In summary, my opinions are that: 1) the substance of the Becker Agreement is to be
interpreted consistent with federal law; 2) the Becker Agreement is subject to the Non-
Intercourse Act; 3) the Becker Agreement is subject to the Indian Mineral Development Act, and
thus should have been approved by the Secretary; and 4) the Ute Business Committee lacked
authority under tribal law to enter into the Becker Agreement without the Secretary's approval.

Sincerely,

Pilar Thomas
Lewis Roca Rothgerber Christie LLP

101556428_4

David K. Isom (4773)
ISOM LAW FIRM PLLC
299 South Main Street, Suite 1300
Salt Lake City, Utah 84111
Telephone: 801.209.7400
david@isomlawfirm.com
Attorney for Plaintiff

## IN THE THIRD JUDICIAL DISTRICT COURT
## SALT LAKE COUNTY, STATE OF UTAH

| | |
|---|---|
| Lynn D. Becker,<br><br>Plaintiff,<br><br>vs.<br><br>Ute Indian Tribe of the Uintah and Ouray Reservation, et al.,<br><br>Defendants | **BECKER'S DESIGNATION OF EXPERT AND DISCLOSURE OF INFORMATION**<br><br>**Case No. 140908394**<br><br>**JUDGE BARRY LAWRENCE** |

Pursuant to Utah R. Civ. P. 26(a)(4)(A) and 26(a)(4)(C)(ii), plaintiff Lynn Becker hereby designates Kelly Williams Esq. to provide information and testimony pursuant to Utah R. Evidence 702.

**1.    Qualifications**

Ms. Williams' qualifications, including a list of all publications authored within the preceding 10 years, is attached hereto.  Ms. Williams has not testified as an expert at trial or by deposition within the preceding four years.

**APPENDIX PAGE 452**

2.      **Brief Summary of Opinions to Which Ms. Williams Is Expected to Testify:**

   a.       The Agreement is not any of the following:

   -lease

   -mineral lease

   -mineral interest

   -working interest

   --production sharing agreement

   -energy development agreement

   -exploration and development agreement

   -agreement providing for the exploration for, or extraction of, or processing of, or
   other development of oil, gas or other mineral resources

   -royalty

   -tax

   -agreement providing for the sale or other disposition of mineral resources

   -agreement providing for the sale or other disposition of the production or products
   of mineral resources

   -lien

   -deed

   -deed of trust

   -interest in Indian tribal or trust lands

   -cost-bearing interest

**APPENDIX PAGE 453**

b.      Ms. Williams will analyze the deposition and trial testimony of the experts designated by defendants to the extent that the testimony is relevant to the opinions stated above, together with the exhibits related to that testimony.

**3.      Data and Information that Will Be Relied Upon In Forming Opinions**

a.      February 9, 2017 order in this action.

b.      Independent Contractor Agreement between Becker and the defendants.

c.      Transcripts of depositions taken in this action and exhibits relating to the opinions stated above.

d.      Defendants' (Second) Rule 56 Motion dated December 5, 2016 with exhibits A (2005 Assignment), B (2007 assignment) and F (Long Royalty Co. Decision); and the following exhibits incorporated from Defendants' First Summary Judgment Motion: Exhibits D (Bassett Declaration), F (Trulock Declaration).

e.      Becker's Opposition to Summary Judgment dated December 19, 2017 and Exhibits A (July 2, 2007 Letter of Secretary of Interior); B (Becker Declaration) and C (Exploration & Development Agreement dated July 13, 2004).

f.      Defendants' Reply Memorandum dated January 6, 2017.

**4.      Compensation**

Ms. Williams will be compensated for study and testimony time at $ 295 per hour.

Dated: March 22, 2017.

ISOM LAW FIRM PLLC

/s/ David K. Isom

_____

David K. Isom

Attorney for Plaintiff Lynn D. Becker

**APPENDIX PAGE 454**

**CERTIFICATE OF SERVICE**

The foregoing was served upon defendants' counsel by emailing it this 22nd day of March, 2017 as follows:  Frances Bassett at fbassett@ndnlaw.com; J. Preston Stieff at jps@stiefflaw.com and Thomasina Real Bird at TRealBird@ndnlaw.com.


