IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| UTE INDIAN TRIBE OF THE UINTAH AND OURAY RESERVATION, et al.,<br><br>Plaintiffs,<br><br>v.<br><br>HONORABLE BARRY G. LAWRENCE, District Judge, Utah Third Judicial District, and LYNN D. BECKER,<br><br>Defendants. | **MEMORANDUM DECISION AND ORDER DENYING PRELIMINARY INJUNCTION**<br><br>Case No. 2:16-cv-00579<br><br>Judge Clark Waddoups |

# TABLE OF CONTENTS

Introduction ........................................................................................................... 3

Procedural Background .......................................................................................... 5

Preliminary Injunction Standard ........................................................................... 8

I. Substantial Likelihood of Success ..................................................................... 9

   A. State Court Subject Matter Jurisdiction ...................................................... 9
     1. The Tribe Is Not Required to Hold a Special Election to Selectively Consent ............... 15
     2. Becker's Independent Contractor Agreement Did Not Involve Trust Property .............. 25

   B. February 28, 2018 Tribal Court Decision .................................................... 26
     1. Background ............................................................................................. 26
     2. The Tribal Court's February 28 Opinion Does Not Have Preclusive Effect ................... 32

   C. Becker's Independent Contractor Agreement Is Valid ................................. 39
     1. The Proceeds to be Distributed to Becker Are Not Trust Property Under Federal
       Law ....................................................................................................... 45
       a. Provision 1 of the Participation Plan Does Not Involve Trust Interests ..................... 48
         &bull; Original Operating Agreement .................................................................. 50
         &bull; Amended and Restated Operating Agreement .............................................. 52
         &bull; Exploration and Development Agreements ................................................... 56
         &bull; Liquidation and the Second Amended and Restated Operating
           Agreement ........................................................................................ 57
       b. Provisions 2, 3, & 4 of the Participation Plan Do Not Involve Trust Interests .......... 59
         &bull; Tribal Court Decision ............................................................................ 61
       c. State Court Jurisdiction Is Not Preempted Because Contract Revenue Is Not
         Trust Property Under Federal Law ............................................................. 62

     2. Becker's Independent Contractor Agreement Is Valid Under Tribal Law ..................... 62
       a. The Tribe Validly Waived Sovereign Immunity Under Tribal Law .......................... 63
         &bull; First Tribal Court Order ......................................................................... 70
         &bull; Second Tribal Court Decision .................................................................. 71
       b. The Ute Business Committee's Pattern and Practice Affirmed the Validity of
         the Waiver ......................................................................................... 73
       c. Contract Is Valid Under Other Tribal Law .................................................... 77
       d. The Tribe Has Waived the Exhaustion Requirement ........................................ 79

II. Conclusion ........................................................................................................ 81

# INTRODUCTION

This case arises from the uncertainty inherent in the overlapping jurisdictional reach of the Utah state courts and the Ute tribal courts when a dispute arises between the Tribe and a non-Indian under a series of complex commercial contracts that create an issue of whether there is an enforceable waiver of sovereign immunity. The case puts at issue the interests of three sovereigns: the United States, the state of Utah, and the Ute Tribe. It is undisputed that Congress, exercising its power as the sovereign, has and may grant—as well as limit—the authority of both the state and the Tribe to exercise their separate jurisdictional authority. And the boundaries of that authority have and continue to evolve.

Traditionally, state courts have general subject matter jurisdiction to resolve disputes that arise within the state's boundaries. When Congress, as the sovereign, has not waived immunity or reserved to the federal courts exclusive jurisdiction in certain areas, the state court's jurisdiction extends to disputes arising within the state's geographic boundaries. Similarly, the doctrine of tribal immunity preempts state court jurisdiction for disputes arising within tribal boundaries. The scope and breadth of tribal immunity and preemption have evolved and continue to evolve, both by congressional action and court decisions. This case requires the court to determine the circumstances under which such tribal sovereign immunity preempting state court jurisdiction may be waived.

Inherent in the recognition of tribal sovereign immunity is the goal of supporting tribal self-governance and control over the Tribe's property, assets, and the management of tribal affairs. The tribal lands have been held in trust by the federal government for the benefit of the tribal members. To avoid misappropriation and abuse, the federal government, as the guardian for the tribal members, has been required to approve alienation of trust assets. As valuable

resources have been found on tribal lands, the motivation for non-Indians to engage in corruption and deceit to deprive tribal members of the value of these resources has often been astounding and a sad commentary on the development of the West's natural resources.[1]

The natural and appropriate response by the tribes has been to be increasingly vigilant and zealous in asserting and protecting their right to control their own affairs. The principal legal mechanism has been for the tribes to assert their rights to sovereign immunity, arguing that disputes over trust assets must be resolved in tribal courts. The tribes, however, have also recognized the value of participating in the commercial development of their resources. These commercial transactions by their very nature are often complex and require significant capital contribution from non-Indian entities. These commercial arrangements, as is customary in all similar complex transactions, require agreements between the parties on how disputes will be resolved, and by which courts. In this case, the agreements have ripened the uncertainty about the overlapping jurisdiction of the state and tribal courts, and about when and under what circumstances tribal sovereign immunity comes into play. The very nature of the agreements themselves requires the parties to determine whether sovereign immunity has been waived and the jurisdiction of the state courts recognized.

The Indian tribes rightly are strongly motivated to enjoy the fullest protection possible to control the resolution of such disputes. Similarly, non-Indians are also appropriately motivated to protect the value of their capital and labor investments. The motivations and intentions of both sides are understandable and cannot be faulted. This case requires the court to resolve how those interests, in compliance with existing law, statutes, and agreements, should be resolved.

---

[1] One of these tragedies is detailed in the history of the Osage Tribe in Oklahoma, where in the 1920s and '30s at least 24 Osage Indians, and likely more, were murdered to gain control of and rights to their valuable oil resources. *See* David Grann, *Killers of the Flower Moon* (2017).

For the reasons stated below, the court concludes that this contract dispute should be resolved in Utah state court and the pending action in the Ute Tribal Court enjoined. The court reaches this conclusion after reviewing hundreds of pages of briefing, considering extensive oral argument, and conducting a careful analysis of a record of more than 5,000 pages. The transaction is complex and the parties' attempts to simplify in order to support their positions have sometimes missed the essential facts and terms upon which the decision must be based.

To address these issues, the court has been required to provide detail and analysis beyond what would be typical or even desired on a motion for preliminary injunction. The detailed analysis has been necessary, however, to fairly and adequately address the facts and legal issues raised. Because of the complexity of the agreements, laws, and issues, the court provided the parties with a draft copy of this memorandum decision as a tentative ruling and held an additional hearing on Friday, April 13, 2018, for the parties to address any errors or misunderstanding in the draft decision. The final decision incorporates relevant issues raised by the parties.

## PROCEDURAL BACKGROUND

This action is before the court on the tribal parties' motion for a preliminary and/or permanent injunction against Mr. Lynn Becker and Judge Barry G. Lawrence proceeding in the matter of *Becker v. Ute Indian Tribe et al*, Case No. 140908394, Third Judicial District Court, Salt Lake County.[2] (ECF No. 54.) A brief history of how this court came to consider this motion is set forth in the Memorandum Decision and Order Granting Temporary Restraining Order

---

[2] Throughout this opinion, the court refers to Mr. Lynn Becker as "Becker," the Ute Indian Tribe of the Uintah and Ouray Reservation, the Uintah and Ouray Tribal Business Committee, and Ute Energy Holdings, LLC as "the tribal parties," and, separately, the Ute Indian Tribe of the Uintah and Ouray Reservation as "the Tribe."

dated February 17, 2018.[3] (ECF No. 85.) The motion concerns the provisions of Article 23 of

Becker's Independent Contractor Agreement and its implications for the jurisdictional conflict

and the issue of tribal exhaustion. In its entirety, Article 23 states:

### Article 23. Limited Waiver of Sovereign Immunity; Submission to Jurisdiction.

If any Legal Proceeding (definition follows) should arise between the Parties hereto, the Tribe agrees to a limited waiver of the defense of sovereign immunity, to the extent such defense may be available, in order that such legal proceeding be heard and decided in accordance with the terms of this Agreement. For purposes of this Agreement, a "Legal Proceeding" means any judicial, administrative, or arbitration proceeding conducted pursuant to this Agreement and relating to the interpretation, breach, or enforcement of this Agreement. To the extent the course of dealing between the Parties might be interpreted to have modified or extended the terms of this Agreement, the limited waiver of sovereign immunity shall apply to such modification or extension. A Legal Proceeding shall not include proceedings related to royalty or similar interests in lands held by the Tribe that are not expressly subject to the terms of this Agreement.

The Tribe specifically surrenders its sovereign power to the limited extent necessary to permit the full determination of questions of fact and law and the award of appropriate remedies in any Legal Proceeding. The Parties hereto unequivocally submit to the jurisdiction of the following courts: (i) U.S. District Court for the District of Utah, and appellate courts therefrom, and (ii) if, and only if, such courts also lack jurisdiction over such case, to any court of competent jurisdiction and associated appellate courts or courts with jurisdiction to review actions of such courts. The court or courts so designated shall have, to the extent the Parties can so provide, original and exclusive jurisdiction, concerning all such Legal Proceedings, and the Tribe waives any requirement of Tribal law stating that Tribal courts have exclusive original jurisdiction over all matters involving the Tribe and waives any requirement that such Legal Proceedings be brought in Tribal Court or that Tribal remedies be exhausted.

Each Party hereto consents to service of processing [sic] for any such Legal Proceeding filed in the court or courts so designated. The Tribe's limited waiver of sovereign immunity and submission to jurisdiction also extends to any arbitration and all review and enforcement of any decision or award of the panel

---

[3] This court was confused about the Tenth Circuit's mandate including a direction to consider supplemental jurisdiction under 28 U.S.C. § 1367. *Ute Indian Tribe v. Lawrence*, 875 F.3d 539, 548 (10th Cir. 2017). Further direction from the Court clarified that this court was to resolve the jurisdictional questions, perhaps under 28 U.S.C. § 1362, rather than § 1367. *Id.*, February 16, 2018 Order.

so convened in the court or courts so designated. The Tribe's limited waiver of sovereign immunity shall be further evidenced by a Tribal Resolution delivered at the time of execution of this Agreement in accordance with Tribal Laws, that expressly authorizes the foregoing submission to jurisdiction of the courts so designated and the execution of this Agreement.

(App'x 98–99, ECF No. 55-1.)

The Temporary Restraining Order was scheduled to expire on March 3, 2018. Thus, the court held an evidentiary hearing on the tribal parties' motion on February 28, 2018, during which no party objected to the court extending the Temporary Restraining Order enjoining the state court action until the court could issue its written opinion. (ECF No. 106.) At the hearing, the court also took evidence and clarified the purpose for which all evidence would be considered. The court further stated that in deciding this motion, it should consider all documents and exhibits on record in this case as well as in the record of companion case *Becker v. Ute Indian Tribe et al*, Case No. 2:16-cv-958, United States District Court for the Central Division of Utah.[4] The parties did not object to this statement. (Feb. 28 Hrg. Tr. 154, 161; ECF No. 111.) The court therefore DENIES as MOOT the tribal parties' motions in limine seeking to limit the evidence the court should consider. (ECF Nos. 97, 98, & 99.)[5]  At the hearing, the court also

---

[4] As a result of the court's conclusions in this action, a memorandum decision is issued simultaneously in the companion case that clarifies the court's February 14, 2018 ruling there and grants Mr. Becker's motion for a preliminary injunction enjoining the parties from proceeding in the tribal court action *Ute Indian Tribe v. Becker*, Case No. CV-16-253, Ute Indian Tribal Court of the Uintah and Ouray Reservation, Fort Duchesne, Utah.

[5] At the April 13, 2018 hearing on the court's tentative ruling, the tribal parties noted that the state court had previously excluded the July 2, 2007 Bureau of Indian Affairs (BIA) letter and that this court should similarly grant a motion to exclude, or at least preserve their objection to the court's consideration of the letter. (Apr. 13 Hrg. Tr. 50–51; ECF No. 132.) The state court excluded the July 2, 2017 BIA letter at the same time it excluded the tribal parties' four expert witnesses from testifying about the necessity of federal approval of the Becker Independent Contractor Agreement under either federal or tribal law. (Ruling on Motions in Limine, Jan. 18, 2018 & Order Nunc Pro Tunc, Feb. 14, 2018; *Becker v. Ute Indian Tribe et al*, Case No. 140908394, Third Judicial District Court, Salt Lake County.) This was due, however, to the state court's previous conclusion on the tribal parties' motion for summary judgment that the

authorized Mr. Becker to submit additional authority for the court's consideration, (ECF No. 106), which he has now done, (ECF No. 109).

On February 28, 2018, the Ute Indian Tribal Court issued an opinion (February 28 Opinion) granting the tribal parties' Motion for Summary Judgment on Grounds of Illegality Under Federal and Tribal Law. (ECF No. 108-1.) On March 1, 2018, the day after the hearing in this court on the tribal parties' motion for preliminary injunction, the tribal parties filed a notice of the February 28 Opinion. (ECF No. 108.) The tribal parties subsequently moved this court to give preclusive effect to the Tribal Court's February 28 Opinion and to consolidate and advance the court's consideration and ruling on the questions of preliminary and permanent injunctive relief as set forth in the tribal parties' motions for summary judgment and/or preliminary and permanent injunctive relief. (ECF No. 110.) Becker has objected to their motion. (ECF No. 115).[6] For the reasons stated below, the court DENIES the tribal parties' motion to give preclusive effect to the February 28 Opinion and to consolidate and advance consideration of their other motions. (ECF No. 110.)  Based on the court's review of the evidence, the arguments, the briefing, and relevant case law, the court DENIES the tribal parties' motions for preliminary injunction. (ECF No. 54 and the injunction portions of ECF Nos. 52 & 53.)

### PRELIMINARY INJUNCTION STANDARD

Because this court has previously set forth the factual background in this matter in its January 31, 2018 Memorandum Decision, (ECF No. 78), the court begins here with the legal standard it must follow when ruling on a preliminary injunction. The court may grant a

---

Agreement did not involve trust property and did not require federal approval. This court considered the BIA letter along with all other materials in the record except as otherwise noted herein.

[6] The court did not consider the Declaration of Lynn Becker and its exhibits B–B-5 in Becker's opposition to the tribal parties' preclusion motion, (ECF No. 115), and thus DENIES as MOOT the tribal parties' motion to strike those materials, (ECF No. 124).

preliminary injunction, in its sound discretion, if the movant shows a substantial likelihood of success on the merits of the relief sought, irreparable harm to the moving party absent an injunction issuing, that the damage an injunction will cause to the non-moving party is outweighed by the threatened injury to the moving party, and that if issued, an injunction will not be adverse to the public interest. *Kiowa Indian Tribe of Okla. v. Hoover*, 150 F.3d 1163, 1171 (10th Cir. 1995). The court first addresses the most disputed—and dispositive—element of the standard in this case: whether the tribal parties have met their burden to show a substantial likelihood of success on the merits.

I.      **SUBSTANTIAL LIKELIHOOD OF SUCCESS**

   **A. The State Court Has Subject Matter Jurisdiction.**

   The tribal parties first seek to enjoin the Utah state court from proceeding, arguing that it lacks subject matter jurisdiction over Becker's contract claims against the tribal parties. Citing case law from as early as 1832, the tribal parties argue that it is a fundamental tenet of federal law that states lack jurisdiction over Indians for conduct occurring within Indian country.[7] *See Worcester v. Georgia*, 31 U.S. 515, 561–63 (1832) (concluding that the 1791 treaty of Holston between the United States and the Cherokee nation precluded the state of Georgia from criminally adjudicating non-Indians for actions that occurred on tribal land). While the tribal parties' initial premise is generally correct, it is not an unequivocal statement of the law, nor does it apply without further analysis in this case. *See White Mountain Apache Tribe v. Bracker*, 448 U.S. 136, 142 (1980) ("Long ago the Court departed from Mr. Chief Justice Marshall's view that 'the laws of [a State] can have no force' within reservation boundaries" (alteration in original

---

[7] While Becker argues that at least 45% of his activities occurred off-reservation, (Hrg. Tr. 2/28/18 at 23:8–9, ECF No. 111), the Tribe claims that Becker's contract claim arose on and was performed on the reservation. For the purpose of this opinion, the court assumes without deciding, that the stricter standards applicable to on-reservation conduct apply.

(quoting *Worcester*, 31 U.S. at 561))). *Worcester* addressed a state criminal adjudication against

non-Indians for actions occurring on tribal land, and the opinion is "perhaps the most expansive

declaration of Indian independence from state regulation ever uttered by this Court, pertain[ing]

to one of the original 13 States, unbound by any Enabling Act whatsoever." *Ariz. v. San Carlos*

*Apache Tribe*, 463 U.S. 545, 563 (1983). Because a state's jurisdiction may be bound by its

Enabling Act, the court begins its analysis of state court subject matter jurisdiction with Utah's

Enabling Act.

In 1894, Utah adopted "[a]n Act to enable the people of Utah to form a constitution and

State government, and to be admitted into the Union on an equal footing with the original states."

28 Stat. 107. Known as the Utah Enabling Act, it contains a disclaimer of Indian lands and

jurisdiction over those lands as a condition of statehood:

> That the people inhabiting said proposed State do agree and declare that they
> forever disclaim all right and title to the unappropriated public lands lying within
> the boundaries thereof; and to all lands lying within said limits owned or held by
> any Indian or Indian tribes; and that until the title thereto shall have been
> extinguished by the United States, the same shall be and remain subject to the
> disposition of the United States, *and said Indian lands shall remain under the*
> *absolute jurisdiction and control of the Congress of the United States . . . .*

28 Stat. 107, Sec. 3 (Second) (emphasis added). Article III, Sec. 2 of the Constitution of Utah

repeats this disclaimer verbatim. The tribal parties argue that the jurisdictional disclaimer

contained in these founding documents means that the state of Utah has no subject matter

jurisdiction over "Indian lands and Indian people on Indian lands in Utah" and that only the

United States Congress can grant such jurisdiction. (Pl.'s Reply 11, ECF No. 101.)[8] The tribal

---

[8] Because the record in this matter is so voluminous and includes materials from four related
proceedings in state, federal, and tribal court, all citations to page numbers of the record in this
opinion refer to the page number in the ECF header rather than to the page number within any
given document cited. The court hopes that this makes location and review of these materials
easier.

parties acknowledge that where Congress has provided "clear federal authorization," (Pl.'s Emerg. Mot. 18, ECF No. 54 (citing COHEN'S HANDBOOK OF FEDERAL INDIAN LAW § 7.03(1)(a)(ii), p. 608 (2012 ed.))), and when "Congress has expressly so provided," *Cal. v. Cabazon Band of Indians*, 480 U.S. 202, 207 (1987), state courts have jurisdiction over "actions against Indians arising within Indian country," (Pl.'s Emerg. Mot. 18, ECF No. 54). Indeed, since *Worcester*, Congress has authorized state jurisdiction over a number of types of actions involving Indian parties on Indian lands, and even over Indian water rights in state courts. *See, e.g.*, *San Carlos Apache Tribe*, 463 U.S. at 570 (stating that "we must conclude that the District Courts were correct in deferring to the state proceedings").

Nonetheless, the tribal parties argue here that Congress has not spoken and that there is not "a single act of Congress that empowers the State of Utah to exercise adjudicatory jurisdiction over the Ute Indian Tribe for actions undertaken by the Tribe within the exterior boundaries of its reservation." (Pl.'s Reply 12, ECF No. 101.) Without such authorization, they argue, the Tribe's alleged contractual waiver of sovereign immunity is ineffective because, even if Becker's Independent Contractor Agreement is valid, Congress has not authorized Utah to exercise subject matter jurisdiction over this civil action. But the tribal parties are incorrect. The Indian Civil Rights Act of 1968, codified in 25 U.S.C. § 1321 *et seq.*, addresses congressional grants of authority for states to exercise jurisdiction over criminal and civil actions involving Indians. Because Becker's action is a civil action, § 1322 governs. It states:

> Consent of the United States; force and effect of civil laws. *The consent of the United States is hereby given* to any State not having jurisdiction *over civil causes of action between Indians or to which Indians are parties which arise in the areas of Indian country situated within such State* to assume, with the consent of the tribe occupying the particular Indian country or part thereof which would be affected by such assumption, *such measure of jurisdiction over any or all such civil causes of action arising within such Indian country or any part thereof* as may be determined by such State *to the same extent that such State has*

> *jurisdiction over other civil causes of action*, and those civil laws of such State that are of general application to private persons or private property shall have the same force and effect within such Indian country or part thereof as they have elsewhere within that State.

