## IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF UTAH

| | |
|---|---|
| **LYNN D. BECKER,** | **MEMORANDUM DECISION AND ORDER** |
| **Plaintiff,** | |
| **v.** | **Case Nos. 2:16-cv-579** |
| **UTE INDIAN TRIBE OF THE UINTAH AND OURAY RESERVATION, et al.,** | **2:16-cv-958** |
| **Defendants.** | **Judge Clark Waddoups** |

On August 13, 2020, Lynn Becker ("Becker") filed a Notice of Intent to Serve Subpoena upon Snow Christensen & Martuneau, who was serving as counsel for John Jurrius ("Jurrius").   (*See* ECF No. 205).[1]   Among other things, that subpoena sought documents related to or arising out of a pending arbitration between Jurrius and the Tribe[2] (the "Arbitration").   (*See* ECF No. 205-1).   The Tribe moved to quash the subpoena (ECF No. 206), and the court held a hearing on the Tribe's motion on August 31, 2020. Following that hearing, and in response to the issues raised thereat, the court entered an Order to Show Cause (ECF No. 221) on September 4, 2020 (the "Order to Show Cause") that directed to Tribe to show cause why: 1) documents that it had sent to the Court *in camera* should not be filed on the docket and made accessible to all parties and the public

---

[1] Unless specifically stated otherwise, the ECF Numbers contained herein refer to documents filed in Case No. 2:16-cv-958.

[2] For purposes of this order, the "Tribe" collectively refers to the Ute Indian Tribe of the Uintah and Ouray Reservation together with the affiliated parties the Uintah and Ouray Tribal Business Committee (the "Business Committee") and Ute Energy Holdings, LLC ("Ute Energy"). To the extent that the court references an action taken by one of these parties independently of the others, it will refer to that party individually by name.

and 2) it should not be sanctioned for abusing the judicial process and/or acting in bad faith for initiating the Arbitration against Jurrius as retaliation for him testifying at the January 7, 2020 evidentiary hearing in this matter (the "Evidentiary Hearing") or as a means to intimidate and influence him from testifying in future proceedings in this matter. (*See* ECF No. 221). All parties have responded to the Order to Show Cause, and the court held a hearing on the same on March 15, 2021.

## FACTS

1.     On or about May 18, 2009, the Tribe and Jurrius entered into a Settlement Agreement (the "Settlement Agreement") to resolve a lawsuit in the District of Colorado. (ECF No. 228-4). The Settlement Agreement contained the following provisions:

     a.     "[e]xcept for information in the public domain, all records of the Tribe and all information generated or accumulated by [Jurrius] in connection with [his] provision of services to the Tribe remaining in [his] possession, custody or control shall be treated as Confidential, and [Jurrius] shall not use such information or disclose such information to other persons or entities without the prior approval of the [Tribe's] Business Committee or its designee" (ECF No. 228-4 at ¶ 4(d));

     b.     "If [Jurrius] becomes subject to any legal obligation to disclose such confidential information or reasonably needs to disclose such information in a lawsuit to which [Jurrius] is a party, [Jurrius] shall, if lawfully permitted to do so and before making any disclosure, promptly notify the [Tribe] of the fact and the Parties shall promptly discuss in good faith ways in which [Jurrius] can reasonably make disclosures and comply with the obligations of confidentiality in this subpart, and if the Paities are unable to reach a

timely agreement on this issue, the [Tribe] shall have the right to seek an injunction *in camera* or otherwise restraining such disclosure" (*id*.);

   c. "For a period of 25 years, [Jurrius] will not conduct business of any kind on Tribal Territory with the Tribe or with any Tribally-related entities or enterprises, or with Ute Tribe allottees. . . . [Jurrius] shall not be considered to 'conduct business' for purposes of this subpart where [he] neither (i) hold[s] an ownership interest of more than five percent in an entity that engages in such a business nor (ii) participate in any aspect of the business pertaining to the [Tribe]" (*id*. at ¶ 4(f));

   d. "[Jurrius] will not use the Tribe as a reference when soliciting new or continued business with other Tribes or any other entity" (*id*. at ¶ 4(g));

   e. Jurrius "will not for any purpose enter within the Ute Indian Tribal Territory . . . without the express prior permission of the [Tribe] [but] may travel on-public highways that pass through such Tribal Territory for purposes of travel to a location other than within the Tribal Territory" (*id*. at ¶ 4(i));

   f. "Any controversy or claim arising out of or relating to [the Settlement Agreement], or to the interpretation, effectuation. enforcement, or breach thereof, shall be determined by arbitration administered by the American Arbitration Association ("AAA") in accordance with its Commercial Arbitration Rules" and that such arbitration "shall take place in Denver, Colorado." (*id*. at ¶ 24).

  2. On October 22, 2019, Becker served the Tribe with a Notice of Intent to Serve Subpoena on Jurrius (the "Production Subpoena") that commanded Jurrius to produce documents and information that related to the three questions that the Tenth Circuit remanded this action to this court to answer. (*See* ECF No. 178).

3.     On November 1, 2019, The Tribe moved to quash the Production Subpoena on the basis that information it sought is "protected from disclosure by the attorney-client privilege and the attorney work product privilege."  (*See* ECF No. 179).

4.     On that same date, the Tribe's counsel sent Jurrius a letter notifying him that the Tribe objected to the Production Subpoena "to the extent that [it] seeks documents that are protected from disclosure under the attorney-client privilege, the attorney work product doctrine, and/or any other applicable doctrine, immunity or limitation on discovery" and instructing him "not to produce any such privileged or protected documents in response to the subpoena without first obtaining the Tribe's approval . . . ."  (*See* ECF No. 228-5 at p. 5).