/s/ David K. Isom
_____

## KELLY A. WILLIAMS

801.323.3391 ● 36 South State Street, Suite 1400 ● Salt Lake City, UT 84111 ● kwilliams@rqn.com

## PROFESSIONAL EXPERIENCE

**Ray Quinney & Nebeker, P.C.** – Salt Lake City, UT                      January 2016 – Present
    *Attorney – Of Counsel*
        My practice focuses on natural resource and public lands law, with deliberate emphasis on all aspects of the upstream and midstream oil and gas industry, including advising clients in state and federal administrative hearings and appeals; consultation with state and federal regulators, agencies and commissions; assistance with exploration, permitting and production of oil, gas and mineral properties; representation in mergers, acquisitions, and mineral financing transactions; preparation of acquisition, financing, drilling and division order title opinions; and preparation and review of agreements and real property instruments.

**Idaho Department of Lands** – Boise, Idaho                      2016 – Present
    *Hearing Officer – Idaho Oil and Gas Commission*
        Conduct hearings pursuant to Idaho Administrative Procedures Act and Idaho Oil and Gas Conservation statutes, rules and regulations on behalf of the Idaho Department of Lands and the Idaho Oil and Gas Commission; direct procedural aspects of administrative hearings, including ruling on admissibility of documentary evidence and oral testimony; prepare findings of fact, conclusions of law and orders based on legal arguments and evidence presented.

**S.J. Quinney College of Law, University of Utah** – Salt Lake City, Utah                      2016 – Present
    *Adjunct Professor – Oil and Gas Law Course*

**Utah State Board of Education** – Salt Lake City, Utah                      2008 – 2016
    *Hearing Officer – Utah Professional Practices Advisory Commission*
        Conducted administrative hearings and ruled on admissibility of documentary evidence and oral testimony; advised Utah Professional Practices Advisory Commission on behalf of Utah State Office of Education; prepared findings of fact, conclusions of law and orders supporting Commission recommendations.

**Welborn, Sullivan, Meck & Tooley, P.C.** – Salt Lake City, Utah                      July 2013 – December 2015
    *Shareholder – see description of current practice*

**Van Cott, Bagley, Cornwall & McCarthy, P.C.** – Salt Lake City, Utah                      January 2012 – July 2013
    *Attorney – see description of current practice*

**Beatty & Wozniak, P.C.** – Salt Lake City, Utah                      August 2010 – December 2011
    *Attorney – see description of current practice*

**Lear & Lear, L.L.P.** – Salt Lake City, Utah                      2001– 2010
    *Attorney – see description of current practice*

**Snell & Wilmer, L.L.P.** – Salt Lake City, Utah                      2000 – 2001
    *Attorney – see description of current practice*

**State of Utah School and Institutional**
**Trust Lands Administration** – *Salt Lake City, Utah*                      1999 – 2000
    *Law Clerk*
        Drafted federal legislation and memorandum of understanding for land exchange between the agency and United States Department of the Interior; drafted legislative rules for agency; examined compliance with Endangered Species Act and the National Environmental Policy Act on state trust lands.

## APPENDIX PAGE 456

**United States Department of the Interior** – *Salt Lake City, Utah*                                    1998
   *Judicial Intern for Judge Harvey Sweitzer*

## EDUCATION

**S.J. Quinney College of Law, University of Utah** – *Salt Lake City, Utah*                    Juris Doctor, 1999
   *Natural Resources and Environmental Law Certificate*

   Legal Writing Teaching Assistant
   National Moot Court Team Member – National Moot Court Competition Semifinalist
   University of Utah Traynor Moot Court Competition Finalist
   Editor, Western Energy Bulletin
   President, Natural Resources Law Forum

**Utah State University** – *Logan, Utah*                                    B.A. in English, *Cum Laude*, 1994
                                                                      Minor in Japanese