25 U.S.C. § 1322(a) (emphases added). By its plain language, section (a) of this statute is express federal consent and authorization for the Utah state court—which otherwise has general jurisdiction over civil matters under Utah Code Ann. § 78A-5-102—to exercise territorial subject matter jurisdiction over "civil causes of action between Indians or to which Indians are parties," including those "which arise in the areas of Indian country situated within such State," as long as the state has the "consent of the tribe." 25 U.S.C. § 1322(a). Then, § 1324 authorized states to amend their constitutions, Enabling Acts, or existing statutes to remove legal impediments to the exercise of congressionally authorized subject matter jurisdiction over tribal matters.[9] 25 U.S.C. § 1324. Utah did so via statute. In Utah Code Ann. § 9-9-201, Utah accepted the jurisdiction, granted by Congress, to preside over civil matters involving Indians.[10] Thus, pursuant to 25 U.S.C. § 1322(a), assuming that the Tribe has consented and the issue does not involve trust property (both of which will be discussed *infra*), Congress has otherwise authorized the Utah state court to be a court of competent subject matter jurisdiction over this action.[11]

---

[9] 25 U.S.C. § 1324 states:
> Notwithstanding the provisions of any enabling Act for the admission of a State, the consent of the United States is hereby given to the people of any State to amend, where necessary, their State constitution or existing statutes, as the case may be, to remove any legal impediment to the assumption of civil or criminal jurisdiction in accordance with the provisions of this title. . . .

[10] Utah Code Ann. § 9-9-201 states:
> The state of Utah hereby obligates and binds itself to assume criminal and civil jurisdiction over Indians and Indian territory, country, and lands or any portion thereof within this state in accordance with the consent of the United States given by the Act of Congress of April 11, 1968, 82 Stat. 78–80 (Public Law 284, 90th Congress), to the extent authorized by that act and this chapter.

[11] At the April 13 hearing on the tentative ruling, the tribal parties argued that Utah did not comply with § 1324 by enacting Utah Code. §§ 9-9-201 to 9-9-213, because these

The tribal parties argue that *Ute Tribe v. Utah*, 521 F. Supp. 1072, 1157 (D. Utah 1981) (*Ute I*), *aff'd in part, rev'd in part on other grounds*, 773 F.3d 1087 (10th Cir. 1985) (*Ute III*) (*en banc*), "holds that the State of Utah lacks jurisdiction over the Ute Tribe for actions undertaken by the Tribe inside the exterior boundaries of its reservation." They further argue that the decision is binding upon Judge Lawrence in state court under the doctrine of res judicata, upon Becker under the doctrine of collateral estoppel, and upon this court under the doctrine of stare decisis. (*See* Pl.'s Reply 12, ECF No. 101.) The argument overstates the holding of the case. They more correctly state the holding of these related cases by quoting *Ute Indian Tribe v. Utah*, 114 F.3d 1513, 1530 (10th Cir. 1997) ("*Ute V*"):

> the Tribe *and the federal government* retain jurisdiction over all trust lands, the National Forest Lands, the Uncompahgre Reservation, and the three categories of non-trust lands that remain within the boundaries of the Uintah Valley

---

statutes do not remove the legal impediment to jurisdiction that still exists in Utah's Enabling Act and Constitution. The court disagrees that Utah's statutes failed to remove the state's legal impediment to jurisdiction. They were enacted in 1971 in direct response to Congress' invitation. *See* COHEN'S HANDBOOK OF FEDERAL INDIAN LAW § 6.04[3][a], p. 538 (2012 ed.). Furthermore, the tribal parties argued that the Utah statutes only assume jurisdiction contingent on a Tribe's consent by special election because these sections must be read *in pari materia*, just as § 1322 must be read *in para materia* with § 1326. (Apr. 13 Hrg. Tr. 8-10; ECF No. 132.) Even reading the statutes *in pari materia*, Utah Code § 9-9-206 specifically supports the court's interpretation here. It states:

> The jurisdiction assumed pursuant to this chapter is subject to the limitations and provisions of the federal Act of Congress of April 11, 1968, 82 Stat. 78-80 (Public Law 284, 90th Congress), and the specific limitations set forth in each [tribal] resolution ceding jurisdiction to the state, both as to geographical area and subject matter.

*Id.* This section foreshadows what the Tribe has done with respect to the single contract at issue in this case; specifically, authorized its properly elected Tribal Business Committee to enact a resolution that waived its sovereign immunity, selected Utah law to govern, and submitted to jurisdiction in a court of competent jurisdiction that includes the Utah courts. While other sections speak to special election requirements for broader Indian acceptance of state jurisdiction, this section speaks to the narrower grounds under which the Utah courts have jurisdiction by "each resolution ceding jurisdiction to the state, both as to geographical area and subject matter," such as the Becker contract. Utah Code § 9-9-206. The court considered the supplemental legal authority submitted by the tribal parties (ECF No. 133), but it does not change the court's opinion.

> Reservation. The state and local defendants have jurisdiction over the fee lands removed from the Reservation under the 1902–1905 allotment legislation.

*Id.* (*See* Pl.'s Expedited Mot. 29, ECF No. 52 (emphasis added).) In other words, as to criminal adjudications in Indian country as defined by 18 U.S.C. § 1151, these opinions clarify the geographic boundaries over which the state of Utah has original criminal jurisdiction versus the boundaries over which the Tribe *and the federal government* retain original criminal jurisdiction as Congress has divided between them. The Tenth Circuit has further clarified that 18 U.S.C. § 1151 defines Indian country as to both criminal and civil jurisdiction. *Pittsburg & Midway Coal Mining Co. v. Watchman*, 52 F.3d 1531, 1540 (10th Cir. 1995). The tribal parties' argument that these cases mean that Utah state courts have no civil subject matter jurisdiction over suits involving tribal parties inside reservation boundaries fails to acknowledge that the federal government can—and here has via 25 U.S.C. § 1322(a)—consented to the state's acceptance of the federal court's civil jurisdiction over Indian country up to the extent of the state's general civil jurisdiction, which Utah accepted in Utah Code Ann. § 9-9-201.[12] Thus, Utah state courts have underlying subject matter jurisdiction over this matter, but only, as discussed below, if the Tribe has consented and if the matter does not involve trust property pursuant to 25 U.S.C. § 1322(b).

---

[12] Utah's broad acceptance of the congressional invitation to accept the federal government's concurrent jurisdiction over tribal lands makes it different than other states within the jurisdiction of the Tenth Circuit, such as Oklahoma, which has a completely different jurisdictional structure. Thus, in Utah the analysis necessarily focuses not on whether Utah has underlying jurisdiction, but on the degree to which a tribe as a whole or through its designated elected officials has ceded its jurisdiction to the state—either wholly by special election or, as to selected geographic or subject matter areas, by individual resolution waiving sovereign immunity and submitting to state jurisdiction.

### 1. *The Tribe Is Not Required to Hold a Special Election to Selectively Consent.*

At oral argument, the tribal parties asserted that the congressional authorization of state court jurisdiction over civil matters in 25 U.S.C. § 1322(a) is effective only if the Tribe consents pursuant to 25 U.S.C. § 1326, which requires a special election as follows:

> State jurisdiction acquired pursuant to this title [25 USCS §§ 1321 et seq.] with respect to criminal offenses or civil causes of action, or with respect to both, *shall be applicable in Indian country only where the enrolled Indians within the affected area of such Indian country accept such jurisdiction by a majority vote of the adult Indians voting at a special election held for that purpose*. The Secretary of the Interior shall call such special election under such rules and regulations as he may prescribe, when requested to do so by the tribal council or other governing body, or by 20 per centum of such enrolled adults.

*Id.* (emphasis added). The court disagrees that a tribe's consent by majority vote is required for a *state* to accept the *federal government's* grant of civil jurisdiction over tribal matters. Instead, § 1326 relates to a *tribe's* ability to independently relinquish to a state the *tribe's* jurisdiction over tribal matters, whether or not the state has accepted the federal government's jurisdiction. In other words, the court interprets §§ 1321–1326 *et seq.* as (1) requiring a formal election under § 1326 if a tribe intends to surrender all of its own jurisdiction over tribal matters to a state that either has or has not yet accepted the federal government's civil or criminal jurisdiction or (2) allowing a tribe's waiver of its sovereign immunity over selected matters if a state has previously accepted the federal government's jurisdiction by complying with § 1324.

The Act of August 15, 1953, is the relevant statute in which five states (California, Minnesota, Nebraska, Oregon, and Washington) were given mandatory jurisdiction to the extent of each state's jurisdiction elsewhere in the state and in which Congress authorized all remaining states to "assume jurisdiction over reservation Indians if the State Legislature or the people vote affirmatively to accept such responsibility." *Williams v. Lee*, 358 U.S. 217, 222 (1959). *See* Act. of Aug. 15, 1953, c. 505, §§ 2, 4, 6–7; 67 Stat. 590 (hereinafter Public Law 280, or PL-280). The

policy surrounding Public Law 280 in The Act of 1953 and its amendments in The Indian Civil Rights Act of 1968 reflect congressional intent to balance—without itself compelling the states—the federal government's relinquishment of jurisdiction over tribal matters to states on the one hand with the ability for Indians, on the other hand, to exercise independent judgment over when and how much of their own sovereign immunity to surrender to the states in whose geographic boundaries they otherwise reside. *See Kennerly v. Dist. Court of Ninth Judicial Dist.*, 400 U.S. 423, 426–29 (1971). The purpose of this policy was to facilitate Indians' greater participation in American society on similar terms as other citizens of the United States and its component states. *See Williams* 358 U.S. at 220–21. Additionally, Supreme Court precedent cited by the tribal parties supports this interpretation.

To begin with, in *Williams*, a non-Indian attempted to sue Indians in Arizona state court for actions that took place on a reservation. 358 U.S. 217. In 1959, PL-280 provided the only clear federal authorization for states to exercise civil or criminal jurisdiction over Indians. Consent by the Indians themselves was not required. In *Williams*, the Supreme Court reversed the Arizona state court judgment against the Indian parties because Arizona had failed to accept the federal government's jurisdiction over Indians by 1959, and moreover, its Enabling Act still expressly disclaimed jurisdiction over Indian lands. 358 U.S. at 222 n.10, 233.

The discussion of the procedural election requirements of 25 U.S.C. § 1326 in *Kennerly* is especially instructive as to this court's interpretation. 400 U.S. 423 (1971). By 1971, Congress had amended the Act of August 15, 1953, with Title IV of the Civil Rights Act of 1968, 82 Stat. 78, 25 U.S.C. §§ 1321–1326 (1964 ed., Supp. V). Section 403(b) of the 1968 Act repealed § 7 of the Act of 1953, which had authorized states to unilaterally accept the federal government's grant of its jurisdiction over civil and criminal offenses in Indian country. Section 402(a) of the

1968 Act reaffirmed congressional willingness to offer that states assume its civil jurisdiction as before, but this time stated a requirement that such assumption was subject to "the consent of the tribe . . . which would be affected by such assumption." *Id. Kennerly* went on to explore the balancing that these provisions require.

In *Kennerly*, Montana had taken no affirmative action to accept civil or criminal jurisdiction over the Blackfeet Reservation pursuant to the Act of 1953. 400 U.S. at 425. Similarly, after the 1968 Act, Montana failed to legislatively accept civil or criminal jurisdiction over the Blackfeet tribe by amending its Enabling Act or other statutes as § 1324 required. *See id.* at 427. Nevertheless, the Montana state court exercised jurisdiction over a civil action involving Indians within the exterior boundaries of the Blackfeet Reservation. *Id.* at 424. The basis for Montana's assertion of civil jurisdiction was that the Blackfeet Tribal Council had adopted Chapter 2, Civil Action, § 1 as part of the Blackfeet Tribal Law and Order Code on November 20, 1967, which stated:

> The Tribal Court and the State shall have concurrent and not exclusive
> jurisdiction of all suits wherein the defendant is a member of the Tribe
> which is brought before the Courts . . . .

*Id.* at 425. By 1971, the Court could have considered evidence of this unilateral tribal action amending the tribe's Law and Order Code as consent to globally waive the tribe's sovereign immunity had Montana previously accepted either Congress' 1953 or 1968 offer of jurisdiction. *See id.* at 428 (examining first whether Montana had assumed "such measure of jurisdiction over any or all such civil causes of action arising within Indian country"). But according to *Kennerly*, after the 1968 Act, even if Montana had accepted jurisdiction under the Act, tribal council legislation is an insufficient prerequisite to manifest the tribe's consent to permanently authorize

the state to assume global jurisdiction over a tribe. *Id.* at 426–30. For that, strict compliance with the election provisions of 25 U.S.C. § 1326 was required.[13] *Id.* at 429.

Dueling footnotes in *Kennerly* between the majority and dissenting justices support this interpretation. The dissenting justices challenged the majority view because they believed that the Court's requirement for a special election in *Kennerly* required the tribe to "choose between exclusive tribal court jurisdiction on the one hand and permanent, irrevocable state jurisdiction on the other." *Id.* at 431 n* (Stewart, J., dissenting). The majority expressly stated that this view "is incorrect." *Id.* at 430. Instead, the majority stated that 25 U.S.C. § 1322(a) "obviously" does not compel the inference that Congress intended to foreclose "selective tribal consent to state exercise of jurisdiction." *Id.* at n.6. Rather, the majority holding is more specific. It states that before a court can conclude that a tribe has irrevocably and permanently ceded its tribal sovereignty and/or consented to share it with a state, the tribe must comply with the procedural election procedures of § 1326. *Id. Kennerly* says nothing, therefore, about whether the procedural election requirements of § 1326 are required before *the state* can accept the *federal government's* grant of jurisdiction. In fact, *the state's* requirements are set forth in § 1324. *Kennerly*'s holding is squarely focused on the actions *a tribe* must take to permanently and globally cede *tribal* jurisdiction to the state. It expressly leaves open the option for a tribe to selectively consent, via selective waivers of tribal sovereign immunity, to a state's exercise of the jurisdiction ceded to the state by the *federal government*. 400 U.S. at 428 (quoting § 402(a) of the Act, 25 U.S.C.

---

[13] Of course, the Blackfeet Tribal Council could not have known about the procedural requirements of the Act of 1968 when they amended their Law and Order code in 1967. Had they known, they still may not have held an election to grant permanent concurrent jurisdiction to the state courts of Montana because the impetus for the Law and Order amendment was apparently a temporary inability to maintain a tribal court. *See Kennerly*, 400 U.S. at 430. This practical explanation for the tribe's code amendment supports the majority's view that the formal procedures of § 1326 must be met before a court finds such a global and irrevocable ceding of *the tribe's* jurisdiction to the state.

§ 1322(a) (1964 ed., Supp. V), which grants the United States' consent for states to assume "such measure of jurisdiction over any or all such civil causes of action arising within such Indian country or any part thereof *as may be determined by such State*" (emphasis added)).

The tribal parties' contrary interpretation of the consent requirement in § 1322(a) relies heavily on "the idea of inherent Indian sovereignty as a bar to state jurisdiction." *McLanahan v. Ariz. Tax Comm'n*, 411 U.S. 164, 172 (1973). The trend, according to the Supreme Court in 1973, had been away from that idea and toward the treaties and statutes that define the limits of state power. *Id.*[14] Thus, in *McClanahan*, where Arizona had never accepted civil jurisdiction over Indians pursuant to § 1324 and the tribe had not consented to the imposition of state tax on Indians on the Navajo Reservation, Arizona's state tax could not be imposed on reservation Indians nor collected or enforced in Arizona state courts. *Id.* at 177–78.[15]

The Supreme Court further clarified the relationship between subject matter jurisdiction and tribal sovereign immunity in *Kiowa Tribe v. Manufacturing Technologies, Inc.* 523 U.S. 751 (1998). *Kiowa* essentially expanded tribal sovereignty to include the commercial activities of a

---

[14] *See also White Mountain Apache*, 448 U.S. at 144–45:

> Where, as here, a State asserts authority over the conduct of non-Indians engaging in activity on the reservation . . . we have examined the language of the relevant federal treaties and statutes in terms of both the broad policies that underlie them and the notions of sovereignty that have developed from historical traditions of tribal independence.

In *White Mountain Apache*, the Court found that a "comprehensive federal regulatory scheme" over logging and hauling Arizona tribal timber on reservation and Bureau of Indian Affairs roads precluded state motor vehicle license and fuel use taxes on a non-Indian corporation under contract with a tribe. *Id.* at 148–49.

[15] At the April 13 hearing on the tentative ruling, the tribal parties further suggested that *Fisher v. District Court of Montana*, 424 U.S. 382 (1976), decided five years after *Kennerly*, elevated tribal sovereign immunity over federal preemption as the premier federal barrier to state court jurisdiction. (Apr. 13 Hrg. Tr. 17, ECF No. 132.) *Fisher* arose in Montana, however, which had not acted to accept the federal court's grant of jurisdiction under § 1322(a). *Fisher*, 424 U.S. at 388. Thus, its reasoning does not speak to *Kennerly*'s holding about selective tribal consent to state court jurisdiction versus permanent irrevocable state jurisdiction only by special election.

tribe conducted off a reservation. In the process, the Court continued its trend against analyzing the existence of state jurisdiction based on inherent Indian sovereignty and instead "toward reliance on federal pre-emption." *McLanahan*, 411 U.S. at 172. In doing so, the *Kiowa* Court stated that "[a]s a matter of federal law, an Indian tribe is subject to suit only where Congress has authorized the suit or the tribe has waived its immunity." 523 U.S. at 754. This distinction suggests that "clear federal authorization," (Pl.'s Emergency Mot. 18, ECF No. 54, citing COHEN'S HANDBOOK OF FEDERAL INDIAN LAW § 7.03(1)(a)(ii), p. 608 (2012 ed.)), is one side of a coin by which subject matter jurisdiction is transferred from the federal government to a state that accepts it. And tribal waiver of sovereign immunity—either globally pursuant to special election via 25 U.S.C. § 1326 or selectively as suggested by *Kennerly*—is the other side of the same coin. Both are necessary. This view is consistent with the Tenth Circuit's statement in *Lawrence* that the two concepts are "different animals." 875 F.3d at 545. In *Kiowa*, the state of Oklahoma, which is not a PL-280 mandatory jurisdiction state, did not have subject matter jurisdiction over a contract case both because it has not acted to accept civil or criminal jurisdiction under § 1324, *see, e.g.*, *Muscogee (Creek) Nation v. Hodel*, 851 F.2d 1439 (U.S. App. D.C. 1988); *Indian Country, U.S.A. v. Okla.*, 829 F.2d 967 (10th Cir. 1987), and because the tribe had not waived its immunity. *Kiowa*, 523 U.S. at 760.

The Supreme Court confirmed the interpretation that a special election is not required for a tribe to selectively consent to waive sovereign immunity in *C & L Enterprises v. Citizen Band Potawatomi Indian Tribe of Oklahoma*, 532 U.S. 411 (2001). The case arose in Oklahoma, which has never accepted general civil jurisdiction over Indians pursuant to § 1324. The Supreme Court held that a sufficiently clear contractual waiver of tribal immunity, combined with a state statute accepting jurisdiction over contracts involving arbitration, was sufficient for a

state court to exercise civil jurisdiction over an Indian tribe for off-reservation commercial activity.[16] *Id.* at 418–19. *C & L* thus means that not only can tribes selectively consent to state jurisdiction as *Kennerly* suggested, but also that states can selectively assent to accept the federal government's subject matter jurisdiction over tribal matters under § 1324 by enacting statutes that do not disclaim jurisdiction over tribes or tribal parties on that subject. *Id.* at 419–20 (finding that Okla. Stat., Tit. 15, § 802.B (1993) regarding arbitration agreements vests jurisdiction over such agreements—regardless of the parties—in "any court of competent jurisdiction of this state," including the Oklahoma state court).[17]

Based on this analysis, the court concludes that a special election under 25 U.S.C. § 1326 is not required for the Tribe to selectively consent to suit in a state court where—as in Utah—the state has undisputedly accepted the federal court's jurisdictional authority pursuant to § 1324.[18]

---

[16] The tribal parties cite *Mescalero Apache Tribe v. Jones*, 411 U.S. 145, 148–49 (1973), in an unsuccessful attempt to factually distinguish *C & L*. They argue that of course Indians are generally subject to state jurisdiction for off-reservation Indian activity, whereas the activity here was on the reservation and subject to different rules. Not only is the situs of the activity here in dispute, but *Mescalero* is a 1973 case issued prior to *Kiowa*, when tribal sovereign immunity was extended to a tribe's off-reservation activity. *Kiowa*, 523 U.S. 751. That the *C & L* Court specifically analyzed the necessity of both state court jurisdiction in a state that has otherwise not globally accepted federal jurisdiction over Indian matters under § 1324 *and* waiver of tribal immunity for a tribe's off-reservation activity per *Kiowa* demonstrates that the tribal parties' distinction is not compelling.