5.     On November 15, 2019, Becker and the Tribe resolved the dispute over the Production Subpoena and entered a stipulation that governed how the requested information would be provided (the "Production Stipulation").  The Production Stipulation provided, in relevant part, that all parties should treat the received documents "as 'attorney eyes only'" and if the Tribe concluded any were privileged or confidential, it would continue to designate the same "as 'attorney eyes only' until and unless the Court determines that the document is not privileged or confidential," but that "[a]ny document produced by Mr. Jurrius as to which the Tribe does not assert a claim of privilege or confidentiality within one week of production may be shared in the normal course with Mr. Becker and Judge Lawrence."  (*See* ECF No. 180).

6.     Jurrius was not involved in negotiating the Production Stipulation, was not a party to it, and had no communication with the Tribe as to the production ordered by it.

7.      On December 4, 2019, Becker's counsel forwarded Jurrius a copy of the Production Stipulation and an explanation of his "understanding of the process [Jurrius] should follow, based upon the stipulation and the Court's order.[3]"  (ECF No. 236-3).

8.      Thereafter, and pursuant to the manner set forth in the Production Stipulation, Jurrius produced 309 pages of documents in response to the Production Subpoena (the "Jurius Production").  The Tribe does not assert that the agreed upon procedure was not followed.

9.      The Jurrius Production contained twenty-eight documents comprised of:

    a.      Photographs taken of a public event; (*see* ECF No. 239-1 at 11)

    b.      Four Tribal ordinances; (*see id*.)

    c.      Five minutes from Business Committee Meetings; (*see id*.)

    d.      Ten Tribal resolutions; (*see id*.)

    e.      Correspondence from the Department of Interior, Bureau of Indian Affairs; (*see id*.)

    f.      A section of a Federal law; (*see id*.)

    g.      A Fax cover page regarding the recording of documents among public land records; (*see id*.)

    h.      Two photographs of bulletins posted in a public newspaper; (*see id*.)

    i.      Three documents relating to Ute Energy LLC—its Amended and Restated Operating Agreement, an outline of a joint venture, and a financing proposal (*see id*.) (the "Ute Energy Documents").

_____

[3]  The court believes that the referenced order is the November 20, 2019 docket text order which found that the Tribe's motion to quash was moot "based on the stipulation of the parties at ECF No. 180."  (*See* ECF No. 181).

j.      Three of these documents, being the photographs taken of a public event and two of the ordinances, were admitted by Becker and/or the Tribe as exhibits at the Evidentiary Hearing.  (*See* ECF No. 214 at ¶ 12; ECF No. 239-1 at p. 11).

10.     On December 10, 2019, the Tribe's counsel sent Jurrius a letter stating, among other things, that he had violated the Settlement Agreement by producing the Jurrius Production.  (*See* ECF No. 228-5 at pp. 6–8).

11.     On January 7, 2020, Becker called Jurrius as a witness and compelled him to testify at the Evidentiary Hearing.

12.     Jurrius did not communicate with the Tribe before he testified at the Evidentiary Hearing.

13.     Before taking the stand, Jurrius's counsel made a statement to the court expressing Jurrius's concern that his compelled testimony could be seen as a violation of privilege, confidentiality, and/or the Settlement Agreement.  (*See* ECF No. 249 at 277:17–280:4).

14.     The court responded to this concern by recognizing that there has been "an excessive claim of privilege" in this action, reminding the parties that "[i]f there is a privilege that would entitle a party to have the testimony not disclosed, the burden falls on the party who has that privilege," and stating that the Tribe's counsel is "more than capable of asserting those privileges" and that it would hear counsel on any instance where they "assert the privilege."  (*See id*. at 280:5–281:7).

15.     During Jurrius's testimony, the Tribe raised four objections as to the information he was providing being privileged or confidential.  Each was overruled.  (*See id*. at 288:8–22; 293:6–295:9l; 296:4–6; 362:2–363:25).

16.     Thereafter, on January 15, 2020, the Tribe informed Jurrius that he had violated the Settlement Agreement by, among other things, producing the Jurius Production, as he disclosed the same "without prior approval of the Tribe's Business Committee" and "willfully ignored the Settlement Agreement's procedure for disclosing information gained in connection with your services to the Tribe if you were to become subject to a legal obligation to do so."  (ECF No. 228-5 at pp. 2–4).

17.     The Tribe thereafter initiated the Arbitration against Jurrius on January 27, 2020, for his alleged breaches of the Settlement Agreement.  As outlined in its Corrected Statement of Claims (the "Statement of Claims"),[4] the Tribe asserts in the Arbitration that Jurrius violated the Settlement Agreement:

a.      in both "substance and process . . . by producing over 300 internal Tribal documents without noticing or obtaining prior approval from the Tribe" (Statement of Claims at ¶ 31).

i.      In Support of this claim, the Tribe alleges that Jurrius "unilaterally produced more than 300 pages of internal tribal documents, materials, and information in flagrant violation of the Settlement Agreement" (*id*. at ¶ 22).

ii.      The Tribe further alleges that by letter dated November 1, 2019, the Tribe notified Jurrius that it objected to the Production Subpoena and "notified Jurrius of his obligations under the Settlement Agreement, to avoid disclosure of documents obtained in the course of his employment with the Tribe which could be

---

[4]  The court has not been provided with a copy of the Tribe's original statement of claims, but it does not appear, based on the pleadings of the parties, that any differences between the original and the "corrected" Statement of Claims are material.

considered privileged or confidential without first obtaining the Tribe's prior approval" but that Jurrius "failed to respond to [the] communication."  (*id*. at ¶¶ 21–22).

        b.    in both "substance and process . . . by providing oral testimony discussing the existence and contents of the Settlement Agreement and providing confidential information regarding [the Tribe] and his employment with [the Tribe] without noticing or obtaining prior approval" (*id*. at ¶ 33);

        i.    In Support of this claim, the Tribe alleges that Jurrius "violated the terms of Section 4(d) of the Settlement Agreement by providing oral testimony at [the Evidentiary Hearing]."  (*Id*. at ¶ 24).