## PROFESSIONAL MEMBERSHIPS, PUBLICATIONS & PRESENTATIONS

   2015 – 2017 Utah Legal Elite (Energy/Natural Resources)
   Scheduled speaker: 2017 Rocky Mountain Mineral Law Foundation Annual Institute – Santa Fe, NM
   Presented testimony at 2017 joint hearing of Idaho's House and Senate Energy and Natural
   Resource Committee
   Speaker:  2014 Rocky Mountain Mineral Law Foundation Annual Institute – Vail, CO
   Co-author, Frontier Flaring: Science & Economics, Politics & Regulation – The Future of Flaring
   Rocky Mountain Mineral Law Foundation Member
   American Association of Professional Landmen
   American Bar Association
   Utah Association of Professional Landmen
   Oil and Gas Section Chair, Utah State Bar (2004-2005)
   Young Lawyer Division Secretary, Utah State Bar (2000-2001)

## ADMISSIONS

   Utah State Bar
   United States District Court for the District of Utah
   Utah Supreme Court
   Wyoming State Bar
   Wyoming Supreme Court
   United States District Court for the District of Wyoming
   Pending: Idaho State Bar

**APPENDIX PAGE 457**

David K. Isom (4773)
ISOM LAW FIRM PLLC
299 South Main Street, Suite 1300
Salt Lake City, Utah 84111
Telephone: 801.209.7400
david@isomlawfirm.com
Attorney for Plaintiff

## IN THE THIRD JUDICIAL DISTRICT COURT
## SALT LAKE COUNTY, STATE OF UTAH

| | |
|---|---|
| Lynn D. Becker,<br><br>　　　　　Plaintiff,<br><br>vs.<br><br>Ute Indian Tribe of the Uintah and Ouray Reservation, et al.,<br><br>　　　　　Defendants | **BECKER'S DESIGNATION OF EXPERT AND DISCLOSURE OF INFORMATION**<br><br>**Case No. 140908394**<br><br>**JUDGE BARRY LAWRENCE** |

Pursuant to Utah R. Civ. P. 26(a)(4)(A) and 26(a)(4)(C)(ii), plaintiff Lynn Becker hereby designates Kelly Williams Esq. to provide information and testimony pursuant to Utah R. Evidence 702.

**1.    Qualifications**

Ms. Williams' qualifications, including a list of all publications authored within the preceding 10 years, is attached hereto. Ms. Williams has not testified as an expert at trial or by deposition within the preceding four years.



EXHIBIT 55
WIT: Williams
DATE: 4·26·17
ALPINE COURT REPORTING

**APPENDIX PAGE 458**

2.    **Brief Summary of Opinions to Which Ms. Williams Is Expected to Testify:**

a.    The Agreement is not any of the following:

-lease

-mineral lease

-mineral interest

-working interest

--production sharing agreement

-energy development agreement

-exploration and development agreement

-agreement providing for the exploration for, or extraction of, or processing of, or other development of oil, gas or other mineral resources

-royalty

-tax

-agreement providing for the sale or other disposition of mineral resources

-agreement providing for the sale or other disposition of the production or products of mineral resources

-lien

-deed

-deed of trust

-interest in Indian tribal or trust lands

-cost-bearing interest

2

b.      Ms. Williams will analyze the deposition and trial testimony of the experts designated by defendants to the extent that the testimony is relevant to the opinions stated above, together with the exhibits related to that testimony.

**3.      Data and Information that Will Be Relied Upon In Forming Opinions**

a.      February 9, 2017 order in this action.

b.      Independent Contractor Agreement between Becker and the defendants.

c.      Transcripts of depositions taken in this action and exhibits relating to the opinions stated above.

d.      Defendants' (Second) Rule 56 Motion dated December 5, 2016 with exhibits A (2005 Assignment), B (2007 assignment) and F (Long Royalty Co. Decision); and the following exhibits incorporated from Defendants' First Summary Judgment Motion: Exhibits D (Bassett Declaration), F (Trulock Declaration).

e.      Becker's Opposition to Summary Judgment dated December 19, 2017 and Exhibits A (July 2, 2007 Letter of Secretary of Interior); B (Becker Declaration) and C (Exploration & Development Agreement dated July 13, 2004).

f.      Defendants' Reply Memorandum dated January 6, 2017.

**4.      Compensation**

Ms. Williams will be compensated for study and testimony time at $ 295 per hour. Dated: March 22, 2017.

ISOM LAW FIRM PLLC

/s/ David K. Isom

———————————————

David K. Isom

Attorney for Plaintiff Lynn D. Becker

3

**APPENDIX PAGE 460**