[17] In fact, this is exactly what § 1322(a) envisions by authorizing a state to assume "such measure of jurisdiction over any or all such civil causes of action arising within such Indian country or any part thereof *as may be determined by the State. . . .*" 25 U.S.C. § 1322(a) (emphasis added); *see Kennerly*, 400 U.S. at 428, 431 n.*. Because Oklahoma's arbitration statute did not disclaim jurisdiction over arbitration agreements that tribes or tribal parties entered, the requirements of 25 U.S.C. § 1324 were met and qualified as state statutory authority to overcome the Oklahoma Enabling Act's impediment to civil jurisdiction over Indian matters. *See C & L*, 532 U.S. at 419.

[18] Dicta in two Tenth Circuit criminal decisions suggest that the Act of 1968 requires tribal consent by special election for a state to accept the congressional grant of jurisdiction over tribal matters. *United States v. Tony*, 637 F.3d 1153, 1158 (10th Cir. 2011) (stating that the 1968 amendment served to "eliminate the requirement of affirmative legislative action and to require the consent of the Indian tribe by special election before a state could assume jurisdiction"); *United States v. Burch*, 169 F.3d 666 (10th Cir. 1999) (The Act of 1953 "was amended in 1968

Rather, the court concludes that because Utah has unequivocally accepted federal authorization to exercise civil jurisdiction, the tribal parties' likelihood of success on the merits of the state court's jurisdiction under § 1322(a) does not rest on the Tribe never having requested or held a § 1326 special election, but depends solely on whether there is a valid selective waiver of the Tribe's sovereign immunity in the Becker Independent Contractor Agreement, which will be comprehensively analyzed *infra*.

This conclusion is also supported by a comparison with jurisdictional and immunity issues in *Blatchford v. Native Village of Noahtak*, 501 U.S. 775 (1991), which held that the congressional grant of original jurisdiction over civil actions brought by Indian tribes arising

---

to omit the requirement of affirmative legislative action and to require the consent of the Indian tribe by special election before a state could assume jurisdiction."). These statements did not support the analytical foundations of either case, because neither New Mexico (*Tony*) nor Colorado (*Burch*) was one of the five mandatory jurisdiction states under PL-280 in The Act of 1953, nor had either state assumed criminal jurisdiction in Indian country per § 1324. *See United States v. Barela*, 797 F.3d 1186, 1191 (10th Cir. 2015) (defining dicta). And although Utah has consented to accept criminal jurisdiction over Indians, the *Ute Indian Tribe v. Utah* cases do nothing if not make clear that the Tribe has neither globally nor selectively waived *the Tribe's* sovereign immunity over criminal matters involving Ute Indians in Indian country. *See* 114 F.3d at 1530.

Dicta in Tenth Circuit civil cases also make clear that Utah tribes have not globally consented to state civil jurisdiction by special election pursuant to § 1326. *See United States v. Felter*, 752 F.2d 1505, 1508 n.7 (10th Cir. 1985) ("Although Utah since has indicated its willingness to assume this jurisdiction, no Indian tribe has accepted its offer."); *see also Superior Oil Co. v. Merritt*, 619 F. Supp. 526 (D. Utah 1985) (stating that federal diversity statute 28 U.S.C. § 1322 cannot be construed as a general federal waiver of tribal sovereign immunity that abrogates the special election requirement under 25 U.S.C. § 1326 to demonstrate a tribe's consent to globally waive its sovereign immunity). The Tenth Circuit's mandate in this case, *Lawrence*, similarly notes that the Tribe has never granted global consent to state court jurisdiction—a point with which this court does not disagree. 875 F.3d at 546 n.4. In fact, the Ute Indian Tribe amended § 1-2-1 of its Law and Order Code to clarify that it has never globally consented to state civil or criminal jurisdiction by way of the special election process required by § 1326. (*See* VIII, ECF No. 52.) The Tenth Circuit's mandate left it to this court in the first instance, however, to decide whether there is state court jurisdiction in this action, and this court finds a distinction between global consent to state court civil jurisdiction by the Tribe pursuant to the special election requirements of § 1326 and selective consent by tribal waiver of sovereign immunity in selected civil actions as contemplated by *Kennerly* and *C & L*.

under the United States Constitution, laws, or treaties pursuant to 28 U.S.C. § 1362 is not a waiver of a state's Eleventh Amendment immunity defense, *id*. at 786 n.4. In other words, the congressional grant of jurisdiction in 28 U.S.C. § 1362 is "wholly distinct" from immunity defenses. *Id.* By analogy to *Blatchford*, the congressional grant of civil jurisdiction under 25 U.S.C. § 1322(a)—that can be accepted by a state pursuant to 25 U.S.C. § 1324—is a "wholly distinct" issue from whether a tribe has (1) globally waived its sovereign immunity by special election consent under 25 U.S.C. § 1326 or (2) selectively waived its sovereign immunity as in *Kennerly* and *C & L*. Existence of subject matter jurisdictional authority is not negated by the existence of immunity; immunity simply limits the exercise of any authorized jurisdiction. *Id.* at 779.

Also supporting this reasoning is the Tenth Circuit's discussion of the United States' waiver of sovereign immunity in The Indian Reorganization Act in *Wopsock v. Natchees*, 279 Fed. Appx. 679 (10th Cir. 2008).[19] In *Wopsock*, former Ute Business Committee members attempted to sue federal Bureau of Indian Affairs officials for allegedly failing to call a special election to approve two ordinances that amended the Tribe's Constitution. *Id.* at 686. By enacting The Indian Reorganization Act, Congress established the federal court's subject matter jurisdiction; in addition, the Act contains a congressionally approved waiver of the United States' sovereign immunity for violations of the Act. *Id.* When discussing whether the court had jurisdiction over the Bureau of Indian Affairs defendants, the Tenth Circuit referred interchangeably to the United States' "consent" to suit and the United States' "waiver of sovereign immunity" and specifically stated that "[i]t is the terms of the United States' consent that define this court's jurisdiction to entertain any suit." *Id.* at 685–86. Notably, there was no

---

[19] This and any other unpublished decisions are not precedential, but are cited for their persuasive value. *See* Fed. R. App. 32.1; 10th Cir. App. R. 32.1.

question that Congress' enactment of The Indian Reorganization Act conferred subject matter jurisdiction on the court. The only question was whether the officials had violated the terms of the Act sufficiently for the Act to trigger the United States' consent, or waiver of its sovereign immunity, and subjected it to suit for redress of those alleged violations. *Id.* at 685–87; *see also Alvarado v. Table Mt. Rancheria*, 509 F.3d 1008, 1016 (9th Cir. 2007) ("To confer subject matter jurisdiction in an action against a sovereign, in addition to a waiver of sovereign immunity, there must be statutory authority vesting a district court with subject matter jurisdiction."); *Quality Tooling v. United States*, 47 F.3d 1569, 1575 (Fed. Cir. 1995) ("The inquiry, then, is not whether there is the one, jurisdiction, or the other, a waiver of immunity, but whether there is both."). Likewise, here there is no question that Congress authorized states to accept civil jurisdiction over Indian matters in § 1322(a), which Utah accepted pursuant to § 1324 by enacting Utah Code Ann. § 9-9-201. The only way, then, that the Tribe's consent impacts the state's jurisdictional authority to entertain a suit is if the Tribe has also waived its sovereign immunity. It is undisputed that the Tribe has not requested a special election pursuant to 25 U.S.C. § 1326 to cede all of its sovereign immunity to Utah, but whether the terms of the Becker Independent Contractor Agreement—if the agreement is valid—triggered the Tribe's selective waiver of its sovereign immunity to consent to suit on the agreement is a substantial question.[20]

---

[20] Because of this court's conclusion about the state's subject matter jurisdiction, the tribal parties' arguments about the state lacking minimum contacts are unavailing. (Pl.'s Reply 15, ECF No. 101.) The court also finds that nothing about its conclusion on Utah's subject matter jurisdiction is at odds with any of the Tenth Circuit's reasoning in *Lawrence*, 875 F.3d 539. In other words, it does not conflate subject matter jurisdiction with sovereign immunity, but rather considers them separately and independently.

### 2. *Becker's Independent Contractor Agreement Did Not Involve Trust Property.*

The court has concluded that the Utah state court has subject matter jurisdiction because Congress authorized Utah to exercise civil jurisdiction over Indian matters in 25 U.S.C. § 1322(a) and because Utah accepted that jurisdiction in Utah Code Ann. § 9-9-201. The next question before the court is whether this action seeks to adjudicate "the ownership or right to possession . . . or any interest therein" of "any real or personal property . . . belonging to any Indian or any Indian tribe . . . that is held in trust by the United States." 25 U.S.C. § 1322(b);[21] 28 U.S.C. § 1360(b).[22] Both statutes provide that Congress has not conferred on states its subject matter jurisdiction over trust property. Therefore, if the action involves trust property, Utah would be precluded from having subject matter jurisdiction over this action, regardless of its acceptance of § 1322(a) via § 1324 and Utah Code Ann. § 9-9-201.

---

[21] 25 U.S.C. § 1322(b) states:

> Alienation, encumbrance, taxation, use, and probate of property. Nothing in this section shall authorize the alienation, encumbrance, or taxation of any real or personal property, including water rights, belonging to any Indian or any Indian tribe, band, or community *that is held in trust by the United States* or is subject to a restriction against alienation imposed by the United States; or shall authorize regulation of the use of such property in a manner inconsistent with any Federal treaty, agreement, or statute, or with any regulation made pursuant thereto; *or shall confer jurisdiction upon the State to adjudicate, in probate proceedings or otherwise, the ownership or right to possession of such property or any interest therein.*

*Id.* (emphasis added.)

[22] 28 U.S.C. § 1360(b) similarly states:

> Nothing in this section shall authorize the alienation, encumbrance, or taxation of any real or personal property, including water rights, belonging to any Indian or any Indian tribe, band, or community that is held in trust by the United States or is subject to a restriction against alienation imposed by the United States; or shall authorize regulation of the use of such property in a manner inconsistent with any Federal treaty, agreement, or statute or with any regulation made pursuant thereto; or shall confer jurisdiction upon the State to adjudicate, in probate proceedings or otherwise, the ownership or right to possession of such property or any interest therein.

At this point, because answers to the questions regarding trust property and selective waiver of the tribe's sovereign immunity dictate the tribal parties' likelihood of success on the merits of their argument that the state court has no jurisdiction over this action, the court must consider in full the validity and terms of the Becker Independent Contractor Agreement at issue. Before doing so, however, the court addresses the tribal parties' motion that the Tribal Court's February 28 Opinion should be given preclusive effect. (ECF No. 110.) This is because the Tribal Court's ruling directly addresses the validity of the contract under federal and tribal law, and if preclusive would dictate the court's evaluation of the tribal parties' likelihood of success on the merits.

## B.     February 28, 2018 Tribal Court Decision

### 1. *Background*

On August 18, 2016, the Ute Indian Tribe, the Uintah and Ouray Tribal Business Committee, and Ute Energy Holdings, LLC, filed a declaratory judgment action against Becker in The Ute Indian Tribal Court of the Uintah and Ouray Reservation. The tribal parties first filed their complaint in Tribal Court three and a half years after Becker initiated federal court action on this contract, (*Becker v. Ute Indian Tribe of the Uintah and Ouray Reservation et al*, Case No. 2:13-cv-123 (dismissed for lack of federal question jurisdiction)), twenty months after Becker sued in state court, and two days after this court, Judge Robert J. Shelby presiding, dismissed the instant action for lack of federal court jurisdiction, (ECF No. 40). Becker's companion case seeking to enjoin the tribal parties from pursuing the 2016 Tribal Court action is Case No. 2:16-cv-958 in this court. (Compl. for Decl. J., ECF No. 2-3, Case No. 2:16-cv-958.) The Tribal Court issued its February 28 Opinion as a result of the following circumstances.

On September 14, 2016, this court initially granted Becker's motion for a temporary restraining order enjoining the parties from pursuing the Tribal Court action, and followed that order with a preliminary injunction on September 28, 2016. (ECF No. 50, Case No. 2:16-cv-958.) The tribal parties had previously filed a motion for summary judgment in Tribal Court on September 12, 2016, two days before this court's temporary restraining order, seeking a ruling that Becker's contract was void as an ultra vires act under tribal law. (App'x 178, ECF No. 122-1, Case No. 2:16-cv-958.) Becker had filed a motion to dismiss the Tribal Court action on September 14, 2016, on the grounds that the contract validly waived the Tribe's sovereign immunity and exhaustion remedies and that the Tribe had submitted to jurisdiction elsewhere. (App'x 206, ECF No. 122-1, Case No. 2:16-cv-958.) The tribal parties immediately appealed this court's preliminary injunction, and on December 30, 2016, the Tenth Circuit stayed the preliminary injunction to allow the parties to pursue the Tribal Court action during the appeal.

After the injunction was stayed, the parties continued litigating in Tribal Court, completing their briefing on the above two motions. On March 9, 2017, the Tribal Court, Judge Pro Tem Thomas Weathers presiding, denied Becker's first motion to dismiss and denied without prejudice the tribal parties' motion for summary judgment.[24] (App'x 4, ECF No. 122-3, Case No. 2:16-cv-958.) Judge Weathers also ordered the parties to show cause why the Tribal Court "should not dismiss or at least stay this lawsuit pending resolution of the state and federal lawsuits as a matter of comity, preservation of limited judicial resources, and avoidance of

---

[24] In its Order, the Tribal Court relied on this court's preliminary conclusion that a consensual relationship between an employee and a tribe gives rise to tribal court jurisdiction. (App'x 8, ECF No. 122-3, Case No. 2:16-cv-958.) And, "[a]t this early stage of this litigation," the Tribal Court was unwilling to assume the validity of the Becker Independent Contract Agreement's waiver of sovereign immunity because of the Tenth Circuit's uncertainty about the validity of the contract itself under tribal law, as well as the Tenth Circuit's suggestion that even if the contract was void, the Tribal Court may still be a "court of competent jurisdiction." (*Id.* at 9.) At that time the Tribal Court did not independently analyze its own jurisdiction under tribal or federal law.

conflicting judgments." (*Id.* at 7.) Following briefing on the order to show cause, the Tribal

Court issued an Order on June 9, 2017, declining to stay or dismiss the case primarily so that it

could rule on the tribal law questions. (*Id.* at 257–58.) Judge Weathers bifurcated the tribal

parties' complaint and scheduled discovery to proceed only on issues related to the validity of

the contract and its terms under tribal and federal law, including the waiver of sovereign

immunity and the need for federal approval of the contract. (ECF No. 70-12, Case No. 2:16-cv-

958.)

On August 25, 2017, during the discovery period on these issues, the Tenth Circuit

reversed this court's preliminary injunction, holding that because Becker had not shown a

likelihood of success on the validity of the contract waiving tribal exhaustion, the Tribal Court

should address in the first instance whether it had jurisdiction. (ECF No. 69, Case No. 2:16-cv-

958.)

In the meantime, discovery disputes had ensued in the Tribal Court action. On September

19, 2017, shortly after the Tenth Circuit's August reversal and well in advance of the Tribal

Court's dispositive motion deadline—but in compliance with Tribal Court rules—the tribal

parties filed three motions for partial summary judgment in Tribal Court: one arguing the

Becker Independent Contractor Agreement is void ab initio under federal law, one arguing the

contract's waiver of sovereign immunity is invalid under tribal law, and one arguing the contract

is invalid under both federal and tribal law because it concerns trust property and failed to

receive the required federal approval. (App'x 678–737, ECF No. 122-4, Case No. 2:16-cv-958.)

Becker, after locating a Tribal Ordinance and Tribal Court decision that he believed directly

related to the tribal parties' second motion for partial summary judgment as to tribal law, filed a

second motion to dismiss on November 2, 2017. (App'x 236, ECF No. 122-5, Case No. 2:16-cv-958.)

On December 18, 2017, Judge Weathers decided both of these motions because they raised the same legal issue.[25] (ECF No. 70-15, Case No. 2:16-cv-958.) Judge Weathers again issued an order to show cause why the Tribal Court action "should not be dismissed or stayed as a matter of comity and preservation of limited tribal judicial resources given the identical suits pending (for some time) in state and/or federal court." (*Id.* at 5.) The next day, Judge Weathers denied all pending discovery and other motions without prejudice, except for the tribal parties' motion for partial summary judgment on whether the Becker Independent Contractor Agreement is void ab initio under federal law, upon which a new discovery and briefing schedule was set. (ECF No. 70-16, Case No. 2:16-cv-958.)

On December 21, 2017, the Tenth Circuit issued its mandate reversing the Preliminary Injunction against the Tribal Court action in Becker's federal companion case. (ECF No. 69, Case No. 2:16-cv-958.) Following the mandate, Becker immediately filed a second motion for preliminary injunction in that case, (ECF No. 70, Case No. 2:16-cv-958), which this court heard

---

[25] Both motions addressed aspects of the Tribal Court's jurisdiction. On the one hand, Judge Weathers rejected the tribal parties' position that Ute Law and Order Code § 1-8-5 precludes successful selective waiver of the Tribe's sovereign immunity when the Business Committee adopts a resolution that incorporates by reference a contract that contains a waiver of sovereign immunity. *Dec. 18 Order*, Ute Indian Tribal Court, Case No. CV-16-253 (rejecting the reasoning in *Toole v. Ute Water Settlement Accounting Servs., LLC,* Ute Indian Tribal Court, Case No. CV-09-061 (August 10, 2010), and adopting the subsequent reasoning in *Yazzie v. Ute Indian Tribe*, Ute Indian Tribal Court, Case No. CV-09-118 (Feb. 14, 2011). Both *Toole and Yazzie* are lower court, not appellate court, decisions of the Ute Tribal Court and thus neither is binding authority on the Tribal Court.) On the other hand, Judge Weathers rejected Becker's argument that § 1-2-3(5) of the Ute Law and Order Code precludes jurisdiction over him if he were found to be an "employee" of the Tribe because the tribal parties alleged that fact in its complaint and thus the Tribal Court was required to accept it on the standard for a motion to dismiss. *See Leatherman v. Tarrant Cty. Narcotics Intelligence and Coordination Unit*, 507 U.S. 163, 164 (1993) (stating that a court must accept as true all the factual allegations in the complaint when considering a motion to dismiss).

29

on February 14, 2018. (ECF No. 106, Case No. 2:16-cv-958.) This court denied Becker's second motion for preliminary injunction because validity of the contract and tribal court exhaustion were still at issue, according to the Tenth Circuit's mandate, even though Judge Weathers' December 18, 2017 Order had held that the Tribe had validly waived its sovereign immunity by Tribal Resolution 05-147 incorporating the Becker Independent Contractor Agreement by reference. (*Id.*; *see also* ECF No. 107, Case No. 2:16-cv-958). In addition, by December 28, 2017, the tribal parties had filed a motion in Tribal Court to reconsider Judge Weathers' December 18, 2017 Order holding that the contract had validly waived the Tribe's sovereign immunity under tribal law. (App'x 144, ECF No. 122-7, Case No. 2:16-cv-958.) The motion also requested that the Tribal Court vacate its December 19 discovery and briefing schedule on the motion arguing that federal law rendered the contract void ab initio. It also asked the Tribal Court to reconsider the denial without prejudice of the tribe's other motions. (*Id.* at 147.) They specifically asserted, however, that the Tribal Court should not reconsider Becker's discovery motions. (*Id.*)

Shortly thereafter, on January 4, 2018, Judge Weathers notified the parties that he would no longer be the judge on the case. (ECF No. 70-18, Case No. 2:16-cv-958.) On January 9, Chief Judge Stiffarm stayed the December 19 order setting the discovery and briefing schedule on the tribal parties' motion for partial summary judgment on whether the Becker Independent Contractor Agreement is void ab initio under federal law. (App'x 302, ECF No. 122-7, Case No. 2:16-cv-958.) The stay order was silent as to whether it granted the tribal parties' request to vacate the portion of Judge Weathers' Order that denied the then-pending motions without prejudice. (*Id.*) On January 10, Chief Judge Stiffarm reassigned the Tribal Court action to Judge Terry Pechota. (App'x 303, ECF No. 122-7, Case No. 2:16-cv-958.)