        ii.    The Tribe also alleges that the transcripts from the Evidentiary Hearing "show that despite having the intent to testify in the [Evidentiary Hearing] . . . Jurrius at no time acted to notify the Tribe of these communications or to otherwise fulfill his legal obligations to the Tribe under the Settlement Agreement."  (*Id*. at ¶ 27).

        iii.    The Tribe also alleges that Jurrius's testimony at the Evidentiary Hearing "included extensive details obtained in connection with his employment with the Tribe, including information regarding his employment with the Ute Tribe, the Tribe's economic and business development strategies, development of Tribal ordinances and financial investment strategies, the interests of the Tribe's governing body and membership, and the Tribe's actions and understanding as to the contractual relationships with third parties."  (*Id*. at ¶ 28).

        c.    by continuing using the Tribe's "name and work history in the solicitation of continued or new business," despite "being placed on notice by the Tribe

over four (4) months ago in written correspondence" that he was violating the Settlement

Agreement (*id*. at ¶ 35);

         i.      In Support of this claim, the Tribe references a June 6, 2017

letter that it sent to Jurrius in which it demanded that Jurrius and his "affiliated entities

cease and desist from invoking the [Tribe] on your websites and in your promotional

materials." (*Id*. at ¶ 19; *see also* ECF No. 239-1 at 54–55).

         ii.      The June 6, 2017 letter further stated that this activity

constituted a breach of the Settlement Agreement, which "prohibits you from using the

Tribe as a reference when soliciting 'new or continued business with other Tribes or any

other entity.'" (*Id*. at ¶ 19; *see also* ECF No. 239-1 at 54–55).

         iii.      In further support of this claim, the Tribe alleges that "[o]n

or around January 13, 2020, the Tribe became aware of Jurrius' ongoing violation of

Section 4(g) of the Settlement Agreement by listing the [Tribe] as a reference on his

professional LinkedIn page for his past work as President & CEO of Jurrius Group and as

the owner of Native American Resource Partners LLC," further alleging that such

references "include a document that provides extensive details on Jurrius' work for the

[T]ribe, including an extensive list of third parties with whom the Tribe has business ties

and financial information related to Tribal entities and critical infrastructure on the Tribe's

Reservation." (*Id*. at ¶ 19).

         d.     by "conducting business on 'Tribal Territory' as defined by the

Settlement Agreement" (*id*. at ¶ 37); and

         i.      In Support of this claim, the Tribe references a June 6, 2017

letter that it sent to Jurrius in which it indicated that Jurrius violated the Settlement

Agreement because Indigena Capital, a company that it alleges Jurrius was affiliated with, solicited the Tribe's "participation in a petroleum pipeline project that apparently is planned to cross portions of the [Tribe's] Reservation." (*Id.* at ¶ 19; *see also* ECF No. 239-1 at 54–55).

> e.     by "entering 'Tribal Territory' as defined by the Settlement Agreement for purposes other than passing through to travel to a location other than within 'Tribal Territory'" (*id.* at ¶ 38).

>> i.     The Tribe does not support this claim in the Statement of Claims.

18.     After the court entered the Order to Show Cause, the Tribe filed a Second Corrected Statement of Claims in Arbitration (the "Amended Statement of Claims"). (ECF No. 228-3). This filing was intended "to eliminate language that may have given the Court pause." (*See* ECF No. 228 at 6–7). Essentially, the amendments refined the language of the claims it was asserting against Jurrius to clarify that the Tribe was only objecting to the *procedure* by which Jurrius produced the Jurrius Production and offered testimony at the Evidentiary, namely his failure to notify and confer with the Tribe before taking those actions. (*See* ECF No. 228-3). These changes are most materially reflected in the Tribe's first and second causes of action, which have been amended to remove allegations that these actions violated "the *substance*" of the Settlement Agreement. (*Compare* Statement of Claims at ¶¶ 31, 33 *with* ECF No. 228-3 at ¶¶ 28, 30).

19.     The Amended Statement of Claim also expands upon, or modifies, the references in the Statement of Claims regarding communications between the Tribe and Jurrius. It also makes minor changes to the Tribe's claims, including its recognition that

although Jurrius "and/or his affiliated entities have made some revisions to their websites' references to the Tribe since the Tribe initiated this [A]rbitration, [they] have failed to remove references and information related to the Tribe from internet websites." (*See* ECF No. 228-3 at ¶¶ 17, 33).

20.     As of January 8, 2020, Jurrius's LinkedIn profile stated, in relevant part, that as "Owner, President & CEO" of Jurrius Group, he "served as Financial Advisor for [the Tribe] [and] established and implemented [its] 'financial plans' and founded, formed and financed the majority of [its] energy enterprises." (*See* ECF No. 239-1 at p. 57).  The page also had attached to it a resume that stated that Jurrius worked for the Tribe and outlined some of the work he completed during his employment, including, among other things, that he formed Ute Energy, founded major projects, created the Tribe's Financial Plan, secured capital, oversaw the leasing of the 1.5 million acre estate, and "[s]old Ute Energy for approximately $1 Billion." (*Id*. at 59–61).

21.     On January 15, 2020, the Tribe sent Jurrius a letter summarizing what it considered to be his breaches of the Settlement Agreement.  (*See* ECF No. 239-1 at 47–49).  That letter states that Jurrius has breached the Settlement Agreement by producing the Jurrius Production, failing to notify the Tribe and/or obtain its approval before producing the Jurrius Production, and testifying at the Evidentiary Hearing, making solicitations regarding a proposed pipeline project, and referenced the Tribe on his website, promotional materials, and LinkedIn profile.  (*Id*.).

22.     Following the court's August 31, 2020 hearing on the Tribe's motion to quash Becker's subpoena, the Tribe sent the court four documents (the "Documents") for it to review *in camera*—the Statement of Claims, Jurrius's Counterclaim in Arbitration,

the Tribe's Answer to Jurrius's Counterclaim (together the "Arbitration Documents"), and the Settlement Agreement.