Following the change in Tribal Court judges, there was a flurry of litigation activity in federal, state, and tribal courts. In the Tribal Court action, the tribal parties moved for expedited rulings on all of their pending motions, including those Judge Weathers previously dismissed without prejudice. Judge Pechota heard these motions in Tribal Court on February 16, 2018.[26] (App'x 26, ECF No. 122-8, Case No. 2:16-cv-958.) Becker actively pursued preparations for the state court trial, set to begin on February 26, 2018, while trying to fend off the tribal parties' efforts to stay the state court trial and precipitously pursue rulings in Tribal Court. The tribal parties filed an interlocutory appeal to the Tenth Circuit regarding this court's January 17, 2018 ruling declining to exercise supplemental jurisdiction over the tribal parties' preliminary injunction motion. Becker filed a third motion to dismiss in Tribal Court asking it to fully consider its jurisdiction on the merits. (App'x 337, ECF No. 122-8, Case No. 2:16-cv-958.)

Among other issues, Becker's third motion to dismiss in the Tribal Court action addressed the merits of the tribal parties' motion to reconsider Judge Weathers' December 18 decision, which found waiver of the Tribe's sovereign immunity under Ute Law and Order Code § 1-8-5 and *Yazzie*,[27] as well as whether the Tribal Court was a "court of competent jurisdiction" under § 1-2-3(5) of the Ute Law and Order Code. (*Id.*) On February 17, 2018, this court issued a temporary restraining order enjoining the state court action. (ECF No. 85.) On February 20 in the Tribal Court action, the tribal parties objected to Judge Pechota's consideration of Becker's third motion to dismiss on jurisdictional grounds, encouraging the Tribal Court "to focus like a laser on the action in Tribal Court" and assuring the Tribal Court they are "fully prepared to defend the Tribal Court's rulings in subsequent federal court review of this Tribal Court proceeding."

---

[26] The hearing was held notwithstanding that briefing was incomplete because Judge Weathers' December 19 discovery and briefing schedule and order dismissing the remaining motions without prejudice had been stayed by Judge Stiffarm on January 9.

[27] *See* Section I.C.2.a., *infra*.

(App'x 208, ECF No. 122-8, Case No. 2:16-cv-958.) On February 26, 2018, the date the state court action had previously been set to begin, the tribal parties responded to Becker's jurisdictional motion to dismiss in Tribal Court, again urging Judge Pechota to rule on motions Judge Weathers had previously dismissed regarding contract validity and to reject Judge Weathers' decision finding that the Tribe had acceptably waived its sovereign immunity under tribal law. (App'x 395, ECF No. 122-8, Case No. 2:16-cv-958.)

Ultimately, the Tenth Circuit's direction to this court clarified its November 29, 2017 mandate in this action. (ECF No. 81.) On February 28, 2018, this court conducted an evidentiary hearing on the tribal parties' preliminary injunction motion to enjoin the state court action and took the matter under submission. (ECF No. 106.) The Tribal Court, Judge Pechota presiding, issued its February 28, 2018 Opinion on the same day. (ECF No. 108.)

## 2. *The Tribal Court's February 28 Opinion Does Not Have Preclusive Effect*

The tribal parties quote from 2 Commercial Arbitration § 40:41 (2017) to support their argument that this court should give the Tribal Court's February 28 Opinion preclusive effect: "If the federal court *concurs* with the tribal court's acceptance of jurisdiction and determination of the facts, then the matter is res judicata and cannot be relitigated in federal court." (Mot. re Preclusion 4, ECF No. 110) (emphasis added).) The requirement that the federal court concur supports that the federal court has authority to independently evaluate the Tribal Court's conclusions to give the February 28 Opinion preclusive effect. The tribal parties simultaneously argue that "'[t]he Tenth Circuit has rejected the argument that federal courts sit as a referee of tribal courts.'" (*Id.* ("[W]e firmly reject the [] position that the district court had a duty to monitor the proceedings before the tribal court.") (quoting *Burrell v. Armijo*, 456 F.3d 1159, 1173 (10th Cir. 2006).) They also argue that "[u]nless a federal court determines that the Tribal

Court lacked jurisdiction . . . proper deference to the tribal court system precludes relitigation of issues raised . . . and resolved in the Tribal Courts." (*Id.* (quoting *Iowa Mutual Ins. Co. v. LaPlante*, 480 U.S. 9, 19 (1987)).)

To address the tribal parties' conflicting positions, this court reviewed relevant precedent that confirms that this court "may evaluate the existence of a tribal court's jurisdiction" after a tribal court's "ruling that it had jurisdiction" has been exhausted. *Burrell*, 456 F.3d at 1168. The tribal parties assert that "the Ute Indian Rules of Civil Procedure do not permit interlocutory appeals," (Mot. for Clarification 3, ECF No. 88); therefore, the Tribal Court's February 28 Opinion is not fully exhausted because it cannot yet be appealed and thus is not final.[28] *See Murdock v. Ute Indian Tribe*, 975 F.2d 683, 687 (10th Cir. 1992) (requiring a final adjudication on the merits as an element of preclusion). Nevertheless, the tribal parties argue that the Tribal Court's February 28 Opinion granting their partial motions for summary judgment should be given preclusive effect here because "[s]ummary judgment orders are afforded preclusive effect," (Mot. re Preclusion 3, ECF No. 110 (citing the court to Charles Alan Wright, et al., 18A Federal Practice & Procedure Juris § 4444 (2d ed. 2002) and *In re Griego*, 64 F.3d 580, 584 (10th Cir. 1995)).) *In re Griego* points out, however, that "[r]edetermination of issues is warranted if there is reason to doubt the quality, extensiveness, or fairness of procedures followed in prior litigation." 64 F.3d at 584–85. Similarly, Wright explains that "claim preclusion and issue preclusion result from summary judgments that rest on the lack of any genuine dispute of material fact going to the merits of a claim or defense." Charles Alan Wright, et al., 18A Federal Practice & Procedure Juris § 4444 (2d ed. 2002).

---

[28] As the court explains further *infra*, the Becker Independent Contractor Agreement was valid and enforceable and included an express waiver of any requirement of tribal law that tribal remedies be exhausted.

Upon review of the February 28 Opinion, this court has ample doubts about the quality, extensiveness, or fairness of the procedures followed by the Tribal Court. This court also doubts that the Tribal Court acknowledged genuine disputes of fact material to the merits of the jurisdictional claims and that it considered those disputed facts in the light most favorable to the non-moving party. *Tolan v. Cotton*, 134 S. Ct. 1861, 1863 (2014) (stating that "[i]n articulating the factual context of the case, the [court] failed to adhere to the axiom that in ruling on a motion for summary judgment, '[t]he evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor'") (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)).

For example, the February 28 Opinion holds that the Tribal Court has jurisdiction over Becker under Title I, Chapter 2, §§ 1-2-1 to 1-2-4, Ute Indian Law and Order Code, Amended and Restated, Ordinance 13-010. (Opinion 3, ECF No. 108-1.) None of those sections, however, grants the Tribal Court subject matter jurisdiction over civil matters, which § 1-2-5 apparently does, and then in § 1-2-6 only concurrently with state and federal courts that have valid jurisdiction. (App'x 53, ECF No. 55-1.) In addition, the February 28 Opinion is silent on the fact that Ordinance 13-010 was not executed until March 27, 2013, about six weeks after Becker filed his first federal action against the tribal parties. (Compl., ECF No. 2, Case No. 2:13-cr-123.) While Ordinance 13-010 could be relevant if the issue was whether the Tribal Court has jurisdiction over a contract with a non-Indian that arose after March 27, 2013, the Opinion does not mention that Ordinance 87-04 governed between November 16, 1987 and March 27, 2013— which includes the time period when Becker worked for the Tribe and the Independent Contractor Agreement was executed. (ECF No. 70-2, Case No. 2:16-cv-00958.)

Thus, the Tribal Court failed to analyze that Ordinance 87-04 and the Ute Law and Order Code at the relevant time did not provide broad civil jurisdiction over non-Indians, and, in fact, expressly precluded the Tribal Court from exercising jurisdiction over claims "against the Ute Indian Tribe [and] the Tribal Business Committee," both of which are parties to the Tribal Court action. (App'x 52, ECF No. 55-1.) Had the Tribal Court's February 28 Opinion acknowledged that Ordinance 87-04 was the relevant Ordinance in effect at the time the Independent Contractor Agreement was negotiated, the Tribal Court would have been required to analyze whether Becker was an employee or an independent contractor in deciding whether it had jurisdiction over him.[29] The February 28 Opinion also fails to address that Ordinance 13-010—even if it were the relevant Ordinance—retains Ordinance 87-04's § 1-2-3(4) of the Ute Indian Law and

---

[29] The February 28 Opinion merely states that Becker "was a tribal employee or independent contractor," without deciding which he was. (*Id.* at 4, ECF No. 108-1.) This is critical because under Ordinance 87-04, the Tribal Court only had subject matter jurisdiction over employees, not independent contractors. Title I, Chapter 2, § 1-2-3(4), Ute Indian Law and Order Code, Amended and Restated, Ordinance 87-04 states:

> The Courts of the Ute Indian Tribe *shall not have jurisdiction to hear claims against the Ute Indian Tribe of the Uintah and Ouray Reservation, the Ute Tribal Business Committee of the Uintah and Ouray Reservation*, or any Tribal officers or employees in their official capacities, except that the Ute Indian Tribal Court shall have jurisdiction to hear actions brought by the Ute Indian Tribe against the bonds of officers or employees *and actions against officers or employees* for restitution of Tribal money, property, or services wrongfully converted to their personal benefit.

(ECF No. 70-2, 2:16-cv-00958) (emphases added).) Equally important to an analysis of the parties' intent when contracting about jurisdiction over Becker is an analysis of the parties' intent when contracting about jurisdiction over the Tribe. As shown in the section just quoted, Ordinance 87-04 precluded jurisdiction over claims against the Tribe itself, including the Business Committee. Previous language that had authorized civil actions against the Tribe itself was stricken by § 1-2-3(5) of Ordinance 87-04, which as amended stated:

> [T]he Courts of the Ute Indian Tribe *shall not assume jurisdiction over any civil or criminal matter which does not involve a member of the Tribe, or a member of a federally recognized Tribe*, if some other forum exists for the handling of the matter and if the matter is not one in which the rights of Tribal members may be directly or indirectly affected.

(ECF No. 70-2, 2:16-cv-00958) (emphasis added).)

Order Code, thus resulting in the oddity that under Ordinance 13-010 the Tribal Court can have jurisdiction over claims against non-Indians but prohibits non-Indians from raising their claims against the Tribe or the Business Committee.[30] (*Id.*) *See Kremer v. Chem. Const. Corp.*, 456 U.S. 461, 480 (1982) (holding that a party who does not have a full and fair opportunity to ligate a claim or issue is not subject to claim preclusion on such issues). By its unreasoned and incorrect one sentence conclusion that the Tribal Court "clearly has jurisdiction" over Becker under Title I, Chapter 2, §§ 1-2-1 to 1-2-4 of the Ute Indian Law and Order Code, the February 28 Opinion entirely ignores disputed facts about the parties' expectations about jurisdiction over the Independent Contractor Agreement at the time it was executed and fails to consider those facts in the light most favorable to Becker.

Additionally, the exhaustion doctrine that provides a tribal court the first opportunity to examine its own jurisdiction does not apply "where exhaustion would be futile because of the lack of an adequate opportunity to challenge the [tribal] court's jurisdiction" or "where the action is patently violative of express jurisdictional prohibitions." *Burrell*, 456 F.3d at 1168 (quoting *Nat'l Farmers Union Ins. Co. v. Crow Tribe of Indians*, 471 U.S. at 857 n.21). Additional

---

[30] The jurisdictional restriction on the Tribal Court in Ordinance 87-04 and its successor, Ordinance 13-010, against resolving claims against the Tribe or its Business Committee raises an additional question. Can any Ute Tribal Court exhaust the question of whether the Tribe has validly waived its sovereign immunity and decide that against the Tribe's interest? It appears not, because the Tribal Court has no jurisdiction to do so. The tribal parties suggest that in this circumstance provisions in the Tribe's Constitution or By-Laws allow the Tribal Business Committee to decide—or delegate the decision to an entity other than the Business Committee— which, even if true would not provide an adequate solution to this problem. These due process concerns support this court's conclusion that it should not give preclusive effect to the February 28 Opinion. In light of this conclusion, it would be futile in the companion case for this court to defer to the Tribal Court to exhaust the issue of its own jurisdiction. Additionally, because Becker's claims against the tribal parties are expressly precluded by § 1-2-3(4) of Ordinance 87-04 and § 1-2-3(5) of Ordinance 13-010, the Tribal Court also had no jurisdiction to determine that Becker is not entitled to the 2% of net revenue distributed to Ute Energy Holding from Ute Energy that he is seeking in the state, federal, and Tribal Court actions. (February 28 Opinion 11, ECF No. 108-1.)

exceptions to exhaustion apply "'[w]hen . . . it is plain that no federal grant provides for tribal governance of nonmembers' conduct on land covered by [the main rule established in *Montana v. United States*],'" *id.* (quoting *Strate v. A-1 Contrs.*, 520 U.S. 438, 459 n. 14 (1997)), or when "it is otherwise clear that the tribal court lacks jurisdiction so that the exhaustion requirement 'would serve no purpose other than delay.'" *Id.* (quoting *Nevada v. Hicks*, 533 U.S. 353, 369 (2001)). As will be described, *infra*, the court finds that these exceptions apply to the Tribal Court's February 28 Opinion. Significantly, this court found in its Preliminary Injunction order in Becker's companion case that "express jurisdictional prohibitions" against the exhaustion rule applied. (ECF No. 50, Case No. 2:16-cv-958.) Yet the Tribal Court's February 28 Opinion purports to have relied on this court for the proposition that the exceptions in *Montana v. U.S.*, 450 U.S. 544, 565–66 (1981), grant the Tribal Court jurisdiction over non-Indians who enter consensual relationships with the Tribe. (February 28 Opinion 3–4, ECF No. 108-1.) This is erroneous for two reasons.

First, *Montana* does not create tribal court jurisdiction over nonmembers. It establishes "a presumption *against* tribal court civil jurisdiction over non-Indians" that can only be overcome if a tribe can meet the burden to show that an exception applies. *Crowe & Dunlevy, P.C. v. Stidham*, 640 F.3d 1140, 1150 (10th Cir. 2011) (emphasis added). Second, this court's Preliminary Injunction did not hold that Tribal Court jurisdiction over Becker was established because of the existence of a consensual agreement. Rather, it held that because the tribal parties' contractual waiver of sovereign immunity in the Becker Independent Contractor Agreement overlaps with the question of "express jurisdictional prohibitions," exhaustion in Tribal Court was not required. (ECF No. 50, Case No. 2:16-cv-958.) What the February 28 Opinion fails to analyze is that if a consensual relationship is rooted in a contract, and the terms of that contract

37

expressly waive sovereign immunity for legal proceedings on the contract; explicitly waive any requirement that legal proceedings be brought in Tribal Court or that tribal remedies be exhausted; expressly provide that Utah law governs the contract and any disputes; and state that all contract disputes "shall" be resolved in the United States District Court for the District of Utah or any court of competent jurisdiction, that contract cannot represent a "consensual relationship" that equates to consent to Tribal Court jurisdiction. The tribal parties argue that a contractual agreement is not a prerequisite to a consensual relationship and that Becker's consensual relationship began through an employment relationship before the parties entered into the contract. (App'x 403–04, ECF No. 122-8, Case No. 2:16-cv-958.) While true, this fails to address the complexity created by the terms of the contract that renounced Becker's status as an employee and made the agreement retroactively effective on March 1, 2004, when his relationship with the Tribe began. (Preamble and Art. 6-E, App'x 91–95, ECF No. 55-1.)[31]

Accordingly, the court DENIES the tribal parties' motion to give preclusive effect to the Tribal Court's February 28 Opinion and to advance this court's consideration of the questions of both preliminary and permanent injunctive relief enjoining the state court from proceeding in the tribal parties' summary judgment motions before this court. (ECF No. 110.) The court will, however, consider the Tribal Court's February 28 Opinion in its analysis below. *See MacArthur*

---

[31] The court also notes that the February 28 Opinion held, without analysis, that the second *Montana* exception gave the Tribal Court jurisdiction. (February 28 Opinion 3, ECF No. 108-1.) That narrow exception rebuts the presumption against jurisdiction over a non-Indian if such non-Indian "threatens or has some direct effect on the political integrity, the economic security, or the health or welfare of the tribe." *Montana*, 450 U.S. at 511. *See also Crowe & Dunlevy*, 640 F.3d at 1153. "The conduct must do more than injure the tribe, it must 'imperil the subsistence' of the tribal community," *Plains Commerce Bank v. Long Family & Cattle Co.*, 554 U.S. 316, 330 (2008) (quoting *Montana*, 450 U.S. 544), such that assertion of Tribal Court jurisdiction under this exception is necessary to "avert catastrophic consequences." *Id.* at 341. Not only did the Tribe not argue this exception applies, (*see* App'x 403, ECF No. 122-8), the Tribal Court identified no facts that would support this conclusion.

*v. San Juan Cty.*, 497 F.3d 1057, 1066 (10th Cir. 2007) ("The decision whether to enforce non-final orders of a tribal court is left primarily to [the court's] discretion under the doctrine of comity."). Additionally, to make the record clear, the tribal parties' motion to clarify this court's ruling on the Tribal Court's consideration of its own jurisdiction, (*see* ECF No. 88), does not relate to this action in the same way it relates to Becker's federal companion case seeking to enjoin tribal court proceedings. (Case No. 2:16-cv-958). This court clarifies that its February 16, 2018 Order in that case, (ECF No. 107, Case No. 2:16-cv-958), does not separately apply to this case, and the motion in this action is DENIED as MOOT. (ECF No. 88.)

   **C.     Becker's Independent Contractor Agreement Is Valid.**

   The court now considers the tribal parties' likelihood of success on the invalidity of Becker's Independent Contractor Agreement under tribal and federal law, including the Tribal Court's conclusions. The court begins with whether Becker's Independent Contractor Agreement involves trust property because that issue drives the contract's validity under both federal and tribal law.

   The tribal parties' preliminary injunction motion did not cite the court to any specific facts that demonstrate that Becker's agreement alienates Indian assets held in trust by the United States. (ECF No. 54.) They cite the court to numerous cases for the principle that failure to secure federal approval for alienation of Indian trust property renders that alienation invalid, (*id.*), but that puts the cart before the horse. The motion does, however, incorporate by reference the factual assertions in the tribal parties' partial motions for summary judgment, which the court

also reviewed.[32] (*See* ECF Nos. 52, 53.) The tribal parties assert the following potentially relevant facts about the nature of the property alleged to be alienated by the contract:

1. "The Ute Tribe . . . oversees approximately 1.3 million acres of trust lands, some of which contain significant oil and gas deposits." (Pl.'s Expedited Mot. 11, ECF No. 52.)

2. "Becker's job duties were to manage and develop the Tribe's energy and mineral resources, and the Tribe's Energy and Minerals Department, both of which are located inside the exterior boundaries of the Tribe's U&O Reservation. The IC Agreement states that Becker's services to the Tribe were to include the 'restructuring and development of the Tribal Energy and Minerals Department as set forth in Tribal Ordinance 03.003,' which was attached to the Becker IC Agreement as Exhibit C." (*Id.* at 15.)

3. "The Becker IC Agreement was never authorized or approved by the Secretary of the Interior, or the Secretary's duly-authorized designee. Indeed, in the parallel state-court litigation between the parties, Mr. Becker has admitted that his IC Agreement 'was never approved by the U.S. Congress or the Secretary or Department of Interior.'" (*Id.* at 16.)

4. "The Independent Contractor Agreement ("IC Agreement") that was later signed by Becker and the Tribe contains a provision captioned 'Participation Plan,' that states in relevant part:

> Contractor [Becker] shall receive a beneficial interest of two percent (2%) of net revenue distributed to Ute Energy Holding, LLC from Ute Energy, LLC . . . ('Contractor's Interest').

> \* \* \* \*

---

[32] There, of course, the tribal parties characterized the facts as "undisputed," but the court does not consider them as such on a motion for preliminary injunction, particularly when the unusual urgency and concurrent litigation in two federal cases, a state case, and a tribal court case—and their related appeals—make it appropriate for the court to first decide this preliminary injunction motion and then, after appeal, set a status conference to consider a briefing schedule for the remaining pending motions to give Mr. Becker an opportunity to respond.