## **DISCUSSION**

The Order to Show Cause concerned, and directed to Tribe to address, two distinct issues. First, why the Documents should not be filed on the docket and made accessible to all parties and the public. Second, and more significant, why the Tribe should not be sanctioned for abusing the judicial process and/or acting in bad faith for initiating the Arbitration against Jurrius as retaliation for him testifying at the Evidentiary Hearing or as a means to intimidate and influence him from testifying in future proceedings in this matter. (*See* ECF No. 221).

### I. **The Documents should be filed on the Record in this matter.**

The Tribe has represented that it does not object to placing the Arbitration Documents on the record in this matter. (*See* ECF No. 228). Jurrius has also consented to the same. (*See* ECF No. 238). As such, the Court will file the Arbitration Documents (being the Statement of Claims, Jurrius's Counterclaim in Arbitration, and the Tribe's Answer to Jurrius's Counterclaim) on the dockets in Case No. 2:16-cv-579 and Case No. 2:15-cv-958.

The parties disagree, however, as to whether the Settlement Agreement should be made public in its entirety. The Tribe has filed a redacted version of the Settlement Agreement (the "Redacted Settlement Agreement") and asks that that it be permitted to file the unredacted version under seal. (*See* ECF No. 228). Becker and Jurrius both object to this request and argue that only an unredacted version of the Settlement Agreement should be filed.

As recognized by DUCivR 5.3(a), because "[t]he records of the court are presumptively open to the public," "[t]he sealing of pleadings, motions, memoranda, exhibits, and other documents or portions thereof is highly discouraged."   As such, "the public shall have access to all Documents filed with the court and to all court proceedings" unless those documents are "restricted by statute or court order."  DUCivR 5.3(a).  Nonetheless, the court has the discretion to "seal documents if the public's right of access is outweighed by competing interest.  In exercising this discretion, we weigh the interests of the public, which are presumptively paramount, against those advanced by the parties.  The party seeking to overcome the presumption of public access to the documents bears the burden of showing some significant interest that outweighs the presumption."  *Helm v. Kansas*, 656 F.3d 1277, 1292 (10th Cir. 2011) (internal quotation marks and citation omitted).

Only two paragraphs (and one sentence) are redacted in the Redacted Settlement Agreement.  The redacted information references 1) what interests Jurrius is conveying to the Tribe, 2) what the Tribe is paying Jurrius for those interests, and 3) bank information for the transfer of monies.  Each of these redactions will be discussed in turn.

A.  *Information regarding what interests Jurrius conveyed to the Tribe should be made public.*

As stated above, in order to overcome the presumption that court records should be made open to the public, the Tribe must present a "significant interest" that justifies keeping a record private.  *See Helm*, 656 F.3d at 1292 (10th Cir. 2011).  While the Tribe seeks to keep private information regarding what interests Jurrius conveyed to it as part of the Settlement, much, if not all, of that information is contained in individual, and unredacted, Assignments of Interests that are attached to the Redacted Settlement

Agreement and thus are already a part of the public record in this case.  Because this redacted information has already been made public, the court cannot find that the Tribe has a "significant interest" in keeping it redacted from the Settlement Agreement.  The Tribe is therefore not entitled to redact information regarding what interests Jurrius conveyed to the Tribe from the Settlement Agreement.

B. *Information regarding what Jurrius was paid for the interests he transferred should be made public.*

The Tribe also seeks to redact how much it paid Jurrius under the parties' settlement.  While the Tenth Circuit has recognized that "preserving the confidentiality of settlement agreements may encourage settlement, and that denying a motion to seal may chill future settlement discussions," the Tribe has failed to show a significant interest that justifies why *only this* portion of the Settlement Agreement should be kept from the public. *Colony Ins. Co. v. Burke*, 698 F.3d 1222, 1241 (10th Cir. 2012); *see also XPO Logistics, Inc. v. Leeway Glob. Logistics, LLC*, No. 2:15-CV-00703-CW, 2018 WL 400769, at *5 (D. Utah Jan. 12, 2018).  The Tribe's primary argument on this point is that the information is irrelevant to the matters before the court.  Such rationale does not outweigh "the public's right of access." *See Helm*, 656 F.3d at 1292.  Moreover, Jurrius argues that the failure to disclose the amounts that the Tribe paid to him is prejudicial because it implies that the settlement was unfavorable to him, contrary to the actual facts.  The court is persuaded by Jurrius's argument.  The Tribe is therefore not entitled to redact information regarding how much Jurrius was paid from the Settlement Agreement.

C. *Bank account information contained in the Settlement Agreement should remain redacted.*

The first paragraph of the Settlement Agreement contains bank account numbers. That information qualifies for redaction under DUCivR 5.2-1 and Rule 5.2 of the Federal

Rules of Civil Procedure and should therefore be redacted from the Settlement Agreement before it is filed in this matter.

For the reasons stated herein, the Tribe's request to file the Settlement Agreement under seal is **DENIED**, and the court will file the Settlement Agreement on the dockets in Case No. 2:16-cv-579 and Case No. 2:15-cv-958.  The filed version will, however, and in compliance with DUCivR 5.2-1 and Rule 5.2 of the Federal Rules of Civil Procedure, have redacted from it any bank account numbers contained therein.

## II. <u>The Tribe's initiation of Arbitration against Jurrius was done in bad faith and was an abuse of process.</u>

Following Jurrius's and Becker's allegations that the Tribe initiated the Arbitration against Jurrius as retaliation for him testifying at the Evidentiary Hearing or as a means to intimidate and influence him from testifying in future proceedings in this matter, the Order directed the Tribe to show why it should not be sanctioned for abusing the judicial process and/or acting in bad faith.  (*See* ECF No. 221).