In the future, a) if the Tribe participates in any projects involving the development, exploration and/or exploitation of minerals in which the Tribe has any participating interest and/or earning rights … and Contractor [Becker] is providing services under this agreement, and b) the Tribe elects not to place such interests in Ute Energy Holding, LLC, then Contractor [Becker] shall receive a two percent (2%) beneficial net revenue interest in such assets . . . .

\* \* \* \*

If, at any time, Contractor [Becker] wishes to sell the Contractor Rights, Contractor [Becker] agrees to notify the Tribe of his intention. The Tribe shall have 60 days to exercise this preferential right to purchase with a bona fide, market value offer to purchase on the same terms and conditions that any legitimate offer would entail."

(Pl.'s Second Exped. Mot. 13, ECF No. 53.)

5.     "Since October 1, 2008, Ute Energy Holdings LLC has been wholly owned by the Ute Tribe." (*Id.* at 14.)

6.     "The Ute Tribe was a member of Ute Energy LLC through its membership in Ute Energy Holdings LLC." (*Id.*)

7.     "During the early 2000s, the Tribe was a party to several 'Exploration and Development' Agreements ('EDAs') with various oil and gas companies. The Tribe had a dual legal status under the EDAs; not only was the Tribe the lessor of its oil/gas minerals but, in addition, the Tribe had the option to participate (with the oil/gas company 'partners') as a working interest owner in the drilling and production of oil and gas from wells drilled on tribal lands under the EDAs." (*Id.* at 15.)

8.     "Under Assignments dated May 4, 2005 and May 10, 2007, the Tribe assigned multiple real property and mineral interests, first to Ute Energy Holdings LLC, and then to Ute Energy LLC:

- The Tribe's 33 percent (33%) membership interest in Ute/FNR, LLC (The Operating Agreement for Ute/FNR LLC recites that the LLC's purpose

was, *inter alia*, to 'jointly own, explore, develop, produce . . . [and] market Mineral production' *inter alia*, an oil/gas 'Exploration and Development Agreement, as amended and superseded, between the Tribe and other parties.');

- The Lake Canyon Exploration and Development Agreement ('EDA') between the Tribe, Bill Barrett, and Berry Petroleum;

- The Wolf Flat EDA between the Tribe and Questar Exploration;

- The Monument Butte EDA between the Tribe and Newfield;

- The Little Canyon EDA between the Tribe and Bill Barrett;

- The Tribe's right to develop minerals through the land exchange with SITLA (State of Utah School & Institutional Trust Lands Administration);

- The Dominion Little Canyon EDA between the Tribe and Dominion Exploration;

- The Tribe's thirty-three percent interest in Ute/FRN, LLC's interest in the Uintah Basin Field Services, LLC (construction and ownership in pipeline, gas gathering systems and natural gas compressor station); and

- The Tribe's fifty percent (50%) interest in the Three Rivers Gathers Pipeline, LLC."

(*Id.* at 15–16.)

9. "Both Ute Energy Holdings LLC and Ute Energy LLC were capitalized with the Tribe's interests in the EDAs and with other property assets that the United States holds in trust for the Tribe." (*Id.* at 15.)

10. "Mr. Becker's last day of employment for the Ute Tribe was October 31, 2007." (*Id.* at 17.)

11. "During Ute Energy LLC's seven years of existence—from May 5, 2005 through November 29, 2012—there was only one year in which Ute Energy LLC distributed revenues to

Ute Energy Holdings LLC, and that year was 2010, when Ute Energy LLC distributed $500,000.00 to Ute Energy Holdings LLC." (*Id.* at 18.)

12. "On November 29, 2012, Ute Energy LLC closed the sale of its two operating subsidiaries, Ute Energy Upstream[33] and Ute Energy Midstream. The sale of the two subsidiaries was a liquidating event under the terms of the Ute Energy LLC Operating Agreement." (*Id.* at 17–18.)

13. "Following the liquidation of Ute Energy LLC on November 29, 2012, Ute Energy LLC distributed back to the Ute Tribe (through Ute Energy Holdings LLC) the Tribe's capital contributions to Ute Energy LLC and the appreciation of that capital." (*Id.* at 18.)

---

[33] Incidentally, the court notes that in a pending civil action before this court, *Newfield Prod. Co. v. Crescent Point Energy U.S. Corp.*, 2:17-cv-1064-CW, it is alleged that Newfield entered into an EDA regarding mineral leases with parties including Ute Energy, LLC in 2008, which Ute Energy subsequently assigned to Ute Energy Upstream Holdings, LLC in 2010. (Compl. ¶¶ 1, 18, ECF No. 2, Case No. 2:17-cv-1064.) In 2012, Crescent Point acquired Ute Energy Upstream and merged it into Crescent Point at which time Crescent Point began receiving the working interest payments under the EDA. (*Id.* at ¶¶ 1, 19–20.) Newfield now alleges that Crescent Point has breached its terms and obligations under the EDA by refusing to allow its acquisition of 65% of the fee mineral leases it is entitled to under the agreement. (*Id.* at ¶ 22.) These allegations do not give the court confidence in the tribal parties' assertions that the oil and gas ventures begun in the transactions at issue in this action were a failure. (*See generally* ECF No. 53, Case No. 2:16-cv-579.) Additionally, Crescent Point's answer and counterclaim do not deny the allegation that the Ute Indian Tribe and the Ute Distribution Corporation do not need to be parties to the suit, even though the original parties to the EDA included them as well as Newfield and Ute Energy. (Compl. ¶ 16, ECF No. 2; Answ. ¶ 16, ECF No. 22, Case No. 2:17-cv-1064.) Based on these assertions, the court understands that the Tribe entered into the EDA (after receiving approval from the Secretary of the Interior) and then assigned it to Ute Energy. In preparation for the liquidation of Ute Energy (under the Amended and Restated Operating Agreement at issue here, though irrelevant to this case), the EDA was assigned to Ute Energy Upstream Holdings, LLC in 2010 in exchange for value. During Upstream's merger with Crescent Point in 2012, Crescent Point became the successor-in-interest of the EDA and began receiving the working interest payments under the EDA. If this complicated set of transactions involving payments on the EDA's working interest does not raise questions of Indian trust property requiring participation of the Ute Indian Tribe in the lawsuit, it is difficult to believe that the tribal parties in this action did not fully understand that Becker's 2% "net revenue" interest compensation implicated anything other than similar profits from their working interest in the underlying EDAs and not trust property.

The tribal parties also incorporate 702 pages of appendices, which include state, federal, and tribal orders; treaties; statutes; constitutions and corporate charters; resolutions and ordinances; congressional reports; discovery excerpts; declarations and affidavits; excerpts from the various Operating Agreements and EDAs; assignments; case law; expert witness resumes and reports; excerpts from treatises; and transcripts of court proceedings. A review of many of these materials reveals that some of the thirteen "facts" listed above are not entirely consistent factual representations of the materials themselves, either because they tell an incomplete story or because they assume conclusions not expressed in the materials.

At the evidentiary hearing on the motion for preliminary injunction, the parties also referred the court to supporting facts and exhibits in the companion case, *Becker v. Ute Indian Tribe*, Case No. 2:16-cv-958. Some of those materials are duplicates of the ones presented here, and others, although directly related to the facts at issue here, can only be found there. One of those exhibits is the record of the Tribal Court action, which itself is over 3,600 pages long. Some of that material is extremely illuminating on these facts, such as the parties' oral arguments in Tribal Court on February 16, 2018.

The court makes three observations about the materials provided for consideration of the tribal parties' motion for preliminary injunction. First, the court has considered expert reports or affidavits by counsel as legal argument, not as facts. This is also true for the expert witnesses who testified for the tribal parties at this court's hearing on the preliminary injunction. Second, it has been difficult for the court to rule, on an expedited basis, on a motion supported by over 5,000 pages of generally dense materials without a frank and straightforward explanation of how

the materials support the requested relief.[34] The court has had to scour the dockets of the three other cases for explanations that counsel for the tribal parties, in particular, did not offer here—even when expressly asked to do so at oral argument and despite it being their burden to do so on a motion for preliminary injunction. Finally, key pages in dispositive documents happen to be missing from the tribal parties' appendix. Such omissions are noted where relevant.

1. ***The Proceeds to be Distributed to Becker Are Not Trust Property Under Federal Law.***

As recited in section 1.A.2, *supra*, Congress has not authorized states to adjudicate "the ownership or right to possession of [any real or personal property . . . belonging to any Indian or any Indian tribe, band, or community that is held in trust by the United States] or any interest therein." 28 U.S.C. §1360(b); 25 U.S.C. 1322(b). Additionally, the Indian Non-Intercourse Act of 1790 prohibits any conveyance or claim against Indian lands without the express consent of Congress. 25 U.S.C. § 177. A contract purporting to "convey any land or any interest therein held by the United States in trust for such Indian" is unlawful unless the conveyance was authorized by law. 25 U.S.C. § 202; *see also* 25 U.S.C. § 396 (hereinafter The Indian Mineral Leasing Act of 1938) (providing that leases of Indian property held in trust by the United States may be leased for mining purposes upon approval by the Secretary of the Interior).

The purpose of The Indian Mineral Leasing Act of 1938 was to "bring all mineral-leasing matters in harmony with The Indian Reorganization Act" as a means of giving "the Indians [a] 'voice' in the granting of leases [and] give Indians the greatest return from their property." *Cotton Petroleum Corp. v. New Mexico*, 490 U.S. 163, 188–89 (1989). The 1938 Act "is both

---

[34] Between the issuance of the court's tentative ruling and publication of this opinion, the tribal parties moved to supplement the record with 700-plus additional pages of materials from the tribal court action. The tribal parties made no effort to explain their relevance, and the court notes that most of the documents are already in the record and none of them affect this court's conclusions.

comprehensive and pervasive" and regulates "all stages of the process of oil and gas leasing and production on Indian reservations." *Id.* at 205. The Department of the Interior supervises the auction and bidding process; secures lessee bonds to ensure compliance with lease terms; regulates the actual operations of the lessees; and sets acreage limitations, lease terms, royalty rates, methods, and times of payment, all to ensure that the leases are "in the best interest of the Indian lessor." *Id.* Additionally, the Indian Mineral Development Act of 1982 (25 U.S.C. §§ 2101–2108) authorizes any Indian tribe to enter into "Minerals Agreements" to explore, extract, process, or develop mineral resources on lands held in trust for Indians by the United States, including selling or otherwise disposing of the "production or products of such mineral resources." 25 U.S.C. § 2102(a). Such agreements require approval of the Secretary of the Interior and are subject to "any limitation or provision" contained in a tribe's constitution or charter.[35] *Id.*

Tribes may enact their own regulations to supplement federal guidelines. *Cotton Petroleum*, 490 U.S. at 205. The Ute Indian Tribe of the Uintah and Ouray Reservation has enacted such regulations, the relevant one here being Ordinance 03.003, which was enacted on October 27, 2003 and is appended as Attachment C to Becker's Independent Contractor Agreement. (App'x 104, ECF No. 55-1.) Ordinance 03.003 "restructures and reorganizes the Energy and Minerals Department" of the Tribe for the following purposes:  enhancing collection of royalties, severance taxes, and other payments; improving management and tracking of tribal energy resources; improving forecasting of mineral revenues; providing ongoing monitoring of

---

[35] The Act's regulations can be found at 25 C.F.R. § 225.1 *et seq*. Section 225.1(a) states the regulations apply "to the lands or interests in lands or any Indian tribe, individual Indian or Alaska native the title to which is *held in trust by the United States or is subject to a restriction against alienation imposed by the United States*." (Emphasis added.) A plain reading of the regulation shows the regulations only apply to trust lands or lands restricted from alienation.

46

regulatory matters; and improving coordination with other government agencies. (*Id.*) To accomplish these purposes, the Department is divided into three divisions: Royalty, Severance Tax, and Land. (*Id.* at 105.) Becker was hired as the Land Division Manager of the Energy and Minerals Department. (*Id.* at 91.)

Under Ordinance 03.003, the Land Division had the responsibility to maintain and administer all agreements covering the Tribe's energy, surface, and mineral resources. (*Id.* at 106.) This includes responsibility for collection of all payments, fees, or penalties on its surface and mineral resources imposed by the Tribe or the United States on behalf of the Tribe that are not assigned to the Royalty and Severance Tax Division. (*Id.*) It also includes administering and maintaining business licenses and access permits and supervising all energy or mineral-related field operations. It also maintains the Tribe's ownership database management system and geographic information systems. (*Id.*)  As Manager, Becker was "charged with the overall management of the Land Division." (*Id.* at 107.) His specific duties included preparing reports, projections, and planning documents; preparing and implementing budgets; personnel decisions; and all other functions assigned by the Business Committee. (*Id.*) Becker's Independent Contractor Agreement also had a Services attachment, wherein Becker and the Tribe expected to set additional goals and timelines during his initial 24-month contract that are not specifically identified. (*Id.* at 101.)

Exhibit B—Participation Plan set forth part of the compensation in Becker's Independent Contractor Agreement for service as the Tribe's Land Division Manager. (*Id.* at 103.) Assuming that Becker did not resign without cause and that the Tribe did not terminate Becker for cause within 30 months from March 1, 2004, the parties agreed that the Exhibit B—Participation Plan provisions would otherwise survive the termination of the contract. (*Id.* at 93–94, 103.)

a.  *Provision 1 of the Participation Plan Does Not Involve Trust Interests.*

The first paragraph of the Participation Plan provides that "[i]n recognition of Contractor's services, Contractor shall receive a beneficial interest of two percent (2%) of net revenues distributed to Ute Energy Holding, LLC from Ute Energy, LLC (and net of any administrative costs of Ute Energy Holdings) ('Contractor's Interest')." (App'x 103, ECF No. 55-1.) The court can find no dispute that the revenues referred to here were money. To determine whether this anticipated 2% monetary distribution consisted of trust property, the court examines both the law and the facts.

The tribal parties rely heavily on *U.S. v. Noble*, 237 U.S. 74 (1915). In *Noble*, beginning in 1902 a Quapaw Indian, Charles Blackhawk, entered into a 10-year mining lease and assignment of the rents and royalties due thereunder without approval from the Secretary of the Interior, as permitted by 29 Stat. at L. 321, 331, for leases of that length. *Id.* at 75–76. Blackhawk, 67 years old, was "unable to read or write, or understand intelligently the English language, an ignorant and uneducated child of nature, old and infirm, and wholly incapacitated for the transaction of business." *Id.* at 78 (internal quotations omitted). This first lease and assignment of royalties was valid. *Id.* at 79. Over the next four years, Mr. Blackhawk entered additional leases and assignments, based in part on the first valid assignment, which had an overlapping effect that extended its term beyond ten years. *Id.* at 82. The later assignments included royalties, but also, in the 1906 lease, a percentage of "the whole product on said lands." *Id.* at 81. The assignees argued that the assignment was of "sums of moneys," not interests subject to non-alienation. *Id.* at 80–81. Specifically, the agreed-upon percentage of "the whole product on said lands" was stated as a percentage of "the market value of the minerals." *Id.* Without approval from the Secretary of the Interior, this "lease for ten years . . . subject to an

existing lease for ten years, of the same property" that extended the original lease beyond ten years authorized for mining leases by statute "was unauthorized and void." *Id.* at 84.

The tribal parties argue that the money representing Becker's "beneficial interest of two percent (2%) of net revenue distributed to Ute Energy Holding, LLC from Ute Energy, LLC" is trust property as was Mr. Blackhawk's percentage of "the whole product on said lands." (Pl.'s Second Exped. Mot. 41, ECF No. 53.) Thus, they argue, because it is undisputed that Becker's Independent Contractor Agreement was not approved by the Secretary of the Interior, the agreement is "absolutely null and void." *See Bunch v. Cole*, 263 U.S. 250, 253 (1923) (finding that agreements that require and do not receive approval by the Secretary of the Interior are null and void). Whether Becker's 2% net revenue interest is trust property, as in *Noble*, depends on how Ute Energy generated revenue and then calculated net revenue for distribution to Ute Energy Holding.[36] These issues are governed by Ute Energy's Operating Agreement.[37] Whether

---

[36] At the April 13 hearing on the tentative ruling, the tribal parties argued that the court misconstrued their argument about the monetary revenue anticipated by Becker's Independent Contractor Agreement. (Apr. 13 Hrg. Tr. 21, ECF No. 132) ("We are not arguing that the money representing Becker's beneficial interest of two percent is trust property.") Instead, they argued that because Becker's April 27, 2005 contract anticipated payment of "future" profits from Ute Energy, which was not established until several days later on May 5, 2005, *Noble*'s prohibition on money payments for future profits "issuing out of the land" applies to Becker's contract. (Pl.'s Second Exped. Mot. 42-43, ECF No. 53.) The court finds this argument unpersuasive. *Noble*'s prohibition on money payments for future profits relied on the fact that restricted property was at issue in *Noble*. Even if Ute Energy was not established until several days after the Becker contract was signed, Becker's contract limited his receipt of revenue only to the non-trust profits of Ute Energy. Thus, he was only entitled to revenue from non-trust profits generated if and when Ute Energy was established.

[37] Davis Graham & Stubbs, representing the Tribe, drafted each of the three Operating Agreements, Becker's Independent Contractor Agreement, and all other documents required to effectuate this complex transaction to develop the Tribe's oil and gas resources as contemplated by the Ute Tribal Business Committee. (Feb. 28 Hrg. Tr. 37, ECF No. 111.) This is an experienced law firm that specializes in Indian law and oil and gas law. (*Id.*) It is reasonable to assume the Tribe and its Business Committee were fully advised on the consequences of entering into these agreements.

Ute Energy's revenue generation and *distribution to Ute Energy Holdings*—and subsequently to Becker per the Independent Contractor Agreement—nullifies the Agreement, as was the case in *Bunch*, also depends on whether the Secretary of the Interior was required to but failed to approve the Operating Agreement.[38]

Original Operating Agreement. The court has identified no dispute that the May 4, 2005 Operating Agreement of Ute Energy, LLC, was approved by the Superintendent of the Bureau of Indian Affairs. The members of Ute Energy included Ute Energy Holdings, LLC, whose initial percentage interest in Ute Energy was 81%.[39] (Op. Agr. 53, ECF No. 79-1, Case No. 2:16-cv-958.) Ute Energy Holdings contributed a "90% undivided interest in the Assigned Rights described in Schedule 1 to the Master Agreement." (*Id.* at 54.) The tribal parties failed to include the Master Agreement and its schedules in the record, but the Operating Agreement stated that by unanimous written consent of its managers, Ute Energy Holdings would transfer to Ute Energy "certain rights and interests relating to their ownership interests in Ute/FNR LLC and the associated development rights in the Naval Oil Shale Reserve No. 2 and Brundage Canyon, as well as their direct working interests in the Lake Canyon Exploration and Development Agreement and the anticipated Wolf Flat project (collectively, the 'Working Interests')." (*Id.* at 61.) The "Fair Market Value" of these initial contributions was stated by dollar amount. (*Id.* at 54.) Tribal Resolution No. 05-116, dated March 3, 2005, authorized the Tribe to transfer its "ownership interest in Ute/FNR LLC and the related development rights in the Naval Oil Shale Reserve No. 2 and Brundage Canyon" and its "working interests in the Lake Canyon Exploration and Development and the anticipated Wolf Flat project" to Ute Energy Holdings, which then

---

[38] It does not depend, as the tribal parties argue, on whether Becker's Independent Contractor Agreement itself was approved by the Secretary of the Interior.
[39] The remaining membership interests were held by non-Indian investors.

transferred its membership interest in the agreements as a capital contribution to Ute Energy. (App'x 107, ECF No. 55-2.) Resolution 05-116 expressly stated that "the Tribe is currently the party to the *agreements being assigned* to Ute Energy Holdings and Ute Energy." (*Id.* (emphasis added).) In other words, the agreements—not the mineral rights themselves—were transferred to capitalize Ute Energy.