It is well established that a district court "has the power to control admission to its bar and to discipline attorneys who appear before it."  *See Chambers v. NASCO, Inc.*, 501 U.S. 32, 43 (1991).  "Because of their very potency, [these] inherent powers must be exercised with restraint and discretion."  *Id*. (citation omitted).  While a district court's power to sanction "reaches beyond the multiplication of court proceedings and authorizes sanctions for wide-ranging conduct constituting an abuse of process," (*Farmer v. Banco Popular of N. Am.*, 791 F.3d 1246, 1257 (10th Cir. 2015) (citation omitted)), in exercising that power, a court "must comply with the mandates of due process, both in determining that the requisite bad faith exists and in assessing fees."  *Chambers*, 501 U.S.

at 50.  Generally, sanctions may be warranted for conduct that "abuses the judicial process" or is performed in bad faith.  *Id.* at 43.

While the Tenth Circuit has not developed a definitive standard for what conduct constitutes an "abuse of process," the Supreme Court in *Chambers* found that sanctions were appropriate because the accused party had engaged in a "sordid scheme of deliberate misuse of the judicial process designed to defeat [its opponent's] claim by harassment, repeated and endless delay, mountainous expense and waste of financial resources."  *Id.* at 56–57.  There is similarly no set standard for when conduct arises to the level of "bad faith."  The Tenth Circuit has, however, made it clear that establishing bad faith is a high bar, as "bad faith requires more than a mere showing of a weak or legally inadequate case, and the exception is not invoked by findings of negligence, frivolity, or improvidence." *Autorama Corp. v. Stewart*, 802 F.2d 1284, 1288 (10th Cir. 1986).  Generally, actions taken "vexatiously, wantonly, or for oppressive reasons" support a finding of bad faith, *see Kornfeld v. Kornfeld*, 393 F. App'x 575, 577 (10th Cir. 2010), as does conduct that shows "intentional or reckless disregard of the rules," "substantial and prejudicial obduracy," or "delays or disrupts the litigation."  *See Xyngular Corp. v. Schenkel*, 200 F. Supp. 3d 1273, 1301–02 (D. Utah 2016), *aff'd sub nom. Xyngular v. Schenkel*, 890 F.3d 868 (10th Cir. 2018).  An action need not be motived by "actual ill will" to constitute bad faith.  *Id.*

The Tribe informed Jurrius that it would be initiating Arbitration against him just eight days after Jurrius testified at the Evidentiary Hearing, and it ultimately initiated the proceedings approximately twelve days later.  (*See* ECF No. 239-1 at 47–49).  This strongly supports that the Arbitration was indeed initiated to punish Jurrius for testifying or to discourage him from testifying in future proceedings in this matter.  The Tribe rejects this

allegation, arguing that the Arbitration was filed in response to Jurrius's continued failure to comply with the terms of the Settlement Agreement and that "[t]he Court's inherent power simply does not extend to imposing sanctions for a party's pursuit of a non-frivolous claim in another forum." (ECF No. 243 at 13).

A. The Tribe's allegations that Jurrius violated the Settlement Agreement are meritless.

The crux of the Tribe's response to the Order is that because it had legitimate, non-frivolous claims that Jurrius had violated the Settlement Agreement when it initiated the Arbitration, the court cannot find that the Arbitration was initiated in bad faith or that its initiation of the Arbitration against Jurrius was an abuse of process. The Tribe asserts that Jurrius breached[5] the Settlement Agreement by: 1) producing the Jurrius Production; 2) testifying at the Evidentiary Hearing; 3) impermissibly using the Tribe as a reference to solicit business; 4) conducting business on Tribal Territory; and 5) impermissibly entering Tribal Territory. Each of these alleged violations will be discussed in turn.

---

[5] The court acknowledges that the Tribe has amended its Statement of Claims to clarify that it is now only alleging that the *procedure* that Jurrius followed before producing the Jurrius Production and testifying at the Evidentiary Hearing constituted breaches of the Settlement Agreement, and that it is therefore no longer alleging that Jurrius's production of the Jurrius Production or testimony themselves substantively violated the Settlement Agreement. (*See* ECF No. 228-3). The Tribe represents this amendment was made "to eliminate language that may have given the Court pause." (*See* ECF No. 228 at 6–7). This attempt to retroactively soften the claims in Arbitration does not, however, change or mitigate the facts that are material to the Order to Show Cause. If anything, these changes highlight the fact that the Arbitration was indeed initiated, at least in part, in response to Jurrius producing the Jurrius Production and testifying at the Evidentiary Hearing.

Central to the Order to Show Cause is the question of why the Tribe initiated Arbitration against Jurrius. As such, any modifications that the Tribe made to its Arbitration claims are irrelevant; those changes only reflect the Tribe's current thinking; the original claims represent its original intent. As such, for purposes of this Order, the court will read, and analyze, the Tribe's claims in Arbitration as they were stated in the Statement of Claims—as allegations that Jurrius "willfully violated both the substance and process" of the Settlement Agreement when he produced the Jurrius Production and gave testimony at the Evidentiary Hearing. (*See* Statement of Claims at ¶¶ 31, 33).

17

1.   *The Jurrius Production*

In relevant part, the Settlement Agreement bars Jurrius from disclosing "all records of the Tribe and all information generated or accumulated by [Jurrius] in connection with [his employment]" that are not "in the public domain."  (ECF No. 228-4 at ¶ 4(d)).  It also provides that if Jurrius becomes "subject to any legal obligation to disclose . . . confidential information," he is first required to "notify the [Tribe] of the fact" and "discuss [with the Tribe] in good faith ways in which [he] can reasonably make disclosures . . . ."  (*Id*.).  The Tribe alleges that Jurrius Production violated both of these provisions, both in substance and in process,[6] by producing the Jurrius Production.