Tribal Resolution No. 07-124, dated May 2, 2007, authorized the Tribe to "contribute the Tribe's commercial interests in the SITLA LOI and AMI Agreement to Ute Energy," specifically stating that "the interests to be contributed . . . will consist solely of commercial rights under the respective agreements, and will exclude any governmental rights to regulate the conduct of activities on Reservation lands as well as the rights of the Tribe as a landowner and lessor (collectively, the 'Governmental Rights')." (*Id.* at 111.) Resolution 07-124 further stated that approval for assigning the Tribe's commercial interests "shall affect only the Tribe's commercial interests, and shall exclude any of the Tribe's Governmental Rights in the affected lands." (*Id.*)

Finally, Tribal Resolution No. 07-183, dated June 26, 2007, authorized the Tribe to "assign to Ute Energy its commercial interests" in the Little Canyon EDA, the Monument Butte EDA, the Section 36 Agreement, the Black Tail Ridge EDA, the CDX Farmount Agreement, the Gas Plant Agreement, and the Three Rivers Gathering LLC. (*Id.* at 114–15.) The purpose for transferring these "Newly Contributed Interests" was in part to raise capital to pay off and fully discharge operating funds that Ute Energy had initially borrowed from Laminar, a 10% non-Indian owner of Ute Energy, under a Credit Agreement between the members of Ute Energy, without increasing the Tribe's "financial risk and exposure by contributing cash to Ute Energy." (*Id.* at 114–15.) The transfer of the Tribe's commercial interests in these agreements would result in cash investments by new non-Indian investors Quantum Energy Partners IV, LP and

Quantum Resources, LP, in exchange for the investors' opportunity to "share in potential profits of the [Ute Energy] company." (*Id.* at 115–16.) This new arrangement to secure investment funds to enable Ute Energy to "exercise its participation rights under exploration and development agreement[s]" required an amendment to Ute Energy's Operating Agreement. (*Id.*)

Amended and Restated Operating Agreement. As the means to raise capital, the plan between Ute Energy and its new non-Indian investors was to issue and sell units of the company at an initial public offering (IPO). (Am. Op. Agr. 1, ECF No. 79-2, Case No. 2:16-cv-958.) The July 7, 2007 Amended and Restated Operating Agreement anticipated a limited term of operation and eventual liquidation of Ute Energy, LLC. (*Id.* at 7, 16, 46.) The investors were provided with "all resolutions of the Tribe, the Board of Managers of the Company and the Existing Members" approving the Amended and Restated Operating Agreement and the transactions contemplated by it. (*Id.* at 88.) The Tribe provided satisfactory evidence to the non-Indian investors that it "ha[d] conveyed to the Company [Ute Energy, LLC] all right, title and interest in and to those assets set forth in Schedule 202.(m)," which is not included in the materials provided to the court, "and that such conveyances have received all requisite approvals by the [Bureau of Indian Affairs]." (*Id.* at 89.) In fact, the Amended Operating Agreement contained an entire section of significant representations and express warranties by the company. (*Id.* at 92.)

"An express warranty is a contract collateral to a contract of sale, although incident to and based thereon. Being collateral to the principal contract, it does not with that contract terminate upon delivery or acceptance of the subject-matter of the sale by the purchaser." *M. H. Walker Realty Co. v. Am. Sur. Co.*, 211 P. 998, 1014 (Utah 1922) (internal quotations omitted). Ute Energy warrantied that it "has full power and authority (and has all rights and approvals from the Ute Tribe) that are necessary to hold and own its properties . . . to perform this

Agreement . . . and to issue, sell and deliver the Units." (Am. Op. Agr. 93, ECF No. 79-2, Case No. 2:16-cv-958.) It warrantied the same regarding the Tribe's interests in the non-EDA assets of Ute Energy, including Uintah Basin Field Services, LLC; Ute/FNR, LLC; and Three Rivers Gathering, LLC. (*Id.*) It warrantied that no "consent, approval, notification, waiver or other similar action from any third party" was required for the issuance, sale, and delivery of the "Units" and will not violate "any law, rule, regulation . . . of any Governmental Entity." (*Id.* at 94.) It warrantied that "no registration or filing with, or consent or approval of or other action by, any Governmental Entity or any third party, *including any approval by the U.S. Department of Interior pursuant to the IMDA or otherwise*, is or will be necessary for the Company's valid execution, delivery and performance." (*Id.* at 94) (emphasis added).)

Significantly, with respect to the "Oil and Gas Properties," which were defined only for tax purposes by reference to § 614 of the Internal Revenue Code, (Op. Agr. 15, ECF No. 79-1, Case No. 2:16-cv-958), the Amended and Restated Operating Agreement warrantied the following:

> The quantum and nature of the Company's interest in and to the Oil and Gas Properties as set forth in the Reserve Report includes the entire interest of the Company in such Oil and Gas Properties as of the date of the Reserve Report and are complete and accurate in all material respects as of [that] date. . . . The ownership of the Oil and Gas Properties by the Company **entitles the Company to the share of the Hydrocarbons produced therefrom or attributable thereto set forth as the Company's *"net revenue interest"*** in the Reserve Report and does not in any material respect obligate the Company to bear the costs and expenses relating to the maintenance, development or operations of any such Oil and Gas property in an amount in excess of the **"working interest" of the Company in each Oil and Gas Property** set forth in the Reserve Report.[40]

---

[40] The Reserve Report, which Section 4.13 of the Amended and Restated Operating Agreement discusses, represents estimated proved mineral reserves, except for changes as a result of production in the ordinary course of business or change in price. (Am. Op. Agr. 100, ECF No. 79-2, Case No. 2:16-cv-958.)

(Am. Op. Agr. 98–99, ECF No. 79-2, Case No. 2:16-cv-958 (bold added).) This warranty
continues:

> The Hydrocarbon Interests and operating agreements attributable to the Oil and
> Gas Properties of the Company . . . are in full force and effect in all material
> respects in accordance with their terms. **All rents, royalties and other payments
> due and payable under such Hydrocarbon Interests and operating
> agreements have been properly and timely paid.**

(*Id.* at 99 (bold added).)  These terms of the Amended and Restated Operating Agreement show

that Ute Energy was required to pay the Tribe separately and appropriately for its role as a lessor

and landowner of the trust property and/or the Tribe's mineral interests held in trust by the

United States, as provided by each EDA and LLC agreement constituting Ute Energy Holding's

membership interest in Ute Energy. According to these provisions, "net revenue interest"

distributed from Ute Energy to Ute Energy Holdings necessarily excluded those costs, and thus

represented solely the Tribe's profit from its "working interests," which are not trust property.[41]

---

[41] The tribal parties admitted at oral argument in Tribal Court on February 16, 2018, that Ute
Energy "distinguished between the governmental revenues and then maybe the business rev. So
in other words, the tribe, as the landowner, got its royalties and severance packs. *And those were
not put into Ute Energy, LLC.*" (App'x 47, ECF No. 122-8, Case No. 2:16-cv-958 (emphasis
added).)  The tribal parties also admitted that Mr. Becker's agreement specifically excluded
payments attributable to restricted trust property:
> THE COURT: And Mr. Becker's agreement specifically excluded those kinds of
> payments?
> MS. BASSETT: Yes.

(*Id.*) These admissions made in oral argument to the Tribal Court, while perhaps made in an
attempt by counsel to simplify, expose that the oral argument and briefs in this court did not
accurately represent the complexity of the transactions and the character of the proceeds at issue.
When faced with this issue at the April 13, 2018 hearing on the tentative ruling, the tribal parties
argued that they had previously disclosed to this court that Ute Energy was capitalized with only
the working interest portion of the Energy and Development Agreements, (*See* Feb. 28 Hrg. Tr.
33-34, 54; ECF No. 111). They then argued that even if Ute Energy was not capitalized by trust
assets, the net revenue distributed from Ute Energy to Ute Energy Holdings, of which Becker
was to receive 2%, should be defined under standard oil and gas principles. In their view, net
revenue must then necessarily be derived from production of the Tribe's mineral resources,
which requires the Independent Contractor Agreement to receive separate approval from the
Secretary of the Interior under the Indian Mineral Development Act at 25 U.S.C. § 2102 or the

On July 2, 2007, the Acting Superintendent of the BIA notified the Chairman of the Ute Indian Tribe Business Committee that the Amended and Restated Operating Agreement "is not utilizing the Tribe's surface or mineral assets for collateral, or granting any interest in the Tribe's trust assets" and therefore "is not the type of agreement that is subject to the BIA review process, and that it is therefore unnecessary for the Tribe to seek the BIA's approval of the Restated Agreement." (ECF No. 70-5, Case No. 2:16-cv-958.)

The BIA noted that it is its responsibility to "review[] and approve[] those agreements that grant an interest in *tribal trust lands* or provide for the development of the Tribe's *trust mineral estate*" under The Indian Mineral Development Act, 25 U.S.C. §§ 2101–2108, the Non-Intercourse Act, 25 U.S.C. § 177, 25 U.S.C. § 81, and other authorities. (*Id.* (emphasis added).) The BIA determined that "[t]he Restated Agreement creates no interest in trust lands subject to approval by the BIA. Likewise, the Restated Agreement does not provide for the exploration or development of minerals in which the Tribe holds a beneficial or restricted interest." (*Id.*) The BIA also noted that it had previously approved the Original Operating Agreement of Ute Energy "out of an abundance of caution" but that it no longer believed such approval was necessary, nor was approval of the Amended and Restated Operating Agreement necessary. The BIA expressed its encouragement for the Business Committee's efforts and stated that "[t]he Tribe may, at its discretion, proceed with implementation of the Restated Agreement without any further review by the BIA." (*Id.*) The BIA conclusion is consistent with and supported by the court's own review of the transactions as documented in the record. If the various operating agreements did not implicate restricted interests, it is nonsensical that revenue generated from those operating

---

Indian Non-Intercourse Act at 25 U.S.C. § 177. (Apr. 13 Hrg. Tr. 36-43, ECF No. 132.) The court addresses this argument in the immediately following paragraphs.

agreements, of which Becker was to receive 2%, somehow converted into restricted interests requiring secretarial approval.

<u>Exploration and Development Agreements</u>. Because the EDAs were not expressly warrantied in Ute Energy's Operating Agreement, as the LLC interests were, the court also reviewed (to the extent provided) the Tribe's Exploration and Development Agreements that the Tribe assigned to Ute Energy Holdings and with which Ute Energy Holdings capitalized its membership interest in Ute Energy. (App'x 229–49, ECF No. 55-1, App'x 8–106, ECF No. 55-2.) These agreements support the tribal parties' assertion that "[t]he Tribe had a dual legal status under the EDAs; not only was the Tribe the lessor of its oil/gas minerals but, in addition, the Tribe had the option to participate (with the oil/gas company 'partners') as a working interest owner in the drilling and production of oil and gas from wells drilled on tribal lands under the EDAs." *See* section 1.C at ¶ 7, *supra*. Those portions of the EDAs that the tribal parties produced in the appendix reveal that products from the contractual production of oil and gas on restricted Indian land are owned by the Tribe or by the United States in trust for the Tribe. Sale or other disposition of such trust property requires the payment of specified bonus, royalty, throughput, and similar payments under the terms of the EDAs and thus requires approval by the Secretary of the Interior in satisfaction of all federal laws and regulations. (*See, e.g.* App'x 11–15, 22–27, 35-39, 55–62, 74-85.) There is no dispute that the Secretary approved all the EDAs.

The "working interest" references in the EDAs—which were the actual interests assigned to Ute Energy Holdings and then to Ute Energy—are a result of The Indian Mineral Development Act of 1982, which gave Indian tribes the opportunity to sell, lease, or dispose of their mineral interests not just as lessors of the trust land and mineral interests, but as participants in the development of their mineral resources through joint venture agreements with mineral

developers.[42] 25 U.S.C. §§ 2101–2108. This type of participation offers an opportunity for greater return on resources. But it also comes with risks, costs, and losses that the United States has declined liability for, so long as the Secretary of the Interior ensured that "the rights of a tribe or individual Indian are protected in the event of a violation of the terms of any Mineral Agreement by any other party." *Id.* § 2103. Revenue from participation in "working interests" is separate and distinct from the revenues earned solely by lease arrangements that federal law requires the Secretary of the Interior to approve as fair and appropriate. Significantly, when trust property is not pledged as security for the costs of future production, revenue from "working interests" is thus not revenue from trust property or otherwise a restricted interest that requires secretarial approval. *See id.* § 2105.

    <u>Liquidation and the Second Amended and Restated Operating Agreement</u>. As the 2007 Amended and Restated Operating Agreement anticipated, a Second Amended and Restated Operating Agreement was executed in 2010 to facilitate liquidation of Ute Energy. (Second Am. Op. Agr. 2, ECF 79-3, Case No. 2:16-cv-958.) Both of the amended Operating Agreements provided for distribution in kind of the capital contributions of member Ute Energy Holdings, which means that the increased value attributable to the Tribe's restricted trust interests in its EDAs and LLC agreements could be assigned from Ute Energy back to Ute Energy Holdings without triggering distribution of net revenue. (*See* Am. Op. Agr. 50, ECF No. 79-2 & Second Am. Op. Agr. 47 & 50, ECF 79-3, Case No. 2:16-cv-958.) Specific provisions of the Second Amended and Restated Operating Agreement anticipated re-assignment of Ute Energy Holding's

---

[42] For example, Congress anticipated that this law would allow an Indian tribe to "pledge or hypothecate its interest in tribal mineral resources [for] prospective production, products or proceeds of such minerals . . . as security for the repayment of loans or other advances to permit the tribe to develop its mineral resources." ("United States House of Representatives Report No. 97-746" 183, ECF No. 55-2.) Tribal mineral interests to be severed from the land or pledged as security for future production, of course, require approval from the Secretary of the Interior. *Id.*

capital contributions—the actual EDA and LLC working interests—from Ute Energy to Ute Energy Holdings upon liquidation, describing how the Fair Market Value of the in-kind distributions would be valued in Ute Energy Holdings' member Capital Account. (*Id.* at 47, ECF No. 79-3, Case No. 2:16-cv-958.) After the Net Agreed Value (a defined term) for the in-kind capital contributions was determined and the Permitted Transfer (another defined term) via assignment of the actual agreements back to Ute Energy Holdings, the remaining value in the Capital Accounts was to be distributed to members. (*See* Second Am. Op. Agr., ECF No. 79-3, Case No. 2:16-cv-958.) That value represents unencumbered and unrestricted non-trust net revenue interest Ute Energy distributed to Ute Energy Holdings and to which Becker makes a 2% claim. According to the affidavit of Ute Energy's accountant, that value distributed to Ute Energy Holdings was $378,709,233.74 as of April 15, 2016. (Aff. of Laurie Bales, ECF No. 79-4, Case No. 2:16-cv-958.) Of that value, $171,807,157.20 was distributed in cash payments to the Ute Tribe. (June 29, 2016 Aff. of Laurie Bales, ECF No. 55-1 at 207.)[43]

---

[43] These provisions of the operating agreements undermine the tribal parties' argument that "the Tribe's interest in the value of Ute Energy was based exclusively on the . . . net mineral acres that were assigned to Ute Energy" and then "distributed back to the Tribe after the liquidation of Ute Energy." (Apr. 13 Hrg. Tr. 38, ECF No. 132.) Here, the tribal parties seem to revert to the argument that Becker cannot be entitled to a 2% distribution of the appreciated value of Ute Energy distributed to Ute Energy Holdings because "it's a return of the assets themselves which are trust assets." (*Id.*) The tribal parties are incorrect. The operating agreements are carefully structured such that the return of the assets themselves does not trigger a distribution of net revenue from Ute Energy to Ute Energy Holdings, so the appreciation and other profits constituting net revenue under the agreements are neither trust assets nor restricted property. Furthermore, even if they were, the tribal parties stated that, when "the money enters into general commerce," a Tribe can use proceeds from trust assets without getting secretarial approval. (*Id.* at 36.) The appreciation and/or profit distributed from Ute Energy to Ute Energy Holdings were not direct proceeds of trust property, mineral production, or other restricted property, but rather money that entered the Tribe's general commerce.

b.    *Provisions 2, 3, & 4 of the Participation Plan Do Not Involve Trust Interests.*

Paragraphs two through four of the Participation Plan, quoted here in full, provide as follows:

2.    In the future, a) if the Tribe participates in any projects involving the development, exploration and/or exploitation of minerals in which the Tribe has any participating interest and/or earning rights, or similar commercial interests and Contractor is providing services under this agreement, and b) the Tribe elects not to place such interests in Ute Energy Holding, LLC, then Contractor shall receive a two percent (2%) beneficial **net revenue interest** in such assets, provided however, that in the event the Tribe should enter into an agreement under which the Tribe would be required to pay any project costs or expenses without the benefit of financing or a form of carried interest, then Contractor agrees that in the event Contractor elects to participate in such projects, Contractor shall in the same manner as the Tribe pay two percent (2%) of any project costs and expenses and receive the net revenue attributable to such participation interest.

3.    **Contractor shall receive no interests in or incentive payments or payments of any kind based on any fees or revenues paid to the Tribe that are regulatory in nature including, but not limited to, the following: royalties, severance tax, through-put fees, surface or rights-of-way payments, and lease bonuses.**

4.    If, at any time, Contractor wishes to sell the Contractor Rights, Contractor agrees to notify the Tribe of his intention. The Tribe shall have 60 days to exercise this preferential right to purchase with a bona fide, market value offer to purchase on the same terms and conditions that any legitimate offer would entail.

(App'x 103, ECF No. 55-1 (bold added).)

In light of the definitions in and provisions of all three versions of the Ute Energy Operating Agreements from inception through liquidation, as discussed above, the court finds that no provision of Becker's Exhibit B—Participation Plan required the Tribe to distribute any portion, proceeds, or revenue from restricted Indian mineral interests or mineral interests that the United States held in trust for the Tribe. This conclusion is required because under either

provision 1 or 2, Becker was to receive 2% of net revenues distributed as defined by the Amended and Restated Operating Agreement, whether from participation rights the Tribe exercised through or independently from Ute Energy.

First, if the Tribe participated in its working interests through Ute Energy, net revenue interests the Tribe received by virtue of its protected role as a lessor were already excluded by the Operating Agreement. In other words, the nature of the capital contributions made by the Tribe—consisting only of the "working," "participation," and "development" interests in its various EDAs and LLC interests—do not, the Secretary of the Interior pointed out, "utilize[] the Tribe's surface or mineral assets for collateral, or grant[] any interest in the Tribe's trust assets."[44] (ECF No. 70-5, Case No. 2:16-cv-958.)  Second, if the Tribe elected to participate in its working interests independently of Ute Energy, paragraph 3 of Exhibit B—Participation Plan specifically excluded interests in or payments related to trust property, while paragraph 2 was carefully drafted to require Becker to pay his proportional share of expenses so that the Tribe's trust assets would never be diminished or alienated by Becker's 2% share of the resulting net revenue.[45] Finally, because paragraph 4 only authorized Becker to sell his rights under the Participation Plan, and those rights did not involve trust property, paragraph 4 also does not

---

[44] To the extent the tribal parties' experts opined otherwise, the court did not find those opinions persuasive. The court appreciates, however, that at oral argument the tribal parties' expert, Mr. Wozniak, acknowledged that his opinion about the meaning of "net revenue interest" was given in the context of his familiarity with oil and gas leases and that he had not been given or reviewed the Operating Agreements at issue here, which he acknowledged could influence his definition of the term. (Feb. 28, 2018 Hrg. Tr. 124–30, ECF No. 111.)

[45] This provision never took effect in any event, but even if it had, it did not implicate trust property.

represent an alienation of trust property requiring approval from the Secretary of the Interior. In short, Becker's Independent Contractor Agreement is not invalid under federal law.[46]

Tribal Court Decision. Judge Pechota's February 28 Opinion granted the tribal parties' motion for summary judgment on the invalidity of Becker's Independent Contractor Agreement under federal law without first granting a motion to vacate Judge Weathers' December 19 Order allowing Becker to complete discovery and complete briefing on the motion. (*See* ECF 108-1 and ECF No. 70-16, Case No. 2:16-cv-958.) In addition to this procedural irregularity that calls the ruling into question, the Tribal Court did not examine the Ute Energy Operating Agreements that were directly implicated by the terms of the Independent Contractor Agreement. The Independent Contractor Agreement's provisions distributing revenue from Ute Energy to Ute Energy Holdings can only be interpreted in conjunction with Ute Energy's Operating Agreements. When viewed together, the provisions are not ambiguous. Thus the Tribal Court improperly relied for its interpretation of the term "net revenue interest" on parol evidence of early contract negotiation discussions and the reports of expert witnesses, most of whom also did not review the Operating Agreements. (ECF No. 108-1.) *See* Restatement (Second) of Contracts § 209(3) (1981) ("Where the parties reduce an agreement to a writing which in view of its completeness and specificity reasonably appears to be a complete agreement, it is taken to be an integrated agreement . . . ."); Restatement (Second) of Contracts § 213 (1981) ("A binding completely integrated agreement discharges prior agreements to the extent that they are within its scope.").