The Tribe alleges that Jurrius produced "internal tribal documents, materials, and information, or documents "which could be considered privileged or confidential."  (*See* Statement of Claims at ¶¶ 21, 22).  But this is not what the Settlement Agreement prohibits.  Jurrius is only barred from disclosing documents that were not "in the public domain." (*See* ECF No. 228-4 at ¶ 4(d))

As discussed above, the Jurrius Production consisted of: photographs taken of a public event; four Tribal ordinances; five minutes from Business Committee Meetings; ten Tribal resolutions; correspondence from the Department of Interior, Bureau of Indian Affairs; a section from a Federal law; a Fax cover page regarding the recording of documents among public land records; two photographs of bulletins posted in a public newspaper; and the Ute Energy Documents.  (*See* ECF No. 239-1 at 11).  Each of these documents, with the exception of, possibly, the Ute Energy Documents, was in the public domain.  Even the Ute Energy Documents relate to public matters known to all the parties

---

[6]  *See supra* note 6.

involved in the transaction and likely would have been available to Tribal members. As such, the Jurrius Production was, facially, not a violation of the Settlement Agreement, and the Tribe alleging otherwise is **MERITLESS**.

Turning to the only claim regarding the Jurrius Production that is not meritless on its face—that Jurrius violated the Settlement Agreement by disclosing the Ute Energy Documents—the court finds that any merit the claim may have had is eliminated by the fact that those documents were disclosed pursuant to the Tribe's *agreed-upon procedure*.

The Jurrius Production was executed pursuant to the Production Subpoena, which the Tribe moved to quash. (*See* ECF Nos. 178, 179). Becker and the Tribe subsequently resolved the dispute over the Production Subpoena and entered into a Production Stipulation that governed how the requested information would be provided. (*See* ECF No. 180). Although Jurrius was not directly a party to the Production Stipulation, Becker's counsel forwarded him a copy of it, and Jurrius followed the procedure outlined therein when he made the Jurrius Production. (*See* ECF No. 236-3).

As such, and pursuant to the Production Stipulation, the process by which the Tribe agreed to have the Ute Energy Documents disclosed was followed. That process treated the documents "as 'attorney eyes only'" and afforded the Tribe the opportunity to review the same for privilege and confidentiality before they were shared with Becker and Judge Lawrence. (*See* ECF No. 180). The process Jurrius followed in disclosing the Ute Energy Documents therefore satisfied the goals of the Settlement Agreement—that the Tribe be given an opportunity to weigh in on how disclosures can be made without compromising confidentiality. (*See* ECF No. 228-4 at ¶ 4(d)).

19

Having received the benefit of its bargain in the Production Stipulation and the Settlement Agreemeing, the Tribe resorts to a purely technical claim in its Arbitration—that Jurrius was required, but failed, to personally confer with it before he provided the Ute Documents. In essence, the Tribe is complaining that Jurrius did not first ask it "Mother, May I?" This contention is frivolous. The Tribe agreed to a process for the documents to be disclosed, Jurrius was informed of that process, and he followed the same. The Tribe was able to assess the Ute Energy Documents before they were distributed to the parties in this matter, and confidentialities were not violated. The Tribe's contention that Jurrius violated the Settlement Agreement by producing the Jurrius Production is **MERITLESS**.

2. *Testimony at the Evidentiary Hearing*

The Settlement Agreement's provisions regarding the disclosure of information and the process by which Jurrius must follow before he may make such disclosures are also relevant to the Tribe's claims that Jurrius violated the Settlement Agreement, both in substance and in process,[7] by testifying at the Evidentiary Hearing. (*See* ECF No. 228-4 at ¶ 4(d)). And like the Tribe's complaints regarding the Jurrius Production, those claims are also meritless.

On January 7, 2020, Becker called Jurrius as a witness and compelled him to testify at the Evidentiary Hearing. Before Jurrius took the stand, his counsel made a statement to the court expressing concern that the compelled testimony could be seen as a violation of the Settlement Agreement. (*See* ECF No. 249 at 277:17–280:4). In response to this concern, the court recognized that there has been "an excessive claim of privilege" in this action, reminded the parties that "[i]f there is a privilege that would entitle a party to have

---

[7] *See supra* note 6.

the testimony not disclosed, the burden falls on the party who has that privilege," and stated that the Tribe's counsel is "more than capable of asserting those privileges" and that it would hear counsel on any instance where they "assert the privilege." (*See id*. at 280:5–281:7). The Tribe subsequently raised four objections that the Jurrius was providing privileged or confidential information, but each was overruled. (*See id*. at 288:8–22; 293:6–295:9l 296:4–6; 362:2–363:25).

The Tribe claims that Jurrius's testimony violated the Settlement Agreement in three ways. First, the testimony itself was a violation.[8] (*See* Statement of Claims at ¶ 24). Second, it alleges that Jurrius failed to notify the Tribe before testifying. (*Id*. at ¶ 27). Third, it alleges that Jurrius's testimony impermissibly "included extensive details obtained in connection with his employment with the Tribe . . . ." (*Id*. at ¶ 28).

The Settlement Agreement does not bar Jurrius from testifying in a proceeding. As such, his conduct at the Evidentiary Hearing did not, by itself, violate the Settlement Agreement, and the Tribe's allegations otherwise are **MERITLESS**. It would be prone to widespread abuse if private parties could preclude testimony that would be relevant to a third party or interfere with the ability of the court to compel such testimony. The Tribe's second claim, like its claim related to the Jurrius Production, complains that Jurrius did not follow the technical procedures set forth in the Settlement Agreement before testifying. But, as discussed above, the purpose of those procedures was to provide the Tribe with an opportunity to object to any content that it believed was confidential or privileged. While it is true that Jurrius did not consult with the Tribe before he was forced to testify, it is equally true that the Tribe was given a full opportunity to object to the content of any of

---

[8]  *See supra* note 6.

his testimony and that it took full advantage of that opportunity.  (*See* ECF No. 249 at 277:17–281:7; 288:8–22; 293:6–295:9l; 296:4–6; 362:2–363:25).   As such, the Tribe received the full benefit of the Settlement Agreement and was not injured by Jurrius's technical failure to notify it before he offered testimony.   Again, the Tribe's allegations again resort to nothing more than a contention that Jurrius did not ask "Mother, May I?" Such a claim is **MERITLESS**.