The Tribal Court also incorrectly asserts that "[i]t is undisputed that the revenue upon which Becker's 2% interest was to be calculated came from oil and gas production on land held

---

[46] The elegance and sophistication of the Participation Plan and related contracts demonstrate the Ute Indian Tribe's acumen in managing its resources. *Contra U.S. v. Noble*, 237 U.S. at 78.

in trust." (February 28 Opinion 11, ECF No. 108-1.) First, Becker expected to conduct discovery and complete briefing based on the December 19 Order; thus the facts were not undisputed, but were unaddressed. Second, at oral argument in Tribal Court Becker hotly disputed this allegedly undisputed fact. (App'x 26, ECF No. 122-8, Case No. 2:16-cv-958.) This court is not persuaded that the February 28 Opinion can stand on appeal through the Tribal appellate courts, and thus does not find that it should give comity to the decision or weigh it in favor of the tribal parties' likelihood of success on the invalidity of the Independent Contractor Agreement under federal law.

        c.        *State Court Jurisdiction Is Not Preempted Because Contract Revenue Is Not Trust Property Under Federal Law*.

Because this court concludes that Becker's 2% "net revenue" interest in distributions under the Independent Contractor Agreement is not restricted trust property, it finds that the tribal parties are unlikely to succeed on the merits of their argument that the state court does not have jurisdiction over this action under federal statutes 25 U.S.C. §§ 1322(b) and 1360(b).

In the next section, the court considers whether the Independent Contractor Agreement is invalid under tribal law.

## 2.     *The Independent Contractor Agreement Is Valid Under Tribal Law*

Because of the court's conclusion that Becker's 2% "net revenue" interest in distributions under the Independent Contractor Agreement is not restricted trust property, the tribal parties' arguments about the invalidity of the contract related to tribal law restrictions on the power of the Ute Indian Tribal Business Committee to approve transactions involving trust property are already resolved against the tribal parties. With respect to trust property, the Business Committee did not act ultra vires when it approved the agreement. (*See* Feb. 28 Hrg. Tr. 89–93, ECF No.

111) (referring to limitations on the Business Committee's authority to alienate trust property under the Tribe's Constitution and Charter).

The tribal parties assert two additional reasons why the state court cannot exercise jurisdiction over this action under tribal law. The court first examines whether the tribal parties are likely to succeed on their argument that the Business Committee acted ultra vires to waive the Tribe's sovereign immunity and whether such waiver was valid under tribal law. The court then examines whether the tribal parties are likely to succeed on their argument that Becker's Independent Contractor Agreement is otherwise invalid under the Tribe's Corporate Charter.

   a.    *The Tribe Validly Waived Sovereign Immunity Under Tribal Law.*

Beyond cursory statements claiming it is so, the tribal parties' pending motions for preliminary injunctions and summary judgment in this action do not argue specific tribal law grounds for the invalidity of the Tribe's waiver of sovereign immunity in the Independent Contractor Agreement. (Pl.'s Mot. 32, ECF No. 54; Pl.'s First Summ. J. Mot. 29, ECF No. 52; Pl.'s Second Summ. J. Mot. 43, ECF No. 53.) The tribal parties' specific assertions of tribal law are in their appendix and were raised at oral argument.

The tribal parties state that the Tribe is governed by a six-member body known as the Uintah and Ouray Tribal Business Committee. *See* art. III, § 1 Constitution and By-Laws of the Ute Indian Tribe of the Uintah and Ouray Reservation. (App'x 61, ECF No. 55-1.) The Tribal By-Laws provide that "[n]o tribal business shall be transacted" except through a majority vote of a quorum of the Business Committee." (*See* By-Laws, art. VI, §§ 3, 5; ECF No. 55-1 at 71.) Only the Chairman of the Tribal Business Committee (and the Vice-Chairman in the Chairman's absence and when called upon to preside) can individually exercise authority to transact tribal

business as delegated by the Business Committee." (*See* By-Laws, art. I, §§ 1-2; ECF No. 55-1 at 69.)

The tribal parties argue that Business Committee Resolution 05-147, which references Becker's Independent Contractor Agreement and was adopted on April 27, 2005, does not contain an express waiver of the Tribe's sovereign immunity. (App'x. 89, ECF No. 55-1; Feb. 28 Hrg. Tr. 86–89, ECF No. 111.)  Resolution 05-147 states that the Business Committee in Tribal Ordinance 01-007 enacted a long-term Financial Plan for the Tribe and that a referendum vote of the membership of the Tribe on December 20, 2001 ratified and approved the Financial Plan. (App'x 89, ECF No. 55-1.) As part of the Financial Plan, the Business Committee designated a nine-member Venture Fund Board. (*Id.*) The Business Committee passed Tribal Ordinance 03.003 to restructure the Energy and Minerals Department. (*Id.*) Thereafter, the Venture Fund Board recommended that Mr. Becker be engaged as an Independent Consultant to implement Tribal Ordinance 03.003 under the terms and conditions of the Independent Contractor Agreement attached as Exhibit A to Resolution 05-147. (*Id.*)

The resolution goes on to state that the Business Committee determined that it should accept the Venture Fund Board's recommendation, that it specifically agreed to enter into the attached Independent Contractor Agreement, and that it authorized the Business Committee Chairman to execute any document necessary to carry out the resolution consistent with the By-Laws. (*Id.*) The certified version of Resolution 05-147, provided by the tribal parties in their appendix, is stamped as Resolution 05-147 and includes Becker's 13-page Independent Contractor Agreement, including its Services and Participation Plan attachments A and B, each

page of which is also stamped with the same resolution number, and included the separately-stamped and numbered Ordinance 03.003 as attachment C.[47] (*Id.* at 89–112.)

Article 23 of Resolution 05-147 bears the title Limited Waiver of Sovereign Immunity; Submission to Jurisdiction. (*Id.* at 98.) In it, the Tribe agrees to a limited waiver of its sovereign immunity defense relating to the interpretation, breach, or enforcement of the agreement.[48] (*Id.*) The Tribe also waived tribal law requirements for exhaustion of tribal remedies. (*Id.* at 99.) Article 23 concluded as follows:

> The Tribe's limited waiver of sovereign immunity shall be further evidenced by a Tribal Resolution delivered at the time of execution of this Agreement in accordance with Tribal laws, that expressly authorizes the foregoing submission to jurisdiction of the courts so designated and the execution of this Agreement.

(*Id.*) As stated above, the contract itself was stamped as a part of Resolution 05-147.

The tribal parties' argument is simple. They claim that § 1-8-5 of the Ute Law and Order Code requires that any resolution or ordinance of the Business Committee that waives the Tribe's sovereign immunity

> be clear, unequivocal and express. All waivers must be contained within a resolution or ordinance *and cannot be made by reference to a contract, agreement, memorandum of agreement, memorandum of understanding or other writing* . . . Sovereign immunity cannot be waived by any official, director, employee, or agent of the Ute Indian Tribe. The provisions of this Section 1-8-5

---

[47] The tribal parties' complaint in this matter alleged that there was no Business Committee resolution that "specifically" waived the Tribe's sovereign immunity for suit on Becker's contract. They attached as an exhibit to the complaint a version of Becker's contract that (1) did not include the first page of Resolution 05-147 agreeing to the contract and (2) sanitized the pages of the contract itself to remove the stamp on each page indicating it was a part of Resolution 05-147. (*Compl.* ¶ 48 & Ex. A, ECF No. 2 & 2-1.) It took the tribal parties a year and a half to ameliorate these omissions in their appendix. (*See* ECF No. 55-1.)

[48] Additional support for the court's conclusion that the contract did not include trust property is that Article 23 provided that the interpretation, breach, or enforcement of the agreement in a "Legal Proceeding shall not include proceedings related to royalty or similar interests in lands held by the Tribe that are not expressly subject to the terms of this Agreement." (*Id.*) In other words, those interests were not a part of the contract for which Becker could be compensated.

replace and supersede any other conflicting provisions of the Ute Law and Order Code, specifically . . . Ordinance No. 98-002.

(App'x 44–45, ECF 55-1 (emphasis added).) The tribal parties argue that, because Becker's Independent Contractor Agreement was identified as an exhibit in Resolution 05-147, the resolution itself did not make or authorize a valid waiver of sovereign immunity under tribal law. Thus, they argue it was an ultra vires act of the Business Committee and Chairman Natchees, who signed the contract. (Feb. 28 Hrg. Tr. 86–89, ECF No. 111.)

Interestingly enough, the version of § 1-8-5 that the tribal parties rely upon was amended by Tribal Ordinance 14-001 adopted on January 7, 2014. (App'x 44–45, ECF 55-1.)  In effect at the time Resolution 05-147 was adopted was the version of § 1-8-5 attached to the tribal parties' complaint. It does not refer to the "no incorporation by reference" argument and simply states:

> Except as required by federal law, or the Constitution and Bylaws of the Ute Indian Tribe, or as specifically waived by a resolution or ordinance of the Business Committee specifically referring to such, the Ute Indian Tribe shall be immune from suit in any civil action, and its officers and employees immune from suit for any liability arising from the performance of their official duties.

(*Compl.*; ECF No. 2-6 at 5.) Thus, the tribal parties argue either that a 2014 Ordinance should govern interpretation of a 2005 Resolution or that a 2014 Ordinance should govern interpretation of the 2005 version of Law and Order Code § 1-8-5.

The parties have identified two prior Tribal Court opinions that interpret waivers of sovereign immunity under the version of § 1-8-5 in effect at the time Resolution 05-147 was adopted and the contract was executed. The first case is *Toole v. Ute Water Settlement Accounting Services, LLC*, Case No. CV-09-081, Ute Indian Tribal Court, Ruling and Order dated August 10, 2010. (App'x 653, ECF No. 122-4, Case No. 2:16-cv-958.)

*Toole* came before the Tribal Court on defendant's motion to dismiss the action for lack of jurisdiction. Defendant was a limited liability company wholly owned by Ute Enterprises,

LLC, and established under Ordinance 01-007 as amended by Ordinance 06-005. Defendant's Executive Director, Roseline Taveapont, had entered into an employment contract with Mr. Toole. (*Id.* at 653–54.)  The contract was not signed by the Chairman of the Business Committee and was apparently authorized only by a letter that stated, "the Business Committee has authorised [sic] by motion the use of a Service Contract to be funded out of the CEO's contract." (*Id.* at 654.) The contract specifically stated that "[a]ny dispute under this Agreement shall be first heard in the Tribal Court for the Ute Indian Tribe." (*Id.*)

After Toole's employment was terminated, he brought an action in Tribal Court to enforce the contract. Defendant's motion to dismiss argued that under Ordinance 87-04, (the same Ordinance in effect at the time Becker's Independent Contractor Agreement was executed), the Tribal Court lacked jurisdiction to hear Toole's claims against the Tribe, its Business Committee, or Tribal officers or employees in their official capacities. (*See id.* at 655.) Defendant also argued that the Tribal Court lacked jurisdiction because the Tribe had not waived its sovereign immunity in Toole's contract. (*Id.* at 655.)

After first concluding that the Tribe's sovereign immunity extends to sub-entities and enterprises of the Tribe,[49] the Tribal Court reviewed federal law to determine that a valid waiver of the Tribe's sovereign immunity must be express, clear, and unequivocal and that it cannot be waived by company "officials." (*Id.* at 658–59.)  It also concluded that under § 1-8-5 of the Ute Law and Order Code (the same version in effect at the time Becker's Independent Contractor

---

[49] The *Toole* court reached this conclusion based on language in *Kiowa v. Manufacturing Technologies, Inc.* that a tribe's sovereign immunity extends to commercial activities undertaken by the tribe, combined with an analysis that Defendant's commercial activities were tribal in nature. (App'x at 657, ECF No. 122-4, Case No. 2:16-cv-958.) This analysis was necessary because Defendant LLC was established under the Ute Indian Tribe Limited Liability Act of 1998, which expressly stated that "[t]he sovereign immunity of the Ute Indian Tribe shall not extend to limited liability companies formed under this Title." (*Id.* at 660.)

Agreement was executed), "only the Ute Tribal Business Committee may waive immunity by passing a resolution or ordinance which specifically refers to the express waiver." (*Id.* at 660.) Nothing in the employment contract itself mentioned a waiver of sovereign immunity; instead, Toole relied on contract language stating the availability of fees in actions and choice-of-law provisions to imply a waiver, (*id.* at 661), along with his own honestly held belief that Defendant's Executive Director waived sovereign immunity on behalf of the Tribe, (*id.* at 662).

The Tribal Court noted that while the Business Committee had authorized hiring Toole as part of its usual hiring practices as the chief executive body, those practices did not consist of a specific resolution waiving the Tribe's immunity. (*Id.* at 661.) It then went on to say:

> [T]he Law and Order Code sets forth a very specific standard when executive actions are accompanied by a waiver of the Tribe's immunity. No resolution was passed specifically authorizing the waiver. Nothing in the transaction resembled what Defendant asserts is the normal process for waiving immunity.
>
> *The actions of the Business Committee were not similar to those it undertakes when the Tribe waives immunity in matters involving Ute Oil, LLC. There, the Business Committee waives immunity by passing a resolution or ordinance which specifically refers to the express waiver as is required by U.L.O.C. § 1-8-5.* Defendant has failed provided [sic] any evidence that the Business Committee even reviewed the Agreement or knew of its specific content. How can the Court find a waiver when the record is bereft of evidence that the Business Committee considered immunity and elected to waive the same?

(*Id.* at 661–62 (emphasis added).) As a result of this reasoning, the Tribal Court found that it lacked jurisdiction and dismissed the action. (*Id.* at 662.)

The second case is *Yazzie v. Ute Indian Tribe*, Case No. CV-09-188, Ute Indian Tribal Court, Ruling dated February 14, 2011. (App'x 243, ECF No. 122-5, Case No. 2:16-cv-958.) *Yazzie* was before the Tribal Court on the Tribe and Business Committee Defendants' motion to alter or amend its previous ruling that the Tribe waived its sovereign immunity in a contract with a Chief Judge. (*Id.*) In *Yazzie*, Defendants argued that the 2010 *Toole* decision established

precedent that the Tribal Court lacked jurisdiction because Resolution 07-329 did not contain an express, unequivocal waiver of the Tribe's sovereign immunity and that the contract's enforcement clause did not establish a waiver. (*Id.*)

The Tribal Court found that "Resolution 07-329 was clear beyond doubt that the contract being incorporated by reference was the Chief Judge Contract." (*Id.* at 244.) Further, it found that "[t]he resolution authorized the Chairman of the Business Committee to execute all documents necessary to carry out the intent and purpose of the resolution." (*Id.*) The contract was signed by the Business Committee Chairman and certified by the Business Committee Secretary as adopted "under the authority of the Constitution and By-Laws of the Ute Indian Tribe." (*Id.*) After analyzing the law on incorporation by reference, the Tribal Court concluded that the Chief Judge Contract was a valid contract incorporated into and made a part of Resolution 07-329. (*Id.*)

The Tribal Court ultimately granted the motion to alter the previous ruling but on alternative grounds, not on *Toole*. The Chief Judge contract contained an "Enforcement of Contract clause that irrevocably granted to the Ute Tribal Court jurisdiction to hear and decide any and all breach of contract or other claims." (*Id.* at 245) (internal quotations omitted). Tribal Ordinance 87-04, still in place at the time, thus became an issue, because it "divests the Tribal Court of jurisdiction over claims against the Ute Indian Tribe and Tribal Business Committee." (*Id.*) While the Tribal Court acknowledged that "[t]he Business Committee has authority to waive sovereign immunity by a resolution," which incorporates the contract by reference into the resolution, *Yazzie* held that under the Tribe's Constitution and By-Laws it takes a Tribal

Ordinance, not a resolution or contract, "to amend the Law and Order Code to restore the Ute Tribal Court's jurisdiction over claims brought against the Tribe and its officers."[50] (*Id.*)

First Tribal Court Order. On December 18, 2017, Judge Weathers in the parties' Tribal Court action concluded that under *Yazzie*'s reasoning, the requirements of § 1-8-5 of the Law and Order Code were met. (Order 2, ECF No. 91-5, Case No. 2:16-cv-958.) First, while acknowledging the language in *Toole* that a resolution itself must specifically refer to the waiver of sovereign immunity, Judge Weathers stated that the "incorporation by reference" reasoning in *Yazzie* supports the meaning of "specifically referring to such" in § 1-8-5 of the Law and Order Code. (*Id.* at 4.) Second, Judge Weathers reviewed the meeting minutes of the Business Committee immediately before adoption of Resolution 05-147 and noted that there was a discussion "about Article 23, the applicability of Utah law to the contract, and whether any dispute could go to tribal court first before state or federal court." (*Id.* at 4–5.) Because this discussion "satisfied the purpose behind the 'specifically referring to such' language in Section 1-8-5," which he concluded was to ensure the Business Committee knows it is waiving the Tribe's sovereign immunity when it adopts a given resolution, Judge Weathers concluded that the language adopting Becker's Independent Contractor Agreement on the first page of Resolution 05-147 itself was sufficient to satisfy § 1-8-5 of the Ute Law and Order Code.[51] (*Id.*)

---

[50] It is worth noting that *Yazzie* was dismissed with prejudice because Tribal Ordinance 87-04 precluded the Tribal Court's jurisdiction over the Tribe and its Business Committee, while at the same time the valid contract limited jurisdiction exclusively to the Tribal Court. (*Id.* at 245–46.) This is inconsistent with the usual dismissal *without* prejudice, when a court lacks jurisdiction, to allow the claimant to raise his or her claims in a court of competent jurisdiction. Plaintiff was effectively denied a forum. Becker alleges this is the outcome sought by the tribal parties here. (ECF No. 105.)

[51] During oral argument on the motion to reconsider this decision in Tribal Court, the tribal parties claimed that "no one informed the tribal business committee that the Becker agreement contained a waiver of the Tribe's sovereign immunity. There's only one line that says 'Article 23,' and it doesn't explain what Article 23 does." (Feb. 16 Hrg. Tr. 93, ECF No. 122-8, Case No.

As previously related, the tribal parties moved to reconsider this decision on December 28, 2017, and Judge Weathers notified the parties on January 4, 2018, that he was no longer the judge assigned to the case. (ECF No. 70-18, Case No. 2:16-cv-958.)

Second Tribal Court Decision. At oral argument in Tribal Court on February 16, 2018, the tribal parties argued that the court should find the waiver of sovereign immunity invalid because "the facts here are identical to the facts in *Toole*." (Hrg. Tr. 94, ECF No. 122-8, Case No. 2:16-cv-958.) This is incorrect. First, here the Business Committee passed a resolution to accept Becker's attached Independent Contractor Agreement. There was no resolution at all in *Toole*. Second, the agreement here, each page of which was stamped with the same 05-147 resolution number as the first page of the resolution, contained an explicit waiver of sovereign immunity in Article 23. In *Toole*, the contract specifically provided for jurisdiction first in Tribal Court and did not, as here, explicitly waive tribal exhaustion.

The tribal parties also argued that *Yazzie*, as a tribal court level case, has no precedential value, unlike an appellate level case. (*Id.* at 95.) *Toole*, however, was also a tribal court level case, a point the tribal parties omit. In the February 28 oral argument in this action, the tribal parties further argued that because the court in *Yazzie* found that it lacked subject matter jurisdiction, its substantive ruling on how § 1-8-5 is satisfied by a resolution incorporating a contract by reference is not binding authority. (Feb. 28 Hrg. Tr. 110, ECF No. 111.) The court cannot overlook that under that reasoning, neither is *Toole* binding authority for the tribal parties' argument here, because the *Toole* court similarly found it lacked subject matter

---

2:16-cv-958.)  The February 28 Opinion states that "nothing in the April 27, 2015 [sic] minutes" shows that the Business Committee read the Independent Contractor Agreement, and that they "are absent of any mention about sovereign immunity." (ECF No. 108-1 at 10.) This is far from undisputed, and the record reflects that Becker has yet to receive discovery of additional minutes from meetings that discussed the negotiations and understanding of contract terms. (*See* App'x 348 & 354, ECF No. 122-9, Case No. 2:16-cv-958.)

jurisdiction over the action. *Toole* held that the Tribe's sovereign immunity extends to tribal LLCs. It was incidental to that holding that the *Toole* court noted the Business Committee waives sovereign immunity for tribal LLCs "by passing a resolution or ordinance which specifically refers to the express waiver as is required by U.L.O.C. § 1-8-5," and that in *Toole* "[n]o resolution was passed specifically authorizing the waiver." (App'x 661–662, ECF No. 122-4, Case No. 2:16-cv-958.) *See Barela*, 797 F.3d at 1191 (defining dicta as "statements and comments in an opinion concerning some rule of law or legal proposition not necessarily involved nor essential to determination of the case in hand" (quoting *Rohrbaugh v. Celotex Corp.*, 53 F.3d 1181, 1184 (10th Cir. 1995))).  Furthermore, the tribal parties are simply incorrect. A court "always [has] jurisdiction to determine [its own] jurisdiction," and that includes making conclusions of law based on "jurisdictional facts." *Gonzalez-Alarcon v. Macias*, No. 16-2263, 2018 U.S. App. LEXIS 6753, *12–*13 (10th Cir. Mar. 21, 2018).