The Tribe's third allegation is similarly **MERITLESS**.   At the Evidentiary Hearing, the court, in considering and responding to the Tribe's numerous objections to the testimony Jurrius offered, determined that the information being presented was not privileged, confidential, or otherwise protected.  (*See* ECF No. 249 at 288:8–22; 293:6–295:9l; 296:4–6; 362:2–363:25).   As such, it was already determined, before the Tribe initiated the Arbitration, that Jurrius's testimony did not disclose confidential information, and the Tribe's assertion otherwise in Arbitration is **MERITLESS**.

### 3.    *Using the Tribe as a Reference to Solicit Business*

In relevant part, the Settlement Agreement bars Jurrius from "us[ing] the Tribe as a reference when soliciting new or continued business with other Tribes or any other entity" (ECF No. 228-4 at ¶ 4(g)).   In support of its claim that Jurrius violated this provision, the Tribe alleges that Jurrius used the Tribe's "name and work history in the solicitation of continued or new business."  (*See* Statement of Claims at ¶ 35).   The Tribe's primary complaints regarding this alleged violation is that Jurrius represented on his LinkedIn page, a resume attached thereto, and on other websites, that he worked for the Tribe and detailed some of the work he did during his employment.   But these actions are not what the Settlement Agreement prohibits.   While each of these statements *referenced* the Tribe, in none was Jurrius *using the Tribe as a reference*.   Moreover, the references that Jurrius

made to the work he performed while employed by the Tribe were factual in nature, designed only to express his employment during the relevant time period; they were not made in order to "solicit continued or new business."  Such representations did not, on their face, violate the Settlement Agreement.  The Tribe's allegation that Jurrius violated Paragraph 4(g) of the Settlement Agreement by referring to it on websites, his LinkedIn profile, and on his resume is **MERITLESS**.

### 4.  *Conducting Business on Trial Territory*

The Settlement Agreement bars Jurrius, or any entity for which he owns at least a five percent interest, from conducting business on Tribal Territory "with the Tribe or with any Tribally-related entities or enterprises . . . ."  (ECF No. 228-4 at ¶ 4(f)).  The Tribe's sole support for its allegation that Jurrius breached this provision is contained in its June 6, 2017 letter to Jurrius and states that Indigena Capital, an entity that it alleges Jurrius is affiliated with, had solicited the Tribe's "participation in a petroleum pipeline project that apparently is planned to cross portions of the [Tribe's] Reservation."  (*See* ECF No. 239-1 at 54–55; Statement of Claims at ¶ 19; ECF No. 228-2 at ¶ 5).

But it is not a violation of the Settlement Agreement for an entity with which Jurrius is merely affiliated with to conduct or solicit busines on Tribal Territory; he must be at least a 5% owner of the entity.  Here, Jurrius has no ownership in Indigena Capital.  (*See* ECF No. 257 at 35:23–36:2).  Indeed, the Tribe acknowledges in its Statement of Claims that Jurrius is the "principal and/or CEO" of Indigena Capital, LP, Indigena Capital GP, Inc., Indigena Capital Projects 1 GP, Inc., and Indigena Capital Projects 1 GP, LLC.[9]  (*See*

---

[9]  It is unclear from the Statement of Claims or the June 6, 2017 letter which of these entities was involved in this proposed transaction.

Statement of Claims at ¶ 3).  The Tribe's allegation that Jurrius violated Paragraph 4(f) of the Settlement Agreement by conducting business on Tribal Territory is **MERITLESS**.

      5.    *Entering Tribal Territory*

As recognized above, the Tribe's offers no support for its claim that Jurrius impermissibly entered "Tribal Territory" in violation of the Settlement Agreement.[10]  (*See* Statement of Claims at ¶ 38; ECF No. 239-1 at 7).  The Tribe's unsupported allegation that Jurrius violated Paragraph 4(i) of the Settlement Agreement by impermissibly entering Tribal Territory is baseless on its face and thus **MERITLESS**.

      B.  <u>*The Tribe's initiation of Arbitration against Jurrius was done in bad faith and was an abuse of process.*</u>

The Tribe argues that it did not initiate Arbitration in bad faith, and that it doing so was not an abuse of process, because its actions were done to pursue legitimate, and non-frivolous claims, not to punish Jurrius.[11]  Simply put, the Tribe's position is that the court "can't punish a litigant for bringing nonfrivolous claims."  (*See* ECF No. 257 at 54:1–2).  But none of the Tribe's claims against Jurrius has merit.  Each is frivolous.  The Tribe is therefore not shielded from a finding that it acted in bad faith.

As discussed above, the fact that the Tribe's claims against Jurrius were frivolous is not enough to show it acted in bad faith in initiating the Arbitration.  *See Autorama*

---

[10]  The only example of conduct that could potentially be seen as relating to this allegation was provided bv Jurrius's counsel, who at the hearing on the Order to Show Cause acknowledged that in 2017 Jurrius attended a meeting at Duchesne's city hall.  (See ECF No. 257 at 35:17–22).  To the extent that the Tribe intended this action to serve as the basis for its allegation that Jurrius violated of the Settlement Agreement, the court finds that Jurrius attending a public meeting at a public building on land that is not owned or controlled by the Tribe is not a material breach of the Settlement Agreement and does not, therefore, support its allegations that Jurrius violated the Settlement Agreement.

[11]  The Tribe asserts that *even if* its goal in initiating Arbitration really was to punish Jurrius, that is irrelevant, because it was had non-frivolous claims to assert.  (*See* ECF No. 257 at 53:18–54:5).