Neither the facts nor the law in *Toole* stand for the tribal parties' position that the waiver of sovereign immunity must be contained within the four corners of the resolution in which the Business Committee authorizes the action, as in the 2014 version of § 1-8-5 of the Law and Order Code, rather than "be specifically waived by a resolution or ordinance of the Business Committee specifically referring to such," as in the version of § 1-8-5 in effect at the time Resolution 05-147 was adopted by the Business Committee.

The Tribal Court's February 28 Opinion nevertheless adopted the tribal parties' position without identifying which version of § 1-8-5 it was applying. It could only have been applying the 2014 version of § 1-8-5, however, because it stated that "it was insufficient under Section 1-8-5 for a contract containing a waiver of immunity to be simply appended to a resolution or ordinance if the resolution or ordinance does not itself expressly authorize a waiver of sovereign

72

immunity *within the text of the resolution or ordinance*." (*Id.* at 7 (emphasis added).) Because

Becker's Independent Contractor Agreement actually contained an explicit waiver of sovereign

immunity and was stamped as Resolution 05-147 as was the first page of the resolution that gave

authority for and accepted the agreement, this decision appears to be clear error under the version

of § 1-8-5 in effect at the time. The court is not persuaded that this portion of the February 28

Opinion can stand on appeal through the Tribal appellate courts. Thus, the court declines to give

comity to the decision or weigh it in favor of the tribal parties' likelihood of success on the

invalidity of the waiver of sovereign immunity under tribal law.

        b.    <u>*The Ute Business Committee's Pattern and Practice Affirmed the Validity of the Waiver*</u>.

In further support of this conclusion, to the extent such materials are provided in the

record, the court has examined the tribal parties' pattern and practice during the time period prior

to the Tribe's adoption of the 2014 version of § 1-8-5. For example, on March 31, 2005, the Ute

Business Committee adopted Resolution 05-116 authorizing the execution of the Operating

Agreement of Ute Energy. (App'x 109, ECF No. 55-2.) The Operating Agreement contained the

following waiver:

> 19.9 <u>Waiver of Sovereign Immunity</u>. The Company hereby waives any sovereign
> immunity it may have by reason of the character of its Members or otherwise.

(Op. Agr. 46, ECF No. 79-1, Case No. 2:16-cv-958.) The Business Committee did not expressly

state this waiver within the four corners of Resolution 05-116, yet the tribal parties have not

challenged its validity under tribal law nor the authority of the Chairman of the Business

Committee to enter into the agreement.

Again on June 26, 2007, the Ute Business Committee adopted Resolution 07-183,

approving and authorizing the execution of the Amended and Restated Operating Agreement of

Ute Energy. (App'x 117, ECF No. 55-2.) That Operating Agreement contained a very broad waiver of sovereign immunity that the Business Committee did not expressly state within the four corners of Resolution 07-183:

> 11.1 <u>Waiver of Sovereign Immunity</u>. Each of the Company and Ute Holdings hereby irrevocably and unconditionally waives any sovereign immunity it may have by reason of the character or identify of its members or otherwise.

(Am. Op. Agr. 54, ECF No. 79-2, Case No. 2:16-cv-958.) The tribal parties have not challenged the validity of this waiver under tribal law, nor have they challenged the authority of the Chairman of the Business Committee to enter into the agreement. Notably, it does not appear that either Resolution 05-116 or 07-183 included as attachments the documents containing the waivers of sovereign immunity to the resolutions themselves, as was the case in Resolution 05-147 approving and authorizing the execution of the Becker Independent Contractor Agreement.

As another example found within the record, Resolution 06-216 approved and authorized the execution of the Little Canyon EDA with Dominion Exploration & Production, Inc. "in substantially the same form as that attached to this Resolution as Exhibit A." (App'x 75, ECF No. 55-2, Case No. 2:16-cv-579.) While the record refers to an operating agreement associated with the Dominion EDA, said agreement is not attached to the EDA itself, nor is the EDA stamped with the number of Resolution 06-216. (*Id.* at 78.) Whether or not the operating agreement contained a similar limited waiver of sovereign immunity, at a minimum this demonstrates the Business Committee's pattern of approving and executing all manner of agreements based on resolutions that attach the intended documents as exhibits to the resolution.

Similarly, Resolution 05-283, dated August 30, 2005, approved the FIML Natural Resources LLC, Quester Gas Management Company, and Uintah Basin Field Services, LLC Pipeline Agreements, which are not attached as an exhibit to the resolution nor stamped with the

resolution number. (*Id.* at 89–106.) This agreement does not contain a section that expressly waives sovereign immunity, but it does include a section giving original, exclusive jurisdiction to the United States District Court for the District of Utah, or if that court lacks jurisdiction, agreeing instead to arbitration. (*Id.* at 103.) Nothing about this effective waiver of tribal sovereignty is mentioned in the four corners of Resolution 05-283, yet the waiver has not been challenged as invalid or lacking Business Committee authority.

Resolution 07-124, dated May 2, 2007, approves assignment of the forthcoming SITLA agreements to Ute Energy, even though the final transfer of assignment documents had yet to be created. (*Id.* at 111.) That agreement contained a waiver of sovereign immunity by the State of Utah and the Ute Tribe "to the extent necessary to allow the enforcement of this Agreement." (*Id.* at 72.) Of course, this waiver was not mentioned in Resolution 07-124, nor has it been challenged as invalid or lacking Business Committee authorization.

The tribal parties' appendix contains several other EDA agreements whose indexes reference the Tribe's waiver of sovereign immunity, but the appendix itself did not include the resolutions authorizing those agreements or the pages of the EDA agreements themselves where the waiver of sovereign immunity is set forth. (*Id.* at 20, 33, 53; App'x 239, ECF No. 55-1.) It is reasonable to assume that the indexes to these documents accurately reflect that they contained a waiver of the Tribe's sovereign immunity that was not contained within the four corners of the resolutions accepting the agreements.

These documents demonstrate that the Tribe had a consistent pattern during the relevant time of authorizing the Ute Business Committee to selectively waive the Tribe's sovereign immunity to enter into commercial agreements by resolutions that did not contain an express waiver of sovereign immunity within the four corners of the document; sometimes failed to

mention the words "sovereign immunity" but instead agreed to original and exclusive jurisdiction in a non-tribal court or arbitration; did not stamp the attached document waiving sovereign immunity to the resolution with the same number as the resolution; or did not even include the document that waived sovereign immunity as an attachment to the resolution at all. Given this pattern and practice, the court concludes that, of those that the court reviewed, Resolution 05-147 was the most thorough waiver of sovereign immunity the Ute Business Committee issued between 2005 and 2007. It referred to the Independent Contractor Agreement specifically in the resolution, the Agreement was actually attached to the resolution, the Agreement was stamped with the same resolution number, and the Agreement itself had a three-paragraph Article 23 setting forth clear terms of the tribal parties' waiver of sovereign immunity and submission to jurisdiction elsewhere for disputes over the Agreement.

It is true that the tribal parties have submitted 2010 and 2011 resolutions in which the Ute Tribal Business Committee waived the Tribe's sovereign immunity within the four corners of the resolutions themselves. (*See* Ex. L, ECF No. 14-12.) The first, Resolution 10-085, specifically waives sovereign immunity for the benefit of JP Morgan Chase in relation to entering into a $65 million loan transaction involving Ute Energy that was attached and incorporated to the resolution. The second, Resolution 11-328, specifically waives sovereign immunity for the benefit of RBC Capital Markets for margin trading and leveraging of the same account. (*Id.*)

Notwithstanding the 2010 and 2011 resolutions that waive sovereign immunity consistent with the Tribe's current version of Law and Order Code § 1-8-5, the court has found no evidence that between 2005 and 2007, the relevant time period, the tribal parties have a likelihood of success on the merits of their claim that at the time Resolution 05-147 was adopted in 2005, § 1-8-5 of the Ute Law and Order code required the resolution to identify the waiver within the four

corners of the resolution itself. Therefore, the court concludes that the Becker Independent

Contractor Agreement validly waived the tribal parties' sovereign immunity and was not an ultra

vires act of the Ute Business Committee in 2005.

c.        *Contract Is Valid Under Other Tribal Law.*

Finally, the court considers the tribal parties' arguments that the Tribe's Section 17

Corporate Charter invalidates the Becker Independent Contractor Agreement.  First, however,

the court reiterates that in section I.2.C., *supra*, it concluded that the Ute Business Committee did

not act ultra vires in approving Becker's Independent Contractor Agreement under either the

Tribe's Constitution or Charter because the contract does not involve restricted trust property.[52]

Second, the tribal parties' final argument is that one provision of the Tribe's Corporate

Charter prohibited the Ute Business Committee from entering the Becker Independent

Contractor Agreement. (*See* Pl.'s Second Exp. Mot. 32–33, ECF No. 53; Pl. Reply 8–9 & 20,

ECF No. 101; Feb. 28 Hrg. Tr. 141–43, App'x 81–90, ECF No. 122-8, Case No. 2:16-cv-958.)

The tribal parties' argument relies on art. VI, §§ 1 and 1(f) of the Tribe's Constitution.  Section 1

limits the exercise of the Business Committee's powers as required by the United States

Constitution and/or statutes as well as by the "express restrictions upon such powers contained in

[the Tribe's] Constitution and By-Laws." (App'x 62, ECF No. 55-1.) Section 1(f) authorizes the

Business Committee "[t]o regulate all economic affairs and enterprises *in accordance with the*

*terms of a Charter* that may be issued to the Ute Indian Tribe of the Uintah and Ouray

Reservation by the Secretary of the Interior." (*Id.* at 63 (emphasis added).)

_____

[52] Specifically, the court's conclusion that the Becker Independent Contractor Agreement does
not implicate trust property resolves the tribal parties' arguments under Sections 5(b)(1) and
5(b)(3) of the Charter, as well as under Section 1(f) of the Constitution that requires the Business
Committee to act in accordance with the Charter.  The Tribal Court ruled otherwise in its
February 28 Opinion based on its conclusion that the contract created a claim against trust
property. (ECF No. 108-1.)

The Charter referred to was authorized by section 17 of the Indian Reorganization Act, 25 U.S.C. § 477, and approved by the Secretary of the Interior on January 19, 1937, under section 16 of the Act, 25 U.S.C. § 476. (*See* App'x 74, ECF No. 55-1.) Section 5 of the Charter identifies the powers and limitations of the corporation, section 5(f) of which states that the Business Committee is authorized

> [t]o make and perform contracts and agreements of every description, not inconsistent with law or with any provisions of this Charter, with any person . . . *Provided*, That all contracts entered into . . . requiring payment of money by the corporation . . . shall not exceed $10,000 in total amount except with the approval of the Secretary of the Interior.

(*Id.*)[53] The tribal parties argue that because Becker's contract was for value greater than $10,000, it required approval from the Secretary of the Interior. (Pl. Second Exp. Mot. 32, ECF No. 53.) Interestingly, in the state court action, the tribal parties vigorously objected to Becker's characterization of his suit as also being against the Tribe's Section 17 Corporation.[54] (ECF No. 12 at 55–58.) More recently, the tribal parties state that "[i]n the initial stages of the state court litigation, the Tribe's attorneys mistakenly believed that the Tribe's federally-chartered corporation was defunct." (Pl.'s Reply 9, ECF No. 101.) The court notes, however, that even the

---

[53] The Tribal Court did not opine on this provision of the charter. (*See* ECF No. 108-1.) For the reasons previously stated, *supra*, the court does not find it necessary for the Tribal Court to exhaust this issue.

[54] The tribal parties' objection was based on the Charter's waiver of sovereign immunity in § 5(i). To avoid the waiver, the tribal parties argued that the waiver "is limited to the federally chartered corporation and does not extend to the Tribe itself." (ECF No. 12 at 56.) They also argued that

> the Ute Tribe as a constitutional organization would be the proper defendant because it entered into the contract with Lynn Becker that is the subject of this suit. The federally chartered corporation was not a party to the Agreement. Therefore the Ute Indian Tribe's federally-chartered corporation could not be a party to this action because not only was it not a party to this contract, it is an essentially defunct arm of the Tribe.

(*Id.*) They further stated that "[t]here is no action of the Section 17 Corporation at issue in this case. Neither the disputed contract nor the resolution mentions the Section 17 Corporation." (*Id.*)

tribal parties' expert, Pilar Thomas, opines that Sec. 5(b)(1) relates to the Business Committee "mak[ing] or perform[ing] agreements greater than $10,000 *that will be paid by the corporation without Secretarial approval*." (App'x 216, ECF No. 55-2 (emphasis added).)

This court finds no evidence in Resolution 05-147, including Becker's Independent Contractor Agreement or the associated Operating Agreements, that demonstrates the Tribe's Section 17 Corporation was a party to these contracts. (App'x 89–112, ECF No. 55-1 and ECF Nos. 79-1, 79-2 & 79-3, Case No. 2:16-cv-958.) As a result, the court finds that the tribal parties are unlikely to succeed on the merits of the contract's invalidity under the Charter or the Constitution that requires compliance with the Charter because there is no evidence of involvement by the Section 17 Corporation. This reasoning is consistent with prior precedent. *See Ute Distrib. Corp. v. Ute Indian Tribe*, 149 F.3d 1260 (10th Cir. 1998) (remanding to district court to determine whether the tribal corporate entity or the Ute Tribe itself was the proper defendant); *Kenai Oil & Gas, Inc. v. Dept. of Interior*, 522 F. Supp. 521 (D. Utah 1981) (finding that lack of clarity on whether the section 17 corporation or the Ute Tribe entered seven leases prevented conclusion on sovereign immunity based on tribal charter). Again, there is no evidence here that the Tribe's corporate entity was involved in any way with these agreements.

d.      <u>*The Tribe Has Waived the Exhaustion Requirement*</u>.

The Tenth Circuit directed this court to "exercise its original jurisdiction in accord with the mandate in [its] decision *Ute Indian Tribe v. Lawrence*, 875 F.3d 539 (10th Cir. 2017), and decide the Tribe's request for injunctive relief against the state court proceedings." (Order, *Ute Indian Tribe v. Lawrence*, No. 18-4013 (D.C. No. 2:16-CV-00579-CW) (D. Utah Feb. 16, 2018).) *Lawrence* held that this court has original jurisdiction to determine whether "federal law precludes state-court jurisdiction over a claim against Indians arising on the reservation." 875

F.3d at 540. Pursuant to the Tenth Circuit's mandate, this court has been required to analyze whether the tribal parties are likely to succeed on the merits of their claims. This court concludes that federal law does not preclude state-court jurisdiction because Congress granted subject matter jurisdiction to Utah in these circumstances under 25 U.S.C. §§ 1321–1326, because the Becker Independent Contractor Agreement is valid under federal and tribal law, and because the tribal parties' selective waiver of sovereign immunity in the valid contract consented to the state's exercise of that jurisdiction. As a result, the court concludes the tribal parties are also bound by the Agreement's Article 23 provision that waives any requirement for tribal exhaustion. That provision states:

> and the Tribe waives any requirement of Tribal law stating that Tribal courts have exclusive original jurisdiction over all matters involving the Tribe *and waives any requirement that such Legal Proceedings be brought in Tribal Court or that Tribal remedies be exhausted*.

(App'x 99, ECF No. 55-1) (emphasis added).)

This exhaustion waiver, in conjunction with the other provisions of Article 23 that designate "original and exclusive jurisdiction," (App'x 98–99, ECF No. 55-1), to other courts of competent jurisdiction—of which the Utah state court is one—removes this case from the tribal exhaustion policy pronouncements in *National Farmers Union Insurance Companies. v. Crow Tribe*, 471 U.S. 845 (1985) (requiring a tribal court to first determine whether it has exceeded the lawful limits of its jurisdiction before such a claim may be entertained by a federal court). Similarly, the contract's exhaustion waiver eliminates any requirement for Tribal appellate court review of the February 28 Opinion that may otherwise be required for exhaustion by *Iowa Mutual Insurance Company v. LaPlante*, 480 U.S. 9, 17 (1987) (stating that "[u]ntil appellate review is complete, [the tribal courts] have not had a full opportunity to evaluate the claim and federal courts should not intervene"). In other words, because Article 23 is valid, the Tribal

Court "has exceeded the lawful limits of its jurisdiction." *Nat'l Farmers*, 471 U.S. at 857; *see also Becker v. Ute Indian Tribe*, 868 F.3d 1199, 1203 (10th Cir. 2017) (stating that exhaustion is not a jurisdictional prerequisite, but "required as a matter of comity"); *Burrell v. Armijo*, 456 F.3d 1159, 1168 (10th Cir. 2006) (stating that if the district court finds the tribal court lacks jurisdiction, comity principles do not require litigants to first exhaust tribal court remedies). Therefore, jurisdiction over these contract claims resides in Utah state court. The Utah state court is not required to stay its proceedings for the Tribal Court action to be resolved and the Tribal appellate court to review its jurisdictional conclusions.[55] In fact, in its decision in the companion case today, this court enjoins the parties from proceeding in the Tribal Court action.

## II.     CONCLUSION

The tribal parties have not shown a likelihood of success on the merits of their position to warrant this court's grant of a preliminary injunction enjoining Mr. Lynn Becker and Judge Barry G. Lawrence from proceeding in the state court matter of *Becker v. Ute Indian Tribe*, Case No. 140908394, Third Judicial District Court, Salt Lake County. This court has concluded that the state court has subject matter jurisdiction over the parties' claims because Utah accepted the federal government's offer of jurisdiction in 25 U.S.C. § 1322(a), because the Tribe selectively waived its sovereign immunity in Resolution 05-147 properly under tribal law, and because the contract does not involve restricted property held in trust for the Tribe by the United States. Additionally, the court has concluded that the Tribal Court's February 28 Opinion should not be given preclusive effect and that tribal exhaustion is futile. Because the tribal parties cannot succeed on the merits, the court need not analyze the other elements necessary to grant a

---

[55] *See Harvey v. Ute Indian Tribe*, 2017 UT 75 (Utah) (holding that Utah district courts must decide whether to stay state court proceedings pending tribal exhaustion of claims against tribes or tribal officials).

preliminary injunction motion, and the motion is DENIED. (ECF No. 54.) The court summarizes its rulings herein as follows:

1.      The court DENIES the tribal parties' motions for a preliminary injunction to enjoin the state court action. (ECF No. 54 and the injunction portions of ECF Nos. 52 & 53.)

2.      The court DENIES as MOOT in this case the tribal parties' motion for clarification and reconsideration of the Court's Order Amending February 14, 2018 Ruling in the companion case 2:16-cv-958. (ECF No. 88.)

3.      The court DENIES as MOOT the tribal parties' motions in limine seeking to limit evidence to be considered in the motion for preliminary injunction. (ECF Nos. 97, 98, & 99.)

4.      The court DENIES the tribal parties' motion to give preclusive effect to the Tribal Court's February 28 Opinion and to consolidate and advance consideration of its other motions. (ECF No. 110.)

5.      The court DENIES as MOOT the tribal parties' motion to strike the Declaration of Lynn Becker and its exhibits B–B-5 in Becker's opposition to the tribal parties' preclusion motion because the court did not consider those materials. (ECF No. 124.)

6.      The court GRANTS the tribal parties' motion for leave to supplement legal authority. (ECF No. 133.)

7.      The court GRANTS the tribal parties' motion to supplement the record. (ECF No. 135.)

The court stays this action pending resolution of the state court action, including the tribal parties' partial summary judgment portions of the motions at ECF Nos. 52 & 53, Becker's motion to consolidate this case with the companion case at ECF No. 114, and the tribal parties' Motion for Sanctions at ECF No. 134.

DATED this 30th day of April, 2018.

BY THE COURT:

_____
Clark Waddoups
United States District Judge