*Corp.*, 802 F.2d at 1288.  But the Tribe's bad conduct was not limited to just filing frivolous claims against Jurrius.  It blatantly misrepresented the terms of the Settlement Agreement to artificially bolster these clearly frivolous claims.  The Settlement Agreement bars Jurrius from disclosing documents and information that are not "in the public domain," but the Tribe attacked him for disclosing "internal tribal documents, materials, and information, or documents "which could be considered privileged or confidential."  (*Compare* ECF No. 228-4 at ¶ 4(d) *with* Statement of Claims at ¶¶ 21, 22).  It only barred him from "us[ing] the Tribe as a reference," but the Tribe attacked him for merely *referring* to the Tribe.  (*Compare* ECF No. 228-4 at ¶ 4(g) *with* Statement of Claims at ¶ 19).  Finally, while the Settlement Agreement bars Jurrius, or any entity for which he owns at least a five percent interest, from conducting business of Tribal Territory, it attacked him on the basis that a company that he had no ownership of solicited the Tribe.  (*Compare* ECF No. 228-4 at ¶ 4(f) *with* Statement of Claims at ¶¶ 3, 19).  And the Tribe's misrepresentations were not limited to just the Settlement Agreement.  The Tribe alleged that Jurrius impermissibly shared confidential information at the Evidentiary Hearing after the court expressly ruled that the information was not privileged.  (*See* ECF No. 249 at 277:17–281:7; 288:8–22; 293:6–295:9l 296:4–6; 362:2–363:25).

Basing an action on such blatant misrepresentations rises above frivolousness.  The Tribe's initiation of Arbitration was wanton and vexatious.  It was done with intentional disregard of the terms of the Settlement Agreement and, at a minimum, reckless disregard for the Tribe's, and its counsels' duties of candor.  The Tribe initiated Arbitration against Jurrius in bad faith.

This begs the question: why would the Tribe blatantly misrepresent the terms of the Settlement Agreement to initiate Arbitration against Jurrius based on wholly unsupported and/or frivolous allegations?  After thoroughly reviewing the record in this matter, the court can reach but one conclusion: to punish Jurrius for testifying against it and/or to discourage him from testifying in future proceedings in this matter.[12]  This conclusion is particularly supported by the misrepresentations the Tribe made to bolster, and support, its claims in Arbitration; the timing of the Tribe's initiation of the Arbitration; and the fact that the Statement of Claims stated *on its face* that it considered the Jurrius's participation in this matter, through the Jurrius Production and his testimony at the Evidentiary Agreement, to be violations of the Settlement Agreement.[13]

Filing a patently frivolous action in order to punish an individual is "a sordid scheme of deliberate misuse of the judicial process" that was designed to harass Jurrius. *See Chambers*, 501 U.S. at 56–57.  It is an abuse of process.

C. *The proper sanction for the Tribe's bad faith action and abuse of process is for it to pay the fees that Becker and Jurrius incurred in prosecuting those actions.*

Having found that the Tribe's initiation of Arbitration against Jurrius was done in bad faith and was an abuse of process, the court must determine the proper sanction for the Tribe's conduct.  *See Mountain W. Mines, Inc. v. Cleveland-Cliffs Iron Co.*, 470 F.3d 947, 954 (10th Cir. 2006) (noting that the Tenth Circuit "insist[s] that a trial judge make a finding of bad intent or improper motive" in order to award fees as a sanction).  The

---

[12]  Becker and Jurrius argue that the Tribe was motivation to also send a signal to other potential witnesses of what could happen to them if they also testified against the Tribe.  While the court notes that this could certainly be a consequence of the Tribe's actions here, the record before it does not allow it to find that the Tribe's actions were done with an intent to intimidate potential witnesses.

[13]  *See supra* note 6.

Tenth Circuit has recognized that "[w]hen a party acts 'in bad faith, vexatiously, wantonly, or for oppressive reasons,' a court may properly depart from the traditional American rule disfavoring fee awards." *Id*. (citation omitted). Having found that the Tribe initiated the Arbitration in bad faith, vexatiously, wantonly, or for oppressive reasons, and for the purpose of punishing Jurrius for testifying against it and/or discouraging him from testifying in future proceedings in this matter, the court finds that the proper sanction for the Tribe's conduct is for it to pay the fees that Becker and Jurrius incurred in prosecuting the same.

As such, the Tribe is **HEREBY ORDERED** to pay Becker and Jurrius the fees in prosecuting his matter. This time shall include any and all time expended in, and otherwise related to: drafting the Notice of Intent to Serve Subpoena upon Snow Christensen & Martuneau (ECF No. 205); responding to the Motion to Quash (ECF No. 206); drafting the Motion for Protective Order (ECF No. 214); responding to the Order to Show Cause (ECF No. 221); preparing for and attending any hearings held on the same. Becker and Jurrius are **ORDERED** to, within **ten (10) days** of the date of this order, to submit to the court a sworn and itemized statement showing the actual time expended in such matters and the rate at which fees were computed.

## CONCLUSION

As more fully discussed herein, the court finds that the Tribe's initiation of Arbitration against Jurrius was done in bad faith and was an abuse of process. As such, and as detailed herein, the Tribe is **HEREBY ORDERED** to pay the fees that Becker and Jurrius incurred in prosecuting this matter.

The Tribe's request to file a redacted version of the Settlement Agreement on the dockets in Case No. 2:16-cv-579 and Case No. 2:15-cv-958 is **DENIED**, and as discussed herein, the court will file a full version of the document on the docket.

Finally, the court finds that the development of the record in this matter, together with the relief ordered herein, moots Becker's Notice of Intent to Serve Subpoena upon Snow Christensen & Martuneau (ECF No. 205).  As such, the Tribe's Motion to Quash that Subpoena (ECF No. 206) and Jurrius's Motion for Protective Order from the same (ECF No. 214) are **HEREBY DENIED AS MOOT**.

DATED this 31st day of March, 2021.

BY THE COURT:

Clark Waddoups
United States District Judge